UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 04-12481 WGY

INDIANAPOLIS LIFE INSURANCE COMPANY

Plaintiff

v.

ROSALYN HERMAN, TRUSTEE, FINANCIAL
RESOURCES NETWORK, INC. PROFIT
SHARING PLAN AND TRUST, FINANCIAL
RESOURCES NETWORK, INC. PROFIT
SHARING PLAN AND TRUST, GREGG D.
CAPLITZ, RUDY K. MEISELMAN, M.D. and
HOPE E. MEISELMAN,

Defendants

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    Introduction

1.    This is a civil action for declaratory relief pursuant to 28 U.S.C. §2201, in which the

Plaintiff Indianapolis Life Insurance Company ("ILIC") seeks rescission of and a determination

of its rights and obligations under ILIC Policy Nos. B05020665 and B05020799 (the "Policies"),

attached hereto as Exhibits A and B respectively, both of which insure the "second to die" of Dr.

and Mrs. Meiselman and which were issued to the Financial Resources Network

Profit Sharing Plan and Trust ("FRN Plan"). [See Complaint, attached as Exhibit C].

2.    This is also an action for Breach of Contract, Conversion and Unjust Enrichment against

Defendant Gregg D. Caplitz ("Caplitz") for his retention of the agency commission in breach of

50981.2
50981.1

his Agency Contract with Indianapolis Life Insurance Company (the "Agency Contract"), attached hereto as Exhibit D, between the Plaintiff and Caplitz. [See Exhibit C].

3.      Defendant, Financial Resources Network Profit Sharing Plan and Trust ("the FRN Plan") is an employer-sponsored profit sharing plan for employees of Financial Resources Network, Inc. d/b/a Insight Onsite Financial Solutions ("FRN, Inc."), a registered investment advisor corporation. [See Exhibit C, ¶2 and Defendants' Answer, ¶2, attached hereto as Exhibit E].

4.      FRN, Inc. is a Massachusetts corporation with a principal place of business at 424 Washington St., Woburn, MA 01801. [See Secretary of State's Information Page, attached as Exhibit F].

5.      Defendant, Rosalind Herman ("Herman") was at all relevant times Administrator and Trustee of the FRN Plan.  Herman is President, Treasurer, Secretary and Director of FRN, Inc. [See Exhibit F and Deposition of Dr. Meiselman, p. 59, lines 20-24, attached hereto as Exhibit G].

6.      Defendant Gregg Caplitz ("Caplitz") was at all relevant times a senior design consultant for FRN, Inc.'s clients on behalf FRN, Inc., with a specialization in estate tax planning and compensation planning for high net worth individuals.  Dr. Meiselman was one of Caplitz's clients before he was employed by FRN.  [See Deposition of Gregg Caplitz, attached as Exhibit H, p.17-18]  Caplitz is also an insurance agent, who acted as the agent in the issuance of the Policies under the Agency Contract.  [Exhibit H, p. 20-21].

7.      Defendant, Rudy K. Meiselman, M.D. ("Dr. Meiselman") was at all relevant times an employee of FRN, Inc. and a participant in the FRN Plan.  [See Exhibit G, p. 28, lines 8-13, p.32-34].

8.     Dr. Meiselman was employed by FRN, Inc. from early 2002 until the end of 2004. [Exhibit G, p. 36, lines 4-7].

9.     Only Dr. Meiselman participated in the FRN Plan in 2002 and 2003. Herman had a small account beginning in 2004. [See Exhibit G, p. 55, lines 17-22.]

10.     During the course of his employment at FRN, Inc., while Dr. Meiselman served as a fund analyst, he always communicated with and reported to Caplitz regarding his work. [Exhibit G, p. 38, line 21- p. 40, line 3].

11.     Defendant Hope E. Meiselman ("Mrs. Meiselman") is the spouse of Dr. Meiselman.

**II.     Procurement of the Subject Policies**

12.     In or about July 2003, Caplitz recommended to Dr. Meiselman that he exchange an existing ING life insurance policy on Dr. Meiselman's life for a better product. [Exhibit G, p. 88, lines 7-16]. Dr. Meiselman agreed to look at illustrations and see whether he agreed that they would be superior to his ING policy. [Exhibit G, p. 88, lines 17-23].

13.     On or about July 30 and July 31, 2003, applications for the ILIC Policies were completed; one application pertaining to Dr. Meiselman, is attached hereto as Exhibit I, and one application pertaining to Mrs. Meiselman, is attached hereto as Exhibit J. [Exhibit G, p. 89, lines 1-6].

14.     Dr. and Mrs. Meiselman signed blank applications provided by Caplitz, which were later filled out by Caplitz. [See Exhibit G, p. 110, lines 3-24; Exhibit H, p. 132].

15.     Both of the applications for the ILIC Policies, once completed by Caplitz, designated the FRN Plan as the owner and primary beneficiary of the Policies. [Exhibit I and J].

50981.2
50981.1

16.     The applications provide that the policy will take effect and coverage will begin only "if…the answers and statements in the application(s) and any supplements continue to be complete and true at the time of delivery of the policy." [Page 4 of Exhibits I and J].

17.     In a letter to ILIC' Chief Underwriter, Robert Pedigo which enclosed the applications for the ILIC policies, Caplitz stated that "the purpose of this insurance is to replace an existing ING variable life contract in conjunction with a private placement variable life contract issued by AGL Life Assurance Company." [See July 30, 2003 Letter, attached as Exhibit W].

18.     At some point in time Dr. Meiselman informed Herman and Caplitz that he did not wish to have the ILIC Policies on his life and his wife's life, or any other policies. [Exhibit G, p. 197]

19.     Dr. Meiselman was never made aware that he and his wife had been accepted by underwriting at ILIC for the issuance of the policies. [Exhibit G, p. 116, lines 11-15]. He learned that the policy premium of $1,025,000.00 had been paid by his funds in the FRN Plan when he checked his assets in the FRN Plan on November 26, 2003. [Exhibit G, p. 116, lines 11-24 – p. 117, lines 1-17]. [See also Letter dated 11/28/03, attached as Exhibit K].

20.     Upon discovering that the policies had been issued without his consent, Dr. Meiselman requested that Caplitz cancel them under the policies "free-look" provision which allowed cancellation by the owner within 20 days of receiving the policies. [Exhibit G, p. 194, lines 7-14, p. 196; Exhibit A, p. 1].

21.     However, Caplitz did not exercise the so-called "free look" option to terminate the policies and stated that Herman, as the Trustee of the FRN Plan, was the owner of the policies and did not elect to do so. [Exhibit G, p. 205, lines 9-16] [See also 12/05/03 Letter from Herman to Meiselman, attached as Exhibit L].

-4-

50981.2
50981.1

22.    Dr. Meiselman contacted ILIC during the policies' "free look" period and informed them that he did not want the policies and would like them terminated and the premiums refunded. [Exhibit G, p. 213 and attached Letter from Meiselman to ILIC, attached as Exhibit M and Letter dated 12/1/03, attached as Exhibit N].

23.    Subsequently, Herman, through counsel, informed ILIC that as the policies' owner, she did not wish to cancel the policies. [Letter dated 12/12/03 from Attorney Murphy to ILIC, attached as Exhibit O].

24.    In the course of the dispute over the following months regarding cancellation, Dr. Meiselman revealed to ILIC several misrepresentations made to ILIC in the application process, including the following: [See Letter dated 3/16/04, attached as Exhibit P].

    a)    Dr. Meiselman informed ILIC that the amendment to the application failed to list the $20 million ING policy on his life and that it remained in force. [See Exhibit P, p. 2]; and

    b)    Dr. Meiselman also informed ILIC that prior to the policies being issued he had experienced a significant deterioration in his health for which he sought medical treatment since the date of the original application (July 3, 2003) which was not disclosed in the Amendment. [Exhibit P, p. 2].

25.    After investigation of these allegations, ILIC determined that material misrepresentations and omissions had been made in the negotiation of the policies which warranted their rescission. ILIC notified Herman and the FRN Plan of ILIC's rescission of the policies. [See Letter dated June 14, 2004, attached as Exhibit Q].

-5-

26.    The Policies contain a so-called contestability provision which permits ILIC to rescind the policies based upon misstatements made in the application for a period of two years from the policies' effective date. [See Exhibit A & B, p. 9].

27.    On or about June 15, 2004, by wire transfer to the FRN Plan's account, ILIC refunded the full premium remitted by the FRN Plan for the Policies with interest in the amount of $1,042,004.75. [See Wire Confirmation, attached hereto as Exhibit R].

28.    In their Answer, defendants admitted that these funds were received by the FRN Plan. [See Exhibits C and E, ¶34].

29.    ILIC received no objection from Caplitz, Herman or FRN, Inc. in response to the return of the premium and no attempt was made to return the premium to ILIC or to pay the premiums on the policies into court.

30.    To date neither Herman nor the FRN Plan has sought to return the premiums and interest to ILIC.

31.    After the rescission, Dr. Meisleman left his employment with FRN, Inc. [Exhibit G, p. 36, lines 8-15].

32.    Once his relationship with Caplitz and Herman ended and he ceased employment with FRN, Inc., Dr. Meiselman's account was "rolled over" from the FRN Plan and into an IRA which he established at Profunds. This indicates the returned premium is no longer in the possession of the FRN Plan. [See Exhibit G, p. 64, lines 2-6].

**III.    The Misrepresentations**

33.    Prior to the issuance of the policies, as part of the application process, ILIC required the submission of an "Amendment" to the application which requires the applicant to verify the

-6-

amount of insurance in place on the proposed insured's life and whether the proposed insured had consulted a physician or had a change in health since the initial application. [See Affidavit of Robert Pedigo, attached as Exhibit S, para. 8].

34.    On or about November 25, 2003, Herman as Trustee executed and delivered to ILIC the amendment which stated as follows: "I certify that all persons proposed for such insurance are in the same condition as stated in the application; and since the date of the application, no such person has (1) suffered an illness or injury nor consulted a physician or practitioner...." [See Exhibit T]

35.    The above statement contained in the amendment to the application was false in that Dr. Meiselman's physical health had changed, and in fact deteriorated, from the date of the initial application, July 31, 2003, and the date of the execution of the amendment to the application, November 25, 2003. [Exhibit G, p. 122-123]

36.    Dr. Meiselman had consulted a physician, Dr. Simon, in August of 2003 due to an unexplained weight loss of about 11 lbs.  On September 24, 2003, a CT scan taken of Dr. Meiselman's chest and stomach revealed a right middle lobe pulmonary parenchymal node. [Exhibit G, p. 122-123].

37.    Dr. Meiselman informed Herman and Caplitz about the deterioration in his health prior to Herman's execution of the amendment. [Exhibit G, p. 127]

38.    ILIC did not learn that Dr. Meiselman had consulted a physician or had a CT Scan in September of 2003 until after ILIC made the decision to issue the policies and when Dr. Meiselman notified ILIC that he had not consented to the procurement of the policies on his life and that of his wife. [See Exhibit P].

-7-

50981.2
50981.1

39.    Robert Pedigo ("Pedigo") was the Chief Underwriter at ILIC at the time of the Meiselman applications, and the underwriter in charge of the subject applications. [See Exhibit S, para. 2].

40.    Pedigo would have considered the possible deterioration in health, the CT Scan, and its results relevant and material to his underwriting decision and would not have issued the policies at that time or under the terms ultimately provided, as he would have investigated the matter further. [See Exhibit S, para. 17].

41.    The amendment also required that the prospective insureds list the life insurance policies in force on the lives of Dr. and Mrs. Meiselman at the time the Amendment was executed. The amendment failed to list a $20,000,000 life insurance policy issued by ING. [See Exhibit S, para. 8-9 and Exhibit P].

42.    The underwriter, Pedigo, knew of the existence of the ING policy at the time of the application, but Caplitz represented to him that the ING policy would be cancelled and would be replaced by the new policies. [Exhibit S, para. 10].

43.    As Pedigo understood it, the intended plan was to increase the total coverage on Dr. and Mrs. Meiselmans' lives from $22 million to $32 million. [Exhibit S, para. 10].

44.    If the ING policy was still in place at the time of execution of the amendment to the application Mr. Pedigo expected it to be listed on the amendment. [See Exhibit S, para. 11].

45.    Mr. Pedigo considers the amount of existing insurance on the proposed insured's life on each and every application he underwrites, including the Meiselman application. The amount of insurance already in existence is crucial to the amount of insurance, if any, ILIC will provide. The amount of existing insurance on an applicant's life is significant to an underwriter because

-8-

every individual from an underwriting standpoint has a maximum of amount of coverage that he can acquire. [Exhibit S, para. 12]

46.     Pedigo would not have issued the Indianapolis Life policies if he had known that the ING policy would remain in force after the issuance of the Indianapolis Life policies, as the Meiselmans would have in excess of $42 million in coverage and Indianapolis Life would have been unable to obtain reinsurance for the contract. [Exhibit S, para. 12]

47.     The ING Policy was in force when the ILIC policies were rescinded.  [See ING Policy Statement, attached as Exhibit U].

48.     As part of Pedigo's underwriting review, ILIC required a statement of the Meiselmans' financial condition and earnings from a certified public accountant.  [Exhibit S, para. 4].

49.     Caplitz provided the financial information and represented that it was prepared by Meiselman's accountant. [See Exhibit S, para. 5 and 8/21/03 Letter attached to the Affidavit as Exhibit 2].

50.     The statement of financial condition sent by Caplitz provided that the Meiselmans had a net worth of $24,681,419.00.  The income verification represented that the Meiselmans' unearned income was $3,200,000 and their earned income was $11,000, and their expected income for 2003 was similar to the figures for 2002.  [See Exhibit S, para. 6 and 9/24/03 Letter from Goodness, attached to the Affidavit as Exhibit 2].

51.     Discovery has revealed that Daniel Goodness, James Goodness' son prepared the statement of Dr. Meiselman's financial condition at Mr. Caplitz's request and that he is not a certified public accountant [See Deposition of Daniel Goodness, p. 10 and 11, lines 5-6 attached as Exhibit V] and that Mr. Caplitz asked him to prepare the letter on his father's stationary so

that it would appear to have been produced by a certified public accountant. [Exhibit V, p. 13, lines 18-24, p. 14, lines 20-24 and p. 15, lines 1-7].

52.    Mr. Goodness testified that he prepared the documents at Capplitz's request as a favor for Caplitz. [Exhibit V, p. 14, line 19.]   Moreover, Mr. Caplitz admitted at his deposition that Mr. Goodness was not Dr. Meiselman's accountant. [Exhibit H, p. 148, lines 16-14 and p. 149, lines 1-3]

53.    Furthermore, Dr. Meiselman testified that he never provided any documentation to Mr. Goodness about his finances, he never retained Mr. Goodness as his accountant and that the income statement was not accurate. [See Exhibit G, p. 16, line 22 – p. 19, line 19]

54.    Daniel Goodness also prepared a statement of Dr. Meiselman's income verification and again put it on his father's letterhead, without his father's knowledge so that it would appear to be produced by a CPA. [Exhibit V, p. 13, 15-16, 24-25 and Exhibit 2 attached to Exhibit S]

55.    Caplitz provided this income verification to ILIC on September 24, 2003. [Exhibit S, para. 6 and attached Exhibit 2].

56.    Pedigo relied on the Meiselman's financial information as provided to him by Caplitz in his underwriting decision. [Exhibit S, para. 7].   Financial information is used by the underwriter to determine whether the financial condition of the proposed insured warrants the coverage limits requested and whether those limits are appropriate and acceptable to the company. [Exhibit S, para. 7].

### III.    Caplitz's Breach of Contract and Commission

57.    Caplitz received a commission of $650,297.01 under the Agency Contract with ILIC, and as the agent on the Policies. [See Exhibit H, p. 205-206, and Exhibit C and E, ¶53].

-10-

58.    A valid insurance agent contract entitled "Indianapolis Life Insurance Company Agency Contract" ("the Agency Contract") was entered into between Gregg Caplitz and ILIC on June 11, 1997. [Exhibit D].

59.    The Agency Contract provides that the "General Agent will repay to the Company all compensation received on any premium refunded." [See Exhibit D, Para. II. Sec. A, part 3].

60.    At his deposition, Caplitz admitted that if the policies are validly rescinded an agent has to return the commission.  [See Exhibit H, p. 279, lines 8-11].

**IV.    Caplitz and FRN, Inc.'s Counterclaims**

61.    Defendants, FRN, Inc., and Caplitz have brought counterclaims against the plaintiff. [See Exhibit E].

62.    FRN, Inc. brought a counterclaim for Breach of Contract (Count I), Intentional Interference with Fiduciary Duty (Count III), Negligent Interference with Fiduciary Duty (Count IV), Conspiracy (Count V), and Interference with Advantageous Business Relations (Count VII). [Exhibit E]

63.    Caplitz has brought counterclaims for Breach of Contract (Count II), Conspiracy (VI), Interference with Advantageous Business Relations (Count VIII) and violation of Chapter 93A (Count IX). [Exhibit E].

64.    Each of these counterclaims is based on the factual premise that ILIC's rescission of the subject policies was unlawful and invalid.  [Exhibit E]

-11-

Dated:___1/17/06_____

INDIANAPOLIS LIFE INSURANCE COMPANY
By its attorneys,


_____*/s/ Michele Carlucci*_____
William T. Bogaert, BBO#546321
Michele Carlucci, BBO#655211
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
155 Federal Street
Boston, MA 02110
617-422-5300

-12-

50981.2
50981.1

# EXHIBIT A

# A Policy For:

RUDY K MEISELMAN
HOPE E MEISELMAN
B05020665
OCTOBER 9, 2003
$18,700,000.00

IL0147

# INDIANAPOLIS LIFE

### An AMERUS Company

## INDIANAPOLIS LIFE INSURANCE COMPANY
### Home Office: 2960 North Meridian Street, Indianapolis, IN 46208

## READ YOUR POLICY CAREFULLY

### This Policy is a Legal Contract Between the Owner and Indianapolis Life Insurance Company

### PAYMENT AT DEATH

If the surviving Insured dies while this policy is in force, we will, subject to its provisions and upon receiving proof of death of both Insureds, pay the Death Benefit in one sum, to the Beneficiary. No Death Benefit will be paid upon the death of the first of the Insureds to Die. We may require surrender of the policy, or proof of the interest of the claimant or both.

**Notification of First Death.** While Death Benefit Proceeds will be payable upon the death of the second to die, we must receive proof of the death of both Insureds before payment will be made. Therefore, it is important that due proof of the first death be furnished to the Company at the time of such death.

### DEATH BENEFIT

**Option A.** When the Death Benefit Includes the Cash Value (see Schedule)
The Death Benefit is the larger of the following amounts, computed as of the date of death of the survivor:
1.  The Face Amount, or
2.  The Cash Value on the date of the surviving Insured's death multiplied by the applicable percentage shown in the Table of Percentages on Page 6.

**Option B.** When the Death Benefit Is In Addition To the Cash Value (see Schedule)
The Death Benefit is the larger of the following amounts, computed as of the date of death of the survivor:
1.  The Face Amount plus the Cash Value, or
2.  The Cash Value on the date of the surviving Insured's death multiplied by the applicable percentage shown in the Table of Percentages.

Any withdrawals, policy loans and changes in the Face Amount will change the Death Benefit as described in the provisions of this policy.
The Death Benefit provision does not apply if this policy has lapsed and has not been reinstated before the death of the last survivor.

### TWENTY DAY RIGHT TO RETURN THIS POLICY

If the Owner is not satisfied with this policy, it may be returned to us or our agent within 20 days after receiving it. We will refund any premiums paid and the policy will then be considered as never having been issued.

Signed for us at our Home Office on the Issue Date.

*James A. Smallenberger*

*Amy R McPhail*

Secretary                                                                                President

## JOINT AND LAST SURVIVOR ADJUSTABLE LIFE INSURANCE POLICY
### FLEXIBLE PREMIUMS ARE PAYABLE FOR LIFE OF SURVIVOR TO JOINT AGE SHOWN IN SCHEDULE
### BENEFITS ARE ADJUSTABLE AND PAYABLE AT DEATH OF LAST SURVIVOR
### NON-PARTICIPATING

## TABLE OF CONTENTS

| | Page |
|---|---|
| ASSIGNMENT | 7 |
| BASIS OF COMPUTATION | 14 |
| BENEFICIARY | 9 |
| CASH VALUE | 11 |
| CLAIMS OF CREDITORS | 10 |
| COST OF INSURANCE | 13 |
| FACE AMOUNT (HOW TO CHANGE) | 10 |
| GRACE PERIOD | 8 |
| INCONTESTABILITY | 9 |
| INTEREST | 11 |
| LOANS | 12 |
| MISSTATEMENT OF AGE OR SEX | 9 |
| MONTHLY DEDUCTION | 11 |
| NO-LAPSE GUARANTEE | 8 |
| OWNERSHIP | 7 |
| PAID-UP LIFE INSURANCE | 12 |
| PAYMENT PLANS | 15, 16, 17 & 18 |
| POLICY | 7 |
| POLICY SPLIT OPTION | 13 |
| PREMIUMS | 7 |
| REPORTS | 14 |
| REINSTATEMENT | 8 |
| SCHEDULE | 3 & 4 |
| SUICIDE | 9 |
| SURRENDER | 11 |
| TABLE OF PERCENTAGES | 6 |
| WITHDRAWAL | 12 |

## DEFINITIONS

| | |
|---|---|
| We, us, our | Indianapolis Life Insurance Company. |
| You, your | The persons named as Insureds on the Schedule. |
| Policy Date | The date from which policy months, years, anniversaries and premium payments are determined. |
| Issue Date | The date from which the two year contestable period and two year suicide period of this policy are measured. |
| Policy Loan | Any unpaid policy loan and interest. |
| Joint Equal Age | Joint Equal Age at the Policy Date is the age on which premiums, values and reserves are based. It is the nearest joint equal age which is actuarially equivalent to the ages of both Insureds. The joint equal attained age is the Joint Equal Age at the Policy Date plus the number of whole policy years which have elapsed since the Policy Date. |
| Cash Value | See Page 11. |
| Surrender Value | The cash value, less any surrender charge and less any outstanding policy loan. |
| Benefits | Any money due a payee under any provision or rider. |
| Planned Premium | The renewal premium(s) specified in the application. |
| Payee | The Owner, if an Insured is living, otherwise the Beneficiary. |
| Target Premium | Amount used as a basis in determining premium expense charges for your policy. |

IL0149

**SCHEDULE**

**JOINT INSUREDS:**
RUDY K MEISELMAN                            HOPE E MEISELMAN
**RATE CLASS:**
NO TOBACCO USE                              NO TOBACCO USE


**POLICY NUMBER:** B05020665
**JOINT EQUAL AGE AT ISSUE:** 72
**POLICY DATE:** OCTOBER 9, 2003
**ISSUE DATE:** OCTOBER 9, 2003
**FACE AMOUNT:** $18,700,000
**DEATH BENEFIT OPTION:** A

**POLICY LOAN INTEREST RATE:** 7.40% PER YEAR IN ADVANCE
**POLICY LOAN CREDITED RATE:** 6.00% PER YEAR
**REINSTATEMENT INTEREST RATE:** 6.00% PER YEAR
**GUARANTEED INTEREST RATE FOR POLICY VALUES:**   POLICY YEAR 1       6.15%
                                                  POLICY YEARS 2+    4.00% PER YEAR


THE POLICY MONTH BEGINS ON THE 9TH DAY OF THE MONTH.


**PLAN:** JOINT AND LAST SURVIVOR ADJUSTABLE LIFE

**MINIMUM FACE AMOUNT:**                  $250,000.00
**MAXIMUM PREMIUM EXPENSE CHARGE:**       8% OF PREMIUMS PAID
**MAXIMUM POLICY EXPENSE CHARGE:**        $6.00 PER MONTH ALL YEARS
**MAXIMUM PER UNIT EXPENSE CHARGE:** $0.24000 PER MONTH PER $1,000 OF FACE AMOUNT YEARS 1 - 3
                                     $0.04830 PER MONTH PER $1,000 OF FACE AMOUNT YEARS 4+

| BENEFITS AND PREMIUMS BASE POLICY | AMOUNT/ UNITS | FORM NUMBER | PAYABLE TO AGE |
|---|---|---|---|
| JOINT AND LAST SURVIVOR ADJUSTABLE LIFE | $18,700,000 | ULLS-99 | 100* |
| **ADDITIONAL BENEFITS  (PROVIDED BY RIDER)** | | | |
| DEATH BENEFIT MATURITY EXTENSION | + | E-ULDBE-98 | 100+ |

+ THE AMOUNT EXTENDED IS EQUAL TO THE DEATH BENEFIT AT AGE 100. SEE THE ENDORSEMENT FOR DETAILS.

* JOINT EQUAL AGE

**POLICY SPLIT OPTION CLASS:  UNRESTRICTED**

**FIRST YEAR PREMIUM:**                $871,250.00
**PLANNED ANNUAL PREMIUM:**            $871,250.00
**TARGET PREMIUM:**                    $461,516.00
**BASIC NO-LAPSE PREMIUM:**            $26,295.58 PER MONTH, $315,546.96 PER YEAR
**BASIC NO-LAPSE GUARANTEE PERIOD:**   5 YEARS

THE PREMIUMS ABOVE INCLUDE AN EXTRA AMOUNT BECAUSE THE JOINT EQUAL AGE AT ISSUE HAS BEEN RATED.


**IL0150**

## SCHEDULE - CONTINUED

BENEFICIARY IS AS SHOWN IN APPLICATION UNLESS CHANGED AS PROVIDED IN THE POLICY.

### TABLE OF SURRENDER CHARGES

| BEGINNING OF POLICY YEAR | CHARGE |
|---|---|
| 1 | $559,504.00 |
| 2 | $539,921.36 |
| 3 | $514,743.68 |
| 4 | $474,459.39 |
| 5 | $439,770.14 |
| 6 | $410,116.43 |
| 7 | $384,379.25 |
| 8 | $361,439.58 |
| 9 | $340,737.94 |
| 10 | $321,714.80 |
| 11 | $303,810.67 |
| 12 | $285,906.54 |
| 13 | $268,002.42 |
| 14 | $248,419.78 |
| 15 | $227,158.62 |
| 16 | $203,099.95 |
| 17 | $176,803.26 |
| 18 | $148,268.56 |
| 19 | $118,055.34 |
| 20 | $88,961.14 |
| 21 & UP | $0.00 |

### WITHDRAWALS

AFTER THE FIRST POLICY YEAR, MAXIMUM NUMBER OF WITHDRAWALS IN A POLICY YEAR:  1

BASED ON THE GUARANTEED INTEREST RATE, THE MAXIMUM POLICY AND PREMIUM EXPENSE CHARGES, THE MAXIMUM MONTHLY COST OF INSURANCE RATES AND THE PLANNED PREMIUM, THIS POLICY WILL EXPIRE ON OCTOBER 9, 2018.

## TABLE OF GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES

| JOINT EQUAL ATTAINED AGE | MONTHLY RATE | JOINT EQUAL ATTAINED AGE | MONTHLY RATE |
|---|---|---|---|
| 72 | 0.15092 | 86 | 11.74533 |
| 73 | 0.49500 | 87 | 13.14575 |
| 74 | 0.90883 | 88 | 14.55258 |
| 75 | 1.39408 | 89 | 15.97233 |
| 76 | 1.95008 | 90 | 17.41567 |
| 77 | 2.57258 | 91 | 18.90017 |
| 78 | 3.25408 | 92 | 20.46633 |
| 79 | 3.99700 | 93 | 22.17358 |
| 80 | 4.81333 | 94 | 24.28583 |
| 81 | 5.71583 | 95 | 27.23525 |
| 82 | 6.72292 | 96 | 31.85917 |
| 83 | 7.84633 | 97 | 39.89600 |
| 84 | 9.07350 | 98 | 54.77525 |
| 85 | 10.38192 | 99 | 83.33333 |

THE GUARANTEED MAXIMUM COST OF INSURANCE RATES ARE DERIVED FROM THE 1980 CSO SMOKER MORTALITY TABLE OR THE 1980 CSO NONSMOKER MORTALITY TABLE, AGE NEAREST BIRTHDAY, MALE/MALE, IN ACCORDANCE WITH THE INSUREDS' UNDERWRITING CLASSES.

IL0152

**TABLE OF PERCENTAGES**

| Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage | Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage |
|---|---|---|---|
| 40 or younger | 250% | 68 | 117% |
| 41 | 243% | 69 | 116% |
| 42 | 236% | 70 | 115% |
| 43 | 229% | 71 | 113% |
| 44 | 222% | 72 | 111% |
| 45 | 215% | 73 | 109% |
| 46 | 209% | 74 | 107% |
| 47 | 203% | 75 | 105% |
| 48 | 197% | 76 | 105% |
| 49 | 191% | 77 | 105% |
| 50 | 185% | 78 | 105% |
| 51 | 178% | 79 | 105% |
| 52 | 171% | 80 | 105% |
| 53 | 164% | 81 | 105% |
| 54 | 157% | 82 | 105% |
| 55 | 150% | 83 | 105% |
| 56 | 146% | 84 | 105% |
| 57 | 142% | 85 | 105% |
| 58 | 138% | 86 | 105% |
| 59 | 134% | 87 | 105% |
| 60 | 130% | 88 | 105% |
| 61 | 128% | 89 | 105% |
| 62 | 126% | 90 | 105% |
| 63 | 124% | 91 | 104% |
| 64 | 122% | 92 | 103% |
| 65 | 120% | 93 | 102% |
| 66 | 119% | 94 | 101% |
| 67 | 118% | 95 and higher | 100% |

IL0153

## NO DIVIDENDS UNDER THIS POLICY

This policy does not share in our earnings. No dividends are payable. Any adjustment in cost factors such as: investment earnings, mortality, persistency and expenses cannot distribute past gains or recoup past losses. Adjustments will be based on future expectations.

## GENERAL PROVISIONS

### YOUR POLICY

We issued this policy based on the information given us in the application and the payment of the first premium. The entire contract consists of this policy, any attached riders, the attached application, any attached applications for increases and/or any applications for reinstatements. All statements made in such applications will be considered representations and not warranties. This policy complies with the laws of the state where the policy is delivered.

### WHO HAS AUTHORITY TO CHANGE THIS POLICY

Provisions of this policy may only be changed by a written agreement signed by a Company Officer. No agent can change or waive this policy's provision in any way.

### WHO OWNS AND CONTROLS YOUR POLICY

The Insureds are the Owners of this policy unless otherwise specified in the application or later changed. During the lifetime of the survivor, the rights and privileges of this policy may be exercised only by the Owner, unless the policy is assigned.

If this policy is jointly owned, any policy transaction will require the signatures of all owners unless otherwise stated in writing on a form satisfactory to the Company. Unless otherwise provided, upon the death of a joint owner, his or her interest shall vest in the surviving owners in equal shares and upon the death of the last surviving owner, ownership shall vest in his or her estate.

### TRANSFER OF OWNERSHIP

The Owner may transfer the Ownership of this policy on forms provided by us. The written evidence of transfer must be recorded by us. The transfer will then be effective as of the date it was signed. We may require the return of the policy for endorsement. The transfer is subject to any payment made or other action taken by us before we received written request from the Owner. The Owner may also name a Contingent Owner in the same manner. Upon the death of the Owner, the Contingent Owner assumes all rights previously held by the Owner. A transfer of ownership will not of itself change the interest of any beneficiary.

### ASSIGNMENT

By written request the Owner may assign this policy. We assume no responsibility for the validity or effect of any assignment. We will not be bound by an assignment until it is recorded by us. The rights of an assignee come before those of anyone else except any prior irrevocable beneficiary, prior assignee, or to the Company to the extent of any policy loan.

### PREMIUMS

The first premium is due on or before the Policy Date. All planned premiums after the first are payable to us directly.

Planned premiums for this policy, and any riders attached to it can be paid until the applicable policy anniversary nearest the age shown under "Payable to Age" in the Schedule, or until the death of the surviving Insured. Planned premiums may be paid annually, or at such other intervals as we permit.

Additional premiums can be paid at any time until the applicable policy anniversary nearest the joint equal age shown under "Payable to Age" in the Schedule, or until the death of the surviving Insured. Additional premiums are premiums which are other than planned premiums.

We may require evidence satisfying us of your insurability before we will accept any additional premiums or allow an increase in the planned premiums.

**IL0154**

7-ULLS-99                              Page 7

**PREMIUMS (continued)**

The planned premium does not guarantee that this policy will continue in force to the policy anniversary nearest the joint equal attained age of 100. If the Face Amount is changed, or a policy loan or partial withdrawal is made, or if we adjust the interest, Cost of Insurance rates and/or Expense Charge factors from those we assume on the issue date, coverage may expire before joint equal attained age 100 unless additional premiums are paid.

Total premiums paid in any policy year may not exceed the Maximum Premium Limit for a policy year. The Maximum Premium Limit for a policy year is the largest amount of premium which can be paid in that policy year such that the sum of the premiums paid under the policy will not at any time exceed the Guideline Premium Limitation referred to in the Internal Revenue Code. The Maximum Premium Limit for the following policy year will be shown on the Annual Report sent to the Owner.

The minimum payment we will accept is $25.00.

**GRACE PERIOD**

A grace period of 61 days is provided under this policy. Except as provided in the No-Lapse Guarantee Provision below, this policy and any attached riders will enter the grace period if the Surrender Value at the beginning of a policy month is not enough to cover the monthly deduction. Written notice of the premium required to continue this policy in force will be mailed to the Owner's last known address, and to that of any assignee of record, at least 15 days but not more than 45 days before the date the policy will end. If such premium is not sent to us before the end of the grace period, this policy will end without value. If you die during the grace period, the smaller of the no lapse premium due or Monthly Deduction owed will be deducted from the benefits payable.

**NO-LAPSE GUARANTEE**

This policy contains a no-lapse guarantee. There is a Basic No-Lapse Guarantee Period of five years.

During the no-lapse guarantee period, this policy will not enter the grace period if the Surrender Value is not sufficient to cover the monthly deduction provided:
1. There are no outstanding policy loans; and
2. The policy satisfies the No-Lapse Premium Test.

The No-Lapse Premium Test will be performed at the beginning of any policy month that your policy would have entered the grace period for insufficient Surrender Value. Your policy will satisfy the Basic No-Lapse Premium Test if the sum of the premiums paid since the Policy Date less the total withdrawals taken since the Policy Date equals or exceeds the sum of the monthly Basic No-Lapse Premiums due since the Policy Date.

The monthly Basic No-Lapse Premiums are shown in the Schedule. These premiums will change at the time of any of the following events:
1. You change the death benefit option; or
2. You add, delete, or change a rider; or
3. You change the Face Amount.

We will inform you of any change to the no-lapse premium(s) resulting from any such change. The revised premium(s) will be effective from the date of the change. The no-lapse guarantee period will not be adjusted from that shown in the Schedule.

**REINSTATEMENT**

This policy may be reinstated within five years after the end of the grace period if it was not previously surrendered. We will reinstate only if we get evidence satisfying us of the insurability of both Insureds, or of one Insured, if that Insured was living on the due date of the unpaid premium, and the cost of reinstatement.

IL0155

**REINSTATEMENT (continued)**

The cost to reinstate is equal to the sum of:

1. A premium covering the following costs increased by premium expense charges: a. An amount large enough to keep the policy in force for at least three months beyond the date of reinstatement; b. Any negative Surrender Value at the time of lapse.
2. A charge equal to the interest on item 1. b. above at the reinstatement interest rate shown in the Schedule.

However, if reinstatement occurs within five years from the Policy Date, the cost to reinstate will be the smaller of the sum of 1. and 2. above, or the sum of 3. and 4. below:

3. A premium covering the following: a. The sum of all monthly Basic No-Lapse Premiums as shown in the Schedule during the time of lapse; and b. Three additional monthly Basic No-Lapse Premiums.
4. A charge equal to the interest on item 3. a. above at the reinstatement interest rate shown in the Schedule.

If the cost of reinstatement paid is equal to the sum of 1. and 2. above, then the Basic No-Lapse Premium Test will not be satisfied at reinstatement and your policy will stay in force only as long as the Surrender Value is large enough to cover the monthly deduction. If the cost of reinstatement paid is equal to the sum of 3. and 4. above, the Basic No-Lapse Premium Test will be satisfied at reinstatement. The Basic No-Lapse Premium Test will apply for five years from the original Policy Date.

At reinstatement, the applicable Surrender Charge will be that charge that had been in effect at the time of lapse. The Surrender Charge will reduce monthly, reaching zero after the policy has been in force for twenty years (not including the time the policy lapsed). The effective date of the reinstatement will be the date we approve it.

**SUICIDE**

If either Insured commits suicide within two years after the Issue Date of this policy, the policy will terminate and we will limit our payment to the amount of premiums paid less withdrawals and less any amount owed us on this policy. If either Insured commits suicide within two years after the effective date of an increase in the Face Amount, for which proof of insurability was required, we will limit our payment to a refund in the increase in the Cost of Insurance attributable to the increase in the face amount.

**INCONTESTABILITY**

This policy has a two year contestable period based upon statements made in the application. We cannot claim your policy is void or deny payment of any benefits after the policy has been inforce during the lifetime of each Insured for two years from its Issue Date. We cannot deny payment of any increase in the Face Amount, for which proof of insurability was required, or a reinstatement after such increase or reinstatement has been in force during the lifetime of each Insured for two years from the effective date. This provision does not apply to the determination of eligibility for any waiver of monthly deduction benefit.

**MISSTATEMENT OF YOUR AGE OR SEX**

If the age or sex of either Insured has been misstated, the Face Amount will be adjusted. The Face Amount shall be that which would be purchased by the most recent Cost of Insurance based on the correct age or sex.

**SIMULTANEOUS DEATH OF INSUREDS**

Unless otherwise provided, if payment of death proceeds requires a determination of the order of death of the Insureds, and we are unable to determine which Insured died first, we will assume the Insureds died simultaneously. In such case, we will pay one-half the proceeds with respect to the beneficiary designation under each presumption.

**SUCCESSION IN INTEREST OF BENEFICIARIES AND PAYEES**

The beneficiary at the death of the surviving Insured will be stated in the designation then in effect. Unless otherwise provided, the proceeds will be payable in equal shares to the primary beneficiaries who survive the second Insured to die. The unpaid share of any primary payee who dies while receiving payment will be payable in equal shares to the other primary payees who survive the second Insured to die. Unless otherwise provided, at the death of the last surviving primary beneficiary, the proceeds will be payable in equal shares to the contingent beneficiaries who survive the second Insured to die. The unpaid share of any contingent payee who dies while receiving payment will be payable in equal shares to the other contingent payees who survive.

**IL0156**

## SUCCESSION IN INTEREST OF BENEFICIARIES AND PAYEES (continued)

Unless otherwise provided, at the death of the last to survive of the primary and contingent beneficiaries, the proceeds will be payable in equal shares to the further payees who survive the second Insured to die. If there are no surviving beneficiaries, then the proceeds shall be paid to the Owner or his or her estate. Unless otherwise provided, if any beneficiary dies within 15 days after the surviving Insured, but before due proof of the death of the surviving Insured has been received by us, then payment of the proceeds shall be made as if such beneficiary had died before the second Insured to die.

## DESIGNATION AND CHANGE OF BENEFICIARY

The designation of beneficiary in the application shall remain in effect until changed by the Owner. By written request the Owner may change any revocable Beneficiary at any time during the lifetime of either Insured. The change will take effect as of the date such request is signed. We will not be liable for any payment made or any action taken before we record the request. The Owner, to the extent he or she is a primary beneficiary, may change the beneficiary within 60 days after the death of the second Insured.

## BENEFICIARY FORM AND EFFECTIVE DATE

Any change made by the Owner must be in writing and in a form satisfactory to us. Such change will become effective when it is recorded by us. Upon such recording, it will then relate back to the date the Owner signed the change, whether or not you were living on the date of recording. Any change is subject to the rights of any irrevocable beneficiary or assignee of record with us. Any change is subject to any action or payment made by us before recording.

## CLAIMS OF CREDITORS

To the extent allowed by law, benefits will be exempt from claims of creditors.

### HOW TO CHANGE THE DEATH BENEFIT OPTION

If Option A is in effect, the Owner can apply for a change to Option B. The Owner will have to send the following to us for each Insured alive on the date of request:

1. A completed supplementary application; and
2. Evidence satisfying us of the insurability of each Insured.

If the Death Benefit is changed from Option A to Option B, the Face Amount will be decreased by the amount of the cash value. The decrease will be applied as described in the "How To Change The Face Amount" provision of the policy. If the Face Amount after the change would be less than the Minimum Face Amount shown in the Schedule, the change will not be allowed. Option B will become effective on the beginning of the policy month after the date we approve the change.

If Option B is in effect, the Owner can apply for a change to Option A by sending us a written request. If the Death Benefit Option is changed from Option B to Option A, the Face Amount will be increased by the amount of the cash value. Option A will become effective on the beginning of the policy month after we approve the change.

We will amend the policy when there is a change in the Death Benefit Option after the change becomes effective.

### HOW TO CHANGE THE FACE AMOUNT

The face amount may not be changed in the first policy year. After the first policy year, the Owner can decrease the Face Amount by sending us a written request. The decrease will be applied as follows:

1. First to the initial Face Amount; then
2. To the Face Amount provided by increases, in order of those increases; then
3. To the Face Amount provided by the most recent increase.

In any event, the Face Amount can never be less than the Minimum Face Amount shown in the Schedule.

Your Surrender Charges will not change due to a Face Amount decrease.

**IL0157**

## HOW TO CHANGE THE FACE AMOUNT (continued)

After the first policy year, the Owner can apply for an increase in the Face Amount. The Owner will have to send the following to us for each Insured alive on the date of the request:

1. A completed supplementary application; and
2. Evidence satisfying us of the insurability of each Insured; and
3. The monthly Basic No-Lapse Premium applicable to the increase for any increases made during the first five policy years.

The change will become effective on the beginning of the policy month after we approve it. We will amend the policy when there is a change in the Face Amount after it becomes effective.

Surrender Charges will increase by an amount dependent upon attained age, sex, and the Face Amount of the increase.

## POLICY VALUES

**CASH VALUE**

The Cash Value at the beginning of a policy month is:

1. The Cash Value at the beginning of the prior policy month; plus
2. One month's interest on (1); plus
3. Net premiums received since the beginning of the prior policy month; plus
4. Interest on (3) from the date of receipt; less
5. The monthly deduction for the current policy month; less
6. Any withdrawal then being made.

The Cash Value at any time other than at the beginning of a policy month will be calculated in a consistent manner. The Cash Value on the policy date is equal to the net premium paid less the monthly deduction for the first policy month.

**NET PREMIUM**

The net premium is the premium paid less the premium expense charge shown in the Schedule.

**INTEREST**

The guaranteed interest rate applicable to the calculation of the Cash Values is shown in the Schedule. After the first policy year, we may credit interest in excess of the guaranteed rate. Such interest will be determined at least annually. It will be credited by class based on the future expectations as per procedures filed with the insurance department of the state in which this policy was issued. However, the interest rate for the amount of Cash Value equal to any outstanding policy loan will be the Policy Loan Credited Rate shown in the Schedule.

**MONTHLY DEDUCTION**

Each monthly deduction consists of:

1. The Cost of Insurance; plus
2. The cost of additional benefits provided by rider; plus
3. Any applicable policy expense charge and per unit expense charge shown in the Schedule.

## SURRENDER

The Owner may turn this policy in for its Surrender Value. It can be returned at any time while either Insured is alive. We must receive this policy and a written request for the Surrender Value. When we pay the Owner the Surrender Value, this policy will be canceled. The surrender will be effective as of the date we receive the written request in our office.

If this policy is surrendered within 30 days after a policy anniversary, the amount we pay will not be less than the Surrender Value as of that anniversary, less policy loans and withdrawals made on or after that anniversary.

**SURRENDER CHARGE**

We will deduct a Surrender Charge from the Cash Value when this policy terminates during the lifetime of either Insured. If the policy is surrendered, the Surrender Charge is the applicable charge as shown in the TABLE OF SURRENDER CHARGES, except as provided for in the Reinstatement provision.

The TABLE OF SURRENDER CHARGES will change if:

1. Benefits are increased, or
2. A partial withdrawal is made.

**IL0158**

## WITHDRAWAL

The Owner may request, in writing, to withdraw part of the Surrender Value. The withdrawal must take place at the beginning of a policy month while either Insured is alive. The amount of the withdrawal must be less than the current Surrender Value. A withdrawal charge will be deducted from the amount withdrawn. We can limit the number of withdrawals made in a policy year.

## WITHDRAWAL CHARGE

The withdrawal charge is the sum of:

1. The Surrender Charge multiplied by the ratio of the amount withdrawn to the Surrender Value; plus
2. 5% of the amount withdrawn but no greater than $25.

When the Owner withdraws part of the Surrender Value, we will reduce the Cash Value, the Death Benefit and the Face Amount by the amount withdrawn. Future Surrender Charges in effect as of the date of withdrawal will be calculated by multiplying the Surrender Charges in effect prior to withdrawal by one minus the ratio described in item one above.

The reduction in the Face Amount due to a withdrawal will apply:

1. First to the initial Face Amount due to a withdrawal; then
2. To the Face Amount provided in increases, in order of those increases; then
3. To the Face Amount provided by the most recent increase.

We will not permit a withdrawal:

1. During the first policy year; or
2. If the withdrawal will result in a reduction of the Face Amount to less than the Minimum Face Amount shown in the Schedule.

If the Death Benefit Option B is in effect when the Owner withdraws part of the Surrender Value, we will reduce the Cash Value and the Death Benefit by the amount withdrawn but the Face Amount will not be reduced.

## PAID-UP LIFE INSURANCE

At any time while the policy is in force, the Owner may elect to continue the policy as paid-up life insurance, possibly for a reduced amount, uniform throughout the lifetime of either Insured.

The amount of paid-up life insurance will be the smaller of the Death Benefit on the anniversary and a level amount that will be based on: i) The Surrender Value then in effect; ii) Joint equal attained age; and iii) The single premium rates based on the 1980 Commissioners Standard Ordinary Mortality Table, age nearest birthday, and 4.0% annual interest.

Any excess of the Surrender Value over the single premium required for the paid-up life insurance benefit will be paid to the Owner of the policy. The Owner may surrender the paid-up life insurance for its Surrender Value at any time. If it is surrendered within 30 days after a policy anniversary, we'll pay the Surrender Value as of that anniversary. The Surrender Value of paid-up life insurance equals its net single premium based on the joint equal attained age at the time of surrender.

## POLICY LOANS

By written request, the Owner may borrow the Surrender Value less the total of the monthly deduction to the next policy anniversary while this policy is in force. The policy is the sole security for the cash loan.

When we make a loan, we will deduct from the Surrender Value, interest to the next policy anniversary. Except as provided below, a loan secured by this policy will be charged interest at the rate of 7.4% in advance (equivalent to 8.0% in arrears) per year payable on each policy anniversary. Unpaid interest will be added to the loan and charged the same rate of interest as the loan.

The owner will be eligible for a loan at an interest rate of 5.66% in advance (equivalent to 6.0% in arrears) per year subject to the following conditions and requirements:

1. The 5.66% loan is available during the eligibility period. The eligibility period begins with the tenth policy anniversary and continues as long as the policy remains in force.

## POLICY LOANS (continued)

2. The Maximum amount which may be loaned during any one policy year at an interest rate of 5.66% per year may not exceed 10% of the largest Surrender Value at the end of any preceding policy year during the eligibility period. If such maximum amount is not loaned during a policy year, the balance may not be carried over to later policy years.

3. Amounts loaned in excess of amounts permitted at an interest rate of 5.66% per year during any one policy year will be charged interest at the rate of 7.4% per year.

Any outstanding loan may be repaid while you are living.

Whenever the loan exceeds the Cash Value less the Surrender Charge, we will mail a written notice to the Owner's last known address and to that of any assignee of record. The excess amount must be paid within 31 days from the date of our notice or this policy will then end.

## POLICY COST FACTORS

Adjustments in policy cost factors (interest, Cost of Insurance charges, expense charges) will be by class and based on changes in future expectations for such elements as to investment earnings, mortality, persistency and expenses.

Any change in policy cost factors will be based on procedures and standards on file with the Insurance Department.

We will review policy cost factors whenever they are changed for newly issued policies, but no less frequently than once every five years. Each policy cost factor is subject to adjustment.

## COST OF INSURANCE

The Cost of Insurance is calculated at the beginning of each policy month. To calculate it:
1. Calculate the Net Amount At Risk:
   a. Divide the Death Benefit by one plus the monthly equivalent of the annual guaranteed interest rate (.32737%); then
   b. Subtract the Cash Value; then
2. Divide the Net Amount At Risk by 1,000; then
3. Multiply the result of (2) by the appropriate Cost of Insurance rate(s).

If the Face Amount has increased, the Cash Value is allocated first to the initial Face Amount. If the Cash Value is greater than the initial Face Amount, the Cash Value in excess of the initial Face Amount will be allocated to the increases in Face Amount in the order of such increases.

The Cost of Insurance rate is based on joint equal issue age, duration and rate class for the Face Amount provided by the original application and each increase in Face Amount. If the Death Benefit is the Cash Value multiplied by the applicable percentage, the rate class(es) will be applied as follows:

1. The most recent rate class will apply to an amount up to the Death Benefit less the Face Amount in force prior to the last increase in which the rate class was changed.
2. The next most recent rate class(es), successively, will apply to any remaining amount up to the Face Amount to which that rate class(es) applies.

We can change the Cost of Insurance rates from time to time. Any change will be based upon the expectations of future experience. In any event, the rates will never be more than those shown on Page 5. A change in rates will apply to all policies issued in the same state to Insureds of the same joint equal age and rate class and whose policies have been in force for the same number of years.

## SPECIAL PROVISIONS

**DEFERMENT**
Except for payment of premium, we may defer payment of any withdrawals, surrenders or loans for the period permitted by law, not to exceed six months after written request is received by us.

IL0160

## BASIS OF COMPUTATION

We have filed a statement of the method of determining policy values with the Insurance Department of the state in which this policy is issued. Such values are equal to or greater than those required by law in that state.

We have used certain mortality table(s) and interest rate(s) in determining the guaranteed values for this policy. These mortality table(s) and interest rate(s) are shown in the Schedule.

## INITIAL AND ANNUAL REPORTS

We will deliver at issue, and mail to the Owner at least once each year, a statement containing such information as required by the Insurance Department of the state in which this policy was issued.

## POLICY SPLIT OPTION

At any time while this policy is in force, it may be exchanged for two individual policies covering the Insureds separately within 180 days after the effective date of one of the following events:

1. A final divorce, dissolution or annulment decree with respect to the marriage of the Insureds has been issued while this policy was in force.
2. A change in the Federal Estate Tax Law which results in:
   a. a reduction of the Unlimited Marital Deduction to 75% or less of the value of the estate; or
   b. a reduction of the Federal Unified Credit to 75% or less of the amount in effect at the Issue Date; or
   c. a reduction in the Federal Estate Tax rate to 75% or less of the rate in effect at the Issue Date.

The option may be exercised subject to the following:
1. The amount of coverage under each new policy will be 50% of an amount equal to:
   a. The Death Benefit Amount in effect on the effective date of exchange; less
   b. The amount of any policy loan.
2. After repayment of any loan against the Surrender Value of this policy, 50% of any remaining Surrender Value will be transferred to each of the new policies;
3. The "Policy Split Option Class" is shown on page 3 and indicates whether or not evidence of insurability will be required for an exchange due to a change in the Federal Estate Tax law; "Restricted" means evidence of insurability will be required; "Unrestricted" means evidence of insurability will not be required;
4. The new policies will be issued on any flexible premium adjustable life or level premium whole life plan regularly issued by the Company on the date of exchange;
5. The new policies will be issued as of the date of exchange at the then attained age of each Insured;
6. The new policies will be issued at the risk class of each Insured on the Policy Date of this policy unless evidence of insurability is required;
7. The plan of insurance selected will be subject to our standard minimum amount requirement for such plan;
8. The inclusion of any optional benefits will be subject to our rules on the date of exchange and evidence of insurability satisfactory to us;
9. If monthly deductions for this policy are being waived in accordance with a waiver of monthly deduction rider, premiums for the new polices will not be waived and we will not include a waiver benefit in the new policies;
10. To apply for an exchange, the Owner must submit:
   a. Applications for the new policies; and
   b. Payment of the first premium for each new policy; and
   c. This policy for cancellation.

IL0161

**POLICY SPLIT OPTION (continued)**

11. The Suicide Exclusion and Incontestability provision of the new policies will continue to run from the Issue Date of this policy to the extent of the coverage being exchanged without evidence of insurability. New Suicide Exclusion and Incontestability periods will apply to any amount of coverage or addition of benefits requiring evidence of insurability.

This policy will terminate on the Issue Date of the new policies.

## HOW WE PAY POLICY BENEFITS

**PAYMENT**
Death benefits or surrender benefits will be paid in one (1) lump sum or, if at least $2,000, under a selected settlement option.

**SELECTION**
The Owner has the sole right to select a settlement option during the lifetime of either Insured. If, immediately prior to the death of the surviving Insured, the Owner was not the Insured, and the Owner is a primary beneficiary, then within sixty (60) days after the death of the surviving Insured, the Owner may revoke any existing settlement option and make a final election. This election will only apply to the extent of the Owner's interest. Within one (1) year after the death of the surviving Insured, if the proceeds are payable in a lump sum or under Option 4 or 5 without restriction on withdrawal, the beneficiary may elect any option. Except as allowed by the Payments to a Corporation Provision, the options are not available without our consent to any assignee or beneficiary which is not a natural person.

**PAYMENTS TO A CORPORATION**
The proceeds of this policy may be paid to a corporation under any of the options with the following limitations:
   a. Option 4 may be selected for a period of not more than ten (10) years. At the end of the period, we will pay the amount in a lump sum.
   b. Options 2, 3, or 6 may be selected only if payments are payable during the lifetime of either Insured or the Insured's spouse or any child of the Insured. With our consent, they may be payable during the lifetime of anyone related to an Insured by blood or marriage.
   c. Payments under Options 1 or 5 may not extend beyond twenty (20) years.

**OPTIONS**

**Option 1.** Fixed Period - We will pay the proceeds in equal monthly payments for the number of years the Owner selects from one (1) to thirty (30) years. The monthly payments for each $1,000 applied will not be less than those shown in Table A. The minimum guaranteed interest rate is two and a half percent (2.5%) per year. Payments may be commuted. Another option may not be selected once payments begin under this option.

**Option 2.** Life Income with Installments Certain - We will pay the proceeds in equal monthly installments for a period certain and thereafter during the remaining lifetime of the payee. The period certain may be 0, 5, 10, 15, or 20 years or until the total of installments equals a refund of the proceeds applied under the option. The guaranteed monthly payments for each $1,000 applied are shown in Table B. The guaranteed payments are calculated based on Annuity 2000 Mortality Table with a generational mortality projection of Scale G, and an annual interest rate of two and a half percent (2.5%). Payments may not be commuted. Another option may not be selected once payments begin under this option.

**Option 3.** Annuity Settlement - We will pay the proceeds in the form of a monthly annuity as agreed upon by the Owner, or the beneficiary, and us. Payments may not be commuted if the form of annuity settlement involves life contingencies. Another option may not be selected once payments begin under this option.

**Option 4.** Proceeds at Interest - We will hold the proceeds for the payee's lifetime. We will pay interest at the rate of at least two and a half percent (2.5%) per year. The proceeds may be withdrawn at any time or another option may be selected.

**Option 5.** Installments of Fixed Amounts - We will pay the proceeds in equal monthly installments until they are fully paid. The proceeds will be credited with annual interest at a rate of at least two and a half percent (2.5%) per year. Payments may be commuted. Another option may not be selected once payments begin under this option.

**IL0162**

**Option 6.   Joint and Survivor Life Income with Installments Certain** - We will pay the proceeds in equal monthly installments for a period of ten (10) years certain and so long thereafter as either of two designated payees shall live. If the Owner elects this option during the lifetime of either Insured, and one of the beneficiaries dies before the death of the second Insured to die, then we will pay the surviving beneficiary under Option 2 with a period certain of ten (10) years, unless the Owner elects otherwise. The minimum guaranteed monthly payments for this option are shown in Table C. The guaranteed payments are calculated based on the Annuity 2000 Mortality Table with a generational mortality projection of Scale G, and an annual interest rate of two and a half percent (2.5%). Payments may not be commuted. Another option may not be selected once payments begin under this option.

## PAYMENT FREQUENCY

In lieu of monthly payments, a quarterly, semiannual, or annual frequency may be selected. The selection of any option is subject to our minimum payment requirements. If other than monthly payments are selected, the amount of each payment may be found by multiplying the amount of the monthly payment by the following factors:

| QUARTERLY | SEMIANNUALLY | ANNUALLY |
|-----------|--------------|----------|
| 2.9938 | 5.9693 | 11.8653 |

## DUE DATE OF FIRST PAYMENT

If an option has been selected which calls for installments, the due date of the first payment shall be the date of the surviving Insured's death or surrender of the policy. If the Alternate Larger Life Income is paid, the first payment will be one (1) payment period after the date of the death of the surviving Insured or surrender of the policy.

## ALTERNATE LARGER LIFE INCOME

If Options 2, 3, or 6 become effective and if on the due date of the first payment we have in use a basis for computing the life income which is alternative to that used in the installment tables, then the life income shall be recomputed on the alternative basis. If that results in installment amounts which are larger than those set forth in the tables, then we will automatically pay the larger amounts.

## SUPPLEMENTARY CONTRACT

A supplementary contract providing for the Settlement Option chosen will be issued as of the date of the settlement. When the proceeds of this policy become payable under a settlement option, this policy must be surrendered.

## DEATH OF PAYEE

We may require proof of the date of birth or the continued life of any payee at any time. If at the death of any payee there is no designated person living entitled to receive the remaining payments, we will pay in one (1) sum to such payee's executors, administrators, or assigns, the unpaid sum or the commuted value of any unpaid settlements. The interest rate applied will not be greater than the current interest rate used to calculate installment payments at the time of settlement.

## INCOME PROTECTION

The payee, other than the Owner, may not transfer, assign, commute, or encumber any of the benefits of this policy unless otherwise provided in the settlement election. To the extent permitted by law, settlement option benefits are not subject to claims of creditors or legal process.

## SURPLUS INTEREST

Surplus interest earnings may be added to payments under Options 4, and 5. Under Option 4, surplus interest will be used to increase the amount of each payment. Under Option 5, surplus interest will be used to increase the number of payments.

**IL0163**

# INSTALLMENT TABLES – On Basis of $1,000 of Proceeds

The life income under Option 2 and 6 will be based on the payee's sex and age nearest birthday when the first installment is payable.

## OPTION 1 — Installments For Fixed Period — TABLE A

| Number of Years Payable | Annual Payment | Monthly Payment |
|---|---|---|
| 1 | $1,000.00 | 84.28 |
| 2 | 507.39 | 42.66 |
| 3 | 343.23 | 28.79 |
| 4 | 261.19 | 21.86 |
| 5 | 212.00 | 17.70 |
| 6 | 179.22 | 14.93 |
| 7 | 155.83 | 12.85 |
| 8 | 138.31 | 11.47 |
| 9 | 124.69 | 10.32 |
| 10 | 113.82 | 9.39 |
| 11 | 104.93 | 8.64 |
| 12 | 97.54 | 8.02 |
| 13 | 91.29 | 7.49 |
| 14 | 85.98 | 7.03 |
| 15 | 81.33 | 6.64 |
| 16 | 77.29 | 6.30 |
| 17 | 73.74 | 6.00 |
| 18 | 70.69 | 5.73 |
| 19 | 67.78 | 5.49 |
| 20 | 66.20 | 5.27 |
| 21 | 62.98 | 5.08 |
| 22 | 60.92 | 4.90 |
| 23 | 59.04 | 4.73 |
| 24 | 57.33 | 4.60 |
| 25 | 55.76 | 4.48 |
| 26 | 54.31 | 4.34 |
| 27 | 52.97 | 4.22 |
| 28 | 51.74 | 4.12 |
| 29 | 50.60 | 4.02 |
| 30 | 49.53 | 3.93 |

## OPTION 2 – Table B — MONTHLY LIFE INCOME WITH INSTALLMENTS CERTAIN

| AGE OF PAYEE | LIFE ONLY INCOME MALE | LIFE ONLY INCOME FEMALE | 5 YEARS CERTAIN MALE | 5 YEARS CERTAIN FEMALE | 10 YEARS CERTAIN MALE | 10 YEARS CERTAIN FEMALE | 15 YEARS CERTAIN MALE | 15 YEARS CERTAIN FEMALE | 20 YEARS CERTAIN MALE | 20 YEARS CERTAIN FEMALE |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 3.06 | 2.83 | 3.06 | 2.83 | 3.06 | 2.83 | 3.07 | 2.82 | 3.06 | 2.81 |
| 41 | 3.13 | 2.86 | 3.12 | 2.86 | 3.12 | 2.86 | 3.11 | 2.85 | 3.09 | 2.84 |
| 42 | 3.17 | 2.89 | 3.17 | 2.89 | 3.16 | 2.89 | 3.16 | 2.89 | 3.13 | 2.88 |
| 43 | 3.22 | 2.93 | 3.21 | 2.93 | 3.21 | 2.93 | 3.19 | 2.92 | 3.17 | 2.91 |
| 44 | 3.26 | 2.97 | 3.26 | 2.97 | 3.25 | 2.97 | 3.24 | 2.96 | 3.21 | 2.95 |
| 45 | 3.31 | 3.01 | 3.31 | 3.01 | 3.30 | 3.01 | 3.28 | 3.00 | 3.26 | 2.99 |
| 46 | 3.37 | 3.11 | 3.36 | 3.11 | 3.35 | 3.10 | 3.33 | 3.14 | 3.30 | 3.13 |
| 47 | 3.42 | 3.16 | 3.42 | 3.16 | 3.40 | 3.16 | 3.38 | 3.19 | 3.35 | 3.17 |
| 48 | 3.48 | 3.25 | 3.47 | 3.25 | 3.46 | 3.24 | 3.43 | 3.23 | 3.40 | 3.21 |
| 49 | 3.54 | 3.30 | 3.53 | 3.30 | 3.52 | 3.29 | 3.49 | 3.28 | 3.45 | 3.26 |
| 50 | 3.60 | 3.36 | 3.60 | 3.35 | 3.58 | 3.34 | 3.55 | 3.33 | 3.50 | 3.31 |
| 51 | 3.67 | 3.41 | 3.67 | 3.41 | 3.64 | 3.40 | 3.61 | 3.38 | 3.56 | 3.36 |
| 52 | 3.74 | 3.47 | 3.73 | 3.47 | 3.71 | 3.46 | 3.67 | 3.44 | 3.61 | 3.41 |
| 53 | 3.81 | 3.53 | 3.81 | 3.53 | 3.78 | 3.52 | 3.74 | 3.50 | 3.67 | 3.46 |
| 54 | 3.89 | 3.60 | 3.88 | 3.60 | 3.85 | 3.59 | 3.81 | 3.56 | 3.73 | 3.52 |
| 55 | 3.98 | 3.67 | 3.96 | 3.67 | 3.93 | 3.66 | 3.88 | 3.63 | 3.80 | 3.58 |
| 56 | 4.06 | 3.74 | 4.05 | 3.74 | 4.02 | 3.72 | 3.96 | 3.69 | 3.86 | 3.64 |
| 57 | 4.16 | 3.82 | 4.14 | 3.82 | 4.10 | 3.79 | 4.03 | 3.76 | 3.93 | 3.70 |
| 58 | 4.25 | 3.90 | 4.24 | 3.90 | 4.19 | 3.87 | 4.11 | 3.83 | 3.99 | 3.77 |
| 59 | 4.36 | 3.99 | 4.34 | 3.98 | 4.28 | 3.95 | 4.20 | 3.91 | 4.06 | 3.83 |
| 60 | 4.47 | 4.09 | 4.45 | 4.08 | 4.39 | 4.05 | 4.29 | 3.99 | 4.13 | 3.90 |
| 61 | 4.59 | 4.19 | 4.57 | 4.18 | 4.50 | 4.14 | 4.38 | 4.07 | 4.20 | 3.98 |
| 62 | 4.71 | 4.29 | 4.69 | 4.28 | 4.62 | 4.24 | 4.47 | 4.16 | 4.28 | 4.05 |
| 63 | 4.86 | 4.41 | 4.83 | 4.39 | 4.74 | 4.34 | 4.57 | 4.25 | 4.35 | 4.13 |
| 64 | 5.01 | 4.53 | 4.97 | 4.51 | 4.86 | 4.46 | 4.67 | 4.36 | 4.42 | 4.20 |
| 65 | 6.16 | 4.66 | 6.12 | 4.64 | 5.99 | 4.67 | 5.84 | 4.63 | 5.82 | 4.69 |
| 66 | 6.33 | 4.80 | 6.28 | 4.77 | 6.13 | 4.70 | 5.95 | 4.65 | 4.96 | 4.90 |
| 67 | 6.51 | 4.95 | 6.45 | 4.92 | 6.28 | 4.83 | 6.02 | 4.87 | 5.10 | 4.63 |
| 68 | 6.70 | 5.11 | 6.64 | 5.07 | 6.43 | 4.97 | 6.10 | 4.78 | 5.14 | 4.76 |
| 69 | 6.91 | 5.28 | 6.83 | 5.24 | 6.59 | 5.12 | 6.18 | 5.21 | 5.19 | 4.80 |
| 70 | 6.12 | 5.47 | 6.03 | 5.42 | 6.76 | 5.31 | 6.32 | 5.02 | 5.21 | 4.92 |
| 71 | 6.36 | 5.67 | 6.26 | 5.61 | 6.91 | 5.44 | 6.43 | 5.14 | 5.23 | 4.98 |
| 72 | 6.61 | 5.89 | 6.51 | 5.82 | 7.00 | 5.61 | 6.52 | 5.28 | 5.24 | 5.04 |
| 73 | 6.87 | 6.12 | 6.71 | 6.04 | 6.26 | 5.84 | 6.62 | 5.39 | 5.26 | 5.12 |
| 74 | 7.16 | 6.38 | 6.87 | 6.28 | 6.44 | 6.06 | 6.74 | 5.81 | 5.03 | 5.16 |
| 75 | 7.46 | 6.66 | 7.24 | 6.54 | 6.83 | 6.18 | 6.84 | 5.53 | 5.07 | 5.18 |
| 76 | 7.79 | 6.98 | 7.62 | 6.81 | 7.02 | 6.38 | 6.81 | 5.74 | 5.10 | 5.20 |
| 77 | 8.14 | 7.33 | 7.82 | 6.47 | 7.00 | 6.59 | 6.62 | 5.85 | 5.14 | 5.23 |
| 78 | 8.51 | 7.73 | 8.13 | 7.42 | 7.19 | 6.80 | 6.42 | 5.98 | 5.18 | 5.24 |
| 79 | 8.91 | 8.19 | 8.46 | 7.76 | 7.37 | 7.01 | 6.18 | 6.05 | 5.19 | 5.26 |
| 80 | 9.36 | 8.44 | 8.60 | 8.11 | 7.88 | 7.23 | 6.26 | 6.53 | 5.21 | 5.18 |
| 81 | 9.81 | 8.89 | 9.16 | 8.48 | 7.73 | 7.44 | 6.31 | 6.74 | 5.23 | 5.31 |
| 82 | 10.30 | 8.38 | 8.63 | 6.88 | 7.00 | 7.64 | 6.37 | 6.30 | 5.24 | 5.23 |
| 83 | 10.83 | 9.31 | 3.92 | 9.30 | 8.07 | 7.84 | 6.42 | 6.36 | 5.26 | 5.24 |
| 84 | 11.39 | 10.49 | 10.31 | 9.73 | 8.23 | 8.03 | 6.48 | 6.42 | 5.28 | 5.28 |
| 88+ | 11.99 | 11.12 | 10.71 | 10.18 | 8.37 | 8.21 | 6.50 | 6.47 | 5.28 | 5.20 |

+ And Over

IL0164

17-ULLS-99

## Option 6 - Table C
## JOINT & FULL SURVIVOR WITH 10 YEARS CERTAIN SURVIVOR
### Monthly Payments for each $1,000 Applied

| Female: | Number of Years Younger | | | | | | | | | | Same Age | Number of Years Older | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Male Age (Age Nearest Birthday):** | -10 | -9 | -8 | -7 | -6 | -5 | -4 | -3 | -2 | -1 | Same Age | 1 | 2 | 3 | 4 | 5 |
| 40 | 2.60 | 2.62 | 2.63 | 2.66 | 2.66 | 2.68 | 2.70 | 2.71 | 2.73 | 2.74 | 2.76 | 2.77 | 2.79 | 2.80 | 2.82 | 2.83 |
| 41 | 2.62 | 2.64 | 2.65 | 2.67 | 2.69 | 2.70 | 2.72 | 2.74 | 2.76 | 2.77 | 2.78 | 2.80 | 2.81 | 2.83 | 2.85 | 2.86 |
| 42 | 2.64 | 2.66 | 2.68 | 2.69 | 2.71 | 2.73 | 2.74 | 2.76 | 2.78 | 2.79 | 2.81 | 2.83 | 2.84 | 2.86 | 2.88 | 2.89 |
| 43 | 2.66 | 2.68 | 2.70 | 2.72 | 2.73 | 2.75 | 2.77 | 2.79 | 2.80 | 2.82 | 2.84 | 2.86 | 2.87 | 2.89 | 2.91 | 2.92 |
| 44 | 2.68 | 2.70 | 2.72 | 2.74 | 2.76 | 2.78 | 2.80 | 2.81 | 2.83 | 2.85 | 2.87 | 2.88 | 2.91 | 2.92 | 2.94 | 2.96 |
| 45 | 2.71 | 2.73 | 2.75 | 2.77 | 2.79 | 2.80 | 2.82 | 2.84 | 2.86 | 2.88 | 2.90 | 2.92 | 2.94 | 2.96 | 2.98 | 3.00 |
| 46 | 2.73 | 2.75 | 2.77 | 2.79 | 2.81 | 2.83 | 2.85 | 2.87 | 2.89 | 2.92 | 2.94 | 2.96 | 2.98 | 3.00 | 3.01 | 3.03 |
| 47 | 2.76 | 2.78 | 2.80 | 2.82 | 2.84 | 2.86 | 2.88 | 2.91 | 2.93 | 2.95 | 2.97 | 2.99 | 3.01 | 3.03 | 3.05 | 3.07 |
| 48 | 2.78 | 2.81 | 2.83 | 2.85 | 2.88 | 2.89 | 2.92 | 2.94 | 2.96 | 2.99 | 3.01 | 3.03 | 3.05 | 3.08 | 3.09 | 3.12 |
| 49 | 2.81 | 2.83 | 2.86 | 2.88 | 2.90 | 2.93 | 2.95 | 2.98 | 3.00 | 3.02 | 3.05 | 3.07 | 3.09 | 3.12 | 3.14 | 3.16 |
| 50 | 2.84 | 2.86 | 2.89 | 2.91 | 2.94 | 2.96 | 2.99 | 3.01 | 3.04 | 3.06 | 3.09 | 3.11 | 3.14 | 3.16 | 3.18 | 3.21 |
| 51 | 2.87 | 2.90 | 2.92 | 2.95 | 2.97 | 3.00 | 3.03 | 3.05 | 3.08 | 3.10 | 3.13 | 3.16 | 3.18 | 3.21 | 3.23 | 3.26 |
| 52 | 2.90 | 2.93 | 2.96 | 2.98 | 3.01 | 3.04 | 3.06 | 3.09 | 3.12 | 3.15 | 3.18 | 3.20 | 3.23 | 3.26 | 3.28 | 3.31 |
| 53 | 2.94 | 2.96 | 2.99 | 3.02 | 3.05 | 3.08 | 3.11 | 3.14 | 3.16 | 3.19 | 3.22 | 3.25 | 3.28 | 3.31 | 3.34 | 3.36 |
| 54 | 2.97 | 3.00 | 3.03 | 3.06 | 3.09 | 3.12 | 3.15 | 3.18 | 3.21 | 3.24 | 3.27 | 3.30 | 3.33 | 3.36 | 3.39 | 3.42 |
| 55 | 3.01 | 3.04 | 3.07 | 3.10 | 3.13 | 3.16 | 3.20 | 3.23 | 3.26 | 3.29 | 3.33 | 3.36 | 3.39 | 3.42 | 3.45 | 3.48 |
| 56 | 3.05 | 3.08 | 3.11 | 3.14 | 3.18 | 3.21 | 3.25 | 3.28 | 3.31 | 3.35 | 3.38 | 3.42 | 3.45 | 3.48 | 3.52 | 3.55 |
| 57 | 3.09 | 3.12 | 3.16 | 3.19 | 3.23 | 3.26 | 3.30 | 3.33 | 3.37 | 3.41 | 3.44 | 3.48 | 3.51 | 3.55 | 3.58 | 3.62 |
| 58 | 3.13 | 3.16 | 3.21 | 3.24 | 3.28 | 3.32 | 3.35 | 3.39 | 3.43 | 3.47 | 3.50 | 3.54 | 3.58 | 3.61 | 3.65 | 3.69 |
| 59 | 3.18 | 3.21 | 3.26 | 3.29 | 3.33 | 3.37 | 3.41 | 3.45 | 3.49 | 3.53 | 3.57 | 3.61 | 3.65 | 3.68 | 3.73 | 3.77 |
| 60 | 3.23 | 3.26 | 3.30 | 3.34 | 3.39 | 3.43 | 3.47 | 3.51 | 3.56 | 3.60 | 3.64 | 3.68 | 3.73 | 3.77 | 3.81 | 3.86 |
| 61 | 3.28 | 3.32 | 3.36 | 3.40 | 3.45 | 3.49 | 3.53 | 3.58 | 3.63 | 3.67 | 3.72 | 3.76 | 3.81 | 3.85 | 3.90 | 3.94 |
| 62 | 3.33 | 3.37 | 3.42 | 3.46 | 3.51 | 3.55 | 3.60 | 3.65 | 3.70 | 3.75 | 3.80 | 3.84 | 3.89 | 3.94 | 3.99 | 4.03 |
| 63 | 3.39 | 3.43 | 3.48 | 3.53 | 3.58 | 3.63 | 3.68 | 3.73 | 3.78 | 3.83 | 3.88 | 3.93 | 3.98 | 4.03 | 4.08 | 4.13 |
| 64 | 3.44 | 3.49 | 3.54 | 3.59 | 3.65 | 3.70 | 3.76 | 3.81 | 3.86 | 3.92 | 3.97 | 4.03 | 4.08 | 4.13 | 4.19 | 4.24 |
| 65 | 3.51 | 3.56 | 3.61 | 3.67 | 3.72 | 3.78 | 3.83 | 3.88 | 3.95 | 4.01 | 4.07 | 4.13 | 4.18 | 4.24 | 4.30 | 4.35 |
| 66 | 3.57 | 3.62 | 3.69 | 3.74 | 3.80 | 3.86 | 3.92 | 3.98 | 4.04 | 4.11 | 4.17 | 4.23 | 4.29 | 4.35 | 4.41 | 4.47 |
| 67 | 3.64 | 3.70 | 3.76 | 3.82 | 3.89 | 3.95 | 4.01 | 4.08 | 4.15 | 4.21 | 4.28 | 4.34 | 4.41 | 4.47 | 4.54 | 4.60 |
| 68 | 3.72 | 3.77 | 3.83 | 3.90 | 3.96 | 4.04 | 4.11 | 4.18 | 4.25 | 4.32 | 4.39 | 4.46 | 4.53 | 4.60 | 4.66 | 4.74 |
| 69 | 3.80 | 3.86 | 3.93 | 4.00 | 4.07 | 4.14 | 4.22 | 4.29 | 4.37 | 4.44 | 4.52 | 4.59 | 4.67 | 4.74 | 4.81 | 4.88 |
| 70 | 3.88 | 3.95 | 4.02 | 4.10 | 4.17 | 4.25 | 4.33 | 4.41 | 4.49 | 4.57 | 4.65 | 4.73 | 4.82 | 4.89 | 4.98 | 5.04 |
| 71 | 3.97 | 4.04 | 4.12 | 4.20 | 4.28 | 4.36 | 4.45 | 4.53 | 4.62 | 4.70 | 4.79 | 4.87 | 4.96 | 5.05 | 5.12 | 5.20 |
| 72 | 4.07 | 4.15 | 4.23 | 4.31 | 4.40 | 4.49 | 4.58 | 4.66 | 4.76 | 4.84 | 4.94 | 5.03 | 5.12 | 5.21 | 5.29 | 5.37 |
| 73 | 4.17 | 4.25 | 4.34 | 4.43 | 4.52 | 4.62 | 4.71 | 4.81 | 4.90 | 5.00 | 5.10 | 5.19 | 5.29 | 5.38 | 5.47 | 5.56 |
| 74 | 4.27 | 4.36 | 4.46 | 4.55 | 4.65 | 4.75 | 4.85 | 4.96 | 5.06 | 5.16 | 5.26 | 5.37 | 5.46 | 5.56 | 5.66 | 5.74 |
| 75 | 4.39 | 4.48 | 4.58 | 4.69 | 4.79 | 4.90 | 5.00 | 5.11 | 5.22 | 5.33 | 5.44 | 5.55 | 5.65 | 5.76 | 5.85 | 5.94 |
| 76 | 4.51 | 4.61 | 4.72 | 4.83 | 4.94 | 5.05 | 5.17 | 5.28 | 5.41 | 5.52 | 5.63 | 5.74 | 5.85 | 5.95 | 6.05 | 6.15 |
| 77 | 4.64 | 4.76 | 4.86 | 4.98 | 5.10 | 5.22 | 5.34 | 5.46 | 5.58 | 5.71 | 5.83 | 5.94 | 6.05 | 6.16 | 6.28 | 6.38 |
| 78 | 4.78 | 4.89 | 5.01 | 5.14 | 5.26 | 5.39 | 5.52 | 5.65 | 5.78 | 5.91 | 6.03 | 6.15 | 6.28 | 6.38 | 6.48 | 6.58 |
| 79 | 4.92 | 5.05 | 5.17 | 5.31 | 5.44 | 5.57 | 5.71 | 5.84 | 5.98 | 6.11 | 6.24 | 6.37 | 6.48 | 6.60 | 6.70 | 6.79 |
| 80 | 5.08 | 5.21 | 5.34 | 5.48 | 5.62 | 5.77 | 5.91 | 6.06 | 6.19 | 6.33 | 6.48 | 6.59 | 6.71 | 6.82 | 6.92 | 7.01 |
| 81 | 5.24 | 5.38 | 5.52 | 5.67 | 5.82 | 5.97 | 6.12 | 6.27 | 6.41 | 6.55 | 6.69 | 6.81 | 6.93 | 7.05 | 7.14 | 7.14 |
| 82 | 5.41 | 5.56 | 5.71 | 5.87 | 6.02 | 6.18 | 6.33 | 6.49 | 6.63 | 6.81 | 6.94 | 7.04 | 7.16 | 7.26 | 7.26 | 7.26 |
| 83 | 5.59 | 5.75 | 5.91 | 6.07 | 6.24 | 6.40 | 6.56 | 6.71 | 6.86 | 7.00 | 7.14 | 7.23 | 7.38 | 7.38 | 7.38 | 7.38 |
| 84 | 5.79 | 5.95 | 6.12 | 6.29 | 6.45 | 6.62 | 6.78 | 6.94 | 7.09 | 7.23 | 7.35 | 7.48 | 7.48 | 7.48 | 7.48 | 7.48 |
| 85+ | 5.99 | 6.16 | 6.33 | 6.51 | 6.68 | 6.85 | 7.01 | 7.17 | 7.32 | 7.48 | 7.58 | 7.58 | 7.58 | 7.58 | 7.58 | 7.58 |

+ And Over

IL0165

# INDIANAPOLIS LIFE INSURANCE COMPANY

Indianapolis, Indiana

**JOINT AND LAST SURVIVOR ADJUSTABLE LIFE INSURANCE POLICY**
**FLEXIBLE PREMIUMS ARE PAYABLE FOR LIFE OF SURVIVOR TO JOINT AGE SHOWN IN SCHEDULE**
**BENEFITS ARE ADJUSTABLE AND PAYABLE AT DEATH OF LAST SURVIVOR**
**NON- PARTICIPATING**

For service or information about your policy or to file a claim, contact your Indianapolis Life Agent or call 1-800-228-2812.

**IL0166**

AmerUs Group

# *Privacy Notice*

Applicable to:

| | |
|---|---|
| American Investors Life Insurance Company<br>AmerUs Life Insurance Company<br>Bankers Life Insurance Company of New York | Financial Benefit Life Insurance Co.<br>Indianapolis Life Insurance Company<br>IL Securities, Inc. |

**Your privacy is important to us.** AmerUs Group is committed to protecting your privacy and earning your trust. We respect your right to keep your personal information confidential and to avoid unwanted solicitations. **Please read this to learn how we will handle your personal information.**

### Types of Information Collected

The companies of AmerUs Group collect information about people and property to quote and service insurance policies. Some of this is called **"Nonpublic Personal Information"**, which generally means information that is provided by you, obtained by us, or that results from your transactions with us. It does not include information available to the general public. The type of information we collect varies according to the products or services you request and may include:

- **Application Information:** This is information we may receive from you on application or other forms, by phone, and online. It includes, but is not limited to, your name, address, and telephone number, social security number, date of birth, gender, and medical history.

- **Transaction Information:** This is information about your transactions with us, our affiliates, or others. It includes, but is not limited to, your policy selections and premiums, payment history, policy values, policy inception and maturity dates, agent of record, and interest credited. We may also obtain information about you from other sources when establishing your policy, such as previous policies and consumer reporting agencies. It may also include additional information used to investigate and settle claims or complaints, such as agent statements and death certificates.

- **Medical/ Non-Medical Information:** This is information we may receive from providers of information and database management services, and is used to confirm or underwrite Application Information. It includes, but is not limited to, reports of one or more medical conditions or test results reported by companies, paramedical facilities, and medical facilities or providers.

- **Web Site Information:** Whenever you visit any web site on the Internet, including ours, certain information from your computer may be captured. The information we may receive from your computer when you visit our Web sites includes the referring Web site you visited before ours, your Internet e-mail address, browser version, and statistical information on Web traffic and usage patterns. Any web sites you visit, including ours, may also store "cookies" on your computer to save user information entered while visiting our Web sites, and collect technical data, such as your Internet protocol (IP) address, operating system, and session ID.

### Parties to Whom We May Disclose Information

Nonpublic Personal Information about you and our former customers may be disclosed to others as permitted by law. Generally, this includes disclosures to third parties that are necessary to effect, administer or enforce your transaction with us, or in connection with servicing your policy. These parties may include, but are not limited to, independent contractors, insurance support organizations, insurance agents and brokers, health information management providers, third party administrators, reinsurance providers, and courts and government agencies. In accordance with the Fair Credit Reporting Act, we will not disclose information obtained from consumer reporting agencies without your consent.

We may also disclose information to people and companies that perform marketing services on our behalf or to financial institutions with whom we have joint marketing agreements. The purpose of this is to inform you of other financial products or services jointly offered, endorsed, or sponsored by us that we believe you may find useful.

### Confidentiality & Security

We restrict access to Nonpublic Personal Information about you to those employees and other parties who must use that information to provide products or services to you. Their right to further disclose and use the information is limited by our employee handbook, applicable law, and nondisclosure agreements where appropriate. We also maintain physical, electronic, and procedural safeguards in compliance with applicable laws and regulations to guard your Nonpublic Personal Information.

This Notice is for your information. No reply is necessary.

IL0167

**Indianapolis Life**
**Insurance Company**
**Administrative Office**
611 5th Avenue
Des Moines, IA 50309

Home Office
2960 North Meridian
Indianapolis, IN 46208

# INDIANAPOLIS LIFE
### An AMERUS Company

## POLICY DELIVERY RECEIPT

I acknowledge I received Policy No. B05020665 issued by Indianapolis Life Insurance Company on Rudy K Meiselman and Hope E. Meiselman.

As owner of the policy I understand:

1. This is a life insurance policy providing insurance on the above named insured.
2. I have a limited period of time to examine the policy and return it for a refund of premium (see policy cover page for details).
3. Sufficient premiums must be timely paid for the policy to remain in force. All premiums after the first are to be provided directly to the Company. Except for forwarding my initial premium made payable to the Company, the agent has no authority or responsibility to sign, endorse, deposit or process any payments made on the policy.
4. If a Conditional Life Insurance Agreement or similar document was delivered upon my payment of the first premium, its terms govern the commencement of coverage.
5. Except as stated in a document referred to in paragraph 4, I understand that coverage does not begin until the policy is delivered. The commencement of coverage is subject to all the terms and conditions set forth in the policy. I understand that the policy charges begin on the policy date shown in the policy, which is before the delivery date, and any interest, if applicable, is calculated and credited beginning on the policy date. I further understand that my policy anniversary dates and premium due dates will be calculated from the policy date.


_____
Agent/Broker's Signature

_____
Policyowner Signature

_____
Date

**Information for customers fluent in languages other than English:**

If you do not read and understand English, do not sign this form in the space provided above. Sign below and ask your agent for a Policy Delivery Receipt in your language.
Si no lee ni entiendo inglés, no firme este formulario en el espacio de arriba. Firme a continuación y pídale a su agente un Acuse de Recibo de Póliza en su idioma.

หากคุณอ่านภาษาอังกฤษไม่ออกหรือไม่เข้าใจภาษาอังกฤษ อย่าลงนามในเนื้อที่ที่จัดให้ข้างต้นในแบบฟอร์มนี้

ขอให้ลงนามที่ด้านล่าง และขอใบรับรองการส่งมอบกรมธรรม์นี้ในภาษาของคุณจากตัวแทนของคุณ

ຖ້າຫາກວ່າ ທ່ານອ່ານພາສາອັງກິດບໍ່ໄດ້ແລະບໍ່ເຂົ້າໃຈ, ຢ່າເຊັນຊື່ໃສ່ບ່ອນທີ່ຢູ່ຂ້າງເທິງໃນຟອມນີ້. ໃຫ້ເຊັນຊື່ໃສ່ບ່ອນທີ່ຢູ່ດ້ານລຸ່ມນີ້ ແລະຂໍໃຫ້ຕົວແທນຂອງທ່ານ ເອົາໃບຢັ້ງຢືນການຮັບໃນສັນຍາປະກັນໄພ ທີ່ແປເປັນພາສາຂອງທ່ານ ໃຫ້ທ່ານ.

영어를 읽고 이해하지 못하는 경우, 이 양식에서 위에 제공된 여백에 서명하지 마십시오. 아래에 서명하시고 중개인에게 귀하의 언어로 된 이 보험 증서 배달 영수증을 요청하십시오.

如果您读不懂英语, 请不要在以上提供的位置签署本件。请先在以下位置签字, 然后向您的保险代理表取中文 "保单送达回执"。

Kung hindi kayo nakakabasa o nakakaintindi ng Ingles, huwag lagdaan ang pormularyong ito sa patlang na nakatakda para dito sa itaas. Lumagda sa ibaba at humingi sa inyong ahente ng isang Policy Delivery Receipt (Resibo sa Paghahatid ng Polisa) sa inyong wika.


_____
Signature Firma ลายมือชื่อ ລາຍເຊັນ 서명 签字 Lagda


Please call your agent or Indianapolis Life Insurance Company if you have any questions.

**IL0168**

Form 3PDRPG03

Date Prepared February 5, 2004

SCHEDULE

**JOINT INSUREDS:**
RUDY K MEISELMAN                    HOPE E MEISELMAN
**RATE CLASS:**
NO TOBACCO USE                     NO TOBACCO USE


**POLICY NUMBER:** B05020665
**JOINT EQUAL AGE AT ISSUE:** 72
**POLICY DATE:** OCTOBER 9, 2003
**ISSUE DATE:** OCTOBER 9, 2003
**FACE AMOUNT:** $18,700,000
**DEATH BENEFIT OPTION:** A

**POLICY LOAN INTEREST RATE:**          7.40% PER YEAR IN ADVANCE
**POLICY LOAN CREDITED RATE:**          6.00% PER YEAR
**REINSTATEMENT INTEREST RATE:**        6.00% PER YEAR
**GUARANTEED INTEREST RATE FOR POLICY VALUES:**    POLICY YEAR 1       6.15%
                                                   POLICY YEARS 2 +    4.00% PER YEAR

THE POLICY MONTH BEGINS ON THE 9TH DAY OF THE MONTH.

**PLAN:** JOINT AND LAST SURVIVOR ADJUSTABLE LIFE

**MINIMUM FACE AMOUNT:**              $250,000.00
**MAXIMUM PREMIUM EXPENSE CHARGE:**   8% OF PREMIUMS PAID
**MAXIMUM POLICY EXPENSE CHARGE:**    $6.00 PER MONTH ALL YEARS
**MAXIMUM PER UNIT EXPENSE CHARGE:** $0.24000 PER MONTH PER $1,000 OF FACE AMOUNT YEARS 1 - 3
                                     $0.04830 PER MONTH PER $1,000 OF FACE AMOUNT YEARS 4 +

| BENEFITS AND PREMIUMS<br>BASE POLICY | AMOUNT/<br>UNITS | FORM<br>NUMBER | PAYABLE<br>TO AGE |
|---|---|---|---|
| JOINT AND LAST SURVIVOR ADJUSTABLE LIFE | $18,700,000 | ULLS-99 | 100* |
| | | | |
| **ADDITIONAL BENEFITS** (PROVIDED BY RIDER) | | | |
| DEATH BENEFIT MATURITY EXTENSION | + | E-ULDBE-98 | 100+ |

+ THE AMOUNT EXTENDED IS EQUAL TO THE DEATH BENEFIT AT AGE 100. SEE THE ENDORSEMENT FOR DETAILS.

* JOINT EQUAL AGE

**POLICY SPLIT OPTION CLASS: UNRESTRICTED**

**FIRST YEAR PREMIUM:**              $871,250.00
**PLANNED ANNUAL PREMIUM:**          $871,250.00
**TARGET PREMIUM:**                  $461,516.00
**BASIC NO-LAPSE PREMIUM:**          $26,295.58 PER MONTH, $315,546.96 PER YEAR
**BASIC NO-LAPSE GUARANTEE PERIOD:** 5 YEARS

THE PREMIUMS ABOVE INCLUDE AN EXTRA AMOUNT BECAUSE THE JOINT EQUAL AGE AT ISSUE HAS BEEN RATED.


**IL0169**

3-ULLS-99 MA                    Page 3

## SCHEDULE - CONTINUED

BENEFICIARY IS AS SHOWN IN APPLICATION UNLESS CHANGED AS PROVIDED IN THE POLICY.

### TABLE OF SURRENDER CHARGES

| BEGINNING OF POLICY YEAR | CHARGE |
|---|---|
| 1 | $559,504.00 |
| 2 | $539,921.36 |
| 3 | $514,743.68 |
| 4 | $474,459.39 |
| 5 | $439,770.14 |
| 6 | $410,116.43 |
| 7 | $384,379.25 |
| 8 | $361,439.58 |
| 9 | $340,737.94 |
| 10 | $321,714.80 |
| 11 | $303,810.67 |
| 12 | $285,906.54 |
| 13 | $268,002.42 |
| 14 | $248,419.78 |
| 15 | $227,158.62 |
| 16 | $203,099.95 |
| 17 | $176,803.26 |
| 18 | $148,268.56 |
| 19 | $118,055.34 |
| 20 | $88,961.14 |
| 21 & UP | $0.00 |

### WITHDRAWALS

AFTER THE FIRST POLICY YEAR, MAXIMUM NUMBER OF WITHDRAWALS IN A POLICY YEAR: 1

BASED ON THE GUARANTEED INTEREST RATE, THE MAXIMUM POLICY AND PREMIUM EXPENSE CHARGES, THE MAXIMUM MONTHLY COST OF INSURANCE RATES AND THE PLANNED PREMIUM, THIS POLICY WILL EXPIRE ON OCTOBER 9, 2018.

IL0170

## TABLE OF GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES

| JOINT EQUAL ATTAINED AGE | MONTHLY RATE | JOINT EQUAL ATTAINED AGE | MONTHLY RATE |
|---|---|---|---|
| 72 | 0.15092 | 86 | 11.74533 |
| 73 | 0.49500 | 87 | 13.14575 |
| 74 | 0.90883 | 88 | 14.55258 |
| 75 | 1.39408 | 89 | 15.97233 |
| 76 | 1.95008 | 90 | 17.41567 |
| 77 | 2.57258 | 91 | 18.90017 |
| 78 | 3.25408 | 92 | 20.46633 |
| 79 | 3.99700 | 93 | 22.17358 |
| 80 | 4.81333 | 94 | 24.28583 |
| 81 | 5.71583 | 95 | 27.23525 |
| 82 | 6.72292 | 96 | 31.85917 |
| 83 | 7.84633 | 97 | 39.89600 |
| 84 | 9.07350 | 98 | 54.77525 |
| 85 | 10.38192 | 99 | 83.33333 |

THE GUARANTEED MAXIMUM COST OF INSURANCE RATES ARE DERIVED FROM THE 1980 CSO SMOKER MORTALITY TABLE OR THE 1980 CSO NONSMOKER MORTALITY TABLE, AGE NEAREST BIRTHDAY, MALE/MALE, IN ACCORDANCE WITH THE INSUREDS' UNDERWRITING CLASSES.

**IL0171**

**TABLE OF PERCENTAGES**

| Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage | Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage |
|---|---|---|---|
| 40 or younger | 250% | 68 | 117% |
| 41 | 243% | 69 | 116% |
| 42 | 236% | 70 | 115% |
| 43 | 229% | 71 | 113% |
| 44 | 222% | 72 | 111% |
| 45 | 215% | 73 | 109% |
| 46 | 209% | 74 | 107% |
| 47 | 203% | 75 | 105% |
| 48 | 197% | 76 | 105% |
| 49 | 191% | 77 | 105% |
| 50 | 185% | 78 | 105% |
| 51 | 178% | 79 | 105% |
| 52 | 171% | 80 | 105% |
| 53 | 164% | 81 | 105% |
| 54 | 157% | 82 | 105% |
| 55 | 150% | 83 | 105% |
| 56 | 146% | 84 | 105% |
| 57 | 142% | 85 | 105% |
| 58 | 138% | 86 | 105% |
| 59 | 134% | 87 | 105% |
| 60 | 130% | 88 | 105% |
| 61 | 128% | 89 | 105% |
| 62 | 126% | 90 | 105% |
| 63 | 124% | 91 | 104% |
| 64 | 122% | 92 | 103% |
| 65 | 120% | 93 | 102% |
| 66 | 119% | 94 | 101% |
| 67 | 118% | 95 and higher | 100% |

**IL0172**

# INDIANAPOLIS LIFE
## INSURANCE COMPANY

*Universal Life Administrative Office*
*P.O. Box 9005*
*65 Froehlich Farm Boulevard*
*Woodbury, New York  11797-9847*
*(800) 228-2812*

IF YOU NEED ANY ASSISTANCE WITH YOUR FLEXIBLE PREMIUM ADJUSTABLE (UNIVERSAL LIFE) POLICY, PLEASE FEEL FREE TO CONTACT YOUR AGENT OR US AT:

INDIANAPOLIS LIFE INSURANCE COMPANY
UL ADMINISTRATIVE OFFICE
P.O. BOX 9005
65 FROEHLICH FARM BLVD.
WOODBURY, NY  11797-9847

1-800-228-2812

IL0173

ULNY95

# EXHIBIT B

# A Policy For:

RUDY K MEISELMAN
HOPE E MEISELMAN
B05020799
OCTOBER 9, 2003
$3,300,000.00

IL0223

# INDIANAPOLIS LIFE

An *AMERUS* Company

## INDIANAPOLIS LIFE INSURANCE COMPANY
Home Office: 2960 North Meridian Street, Indianapolis, IN 46208

## READ YOUR POLICY CAREFULLY

This Policy is a Legal Contract Between the Owner and Indianapolis Life Insurance Company

### PAYMENT AT DEATH

If the surviving Insured dies while this policy is in force, we will, subject to its provisions and upon receiving proof of death of both Insureds, pay the Death Benefit in one sum, to the Beneficiary. No Death Benefit will be paid upon the death of the first of the Insureds to Die. We may require surrender of the policy, or proof of the interest of the claimant or both.

Notification of First Death. While Death Benefit Proceeds will be payable upon the death of the second to die, we must receive proof of the death of both Insureds before payment will be made. Therefore, it is important that due proof of the first death be furnished to the Company at the time of such death.

### DEATH BENEFIT

Option A. When the Death Benefit Includes the Cash Value (see Schedule)
The Death Benefit is the larger of the following amounts, computed as of the date of death of the survivor:
1. The Face Amount, or
2. The Cash Value on the date of the surviving Insured's death multiplied by the applicable percentage shown in the Table of Percentages on Page 6.

Option B. When the Death Benefit Is In Addition To the Cash Value (see Schedule)
The Death Benefit is the larger of the following amounts, computed as of the date of death of the survivor:
1. The Face Amount plus the Cash Value, or
2. The Cash Value on the date of the surviving Insured's death multiplied by the applicable percentage shown in the Table of Percentages.

Any withdrawals, policy loans and changes in the Face Amount will change the Death Benefit as described in the provisions of this policy.
The Death Benefit provision does not apply if this policy has lapsed and has not been reinstated before the death of the last survivor.

### TWENTY DAY RIGHT TO RETURN THIS POLICY

If the Owner is not satisfied with this policy, it may be returned to us or our agent within 20 days after receiving it. We will refund any premiums paid and the policy will then be considered as never having been issued.

Signed for us at our Home Office on the Issue Date.

*James A. Smullenberger*

Secretary

*Gary R McPhail*

President

**JOINT AND LAST SURVIVOR ADJUSTABLE LIFE INSURANCE POLICY**
**FLEXIBLE PREMIUMS ARE PAYABLE FOR LIFE OF SURVIVOR TO JOINT AGE SHOWN IN SCHEDULE**
**BENEFITS ARE ADJUSTABLE AND PAYABLE AT DEATH OF LAST SURVIVOR**
**NON-PARTICIPATING**

## TABLE OF CONTENTS

| | Page |
|---|---|
| ASSIGNMENT | 7 |
| BASIS OF COMPUTATION | 7 |
| BENEFICIARY | 14 |
| CASH VALUE | 9 |
| CLAIMS OF CREDITORS | 11 |
| COST OF INSURANCE | 10 |
| FACE AMOUNT (HOW TO CHANGE) | 13 |
| GRACE PERIOD | 10 |
| INCONTESTABILITY | 8 |
| INTEREST | 9 |
| LOANS | 11 |
| MISSTATEMENT OF AGE OR SEX | 12 |
| MONTHLY DEDUCTION | 9 |
| NO-LAPSE GUARANTEE | 11 |
| OWNERSHIP | 8 |
| PAID-UP LIFE INSURANCE | 12 |
| PAYMENT PLANS | 7 |
| POLICY | 15, 16, 17 & 18 |
| POLICY SPLIT OPTION | 7 |
| PREMIUMS | 13 |
| REPORTS | 7 |
| REINSTATEMENT | 14 |
| SCHEDULE | 8 |
| SUICIDE | 3 & 4 |
| SURRENDER | 9 |
| TABLE OF PERCENTAGES | 11 |
| WITHDRAWAL | 6 |

## DEFINITIONS

We, us, our .................................... Indianapolis Life Insurance Company.

You, your .................................... The persons named as Insureds on the Schedule.

Policy Date .................................... The date from which policy months, years, anniversaries and premium payments are determined.

Issue Date .................................... The date from which the two year contestable period and two year suicide period of this policy are measured.

Policy Loan .................................... Any unpaid policy loan and interest.

Joint Equal Age .................................... Joint Equal Age at the Policy Date is the age on which premiums, values and reserves are based. It is the nearest joint equal age which is actuarially equivalent to the ages of both Insureds. The joint equal attained age is the Joint Equal Age at the Policy Date plus the number of whole policy years which have elapsed since the Policy Date.

Cash Value .................................... See Page 11.

Surrender Value .................................... The cash value, less any surrender charge and less any outstanding policy loan.

Benefits .................................... Any money due a payee under any provision or rider.

Planned Premium .................................... The renewal premium(s) specified in the application.

Payee .................................... The Owner, if an Insured is living, otherwise the Beneficiary.

Target Premium .................................... Amount used as a basis in determining premium expense charges for your policy.

IL0225

## SCHEDULE

**JOINT INSUREDS:**
RUDY K MEISELMAN                    HOPE E MEISELMAN
**RATE CLASS:**
NO TOBACCO USE                      NO TOBACCO USE

**POLICY NUMBER:** B05020799
**JOINT EQUAL AGE AT ISSUE:** 71
**POLICY DATE:** OCTOBER 9, 2003
**ISSUE DATE:** OCTOBER 9, 2003
**FACE AMOUNT:** $3,300,000
**DEATH BENEFIT OPTION:** A

**POLICY LOAN INTEREST RATE:**      7.40% PER YEAR IN ADVANCE
**POLICY LOAN CREDITED RATE:**      6.00% PER YEAR
**REINSTATEMENT INTEREST RATE:**    6.00% PER YEAR
**GUARANTEED INTEREST RATE FOR POLICY VALUES:**      POLICY YEAR 1       6.15%
                                                     POLICY YEARS 2+     4.00% PER YEAR

THE POLICY MONTH BEGINS ON THE 9TH DAY OF THE MONTH.

**PLAN:** JOINT AND LAST SURVIVOR ADJUSTABLE LIFE

**MINIMUM FACE AMOUNT:**                $250,000.00
**MAXIMUM PREMIUM EXPENSE CHARGE:**     8% OF PREMIUMS PAID
**MAXIMUM POLICY EXPENSE CHARGE:**      $6.00 PER MONTH ALL YEARS
**MAXIMUM PER UNIT EXPENSE CHARGE:** $0.26750 PER MONTH PER 1,000 OF FACE AMOUNT YEARS 1 - 3
                                     $0.05080 PER MONTH PER 1,000 OF FACE AMOUNT YEARS 4+

| BENEFITS AND PREMIUMS | AMOUNT/ | FORM | PAYABLE |
|---|---|---|---|
| BASE POLICY | UNITS | NUMBER | TO AGE |
| JOINT AND LAST SURVIVOR ADJUSTABLE LIFE | $3,300,000 | ULLS-99 | 100* |

**ADDITIONAL BENEFITS** (PROVIDED BY RIDER)

| | | | |
|---|---|---|---|
| DEATH BENEFIT MATURITY EXTENSION | + | E-ULDBE-98 | 100+ |

+ THE AMOUNT EXTENDED IS EQUAL TO THE DEATH BENEFIT AT AGE 100. SEE THE ENDORSEMENT FOR DETAILS.

* JOINT EQUAL AGE

**POLICY SPLIT OPTION CLASS:** UNRESTRICTED

**FIRST YEAR PREMIUM:**             $153,750.00
**PLANNED ANNUAL PREMIUM:**         $153,750.00
**TARGET PREMIUM:**                 $75,009.00
**BASIC NO-LAPSE PREMIUM:**         $4,310.25 PER MONTH,   $51,723.00 PER YEAR
**BASIC NO-LAPSE GUARANTEE PERIOD:** 5 YEARS

3-ULLS-99 MA                     Page 3                          **IL0226**

## SCHEDULE - CONTINUED

BENEFICIARY IS AS SHOWN IN APPLICATION UNLESS CHANGED AS PROVIDED IN THE POLICY.

### TABLE OF SURRENDER CHARGES

| BEGINNING OF POLICY YEAR | CHARGE |
|:---:|:---:|
| 1 | $96,294.00 |
| 2 | $92,923.71 |
| 3 | $88,590.48 |
| 4 | $81,657.31 |
| 5 | $75,687.08 |
| 6 | $70,583.50 |
| 7 | $66,153.98 |
| 8 | $62,205.92 |
| 9 | $58,643.05 |
| 10 | $55,369.05 |
| 11 | $52,287.64 |
| 12 | $49,206.23 |
| 13 | $46,124.83 |
| 14 | $42,754.54 |
| 15 | $39,095.36 |
| 16 | $34,954.72 |
| 17 | $30,428.90 |
| 18 | $25,517.91 |
| 19 | $20,318.03 |
| 20 | $15,310.75 |
| 21 & UP | $0.00 |

### WITHDRAWALS

AFTER THE FIRST POLICY YEAR, MAXIMUM NUMBER OF WITHDRAWALS IN A POLICY YEAR:  1

BASED ON THE GUARANTEED INTEREST RATE, THE MAXIMUM POLICY AND PREMIUM EXPENSE CHARGES, THE MAXIMUM MONTHLY COST OF INSURANCE RATES AND THE PLANNED PREMIUM, THIS POLICY WILL EXPIRE ON OCTOBER 9, 2020.

**IL0227**

## TABLE OF GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES

| JOINT EQUAL ATTAINED AGE | MONTHLY RATE | JOINT EQUAL ATTAINED AGE | MONTHLY RATE |
|---|---|---|---|
| 71 | 0.12233 | 86 | 11.82583 |
| 72 | 0.40150 | 87 | 13.21417 |
| 73 | 0.74050 | 88 | 14.60975 |
| 74 | 1.14775 | 89 | 16.01925 |
| 75 | 1.62383 | 90 | 17.45367 |
| 76 | 2.16842 | 91 | 18.93033 |
| 77 | 2.77767 | 92 | 20.49000 |
| 78 | 3.44458 | 93 | 22.19183 |
| 79 | 4.17233 | 94 | 24.29958 |
| 80 | 4.97383 | 95 | 27.24542 |
| 81 | 5.86208 | 96 | 31.86642 |
| 82 | 6.85542 | 97 | 39.90058 |
| 83 | 7.96550 | 98 | 54.77742 |
| 84 | 9.17958 | 99 | 83.33333 |
| 85 | 10.47500 | | |

THE GUARANTEED MAXIMUM COST OF INSURANCE RATES ARE DERIVED FROM THE 1980 CSO SMOKER MORTALITY TABLE OR THE 1980 CSO NONSMOKER MORTALITY TABLE, AGE NEAREST BIRTHDAY, MALE/MALE, IN ACCORDANCE WITH THE INSUREDS' UNDERWRITING CLASSES.

## TABLE OF PERCENTAGES

| Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage | Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage |
|---|---|---|---|
| 40 or younger | 250% | 68 | 117% |
| 41 | 243% | 69 | 116% |
| 42 | 236% | 70 | 115% |
| 43 | 229% | 71 | 113% |
| 44 | 222% | 72 | 111% |
| 45 | 215% | 73 | 109% |
| 46 | 209% | 74 | 107% |
| 47 | 203% | 75 | 105% |
| 48 | 197% | 76 | 105% |
| 49 | 191% | 77 | 105% |
| 50 | 185% | 78 | 105% |
| 51 | 178% | 79 | 105% |
| 52 | 171% | 80 | 105% |
| 53 | 164% | 81 | 105% |
| 54 | 157% | 82 | 105% |
| 55 | 150% | 83 | 105% |
| 56 | 146% | 84 | 105% |
| 57 | 142% | 85 | 105% |
| 58 | 138% | 86 | 105% |
| 59 | 134% | 87 | 105% |
| 60 | 130% | 88 | 105% |
| 61 | 128% | 89 | 105% |
| 62 | 126% | 90 | 105% |
| 63 | 124% | 91 | 104% |
| 64 | 122% | 92 | 103% |
| 65 | 120% | 93 | 102% |
| 66 | 119% | 94 | 101% |
| 67 | 118% | 95 and higher | 100% |

6-ULLS-99

**IL0229**

## NO DIVIDENDS UNDER THIS POLICY

This policy does not share in our earnings. No dividends are payable. Any adjustment in cost factors such as: investment earnings, mortality, persistency and expenses cannot distribute past gains or recoup past losses. Adjustments will be based on future expectations.

## GENERAL PROVISIONS

**YOUR POLICY**

We issued this policy based on the information given us in the application and the payment of the first premium. The entire contract consists of this policy, any attached riders, the attached application, any attached applications for increases and/or any applications for reinstatements. All statements made in such applications will be considered representations and not warranties. This policy complies with the laws of the state where the policy is delivered.

## WHO HAS AUTHORITY TO CHANGE THIS POLICY

Provisions of this policy may only be changed by a written agreement signed by a Company Officer. No agent can change or waive this policy's provision in any way.

## WHO OWNS AND CONTROLS YOUR POLICY

The Insureds are the Owners of this policy unless otherwise specified in the application or later changed. During the lifetime of the survivor, the rights and privileges of this policy may be exercised only by the Owner, unless the policy is assigned.

If this policy is jointly owned, any policy transaction will require the signatures of all owners unless otherwise stated in writing on a form satisfactory to the Company. Unless otherwise provided, upon the death of a joint owner, his or her interest shall vest in the surviving owners in equal shares and upon the death of the last surviving owner, ownership shall vest in his or her estate.

## TRANSFER OF OWNERSHIP

The Owner may transfer the Ownership of this policy on forms provided by us. The written evidence of transfer must be recorded by us. The transfer will then be effective as of the date it was signed. We may require the return of the policy for endorsement. The transfer is subject to any payment made or other action taken by us before we received written request from the Owner. The Owner may also name a Contingent Owner in the same manner. Upon the death of the Owner, the Contingent Owner assumes all rights previously held by the Owner. A transfer of ownership will not of itself change the interest of any beneficiary.

## ASSIGNMENT

By written request the Owner may assign this policy. We assume no responsibility for the validity or effect of any assignment. We will not be bound by an assignment until it is recorded by us. The rights of an assignee come before those of anyone else except any prior irrevocable beneficiary, prior assignee, or to the Company to the extent of any policy loan.

## PREMIUMS

The first premium is due on or before the Policy Date. All planned premiums after the first are payable to us directly.

Planned premiums for this policy, and any riders attached to it can be paid until the applicable policy anniversary nearest the age shown under "Payable to Age" in the Schedule, or until the death of the surviving Insured. Planned premiums may be paid annually, or at such other intervals as we permit.

Additional premiums can be paid at any time until the applicable policy anniversary nearest the joint equal age shown under "Payable to Age" in the Schedule, or until the death of the surviving Insured. Additional premiums are premiums which are other than planned premiums.

We may require evidence satisfying us of your insurability before we will accept any additional premiums or allow an increase in the planned premiums.

**IL0230**

**PREMIUMS (continued)**

The planned premium does not guarantee that this policy will continue in force to the policy anniversary nearest the joint equal attained age of 100. If the Face Amount is changed, or a policy loan or partial withdrawal is made, or if we adjust the interest, Cost of Insurance rates and/or Expense Charge factors from those we assume on the issue date, coverage may expire before joint equal attained age 100 unless additional premiums are paid.

Total premiums paid in any policy year may not exceed the Maximum Premium Limit for a policy year. The Maximum Premium Limit for a policy year is the largest amount of premium which can be paid in that policy year such that the sum of the premiums paid under the policy will not at any time exceed the Guideline Premium Limitation referred to in the Internal Revenue Code. The Maximum Premium Limit for the following policy year will be shown on the Annual Report sent to the Owner.

The minimum payment we will accept is $25.00.

**GRACE PERIOD**

A grace period of 61 days is provided under this policy. Except as provided in the No-Lapse Guarantee Provision below, this policy and any attached riders will enter the grace period if the Surrender Value at the beginning of a policy month is not enough to cover the monthly deduction. Written notice of the premium required to continue this policy in force will be mailed to the Owner's last known address, and to that of any assignee of record, at least 15 days but not more than 45 days before the date the policy will end. If such premium is not sent to us before the end of the grace period, this policy will end without value. If you die during the grace period, the smaller of the no lapse premium due or Monthly Deduction owed will be deducted from the benefits payable.

**NO-LAPSE GUARANTEE**

This policy contains a no-lapse guarantee. There is a Basic No-Lapse Guarantee Period of five years.

During the no-lapse guarantee period, this policy will not enter the grace period if the Surrender Value is not sufficient to cover the monthly deduction provided:
1. There are no outstanding policy loans; and
2. The policy satisfies the No-Lapse Premium Test.

The No-Lapse Premium Test will be performed at the beginning of any policy month that your policy would have entered the grace period for insufficient Surrender Value. Your policy will satisfy the Basic No-Lapse Premium Test if the sum of the premiums paid since the Policy Date less the total withdrawals taken since the Policy Date equals or exceeds the sum of the monthly Basic No-Lapse Premiums due since the Policy Date.

The monthly Basic No-Lapse Premiums are shown in the Schedule. These premiums will change at the time of any of the following events:
1. You change the death benefit option; or
2. You add, delete, or change a rider; or
3. You change the Face Amount.

We will inform you of any change to the no-lapse premium(s) resulting from any such change. The revised premium(s) will be effective from the date of the change. The no-lapse guarantee period will not be adjusted from that shown in the Schedule.

**REINSTATEMENT**

This policy may be reinstated within five years after the end of the grace period if it was not previously surrendered. We will reinstate only if we get evidence satisfying us of the insurability of both Insureds, or of one Insured, if that Insured was living on the due date of the unpaid premium, and the cost of reinstatement.

**REINSTATEMENT (continued)**
The cost to reinstate is equal to the sum of:

1. A premium covering the following costs increased by premium expense charges: a. An amount large enough to keep the policy in force for at least three months beyond the date of reinstatement; b. Any negative Surrender Value at the time of lapse.
2. A charge equal to the interest on item 1. b. above at the reinstatement interest rate shown in the Schedule.

However, if reinstatement occurs within five years from the Policy Date, the cost to reinstate will be the smaller of the sum of 1. and 2. above, or the sum of 3. and 4. below:

3. A premium covering the following: a. The sum of all monthly Basic No-Lapse Premiums as shown in the Schedule during the time of lapse; and b. Three additional monthly Basic No-Lapse Premiums.
4. A charge equal to the interest on item 3. a. above at the reinstatement interest rate shown in the Schedule.

If the cost of reinstatement paid is equal to the sum of 1. and 2. above, then the Basic No-Lapse Premium Test will not be satisfied at reinstatement and your policy will stay in force only as long as the Surrender Value is large enough to cover the monthly deduction. If the cost of reinstatement paid is equal to the sum of 3. and 4. above, the Basic No-Lapse Premium Test will be satisfied at reinstatement. The Basic No-Lapse Premium Test will apply for five years from the original Policy Date.

At reinstatement, the applicable Surrender Charge will be that charge that had been in effect at the time of lapse. The Surrender Charge will reduce monthly, reaching zero after the policy has been in force for twenty years (not including the time the policy lapsed). The effective date of the reinstatement will be the date we approve it.

**SUICIDE**
If either Insured commits suicide within two years after the Issue Date of this policy, the policy will terminate, and we will limit our payment to the amount of premiums paid less withdrawals and less any amount owed us on this policy. If either Insured commits suicide within two years after the effective date of an increase in the Face Amount, for which proof of insurability was required, we will limit our payment to a refund in the increase in the Cost of Insurance attributable to the increase in the face amount.

**INCONTESTABILITY**
This policy has a two year contestable period based upon statements made in the application. We cannot claim your policy is void or deny payment of any benefits after the policy has been inforce during the lifetime of each Insured for two years from its Issue Date. We cannot deny payment of any increase in the Face Amount, for which proof of insurability was required, or a reinstatement after such increase or reinstatement has been in force during the lifetime of each Insured for two years from the effective date. This provision does not apply to the determination of eligibility for any waiver of monthly deduction benefit.

**MISSTATEMENT OF YOUR AGE OR SEX**
If the age or sex of either Insured has been misstated, the Face Amount will be adjusted. The Face Amount shall be that which would be purchased by the most recent Cost of Insurance based on the correct age or sex.

**SIMULTANEOUS DEATH OF INSUREDS**
Unless otherwise provided, if payment of death proceeds requires a determination of the order of death of the Insureds, and we are unable to determine which Insured died first, we will assume the Insureds died simultaneously. In such case, we will pay one-half the proceeds with respect to the beneficiary designation under each presumption.

**SUCCESSION IN INTEREST OF BENEFICIARIES AND PAYEES**
The beneficiary at the death of the surviving Insured will be stated in the designation then in effect. Unless otherwise provided, the proceeds will be payable in equal shares to the primary beneficiaries who survive the second Insured to die. The unpaid share of any primary payee who dies while receiving payment will be payable in equal shares to the other primary payees who survive the second Insured to die. Unless otherwise provided, at the death of the last surviving primary beneficiary, the proceeds will be payable in equal shares to the contingent beneficiaries who survive the second Insured to die. The unpaid share of any contingent payee who dies while receiving payment will be payable in equal shares to the other contingent payees who survive.

**SUCCESSION IN INTEREST OF BENEFICIARIES AND PAYEES (continued)**

Unless otherwise provided, at the death of the last to survive of the primary and contingent beneficiaries, the proceeds will be payable in equal shares to the further payees who survive the second Insured to die. If there are no surviving beneficiaries, then the proceeds shall be paid to the Owner or his or her estate. Unless otherwise provided, if any beneficiary dies within 15 days after the surviving Insured, but before due proof of the death of the surviving Insured has been received by us, then payment of the proceeds shall be made as if such beneficiary had died before the second Insured to die.

**DESIGNATION AND CHANGE OF BENEFICIARY**

The designation of beneficiary in the application shall remain in effect until changed by the Owner. By written request the Owner may change any revocable Beneficiary at any time during the lifetime of either Insured. The change will take effect as of the date such request is signed. We will not be liable for any payment made or any action taken before we record the request. The Owner, to the extent he or she is a primary beneficiary, may change the beneficiary within 60 days after the death of the second Insured.

**BENEFICIARY FORM AND EFFECTIVE DATE**

Any change made by the Owner must be in writing and in a form satisfactory to us. Such change will become effective when it is recorded by us. Upon such recording, it will then relate back to the date the Owner signed the change, whether or not you were living on the date of recording. Any change is subject to the rights of any irrevocable beneficiary or assignee of record with us. Any change is subject to any action or payment made by us before recording.

**CLAIMS OF CREDITORS**

To the extent allowed by law, benefits will be exempt from claims of creditors.

### HOW TO CHANGE THE DEATH BENEFIT OPTION

If Option A is in effect, the Owner can apply for a change to Option B. The Owner will have to send the following to us for each Insured alive on the date of request:

1. A completed supplementary application; and
2. Evidence satisfying us of the insurability of each Insured.

If the Death Benefit is changed from Option A to Option B, the Face Amount will be decreased by the amount of the cash value. The decrease will be applied as described in the "How To Change The Face Amount" provision of the policy. If the Face Amount after the change would be less than the Minimum Face Amount shown in the Schedule, the change will not be allowed. Option B will become effective on the beginning of the policy month after the date we approve the change.

If Option B is in effect, the Owner can apply for a change to Option A by sending us a written request. If the Death Benefit Option is changed from Option B to Option A, the Face Amount will be increased by the amount of the cash value. Option A will become effective on the beginning of the policy month after we approve the change.

We will amend the policy when there is a change in the Death Benefit Option after the change becomes effective.

### HOW TO CHANGE THE FACE AMOUNT

The face amount may not be changed in the first policy year. After the first policy year, the Owner can decrease the Face Amount by sending us a written request. The decrease will be applied as follows:

1. First to the initial Face Amount; then
2. To the Face Amount provided by increases, in order of those increases; then
3. To the Face Amount provided by the most recent increase.

In any event, the Face Amount can never be less than the Minimum Face Amount shown in the Schedule.

Your Surrender Charges will not change due to a Face Amount decrease.

**IL0233**

**HOW TO CHANGE THE FACE AMOUNT (continued)**

After the first policy year, the Owner can apply for an increase in the Face Amount. The Owner will have to send the following to us for each Insured alive on the date of the request:

1. A completed supplementary application; and
2. Evidence satisfying us of the insurability of each Insured; and
3. The monthly Basic No-Lapse Premium applicable to the increase for any increases made during the first five policy years.

The change will become effective on the beginning of the policy month after we approve it. We will amend the policy when there is a change in the Face Amount after it becomes effective.

Surrender Charges will increase by an amount dependent upon attained age, sex, and the Face Amount of the increase.

## POLICY VALUES

**CASH VALUE**

The Cash Value at the beginning of a policy month is:

1. The Cash Value at the beginning of the prior policy month; plus
2. One month's interest on (1); plus
3. Net premiums received since the beginning of the prior policy month; plus
4. Interest on (3) from the date of receipt; less
5. The monthly deduction for the current policy month; less
6. Any withdrawal then being made.

The Cash Value at any time other than at the beginning of a policy month will be calculated in a consistent manner. The Cash Value on the policy date is equal to the net premium paid less the monthly deduction for the first policy month.

**NET PREMIUM**

The net premium is the premium paid less the premium expense charge shown in the Schedule.

**INTEREST**

The guaranteed interest rate applicable to the calculation of the Cash Values is shown in the Schedule. After the first policy year, we may credit interest in excess of the guaranteed rate. Such interest will be determined at least annually. It will be credited by class based on the future expectations as per procedures filed with the insurance department of the state in which this policy was issued. However, the interest rate for the amount of Cash Value equal to any outstanding policy loan will be the Policy Loan Credited Rate shown in the Schedule.

**MONTHLY DEDUCTION**

Each monthly deduction consists of:

1. The Cost of Insurance; plus
2. The cost of additional benefits provided by rider; plus
3. Any applicable policy expense charge and per unit expense charge shown in the Schedule.

## SURRENDER

The Owner may turn this policy in for its Surrender Value. It can be returned at any time while either Insured is alive. We must receive this policy and a written request for the Surrender Value. When we pay the Owner the Surrender Value, this policy will be canceled. The surrender will be effective as of the date we receive the written request in our office.

If this policy is surrendered within 30 days after a policy anniversary, the amount we pay will not be less than the Surrender Value as of that anniversary, less policy loans and withdrawals made on or after that anniversary.

**SURRENDER CHARGE**

We will deduct a Surrender Charge from the Cash Value when this policy terminates during the lifetime of either Insured. If the policy is surrendered, the Surrender Charge is the applicable charge as shown in the TABLE OF SURRENDER CHARGES, except as provided for in the Reinstatement provision.

The TABLE OF SURRENDER CHARGES will change if:

1. Benefits are increased, or
2. A partial withdrawal is made.

## WITHDRAWAL

The Owner may request, in writing, to withdraw part of the Surrender Value. The withdrawal must take place at the beginning of a policy month while either Insured is alive. The amount of the withdrawal must be less than the current Surrender Value. A withdrawal charge will be deducted from the amount withdrawn. We can limit the number of withdrawals made in a policy year.

## WITHDRAWAL CHARGE

The withdrawal charge is the sum of:

1. The Surrender Charge multiplied by the ratio of the amount withdrawn to the Surrender Value; plus
2. 5% of the amount withdrawn but no greater than $25.

When the Owner withdraws part of the Surrender Value, we will reduce the Cash Value, the Death Benefit and the Face Amount by the amount withdrawn. Future Surrender Charges in effect as of the date of withdrawal will be calculated by multiplying the Surrender Charges in effect prior to withdrawal by one minus the ratio described in item one above.

The reduction in the Face Amount due to a withdrawal will apply:

1. First to the initial Face Amount due to a withdrawal; then
2. To the Face Amount provided in increases, in order of those increases; then
3. To the Face Amount provided by the most recent increase.

We will not permit a withdrawal:

1. During the first policy year; or
2. If the withdrawal will result in a reduction of the Face Amount to less than the Minimum Face Amount shown in the Schedule.

If the Death Benefit Option B is in effect when the Owner withdraws part of the Surrender Value, we will reduce the Cash Value and the Death Benefit by the amount withdrawn but the Face Amount will not be reduced.

## PAID-UP LIFE INSURANCE

At any time while the policy is in force, the Owner may elect to continue the policy as paid-up life insurance, possibly for a reduced amount, uniform throughout the lifetime of either Insured.

The amount of paid-up life insurance will be the smaller of the Death Benefit on the anniversary and a level amount that will be based on: i) The Surrender Value then in effect; ii) Joint equal attained age; and iii) The single premium rates based on the 1980 Commissioners Standard Ordinary Mortality Table, age nearest birthday, and 4.0% annual interest.

Any excess of the Surrender Value over the single premium required for the paid-up life insurance benefit will be paid to the Owner of the policy. The Owner may surrender the paid-up life insurance for its Surrender Value at any time. If it is surrendered within 30 days after a policy anniversary, we'll pay the Surrender Value as of that anniversary. The Surrender Value of paid-up life insurance equals its net single premium based on the joint equal attained age at the time of surrender.

## POLICY LOANS

By written request, the Owner may borrow the Surrender Value less the total of the monthly deduction to the next policy anniversary while this policy is in force. The policy is the sole security for the cash loan.

When we make a loan, we will deduct from the Surrender Value, interest to the next policy anniversary. Except as provided below, a loan secured by this policy will be charged interest at the rate of 7.4% in advance (equivalent to 8.0% in arrears) per year payable on each policy anniversary. Unpaid interest will be added to the loan and charged the same rate of interest as the loan.

The owner will be eligible for a loan at an interest rate of 5.66% in advance (equivalent to 6.0% in arrears) per year subject to the following conditions and requirements:

1. The 5.66% loan is available during the eligibility period. The eligibility period begins with the tenth policy anniversary and continues as long as the policy remains in force.

## POLICY LOANS (continued)

2. The Maximum amount which may be loaned during any one policy year at an interest rate of 5.66% per year may not exceed 10% of the largest Surrender Value at the end of any preceding policy year during the eligibility period. If such maximum amount is not loaned during a policy year, the balance may not be carried over to later policy years.

3. Amounts loaned in excess of amounts permitted at an interest rate of 5.66% per year during any one policy year will be charged interest at the rate of 7.4% per year.

Any outstanding loan may be repaid while you are living.

Whenever the loan exceeds the Cash Value less the Surrender Charge, we will mail a written notice to the Owner's last known address and to that of any assignee of record. The excess amount must be paid within 31 days from the date of our notice or this policy will then end.

## POLICY COST FACTORS

Adjustments in policy cost factors (interest, Cost of Insurance charges, expense charges) will be by class and based on changes in future expectations for such elements as to investment earnings, mortality, persistency and expenses.

Any change in policy cost factors will be based on procedures and standards on file with the Insurance Department.

We will review policy cost factors whenever they are changed for newly issued policies, but no less frequently than once every five years. Each policy cost factor is subject to adjustment.

## COST OF INSURANCE

The Cost of Insurance is calculated at the beginning of each policy month. To calculate it:

1. Calculate the Net Amount At Risk:
   a. Divide the Death Benefit by one plus the monthly equivalent of the annual guaranteed interest rate (.32737%); then
   b. Subtract the Cash Value; then
2. Divide the Net Amount At Risk by 1,000; then
3. Multiply the result of (2) by the appropriate Cost of Insurance rate(s).

If the Face Amount has increased, the Cash Value is allocated first to the initial Face Amount. If the Cash Value is greater than the initial Face Amount, the Cash Value in excess of the initial Face Amount will be allocated to the increases in Face Amount in the order of such increases.

The Cost of Insurance rate is based on joint equal issue age, duration and rate class for the Face Amount provided by the original application and each increase in Face Amount. If the Death Benefit is the Cash Value multiplied by the applicable percentage, the rate class(es) will be applied as follows:

1. The most recent rate class will apply to an amount up to the Death Benefit less the Face Amount in force prior to the last increase in which the rate class was changed.
2. The next most recent rate class(es), successively, will apply to any remaining amount up to the Face Amount to which that rate class(es) applies.

We can change the Cost of Insurance rates from time to time. Any change will be based upon the expectations of future experience. In any event, the rates will never be more than those shown on Page 5. A change in rates will apply to all policies issued in the same state to Insureds of the same joint equal age and rate class and whose policies have been in force for the same number of years.

## SPECIAL PROVISIONS

**DEFERMENT**

Except for payment of premium, we may defer payment of any withdrawals, surrenders or loans for the period permitted by law, not to exceed six months after written request is received by us.

**IL0236**

## BASIS OF COMPUTATION

We have filed a statement of the method of determining policy values with the Insurance Department of the state in which this policy is issued. Such values are equal to or greater than those required by law in that state.

We have used certain mortality table(s) and interest rate(s) in determining the guaranteed values for this policy. These mortality table(s) and interest rate(s) are shown in the Schedule.

## INITIAL AND ANNUAL REPORTS

We will deliver at issue, and mail to the Owner at least once each year, a statement containing such information as required by the Insurance Department of the state in which this policy was issued.

## POLICY SPLIT OPTION

At any time while this policy is in force, it may be exchanged for two individual policies covering the Insureds separately within 180 days after the effective date of one of the following events:

1. A final divorce, dissolution or annulment decree with respect to the marriage of the Insureds has been issued while this policy was in force.
2. A change in the Federal Estate Tax Law which results in:
    a. a reduction of the Unlimited Marital Deduction to 75% or less of the value of the estate; or
    b. a reduction of the Federal Unified Credit to 75% or less of the amount in effect at the IssueDate; or
    c. a reduction in the Federal Estate Tax rate to 75% or less of the rate in effect at the Issue Date.

The option may be exercised subject to the following:

1. The amount of coverage under each new policy will be 50% of an amount equal to:
    a. The Death Benefit Amount in effect on the effective date of exchange; less
    b. The amount of any policy loan.
2. After repayment of any loan against the Surrender Value of this policy, 50% of any remaining Surrender Value will be transferred to each of the new policies;
3. The "Policy Split Option Class" is shown on page 3 and indicates whether or not evidence of insurability will be required for an exchange due to a change in the Federal Estate Tax law; "Restricted" means evidence of insurability will be required; "Unrestricted" means evidence of insurability will not be required;
4. The new policies will be issued on any flexible premium adjustable life or level premium whole life plan regularly issued by the Company on the date of exchange;
5. The new policies will be issued as of the date of exchange at the then attained age of each Insured;
6. The new policies will be issued at the risk class of each Insured on the Policy Date of this policy unless evidence of insurability is required;
7. The plan of insurance selected will be subject to our standard minimum amount requirement for such plan;
8. The inclusion of any optional benefits will be subject to our rules on the date of exchange and evidence of insurability satisfactory to us;
9. If monthly deductions for this policy are being waived in accordance with a waiver of monthly deduction rider, premiums for the new polices will not be waived and we will not include a waiver benefit in the new policies;
10. To apply for an exchange, the Owner must submit:
    a. Applications for the new policies; and
    b. Payment of the first premium for each new policy; and
    c. This policy for cancellation.

**IL0237**

**POLICY SPLIT OPTION (continued)**

11. The Suicide Exclusion and Incontestability provision of the new policies will continue to run from the Issue Date of this policy to the extent of the coverage being exchanged without evidence of insurability. New Suicide Exclusion and Incontestability periods will apply to any amount of coverage or addition of benefits requiring evidence of insurability.

This policy will terminate on the Issue Date of the new policies.

## HOW WE PAY POLICY BENEFITS

### PAYMENT
Death benefits or surrender benefits will be paid in one (1) lump sum or, if at least $2,000, under a selected settlement option.

### SELECTION
The Owner has the sole right to select a settlement option during the lifetime of either Insured. If, immediately prior to the death of the surviving Insured, the Owner was not the Insured, and the Owner is a primary beneficiary, then within sixty (60) days after the death of the surviving Insured, the Owner may revoke any existing settlement option and make a final election. This election will only apply to the extent of the Owner's interest. Within one (1) year after the death of the surviving Insured, if the proceeds are payable in a lump sum or under Option 4 or 5 without restriction on withdrawal, the beneficiary may elect any option. Except as allowed by the Payments to a Corporation Provision, the options are not available without our consent to any assignee or beneficiary which is not a natural person.

### PAYMENTS TO A CORPORATION
The proceeds of this policy may be paid to a corporation under any of the options with the following limitations:
   a. Option 4 may be selected for a period of not more than ten (10) years. At the end of the period, we will pay the amount in a lump sum.
   b. Options 2, 3, or 6 may be selected only if payments are payable during the lifetime of either Insured or the Insured's spouse or any child of the Insured. With our consent, they may be payable during the lifetime of anyone related to an Insured by blood or marriage.
   c. Payments under Options 1 or 5 may not extend beyond twenty (20) years.

### OPTIONS
**Option 1.** **Fixed Period** - We will pay the proceeds in equal monthly payments for the number of years the Owner selects from one (1) to thirty (30) years. The monthly payments for each $1,000 applied will not be less than those shown in Table A. The minimum guaranteed interest rate is two and a half percent (2.5%) per year. Payments may be commuted. Another option may not be selected once payments begin under this option.

**Option 2.** **Life Income with Installments Certain** - We will pay the proceeds in equal monthly installments for a period certain and thereafter during the remaining lifetime of the payee. The period certain may be 0, 5, 10, 15, or 20 years or until the total of installments equals a refund of the proceeds applied under the option. The guaranteed monthly payments for each $1,000 applied are shown in Table B. The guaranteed payments are calculated based on Annuity 2000 Mortality Table with a generational mortality projection of Scale G, and an annual interest rate of two and a half percent (2.5%). Payments may not be commuted. Another option may not be selected once payments begin under this option.

**Option 3.** **Annuity Settlement** - We will pay the proceeds in the form of a monthly annuity as agreed upon by the Owner, or the beneficiary, and us. Payments may not be commuted if the form of annuity settlement involves life contingencies. Another option may not be selected once payments begin under this option.

**Option 4.** **Proceeds at Interest** - We will hold the proceeds for the payee's lifetime. We will pay interest at the rate of at least two and a half percent (2.5%) per year. The proceeds may be withdrawn at any time or another option may be selected.

**Option 5.** **Installments of Fixed Amounts** - We will pay the proceeds in equal monthly installments until they are fully paid. The proceeds will be credited with annual interest at a rate of at least two and a half percent (2.5%) per year. Payments may be commuted. Another option may not be selected once payments begin under this option.

**IL0238**

**Option 6.   Joint and Survivor Life Income with Installments Certain -** We will pay the proceeds in equal monthly installments for a period of ten (10) years certain and so long thereafter as either of two designated payees shall live.  If the Owner elects this option during the lifetime of either Insured, and one of the beneficiaries dies before the death of the second Insured to die, then we will pay the surviving beneficiary under Option 2 with a period certain of ten (10) years, unless the Owner elects otherwise.  The minimum guaranteed monthly payments for this option are shown in Table C.  The guaranteed payments are calculated based on the Annuity 2000 Mortality Table with a generational mortality projection of Scale G, and an annual interest rate of two and a half percent (2.5%).  Payments may not be commuted.  Another option may not be selected once payments begin under this option.

## PAYMENT FREQUENCY

In lieu of monthly payments, a quarterly, semiannual, or annual frequency may be selected.  The selection of any option is subject to our minimum payment requirements.  If other than monthly payments are selected, the amount of each payment may be found by multiplying the amount of the monthly payment by the following factors:

| QUARTERLY | SEMIANNUALLY | ANNUALLY |
|-----------|--------------|----------|
| 2.9938 | 5.9693 | 11.8653 |

## DUE DATE OF FIRST PAYMENT

If an option has been selected which calls for installments, the due date of the first payment shall be the date of the surviving Insured's death or surrender of the policy.  If the Alternate Larger Life Income is paid, the first payment will be one (1) payment period after the date of the death of the surviving Insured or surrender of the policy.

## ALTERNATE LARGER LIFE INCOME

If Options 2, 3, or 6 become effective and if on the due date of the first payment we have in use a basis for computing the life income which is alternative to that used in the installment tables, then the life income shall be recomputed on the alternative basis.  If that results in installment amounts which are larger than those set forth in the tables, then we will automatically pay the larger amounts.

## SUPPLEMENTARY CONTRACT

A supplementary contract providing for the Settlement Option chosen will be issued as of the date of the settlement.  When the proceeds of this policy become payable under a settlement option, this policy must be surrendered.

## DEATH OF PAYEE

We may require proof of the date of birth or the continued life of any payee at any time.  If at the death of any payee there is no designated person living entitled to receive the remaining payments, we will pay in one (1) sum to such payee's executors, administrators, or assigns, the unpaid sum or the commuted value of any unpaid settlements.  The interest rate applied will not be greater than the current interest rate used to calculate installment payments at the time of settlement.

## INCOME PROTECTION

The payee, other than the Owner, may not transfer, assign, commute, or encumber any of the benefits of this policy unless otherwise provided in the settlement election.  To the extent permitted by law, settlement option benefits are not subject to claims of creditors or legal process.

## SURPLUS INTEREST

Surplus interest earnings may be added to payments under Options 4, and 5.   Under Option 4, surplus interest will be used to increase the amount of each payment.  Under Option 5, surplus interest will be used to increase the number of payments.

# INSTALLMENT TABLES — On Basis of $1,000 of Proceeds

The life income under Option 2 and 6 will be based on the payee's sex and age nearest birthday when the first installment is payable.

## OPTION 1 — Installments For Fixed Period — TABLE A

| Number of Years Payable | Annual Payment | Monthly Payment |
|---|---|---|
| 1 | $1000.00 | $84.28 |
| 2 | 507.29 | 42.66 |
| 3 | 343.23 | 28.79 |
| 4 | 261.19 | 21.86 |
| 5 | 212.00 | 17.70 |
| 6 | 179.22 | 14.93 |
| 7 | 155.83 | 12.95 |
| 8 | 138.31 | 11.47 |
| 9 | 124.69 | 10.32 |
| 10 | 113.82 | 9.39 |
| 11 | 104.93 | 8.64 |
| 12 | 97.54 | 8.01 |
| 13 | 91.29 | 7.49 |
| 14 | 85.95 | 7.03 |
| 15 | 81.33 | 6.64 |
| 16 | 77.29 | 6.30 |
| 17 | 73.74 | 6.00 |
| 18 | 70.59 | 5.73 |
| 19 | 67.76 | 5.49 |
| 20 | 65.26 | 5.27 |
| 21 | 62.98 | 5.06 |
| 22 | 60.92 | 4.90 |
| 23 | 59.04 | 4.74 |
| 24 | 57.33 | 4.60 |
| 25 | 55.76 | 4.46 |
| 26 | 54.31 | 4.34 |
| 27 | 52.97 | 4.21 |
| 28 | 51.74 | 4.12 |
| 29 | 50.60 | 4.02 |
| 30 | 49.53 | 3.93 |

## OPTION 2 — Table B — MONTHLY LIFE INCOME WITH INSTALLMENTS CERTAIN

| AGE OF PAYEE | LIFE ONLY INCOME MALE | LIFE ONLY INCOME FEMALE | 5 YEARS CERTAIN MALE | 5 YEARS CERTAIN FEMALE | 10 YEARS CERTAIN MALE | 10 YEARS CERTAIN FEMALE | 15 YEARS CERTAIN MALE | 15 YEARS CERTAIN FEMALE | 20 YEARS CERTAIN MALE | 20 YEARS CERTAIN FEMALE |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 3.06 | 2.93 | 3.06 | 2.93 | 3.06 | 2.92 | 3.07 | 2.92 | 3.05 | 2.91 |
| 41 | 3.13 | 2.98 | 3.12 | 2.98 | 3.12 | 2.95 | 3.11 | 2.96 | 3.09 | 2.94 |
| 42 | 3.17 | 3.00 | 3.17 | 3.00 | 3.16 | 2.99 | 3.15 | 2.98 | 3.13 | 2.98 |
| 43 | 3.22 | 3.03 | 3.21 | 3.03 | 3.21 | 3.03 | 3.19 | 3.02 | 3.17 | 3.01 |
| 44 | 3.26 | 3.07 | 3.26 | 3.07 | 3.26 | 3.07 | 3.24 | 3.06 | 3.21 | 3.06 |
| 45 | 3.31 | 3.11 | 3.31 | 3.11 | 3.30 | 3.11 | 3.28 | 3.10 | 3.25 | 3.09 |
| 46 | 3.37 | 3.18 | 3.36 | 3.16 | 3.35 | 3.15 | 3.33 | 3.14 | 3.30 | 3.13 |
| 47 | 3.42 | 3.20 | 3.42 | 3.20 | 3.40 | 3.20 | 3.38 | 3.18 | 3.35 | 3.17 |
| 48 | 3.48 | 3.26 | 3.47 | 3.25 | 3.46 | 3.24 | 3.43 | 3.23 | 3.40 | 3.21 |
| 49 | 3.54 | 3.30 | 3.53 | 3.30 | 3.52 | 3.29 | 3.49 | 3.28 | 3.46 | 3.26 |
| 50 | 3.60 | 3.35 | 3.60 | 3.35 | 3.58 | 3.34 | 3.55 | 3.33 | 3.51 | 3.31 |
| 51 | 3.67 | 3.41 | 3.66 | 3.41 | 3.64 | 3.40 | 3.61 | 3.38 | 3.56 | 3.36 |
| 52 | 3.74 | 3.47 | 3.73 | 3.47 | 3.71 | 3.46 | 3.67 | 3.44 | 3.61 | 3.41 |
| 53 | 3.81 | 3.53 | 3.81 | 3.53 | 3.78 | 3.52 | 3.74 | 3.49 | 3.67 | 3.46 |
| 54 | 3.89 | 3.60 | 3.88 | 3.59 | 3.85 | 3.58 | 3.81 | 3.56 | 3.73 | 3.52 |
| 55 | 3.98 | 3.67 | 3.96 | 3.66 | 3.93 | 3.65 | 3.88 | 3.62 | 3.80 | 3.58 |
| 56 | 4.06 | 3.74 | 4.05 | 3.74 | 4.02 | 3.72 | 3.95 | 3.69 | 3.86 | 3.64 |
| 57 | 4.16 | 3.82 | 4.14 | 3.81 | 4.10 | 3.79 | 4.03 | 3.76 | 3.93 | 3.70 |
| 58 | 4.25 | 3.90 | 4.24 | 3.90 | 4.19 | 3.87 | 4.11 | 3.83 | 3.99 | 3.77 |
| 59 | 4.36 | 3.99 | 4.34 | 3.98 | 4.29 | 3.96 | 4.19 | 3.91 | 4.06 | 3.83 |
| 60 | 4.47 | 4.08 | 4.46 | 4.08 | 4.39 | 4.06 | 4.29 | 4.00 | 4.13 | 3.90 |
| 61 | 4.59 | 4.19 | 4.57 | 4.18 | 4.50 | 4.14 | 4.38 | 4.07 | 4.20 | 3.96 |
| 62 | 4.72 | 4.29 | 4.70 | 4.28 | 4.62 | 4.24 | 4.47 | 4.16 | 4.28 | 4.06 |
| 63 | 4.86 | 4.41 | 4.83 | 4.39 | 4.74 | 4.34 | 4.57 | 4.26 | 4.36 | 4.13 |
| 64 | 5.01 | 4.53 | 4.97 | 4.51 | 4.86 | 4.45 | 4.67 | 4.36 | 4.42 | 4.20 |

| AGE OF PAYEE | LIFE ONLY INCOME MALE | LIFE ONLY INCOME FEMALE | 5 YEARS CERTAIN MALE | 5 YEARS CERTAIN FEMALE | 10 YEARS CERTAIN MALE | 10 YEARS CERTAIN FEMALE | 15 YEARS CERTAIN MALE | 15 YEARS CERTAIN FEMALE | 20 YEARS CERTAIN MALE | 20 YEARS CERTAIN FEMALE |
|---|---|---|---|---|---|---|---|---|---|---|
| 65 | 5.16 | 4.68 | 5.12 | 4.64 | 4.99 | 4.87 | 4.78 | 4.64 | 4.49 | 4.28 |
| 66 | 5.33 | 4.80 | 5.28 | 4.77 | 5.13 | 4.70 | 4.88 | 4.66 | 4.55 | 4.38 |
| 67 | 5.51 | 4.95 | 5.45 | 4.92 | 5.28 | 4.83 | 5.02 | 4.87 | 4.63 | 4.44 |
| 68 | 5.70 | 5.11 | 5.64 | 5.07 | 5.43 | 5.00 | 5.14 | 5.00 | 4.70 | 4.53 |
| 69 | 5.91 | 5.28 | 5.83 | 5.24 | 5.58 | 5.14 | 5.27 | 5.14 | 4.78 | 4.61 |
| 70 | 6.12 | 5.47 | 6.03 | 5.42 | 5.76 | 5.28 | 5.44 | 5.27 | 4.85 | 4.69 |
| 71 | 6.36 | 5.67 | 6.26 | 5.61 | 5.91 | 5.44 | 5.61 | 5.44 |  |  |
| 72 | 6.61 | 5.88 | 6.47 | 5.82 | 6.08 | 5.61 | 5.78 | 5.61 |  |  |
| 73 | 6.87 | 6.12 | 6.71 | 6.04 | 6.28 | 5.78 | 5.96 | 5.78 |  |  |
| 74 | 7.16 | 6.38 | 6.97 | 6.28 | 6.47 | 5.98 | 6.14 | 5.96 |  |  |
| 75 | 7.46 | 6.66 | 7.24 | 6.54 | 6.63 | 6.18 | 6.31 | 6.04 |  |  |
| 76 | 7.79 | 6.98 | 7.52 | 6.81 | 6.81 | 6.38 | 6.49 |  |  |  |
| 77 | 8.14 | 7.28 | 7.82 | 7.11 | 7.00 | 6.60 |  |  |  |  |
| 78 | 8.51 | 7.63 | 8.13 | 7.42 | 7.18 | 6.80 |  |  |  |  |
| 79 | 8.91 | 8.02 | 8.46 | 7.75 | 7.37 | 7.01 |  |  |  |  |
| 80 | 9.36 | 8.44 | 8.80 | 8.11 | 7.58 | 7.23 |  |  |  |  |
| 81 | 9.81 | 8.89 | 9.16 | 8.48 | 7.73 | 7.44 |  |  |  |  |
| 82 | 10.30 | 9.36 | 9.53 | 8.90 | 7.91 | 7.64 |  |  |  |  |
| 83 | 10.83 | 9.91 | 9.92 | 9.30 | 8.07 | 7.84 |  |  |  |  |
| 84 | 11.39 | 10.49 | 10.31 | 9.73 | 8.23 | 8.04 |  |  |  |  |
| 85 | 11.99 | 11.12 | 10.71 | 10.18 | 8.37 | 8.21 |  |  |  |  |
| 86+ |  |  |  |  |  |  |  |  |  |  |

+ And Over

## Option 6 - Table C
### JOINT & FULL SURVIVOR WITH 10 YEARS CERTAIN SURVIVOR
Monthly Payments for each $1,000 Applied

Female: / Male Age (Age Nearest Birthday):

| Male Age | Number of Years Younger | | | | | | | | | | Same Age | Number of Years Older | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | -10 | -9 | -8 | -7 | -6 | -5 | -4 | -3 | -2 | -1 | Age | 1 | 2 | 3 | 4 | 5 |
| 40 | 2.60 | 2.62 | 2.63 | 2.65 | 2.66 | 2.68 | 2.70 | 2.71 | 2.73 | 2.74 | 2.76 | 2.77 | 2.79 | 2.80 | 2.82 | 2.83 |
| 41 | 2.62 | 2.64 | 2.66 | 2.67 | 2.69 | 2.70 | 2.72 | 2.74 | 2.75 | 2.77 | 2.78 | 2.80 | 2.81 | 2.83 | 2.85 | 2.86 |
| 42 | 2.64 | 2.66 | 2.68 | 2.69 | 2.71 | 2.73 | 2.75 | 2.76 | 2.78 | 2.79 | 2.81 | 2.83 | 2.84 | 2.86 | 2.88 | 2.90 |
| 43 | 2.66 | 2.68 | 2.70 | 2.72 | 2.73 | 2.75 | 2.77 | 2.79 | 2.80 | 2.82 | 2.84 | 2.86 | 2.87 | 2.89 | 2.91 | 2.92 |
| 44 | 2.69 | 2.70 | 2.72 | 2.74 | 2.76 | 2.78 | 2.80 | 2.81 | 2.83 | 2.85 | 2.87 | 2.88 | 2.90 | 2.92 | 2.94 | 2.96 |
| 45 | 2.71 | 2.73 | 2.75 | 2.77 | 2.78 | 2.80 | 2.82 | 2.84 | 2.86 | 2.88 | 2.90 | 2.92 | 2.94 | 2.96 | 2.98 | 3.00 |
| 46 | 2.73 | 2.75 | 2.77 | 2.79 | 2.81 | 2.83 | 2.85 | 2.87 | 2.88 | 2.90 | 2.92 | 2.94 | 2.96 | 2.98 | 3.01 | 3.03 |
| 47 | 2.76 | 2.78 | 2.80 | 2.82 | 2.84 | 2.86 | 2.88 | 2.90 | 2.93 | 2.95 | 2.97 | 2.99 | 3.01 | 3.03 | 3.05 | 3.07 |
| 48 | 2.78 | 2.80 | 2.83 | 2.85 | 2.87 | 2.89 | 2.91 | 2.94 | 2.96 | 2.98 | 3.01 | 3.03 | 3.05 | 3.07 | 3.09 | 3.12 |
| 49 | 2.81 | 2.83 | 2.86 | 2.88 | 2.90 | 2.92 | 2.95 | 2.98 | 3.00 | 3.02 | 3.05 | 3.07 | 3.09 | 3.12 | 3.14 | 3.16 |
| 50 | 2.84 | 2.86 | 2.89 | 2.91 | 2.94 | 2.96 | 2.99 | 3.01 | 3.04 | 3.06 | 3.09 | 3.11 | 3.14 | 3.16 | 3.18 | 3.21 |
| 51 | 2.87 | 2.90 | 2.92 | 2.95 | 2.97 | 3.00 | 3.03 | 3.06 | 3.08 | 3.10 | 3.13 | 3.16 | 3.18 | 3.20 | 3.23 | 3.26 |
| 52 | 2.90 | 2.93 | 2.95 | 2.98 | 3.01 | 3.04 | 3.06 | 3.09 | 3.12 | 3.15 | 3.18 | 3.20 | 3.23 | 3.26 | 3.28 | 3.31 |
| 53 | 2.94 | 2.96 | 2.99 | 3.02 | 3.05 | 3.08 | 3.11 | 3.14 | 3.16 | 3.19 | 3.22 | 3.25 | 3.28 | 3.31 | 3.34 | 3.38 |
| 54 | 2.97 | 3.00 | 3.03 | 3.06 | 3.09 | 3.12 | 3.15 | 3.18 | 3.21 | 3.24 | 3.27 | 3.30 | 3.33 | 3.36 | 3.39 | 3.42 |
| 55 | 3.01 | 3.04 | 3.07 | 3.10 | 3.13 | 3.16 | 3.20 | 3.23 | 3.26 | 3.29 | 3.33 | 3.36 | 3.39 | 3.42 | 3.45 | 3.48 |
| 56 | 3.05 | 3.08 | 3.11 | 3.14 | 3.18 | 3.21 | 3.25 | 3.28 | 3.31 | 3.35 | 3.38 | 3.42 | 3.45 | 3.48 | 3.52 | 3.55 |
| 57 | 3.08 | 3.12 | 3.15 | 3.19 | 3.23 | 3.26 | 3.29 | 3.33 | 3.37 | 3.41 | 3.44 | 3.48 | 3.51 | 3.55 | 3.58 | 3.62 |
| 58 | 3.13 | 3.16 | 3.20 | 3.24 | 3.28 | 3.31 | 3.35 | 3.39 | 3.43 | 3.47 | 3.50 | 3.54 | 3.58 | 3.62 | 3.65 | 3.69 |
| 59 | 3.18 | 3.21 | 3.26 | 3.29 | 3.33 | 3.37 | 3.41 | 3.45 | 3.49 | 3.53 | 3.57 | 3.61 | 3.65 | 3.69 | 3.73 | 3.77 |
| 60 | 3.23 | 3.26 | 3.30 | 3.34 | 3.39 | 3.43 | 3.47 | 3.51 | 3.55 | 3.60 | 3.64 | 3.68 | 3.72 | 3.77 | 3.81 | 3.86 |
| 61 | 3.28 | 3.32 | 3.36 | 3.40 | 3.45 | 3.49 | 3.53 | 3.58 | 3.63 | 3.67 | 3.72 | 3.76 | 3.81 | 3.85 | 3.90 | 3.94 |
| 62 | 3.33 | 3.37 | 3.42 | 3.46 | 3.51 | 3.55 | 3.60 | 3.65 | 3.69 | 3.75 | 3.80 | 3.84 | 3.89 | 3.94 | 3.99 | 4.04 |
| 63 | 3.39 | 3.43 | 3.48 | 3.53 | 3.58 | 3.63 | 3.68 | 3.73 | 3.78 | 3.83 | 3.88 | 3.93 | 3.98 | 4.03 | 4.08 | 4.13 |
| 64 | 3.44 | 3.49 | 3.54 | 3.59 | 3.65 | 3.70 | 3.75 | 3.81 | 3.86 | 3.92 | 3.97 | 4.03 | 4.08 | 4.13 | 4.19 | 4.24 |
| 65 | 3.51 | 3.56 | 3.61 | 3.67 | 3.72 | 3.78 | 3.83 | 3.89 | 3.95 | 4.01 | 4.07 | 4.13 | 4.18 | 4.24 | 4.30 | 4.36 |
| 66 | 3.57 | 3.63 | 3.68 | 3.74 | 3.80 | 3.86 | 3.92 | 3.98 | 4.04 | 4.11 | 4.17 | 4.23 | 4.29 | 4.35 | 4.41 | 4.47 |
| 67 | 3.64 | 3.70 | 3.76 | 3.82 | 3.89 | 3.95 | 4.01 | 4.08 | 4.14 | 4.21 | 4.28 | 4.34 | 4.41 | 4.47 | 4.54 | 4.60 |
| 68 | 3.72 | 3.78 | 3.84 | 3.91 | 3.98 | 4.04 | 4.11 | 4.18 | 4.25 | 4.32 | 4.39 | 4.46 | 4.53 | 4.60 | 4.67 | 4.74 |
| 69 | 3.80 | 3.86 | 3.93 | 4.00 | 4.07 | 4.14 | 4.22 | 4.29 | 4.37 | 4.44 | 4.52 | 4.59 | 4.67 | 4.74 | 4.81 | 4.88 |
| 70 | 3.88 | 3.95 | 4.02 | 4.10 | 4.17 | 4.25 | 4.33 | 4.41 | 4.49 | 4.57 | 4.65 | 4.73 | 4.81 | 4.89 | 4.96 | 5.04 |
| 71 | 3.97 | 4.05 | 4.12 | 4.21 | 4.28 | 4.36 | 4.45 | 4.53 | 4.62 | 4.70 | 4.78 | 4.87 | 4.96 | 5.04 | 5.12 | 5.20 |
| 72 | 4.07 | 4.15 | 4.24 | 4.31 | 4.40 | 4.49 | 4.57 | 4.66 | 4.76 | 4.85 | 4.94 | 5.03 | 5.12 | 5.21 | 5.29 | 5.38 |
| 73 | 4.17 | 4.26 | 4.34 | 4.43 | 4.52 | 4.61 | 4.71 | 4.81 | 4.90 | 5.00 | 5.10 | 5.19 | 5.29 | 5.38 | 5.47 | 5.56 |
| 74 | 4.27 | 4.36 | 4.46 | 4.55 | 4.65 | 4.75 | 4.85 | 4.96 | 5.06 | 5.16 | 5.28 | 5.37 | 5.48 | 5.56 | 5.65 | 5.74 |
| 75 | 4.39 | 4.48 | 4.58 | 4.69 | 4.79 | 4.90 | 5.00 | 5.11 | 5.22 | 5.33 | 5.44 | 5.55 | 5.65 | 5.75 | 5.85 | 5.94 |
| 76 | 4.51 | 4.61 | 4.72 | 4.83 | 4.94 | 5.05 | 5.17 | 5.28 | 5.40 | 5.52 | 5.63 | 5.74 | 5.85 | 5.95 | 6.05 | 6.15 |
| 77 | 4.64 | 4.76 | 4.86 | 4.98 | 5.10 | 5.22 | 5.34 | 5.46 | 5.59 | 5.71 | 5.82 | 5.94 | 6.06 | 6.16 | 6.26 | 6.36 |
| 78 | 4.78 | 4.89 | 5.01 | 5.14 | 5.26 | 5.39 | 5.52 | 5.65 | 5.78 | 5.91 | 6.03 | 6.15 | 6.27 | 6.38 | 6.48 | 6.57 |
| 79 | 4.92 | 5.05 | 5.17 | 5.31 | 5.44 | 5.57 | 5.71 | 5.85 | 5.98 | 6.11 | 6.24 | 6.37 | 6.48 | 6.60 | 6.70 | 6.79 |
| 80 | 5.08 | 5.21 | 5.34 | 5.48 | 5.62 | 5.77 | 5.91 | 6.05 | 6.19 | 6.33 | 6.46 | 6.59 | 6.71 | 6.82 | 6.92 | 7.01 |
| 81 | 5.24 | 5.38 | 5.52 | 5.67 | 5.82 | 5.97 | 6.12 | 6.27 | 6.41 | 6.55 | 6.69 | 6.81 | 6.93 | 7.04 | 7.14 | 7.14 |
| 82 | 5.41 | 5.56 | 5.71 | 5.87 | 6.02 | 6.19 | 6.33 | 6.50 | 6.63 | 6.78 | 6.91 | 7.04 | 7.16 | 7.26 | 7.26 | 7.28 |
| 83 | 5.59 | 5.76 | 5.91 | 6.07 | 6.24 | 6.40 | 6.56 | 6.71 | 6.86 | 7.00 | 7.15 | 7.26 | 7.38 | 7.48 | 7.38 | 7.38 |
| 84 | 5.79 | 5.96 | 6.12 | 6.29 | 6.45 | 6.62 | 6.78 | 6.94 | 7.09 | 7.23 | 7.36 | 7.48 | 7.48 | 7.48 | 7.48 | 7.48 |
| 85+ | 5.99 | 6.16 | 6.33 | 6.51 | 6.68 | 6.85 | 7.01 | 7.17 | 7.32 | 7.48 | 7.68 | 7.58 | 7.58 | 7.58 | 7.58 | 7.58 |

+ And Over

Page Eighteen

18-ULLS-99

# INDIANAPOLIS LIFE INSURANCE COMPANY

Indianapolis, Indiana

**JOINT AND LAST SURVIVOR ADJUSTABLE LIFE INSURANCE POLICY**
**FLEXIBLE PREMIUMS ARE PAYABLE FOR LIFE OF SURVIVOR TO JOINT AGE SHOWN IN SCHEDULE**
**BENEFITS ARE ADJUSTABLE AND PAYABLE AT DEATH OF LAST SURVIVOR**
**NON- PARTICIPATING**

For service or information about your policy or to file a claim, contact your Indianapolis Life Agent or call 1-800-228-2812.

**IL0242**

ULLS-99 B

(Rev. 01/01)

AmerUs Group

# *Privacy Notice*

### Applicable to:

| | |
|---|---|
| American Investors Life Insurance Company | Financial Benefit Life Insurance Co. |
| AmerUs Life Insurance Company | Indianapolis Life Insurance Company |
| Bankers Life Insurance Company of New York | IL Securities, Inc. |

**Your privacy is important to us.** AmerUs Group is committed to protecting your privacy and earning your trust. We respect your right to keep your personal information confidential and to avoid unwanted solicitations. **Please read this to learn how we will handle your personal information.**

### Types of Information Collected

The companies of AmerUs Group collect information about people and property to quote and service insurance policies. Some of this is called **"Nonpublic Personal Information"**, which generally means information that is provided by you, obtained by us, or that results from your transactions with us. It does not include information available to the general public. The type of information we collect varies according to the products or services you request and may include:

- **Application Information:** This is information we may receive from you on applications or other forms, by phone, and online. It includes, but is not limited to, your name, address, and telephone number, social security number, date of birth, gender, and medical history.

- **Transaction Information:** This is information about your transactions with us, our affiliates, or others. It includes, but is not limited to, your policy selections and premiums, payment history, policy values, policy inception and maturity dates, agent of record, and interest credited. We may also obtain information about you from other sources when establishing your policy, such as previous policies and consumer reporting agencies. It may also include additional information used to investigate and settle claims or complaints, such as agent statements and death certificates.

- **Medical/ Non-Medical Information:** This is information we may receive from providers of information and database management services, and is used to confirm or underwrite Application Information. It includes, but is not limited to, reports of one or more medical conditions or test results reported by companies, paramedical facilities, and medical facilities or providers.

- **Web Site Information:** Whenever you visit any web site on the Internet, including ours, certain information from your computer may be captured. The information we may receive from your computer when you visit our Web sites includes the referring Web site you visited before ours, your Internet e-mail address, browser version, and statistical information on Web traffic and usage patterns. Any web sites you visit, including ours, may also store "cookies" on your computer to save user information entered while visiting our Web sites, and collect technical data, such as your Internet protocol (IP) address, operating system, and session ID.

### Parties to Whom We May Disclose Information

Nonpublic Personal Information about you and our former customers may be disclosed to others as permitted by law. Generally, this includes disclosures to third parties that are necessary to effect, administer or enforce your transaction with us, or in connection with servicing your policy. These parties may include, but are not limited to, independent contractors, insurance support organizations, insurance agents and brokers, health information management providers, third party administrators, reinsurance providers, and courts and government agencies. In accordance with the Fair Credit Reporting Act, we will not disclose information obtained from consumer reporting agencies without your consent.

We may also disclose information to people and companies that perform marketing services on our behalf or to financial institutions with whom we have joint marketing agreements. The purpose of this is to inform you of other financial products or services jointly offered, endorsed, or sponsored by us that we believe you may find useful.

### Confidentiality & Security

We restrict access to Nonpublic Personal Information about you to those employees and other parties who must use that information to provide products or services to you. Their right to further disclose and use the information is limited by our employee handbook, applicable law, and nondisclosure agreements where appropriate. We also maintain physical, electronic, and procedural safeguards in compliance with applicable laws and regulations to guard your Nonpublic Personal Information.

This Notice is for your information. No reply is necessary.

IL0243

## *INDIANAPOLIS LIFE*
### *INSURANCE COMPANY*

*Universal Life Administrative Office*
*P.O. Box 9005*
*65 Froehlich Farm Boulevard*
*Woodbury, New York 11797-9847*
*(800) 228-2812*

IF YOU NEED ANY ASSISTANCE WITH YOUR FLEXIBLE PREMIUM ADJUSTABLE (UNIVERSAL LIFE) POLICY, PLEASE FEEL FREE TO CONTACT YOUR AGENT OR US AT:

INDIANAPOLIS LIFE INSURANCE COMPANY
UL ADMINISTRATIVE OFFICE
P.O. BOX 9005
65 FROEHLICH FARM BLVD.
WOODBURY, NY 11797-9847

1-800-228-2812

ULNY95

**IL0244**

**Indianapolis Life**
**Insurance Company**
Administrative Office
611 5th Avenue
Des Moines, IA 50309

Home Office
2960 North Meridian
Indianapolis, IN 46208

# INDIANAPOLIS LIFE

*An AMERUS Company*

## POLICY DELIVERY RECEIPT

I acknowledge I received Policy No. B05020799 issued by Indianapolis Life Insurance Company on Rudy K. Meiselman and Hope E Meiselman.

As owner of the policy I understand:

1. This is a life insurance policy providing insurance on the above named insured.
2. I have a limited period of time to examine the policy and return it for a refund of premium (see policy cover page for details).
3. Sufficient premiums must be timely paid for the policy to remain in force. All premiums after the first are to be provided directly to the Company. Except for forwarding my initial premium made payable to the Company, the agent has no authority or responsibility to sign, endorse, deposit or process any payments made on the policy.
4. If a Conditional Life Insurance Agreement or similar document was delivered upon my payment of the first premium, its terms govern the commencement of coverage.
5. Except as stated in a document referred to in paragraph 4, I understand that coverage does not begin until the policy is delivered. The commencement of coverage is subject to all the terms and conditions set forth in the policy. I understand that the policy charges begin on the policy date shown in the policy, which is before the delivery date, and any interest, if applicable, is calculated and credited beginning on the policy date. I further understand that my policy anniversary dates and premium due dates will be calculated from the policy date.

_____
Agent/Broker's Signature

_____
Policyowner Signature

_____
Date

**Information for customers fluent in languages other than English:**

If you do not read and understand English, do not sign this form in the space provided above. Sign below and ask your agent for a Policy Delivery Receipt in your language.

Si no lee ni entiendo inglés, no firme este formulario en el espacio de arriba. Firme a continuación y pídale a su agente un Acuse de Recibo de Póliza en su idioma.

หากคุณอ่านภาษาอังกฤษไม่ออกหรือไม่เข้าใจภาษาอังกฤษ อย่าลงนามในเนื้อที่ที่จัดให้ข้างต้นในแบบฟอร์มนี้

ขอให้ลงนามที่ด้านล่าง และขอใบรับรองการส่งมอบกรมธรรม์เป็นภาษาของคุณจากตัวแทนของคุณ

ຖ້າທ່ານອ່ານພາສາອັງກິດບໍ່ໄດ້ແລະບໍ່ເຂົ້າໃຈ, ຢ່າເຊັນຊື່ໃສ່ໃນທີ່ທີ່ເຂົາຈັດໄວ້ໃນຟອມນີ້. ໃຫ້ເຊັນຊື່ໃສ່ໃນທີ່ທີ່ຢູ່ຂ້າງລຸ່ມນີ້ ແລະຂໍໃຫ້ຕົວແທນຂອງທ່ານ ເອົາໃບຢັ້ງຢືນການຮັບເອົາໃນສັນຍາປະກັນໄພ ທີ່ແປເປັນພາສາຂອງທ່ານ ໃຫ້ທ່ານ.

영어를 읽고 이해하지 못하는 경우, 이 양식에서 위에 제공된 여백에 서명하지 마십시오. 아래에 서명하시고 중개인에게 귀하의 언어로 된 이 보험 증서 배달 영수증을 요청하십시오.

如果您读不懂英语，请不要在以上提供的位置签署本件。请先在以下位置签字，然后向您的保险代理索取中文"保单送达回执"。

Kung hindi kayo nakakabasa o nakakaintindi ng Ingles, huwag lagdaan ang pormularyong ito sa patlang na nakatakda para dito sa itaas. Lumagda sa ibaba at humingi sa inyong ahente ng isang Policy Delivery Receipt (Resibo sa Paghahatid ng Polisa) sa inyong wika.

_____
Signature Firma ลายมือชื่อ ລາຍເຊັນ 서명 签字 Lagda

Please call your agent or Indianapolis Life Insurance Company if you have any questions.

**IL0245**

Form 3PDRPG03

Date Prepared February 5, 2004

## SCHEDULE

**JOINT INSUREDS:**
RUDY K MEISELMAN                              HOPE E MEISELMAN
**RATE CLASS:**
NO TOBACCO USE                               NO TOBACCO USE


**POLICY NUMBER:** B05020799
**JOINT EQUAL AGE AT ISSUE:** 71
**POLICY DATE:** OCTOBER 9, 2003
**ISSUE DATE:** OCTOBER 9, 2003
**FACE AMOUNT:** $3,300,000
**DEATH BENEFIT OPTION:** A


**POLICY LOAN INTEREST RATE:**        7.40% PER YEAR IN ADVANCE
**POLICY LOAN CREDITED RATE:**        6.00% PER YEAR
**REINSTATEMENT INTEREST RATE:**      6.00% PER YEAR
**GUARANTEED INTEREST RATE FOR POLICY VALUES:**    POLICY YEAR 1      6.15%
                                                   POLICY YEARS 2+    4.00% PER YEAR


THE POLICY MONTH BEGINS ON THE 9TH DAY OF THE MONTH.


**PLAN:** JOINT AND LAST SURVIVOR ADJUSTABLE LIFE


**MINIMUM FACE AMOUNT:**              $250,000.00
**MAXIMUM PREMIUM EXPENSE CHARGE:**   8% OF PREMIUMS PAID
**MAXIMUM POLICY EXPENSE CHARGE:**    $6.00 PER MONTH ALL YEARS
**MAXIMUM PER UNIT EXPENSE CHARGE:**  $0.26750 PER MONTH PER $1,000 OF FACE AMOUNT YEARS 1 - 3
                                      $0.05080 PER MONTH PER $1,000 OF FACE AMOUNT YEARS 4+


| BENEFITS AND PREMIUMS<br>BASE POLICY | AMOUNT/<br>UNITS | FORM<br>NUMBER | PAYABLE<br>TO AGE |
|---|---|---|---|
| JOINT AND LAST SURVIVOR ADJUSTABLE LIFE | $3,300,000 | ULLS-99 | 100* |


**ADDITIONAL BENEFITS** (PROVIDED BY RIDER)

| DEATH BENEFIT MATURITY EXTENSION | + | E-ULDBE-98 | 100+ |
|---|---|---|---|

+ THE AMOUNT EXTENDED IS EQUAL TO THE DEATH BENEFIT AT AGE 100. SEE THE ENDORSEMENT FOR DETAILS.


\* JOINT EQUAL AGE


**POLICY SPLIT OPTION CLASS:** UNRESTRICTED


**FIRST YEAR PREMIUM:**               $153,750.00
**PLANNED ANNUAL PREMIUM:**           $153,750.00
**TARGET PREMIUM:**                   $75,009.00
**BASIC NO-LAPSE PREMIUM:**           $4,310.25 PER MONTH,   $51,723.00 PER YEAR
**BASIC NO-LAPSE GUARANTEE PERIOD:**  5 YEARS


**IL0246**

### SCHEDULE - CONTINUED

BENEFICIARY IS AS SHOWN IN APPLICATION UNLESS CHANGED AS PROVIDED IN THE POLICY.

### TABLE OF SURRENDER CHARGES

| BEGINNING OF POLICY YEAR | CHARGE |
|:---:|:---:|
| 1 | $96,294.00 |
| 2 | $92,923.71 |
| 3 | $88,590.48 |
| 4 | $81,657.31 |
| 5 | $75,687.08 |
| 6 | $70,583.50 |
| 7 | $66,153.98 |
| 8 | $62,205.92 |
| 9 | $58,643.05 |
| 10 | $55,369.05 |
| 11 | $52,287.64 |
| 12 | $49,206.23 |
| 13 | $46,124.83 |
| 14 | $42,754.54 |
| 15 | $39,095.36 |
| 16 | $34,954.72 |
| 17 | $30,428.90 |
| 18 | $25,517.91 |
| 19 | $20,318.03 |
| 20 | $15,310.75 |
| 21 & UP | $0.00 |

### WITHDRAWALS

AFTER THE FIRST POLICY YEAR, MAXIMUM NUMBER OF WITHDRAWALS IN A POLICY YEAR:  1

BASED ON THE GUARANTEED INTEREST RATE, THE MAXIMUM POLICY AND PREMIUM EXPENSE CHARGES, THE MAXIMUM MONTHLY COST OF INSURANCE RATES AND THE PLANNED PREMIUM, THIS POLICY WILL EXPIRE ON OCTOBER 9, 2020.

IL0247

## TABLE OF GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES

| JOINT EQUAL ATTAINED AGE | MONTHLY RATE | JOINT EQUAL ATTAINED AGE | MONTHLY RATE |
|---|---|---|---|
| 71 | 0.12233 | 86 | 11.82583 |
| 72 | 0.40150 | 87 | 13.21417 |
| 73 | 0.74050 | 88 | 14.60975 |
| 74 | 1.14775 | 89 | 16.01925 |
| 75 | 1.62383 | 90 | 17.45367 |
| 76 | 2.16842 | 91 | 18.93033 |
| 77 | 2.77767 | 92 | 20.49000 |
| 78 | 3.44458 | 93 | 22.19183 |
| 79 | 4.17233 | 94 | 24.29958 |
| 80 | 4.97383 | 95 | 27.24542 |
| 81 | 5.86208 | 96 | 31.86642 |
| 82 | 6.85542 | 97 | 39.90058 |
| 83 | 7.96550 | 98 | 54.77742 |
| 84 | 9.17958 | 99 | 83.33333 |
| 85 | 10.47500 | | |

THE GUARANTEED MAXIMUM COST OF INSURANCE RATES ARE DERIVED FROM THE 1980 CSO SMOKER MORTALITY TABLE OR THE 1980 CSO NONSMOKER MORTALITY TABLE, AGE NEAREST BIRTHDAY, MALE/MALE, IN ACCORDANCE WITH THE INSUREDS' UNDERWRITING CLASSES.

## TABLE OF PERCENTAGES

| Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage | Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage |
|---|---|---|---|
| 40 or younger | 250% | 68 | 117% |
| 41 | 243% | 69 | 116% |
| 42 | 236% | 70 | 115% |
| 43 | 229% | 71 | 113% |
| 44 | 222% | 72 | 111% |
| 45 | 215% | 73 | 109% |
| 46 | 209% | 74 | 107% |
| 47 | 203% | 75 | 105% |
| 48 | 197% | 76 | 105% |
| 49 | 191% | 77 | 105% |
| 50 | 185% | 78 | 105% |
| 51 | 178% | 79 | 105% |
| 52 | 171% | 80 | 105% |
| 53 | 164% | 81 | 105% |
| 54 | 157% | 82 | 105% |
| 55 | 150% | 83 | 105% |
| 56 | 146% | 84 | 105% |
| 57 | 142% | 85 | 105% |
| 58 | 138% | 86 | 105% |
| 59 | 134% | 87 | 105% |
| 60 | 130% | 88 | 105% |
| 61 | 128% | 89 | 105% |
| 62 | 126% | 90 | 105% |
| 63 | 124% | 91 | 104% |
| 64 | 122% | 92 | 103% |
| 65 | 120% | 93 | 102% |
| 66 | 119% | 94 | 101% |
| 67 | 118% | 95 and higher | 100% |

**IL0249**

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETS

FILED
IN CLERKS OFFICE
2004 NOV 23 P 2: 46

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| INDIANAPOLIS LIFE INSURANCE COMPANY | ) ) ) ) | **- 1248 1 WGY** |
|  | ) | CIVIL ACTION NO.: |
| Plaintiff, | ) |  |
| v. | ) ) |  |
| ROSALYN HERMAN, TRUSTEE, FINANCIAL RESOURCES NETWORK, INC., PROFIT SHARING PLAN AND TRUST, FINANCIAL RESOURCES NETWORK, INC. PROFIT SHARING PLAN AND TRUST, GREGG D. CAPLITZ, RUDY K. MEISELMAN, M.D., and HOPE E. MEISELMAN, | ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

## COMPLAINT

### Introduction

This is a civil action for declaratory relief pursuant to 28 U.S.C. §2201, in which the

Plaintiff Indianapolis Life Insurance Company ("ILIC") seeks rescission of and a determination

of its rights and obligations under ILIC Policy Nos. B05020665 and B05020799 (the "Policies"),

attached hereto as Exhibits A and B respectively, both of which insure the "second to die" of Dr.

and Mrs. Meiselman and which were issued to the Financial Resources Network

27235.3

Profit Sharing Plan and Trust ("FRN Plan"). This is also an action for Breach of Contract, Conversion and Unjust Enrichment against Defendant Gregg D. Caplitz ("Caplitz") for his retention of the agency commission in breach of his Agency Contract with Indianapolis Life Insurance Company (the "Agency Contract"), attached hereto as Exhibit C, between the Plaintiff and Caplitz.

<u>**The Parties**</u>

1.      Plaintiff, Indianapolis Life Insurance Company ("ILIC"), is an Indiana corporation with a principal place of business in Indianapolis, Indiana.

2.      Defendant, Financial Resources Network Profit Sharing Plan and Trust ("the FRN Plan") is, upon information and belief, an employer-sponsored profit sharing plan for employees of Financial Resources Network, Inc. d/b/a Insight Onsite Financial Solutions ("FRN, Inc."), a registered investment advisor corporation with a business address of 424 Washington Street, Woburn, MA.

3.      Defendant, Rosalyn Herman ("Herman") is upon information and belief an individual residing at 27 Davis Street, Woburn, Massachusetts and was at all relevant times Administrator and Trustee of the FRN Plan. Herman is President, Treasurer, Secretary and Director of FRN, Inc, and upon information and belief, the sole shareholder.

4.      Defendant Gregg Caplitz ("Caplitz") is upon information and belief, an undisclosed principal of FRN, Inc., who exercises control over its operations, including administration of the FRN Plan. Caplitz is also an insurance agent, who acted as the agent in the issuance of the Policies under the Agency Contract.

-2-

27235.3

5.    Defendant, Rudy K. Meiselman, M.D. ("Dr. Meiselman") is an individual residing at 775 Longboat Club Road #603, Longboat Key, Florida and was at all relevant times an employee of FRN, Inc. and a participant in the FRN Plan.

6.    Defendant Hope E. Meiselman ("Mrs. Meiselman") is an individual residing at 775 Longboat Club Road #603, Longboat Key, Florida, and is the spouse of Dr. Meiselman.

### Jurisdiction

7.    Jurisdiction over this matter exists pursuant to 28 U.S.C.A. §1332(a)(1), based upon the diversity of citizenship of all parties and a matter in controversy in excess of the statutory minimum. The law of Massachusetts shall apply.

8.    Personal jurisdiction over Defendants is based upon the following:

(a)    The FRN Plan is an employer-sponsored profit sharing plan offered to employees of FRN, Inc., a registered investment advisor corporation with a principal place of business in Massachusetts;

(b)    Dr. Meiselman was employed by FRN, Inc. and was a participant in the FRN Plan;

(c)    Mrs. Meiselman was also at relevant times an employee of FRN, Inc.

(d)    Gregg Caplitz is a resident of Massachusetts and is an insurance agent doing business in the state of Massachusetts.

(e)    Rosalyn Herman is a resident of Massachusetts.

## Statement of Facts

9.      On or about July 30 and July 31, 2003, applications for the Policies were completed by Dr. and Mrs. Meiselman and the FRN Plan; one application pertaining to Dr. Meiselman, is attached hereto as Exhibit D, and one application pertaining to Mrs. Meiselman, is attached hereto as Exhibit E.

10.     The application on the life of Dr. Meiselman is dated July 31, 2003 and is signed both by Dr. Meiselman as the proposed insured and by Herman as Trustee for the FRN Plan.

11.     The application on the life of Mrs. Meiselman is dated July 30, 2003 and is signed both by Mrs. Meiselman as the proposed insured and by Herman as Trustee for the FRN Plan.

12.     Both of the applications for the Policies designate the FRN Plan as the owner and primary beneficiary of the Policies.

13.     The applications provide that the policy will take effect and coverage will begin only "if...the answers and statements in the application(s) and any supplements continue to be complete and true at the time of delivery of the policy." (Page 4 of Exhibits D and E).

14.     After submission of the applications, ILIC required that Dr. and Mrs. Meiselman undergo physical examinations.

15.     On information and belief, after the physical examination and prior to issuing the policies, Dr. Meiselman informed Herman and Caplitz that he did not wish to have the ILIC Policies on his life and his wife's life.

-4-

27235.3

16.     Despite Dr. Meiselman's objection, the FRN Plan continued with the application process for the policies, and paid a premium of $1,025,000.00 on November 18, 2003 for the Policies from Dr. Meiselman's 401(K) account.

17.     Prior to issuing and delivering the policies, ILIC required that an amendment to the application for the Policies on the life of Dr. Meiselman be executed by the proposed insured as a condition of the Policies' effectuation.

18.     On or about November 25, 2003, Herman as Trustee executed and delivered to ILIC the amendment which stated as follows:  "I certify that all persons proposed for such insurance are in the same condition as stated in the application; and since the date of the application, no such person has (1) suffered an illness or injury nor consulted a physician or practitioner...."  (A true and correct copy of the executed amendment is attached hereto as Exhibit F.)

19.     On information and belief the above statement contained in the amendment to the application was false in that Dr. Meiselman's physical health had changed, and in fact deteriorated, from the date of the initial application, July 31, 2003, and the date of the execution of the amendment to the application, November 25, 2003.

20.     On information and belief Dr. Meiselman had consulted a physician, Dr. Simon, in August of 2003 due to an unexplained weight loss.  On September 24, 2003, a CT scan taken of Dr. Meiselman's chest and stomach revealed a right middle lobe pulmonary parenchymal node.

21.     On information and belief, Dr. Meiselman informed Herman and Caplitz about the deterioration in his health prior to Herman's execution of the amendment.

-5-

22.     The amendment also required that the insured list on the amendment the life insurance policies in force on the lives of Dr. and Mrs. Meiselman at the time the Amendment was executed. The amendment failed to list a $20,000,000 life insurance policy issued by ING.

23.     In issuing the policies, ILIC relied upon the statement in the Amendment that there had been no change in Dr. and Mrs. Meiselman's medical condition since the initial application was submitted.

24.     In issuing the policies, ILIC relied upon the statement in the Amendment that neither Dr. nor Mrs. Meiselman had consulted a physician since the initial application was submitted.

25.     In issuing the policies, ILIC relied upon the representation in the Amendment that there were no other policies on the lives of Dr. and Mrs. Meiselman.

26.     Had ILIC known that there had been a deterioration in Dr. Meiselman's health, ILIC would not have issued the subject policies under the terms issued, if it would have issued the policies at all.

27.     Had ILIC known that Dr. Meiselman had seen a physician for a medical examination subsequent to the receipt of the initial application, ILIC would not have issued the subject policies under the terms issued, if it would have issued the policies at all.

28.     Had ILIC known that there were additional life insurance policies in force on Dr. Meiselman's life, ILIC would not have issued the subject policies under the terms issued, if it would have issued the policies at all.

-6-

27235.3

29.   Caplitz received a commission of $650,297.01 under the Agency Contract with ILIC, and as the agent on the Policies.

30.   Each Policy contains a provision captioned "Twenty Day Right To Return This Policy" which states as follows: "If the owner is not satisfied with this policy, it may be returned to our agent within twenty days after receiving it.   We will refund any premiums paid and the policy will then be considered as never having been issued."

31.   After each Policy was issued and delivered, ILIC was notified by Dr. and Mrs. Meiselman that they wanted the policies rescinded and that they had not authorized the FRN Plan to purchase the Policies.

32.   Notwithstanding the above, ILIC was advised by Herman and the FRN Plan that the Plan did not wish to exercise its right to return the Policies within the twenty (20) day period and that it wanted the Policies to remain in force.

33.   The Policies contain a provision allowing ILIC to contest the policy based upon statements made in the application for a period of two years from the effective date.

34.   On or about June 15, 2004, by wire transfer to the FRN Plan's account, ILIC refunded the full premium remitted by the FRN Plan for the Policies with interest in the amount of $1,042,004.75.

35.   To date neither Herman nor the FRN Plan have disputed ILIC's rescission nor have they sought to return the tender of premiums and interest.

-7-

36.    Upon information and belief, Dr. Meiselman's entire contribution and benefits in the FRN Plan, including ILIC's refunded premium plus interest, have been disbursed to Dr. Meiselman.

37.    Therefore, the FRN Plan cannot dispute acceptance of the returned premium, as it disbursed the funds to Dr. Meiselman.

## COUNT I

**Rescission Based on Misrepresentation in the Application**
**v.**
**Financial Resources Network Profit Sharing Plan & Trust,**
**Rosalyn Herman, Trustee of the Financial Resources Network Profit Sharing Plan & Trust,**
**Rudy K. Meiselman, M.D., and Hope E. Meidelman**

38.    ILIC repeats the allegations set forth in paragraphs 1 through 37 as if the same were fully set forth herein.

39.    Herman, the Trustee, and the FRN Plan made material misrepresentations in the amendments to the applications which increased the risk of loss of ILIC.

40.    Had ILIC had been aware of the true facts with respect to Dr. Meiselman's deterioration in health, it would not have issued the Policies under the same terms as issued, if at all.

41.    Had ILIC been aware of Dr. Meiselman's undisclosed medical treatment, it would not have issued the Policies under the same terms as issued, if at all.

42.    Had ILIC had been aware of the continued existence of the ING Policy, it would not have issued the Policies under the same terms as issued, if it all.

-8-

WHEREFORE, Indianapolis asks this Court to declare the Policies rescinded based on material misrepresentations having been made in the applications which increased the risk of loss to Indianapolis.

## COUNT II

**Rescission Due to Mutual Mistake**
**v.**
**Financial Resources Network Profit Sharing Plan & Trust,**
**Rosalyn Herman, Trustee of the Financial Resources Network Profit Sharing Plan & Trust,**
**Rudy K. Meiselman, M.D., and Hope E. Meidelman**

43.    Indianapolis repeats the allegations set forth in paragraphs 1 through 42 as if the same were fully set forth herein.

44.    On information and belief, at the time that the FRN Plan purchased the Policies, both it and ILIC believed that Dr. and Mrs. Meiselman wished to have the Policies purchased by the FRN Plan.

45.    Following the Policies' issuance, Dr. and Mrs. Meiselman have expressly advised Caplitz, Herman, the FRN Plan and ILIC that they never authorized the FRN Plan to purchase the Policies nor wanted the Policies purchased on their lives.

WHEREFORE, ILIC asks this Court to declare the Policies rescinded based on mutual mistake.

## COUNT III

**Breach of Contract**
**v.**
**Gregg D. Caplitz**

46.    ILIC repeats the allegations set forth in paragraphs 1 through 45 as if the same were fully set forth herein.

-9-

27235.3

47.   A valid insurance agent contract entitled "Indianapolis Life Insurance Company Agency Contract" ("the Agency Contract") was entered into between Gregg Caplitz and ILIC on June 11, 1997. (See a true and accurate copy attached hereto as Exhibit C).

48.   The Agency Contract between ILIC and Caplitz sets forth that the "General Agent [Caplitz] shall not deliver or permit delivery of a policy unless the proposed insured at the time of delivery is, to the best of the General Agent's knowledge and belief, in as good a condition of health and insurability as stated in the application..." [See Exhibit "C", Para. 1, Sec. C].

49.   Prior to delivery of the Policies, Caplitz knew and/or believed the true facts with respect to Dr. Meiselman's health condition, medical treatment and/or the continued existence of the ING Policy.

50.   Caplitz delivered the ILIC policies to the insured despite this belief or knowledge.

51.   In so doing, Caplitz breached the Agency Contract.

52.   The Agency Contract further provides that the "General Agent will repay to the Company all compensation received on any premium refunded." [See Exhibit "C", Para. II. Sec. A, part 3].

53.   Caplitz received a commission of $650,297.01 on the Policies.

54.   ILIC refunded to the FRN Plan the total premium plus interest.

55.   Despite ILIC's demand that he do so, Caplitz has failed and refused to refund his commission.

-10-

27235.3

56.     Caplitz's failure to refund the commission to ILIC also constitutes a breach of the
Agency Contract.

57.     As a result of Caplitz's breach of the Agency Contract, ILIC suffered damages.

WHEREFORE, ILIC asks this Court to award the Plaintiff damages in the amount of
$650,297.01, together with interests and costs, and any such further relied that the this Court
deems appropriate.

## COUNT IV

### Conversion
### v.
### Gregg D. Caplitz

58.     ILIC repeats the allegations set forth in paragraphs 1 through 57 as if the same
were fully set forth herein.

59.     ILIC has a right to the return of Caplitz's commission earned on the Policies in
the amount of $650,297.01 plus interest.

60.     Caplitz has not returned the commission he received from ILIC.

61.     Caplitz's wrongful retention of the commission constitutes conversion.

62.     As a result of Caplitz's retention of the commission amount, ILIC has suffered
damages.

WHEREFORE, ILIC asks this Court to award the Plaintiff damages in the amount of
$650,297.01, together with interests and costs, and any such further relied that the this Court
deems appropriate.

-11-

27235.3

## COUNT V

**Unjust Enrichment**
**v.**
**Gregg D. Caplitz**

63.    ILIC repeats the allegations set forth in paragraphs 1 through 62 as if the same were fully set forth herein.

64.    ILIC conferred a benefit upon Caplitz by awarding him $650,297.01 in commission for the Policies.

65.    Caplitz knowingly retained the benefit of that sum.

66.    Caplitz's retention of the commission on the Policies is inequitable and unjust.

WHEREFORE, ILIC asks this Court to award the Plaintiff damages in the amount of $650,297.01, together with interests and costs, and any such further relied that the this Court deems appropriate.

The Plaintiff demands a jury trial on all such triable issues.

Dated: 11/23/04

INDIANAPOLIS LIFE INSURANCE COMPANY
By its attorneys,

William T. Bogaert, BBO#546321
Kathleen M. Colbert, BBO#561174
Michele Carlucci, BBO#655211
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
155 Federal Street
Boston, MA 02110
617-422-5300

-12-

27235.3

# EXHIBIT D

Z7X00

# INDIANAPOLIS LIFE INSURANCE COMPANY
# AGENCY CONTRACT

_Gregg D. Caplitz_, (SSN, or TIN: _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_), engaged in operating a life insurance agency as an independent business (referred to as the "General Agent")

and

**INDIANAPOLIS LIFE INSURANCE COMPANY**, a mutual life insurance company (referred to as "the Company")

In consideration of the following terms and conditions, the parties enter into this Contract.

I. **RESPONSIBILITIES OF THE General Agent**

    A. The General Agent shall be duly licensed by the Department(s) of Insurance having jurisdiction and shall operate its business in strict conformance with all applicable laws.

    B. The General Agent agrees to:

        1. Use its best efforts to recruit and recommend for appointment qualified agents/producers.
        2. Properly train and supervise agents/producers.
        3. Exert its best efforts in keeping all insurance effected under this Contract in full force and effect.
        4. Ensure that agents/producers comply with the underwriting and issue requirements of the Company and the applicable insurance laws and regulations of the state or states in which the General Agent operates.
        5. Conduct the General Agent's business in accordance with written instructions, manuals and other directions published by the Company from time to time.

    C. Deliver, and ensure that agents/producers deliver, in accordance with Company procedures, all policies and contracts solicited and received on behalf of the Company.

    The General Agent shall not deliver or permit a policy delivery of a policy unless the proposed insured at the time of delivery is, to the best of the General Agent's knowledge and belief, in as good a condition of health and insurability as is stated in the application for such policy and unless the first premium has been fully paid and delivery is made within sixty (60) days from the date the policy is mailed from the Home Office.

    D. The General Agent agrees to keep accurate records of all transactions on behalf of the Company and to make such records available for examination and copying at any time by authorized representatives of the Company.

    E. The General Agent shall immediately forward to the Company any payment, entire or partial, taken with an application or taken upon delivery of the policy. The General Agent has no right or authority to collect or receive any monies for, or on behalf of, the Company except the initial premium procured by or through the General Agent. The General Agent shall securely hold all monies received as a fiduciary trust and same shall not be commingled with other monies.

II. **COMPENSATION**

ILAGY (12-30-96)

1

A. Compensation to the General Agent shall be as follows:

1. Subject to the conditions of this Contract, the Company shall pay the General Agent compensation on the terms and conditions set forth in the Compensation Schedules in effect at the time the business is written. Compensation shall not be earned or payable until the premium is received in cash (or waived pursuant to policy provisions) by the Company, and the policy is placed in force.

2. The Company may modify, discontinue or withdraw any plan of insurance in any jurisdiction; fix the compensation on plans not included in the Compensation Schedules which are now or may hereafter be issued by the Company; and may change compensation for specific plans of insurance, on business thereafter written, not less than ten (10) days following written notice to the General Agent.

3. The Company reserves the right to refund any premiums paid on any policy or contract if in its opinion such refund is justified for any reason. The General Agent will repay to the Company all compensation received on any premium refunded.

4. The amount, if any, and the time of payment of compensation on changes, conversions, exchanges, reinstatements, term renewals, premiums paid in advance, policies issued on a guaranteed issue basis, other special cases and programs shall be governed by the Company's underwriting and administrative rules then in effect.

5. Except for those forms of compensation which continue to be payable after termination of this Contract as set forth below in Section V, compensation will be payable only so long as this Contract remains in force.

## III. GENERAL PROVISIONS

A. The General Agent may not assign the rights to procure insurance applications or be relieved of the obligations of the General Agent under this Contract without the Company's prior written consent, which consent shall not be unreasonably withheld.

B. The General Agent may assign the compensation accruing under this Contract. Such assignment shall not be effective until the Company receives written notice and a complete copy of the assignment at its Home Office. any assignment shall always be subject to the offset and lien provided for in this Contract unless the Company agrees to the contrary in writing.

C. The General Agent shall be personally liable for any indebtedness or debit balance incurred by the General Agent or agents/producers recruited by the General Agent. As security for payment, the General Agent hereby agrees that the Company shall have a first and prior lien against the compensation provided under this Contract to the extent of such indebtedness or debit balance. The Company may offset the compensation which may accrue under this Contract by any indebtedness or debit balance, including interest. The existence of this lien shall not prevent the Company from recovering any indebtedness from the General Agent. The Company will waive this lien if substitute collateral is provided which is satisfactory to the Company.

D. The General Agent shall be free to exercise independent judgment as to the time, place and means of performing all acts under this Contract, and the relationship of the General Agent to the Company shall be that of an independent contractor. Nothing in this Contract shall be construed to create the relationship of employer and employee between the General Agent and the Company.

E. The furnishing of information concerning policyholders and beneficiaries shall be governed by such reasonable rules as may be established and published from time to time by the Company. Subject to applicable law, the Company will not require the policyholder consent as a precondition to furnishing such information as long as this Contract remains in force.

F. Failure of the General Agent or the Company to insist upon strict compliance with any of the conditions of this Agreement shall not be construed as a waiver of any such conditions.

G. No oral promises or representations shall be binding nor shall this Contract be modified except by agreement in writing, executed on behalf of the Company by a duly authorized officer and by the General Agent.

H. This Contract and any schedules referred to herein supersede all previous Contract and agreements between the General Agent and the Company made for the procurement of insurance products; but it shall not diminish economic obligations of either party on existing policies which exist under any previous Contracts.

I. All books, accounts, records, (including electronic records), documents, vouchers, letters received and all other items provided by the Company and relating to or connected with the business of the Company shall be the property of the Company. Upon termination of this Contract by either party, for any reason, the General Agent shall immediately return to the Company all accounts and records. The General Agent shall at all times, up to and including the return of said accounts and records to the Company, preserve and protect the confidentiality of such accounts, records and other items. The General Agent's breach of this confidentiality by releasing any information contained in said accounts, records and other items to other than the client, the client's advisor, or person specifically authorized by the Company shall be deemed a violation of this Contract.

J. The General Agent has no authority to use, or permit the use of, any materials, supplies, advertising or other printed or written matter involving the Company (except that provided by the Company) without prior written approval.

K. This Contract is an Indiana contract and shall be interpreted in accordance with the laws of the sate of Indiana. The General Agent agrees to subject itself to the jurisdiction of courts in Marion County, Indiana for any legal proceeding arising under this Contract. General Agent further agrees that any legal proceeding that it may bring against the Company in connection with this Contract, shall be in Marion County, Indiana.

L. The provisions of this Section shall survive any termination of this Contract.

IV. **TERMINATION**

A. This Contract, together with any and all riders, supplements and schedules, shall terminate at the earliest of:

1.  Except as provided below, ten days (10) following written notice, by either party to the other party mailed to the address of the other party specified in VII below, with or without cause.

2.  Immediately upon the death, sale, dissolution, termination or discontinuance of the General Agent unless the Company has given its written consent to the continuation of the contractual relationship, which consent shall not be unreasonably withheld.

3.  Immediately for any material act of fraud or dishonesty, or any wrongful withholding of funds, policies, receipts or other property belonging to the Company or to an applicant for insurance.

B.  The General Agent agrees that commencing with the termination date of this Contract by either party and for a period of two (2) years thereafter, the General Agent shall not directly or indirectly, solicit any application on any product sold by any competing organization which will result in the replacement of any Company product which was sold or serviced by the General Agent, Agent, Producer or Agencies recruited by it. The General Agent further agrees that during this two year period, the General Agent will not use values from products of the Company to fund the sale of any product sold by a competing organization. The General Agent further agrees that it will not induce any agent or general agent to terminate an insurance product with the Company.

## V.   VESTED COMPENSATION

Payments of any sums by the Company to the General Agent after termination of this Contract shall be made only under this section. Upon termination of this Contract, commissions under this Contract are vested subject to the following:

A.  Payment of renewal commissions after termination shall continue as long as renewal commissions are generated on the policies involved.

B.  Notwithstanding anything to the contrary in this Contract, if this Contract is terminated under the provisions of Paragraph IV.A.3., no payments of any kind shall be continued after termination.

## VI.   NOTICE/MULTIPLE COPIES

A.  Any notice given under any provision of this Contract shall be complete upon deposit, postage prepaid, in the US Mail addressed to General Agent's address according to the Company's records or the Company at its home office, whichever applies.

B.  This Contract has been executed in multiple copies, each of which is deemed to be an original.

## VII.   INDEMNITY

A.  The Company shall indemnify and hold the General Agent harmless against any and all costs, expenses, losses damages, including exemplary and punitive damages, charges, counsel fees, payments and liabilities which may be asserted against it or for which it may be held liable arising out of or attributable to:

(i)   any unauthorized or negligent act or omission of the Company or its designees, affiliates or employees; and

(ii)  any wrongful or tortious conduct of the Company or its designees, affiliates or employees.

ILAGY (12-30-96)

4

B. The General Agent shall indemnify and hold the Company harmless against any and all costs, expenses, losses damages, including exemplary and punitive damages, charges, counsel fees, payments and liabilities which may be asserted against it or for which is may be held liable arising out of or attributable to:

(i) any unauthorized or negligent act or omission of the General Agent, its employees and agents/producers; and

(ii) any wrongful or tortious conduct of the General Agent, its employees and agents/producers.

C. The terms of this Article shall survive the termination of this Agreement.

Executed at Indianapolis, Indiana, of this _____xxxxx_____ day of, _____xxxxxxxxx_____, _____97_____ .
                                            11th                    June              1997

_Gregg D. Coplitz._
**THE GENERAL AGENT**

By _____

As its _____

**INDIANAPOLIS LIFE INSURANCE COMPANY**

By _____
      James W. Cassel

As its    Vice President, Agencies

# EXHIBIT E

UNITED STATES DISTRICT COURT FILED
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| INDIANAPOLIS LIFE INSURANCE COMPANY | ) ) ) | |
| **Plaintiff** | ) ) | |
| v. | ) ) | |
| ROSALIND HERMAN, TRUSTEE, FINANCIAL RESOURCES NETWORK, INC., PROFIT SHARING PLAN AND TRUST, FINANCIAL RESOURCES NETWORK INC. PROFIT SHARING PLAN AND TRUST, GREGG D. CAPLITZ, RUDY K. MEISELMAN, M.D. and HOPE E. MEISELMAN | ) ) ) ) ) ) ) ) ) | **Case No. 04-12481WGY** |
| **Defendants** | ) ) | |

**ANSWER AND COUNTERCLAIM OF ROSALIND HERMAN, TRUSTEE, FINANCIAL RESOURCES NETWORK, INC. PROFIT SHARING PLAN AND TRUST, FINANCIAL RESOURCES NETWORK, INC. PROFIT SHARING PLAN AND TRUST, FINANCIAL RESOURCES NETWORK, INC. AND GREGG D. CAPLITZ**

NOW COME the defendants/plaintiffs in counterclaim, Rosalind Herman, Trustee, Financial Resources Network, Inc. Profit Sharing Plan and Trust, Financial Resources Network, Inc. Profit Sharing Plan and Trust and Gregg D. Caplitz (hereinafter "Defendants/Plaintiffs in counterclaim") and hereby answers the Complaint (hereinafter "Complaint") of the plaintiff Indianapolis Life Insurance Company (hereinafter "Indianapolis Life") as follows:

<u>Introduction</u>

No answer is required by the Federal Rules of Civil Procedure. To the extent an

answer is required the Defendants/Plaintiffs in counterclaim hereby incorporate by reference its answer to the Complaint contained herein.

## The Parties

1.       Admitted;

2.       Admitted;

3.       Defendants/Plaintiffs in counterclaim admit that Rosalind Herman is an individual with an address of 27 Davis Road, Woburn, MA but deny the remaining allegations contained in paragraph 3 of the Complaint;

4.       Defendants/Plaintiffs in counterclaim admit that Caplitz is an insurance agent who acted as the agent in the issuance of the policies at issue in this matter but deny the remaining allegations contained in paragraph 4 of the Complaint;

5.       Admitted;

6.       Admitted;

7.       Defendants/Plaintiffs in counterclaim admit that 28 U.S.C.A. sec.1332(a)(1) confers jurisdiction over such claims but denies the remaining allegations contained in Paragraph 7 of the Complaint;

8.       No answer is required.  To the extent an answer is required Defendants/Plaintiffs in counterclaim state that the Agency Contract between Indianapolis Life and Gregg D. Caplitz mandates that the Courts of Marion County, Indiana serve as the forum for any legal proceedings arising under this Contract [See Exhibit "C" section III K of Complaint]. All other averments in Paragraph 8 are denied;

9. Admitted;

10. Admitted;

11. Admitted;

12. Admitted;

13. No answer is required as the document referenced in Paragraph 13 of the Complaint speaks for itself;

14. Denied;

15. Denied;

16. Denied;

17. Denied;

18. Admitted;

19. Denied;

20. Denied;

21. Denied;

22. Denied;

23. Denied;

24. Denied;

25. Denied;

26. Denied;

27. Denied;

28. Denied;

29. Admitted;

30. Admitted;

31.   Denied;

32.   Defendants/Plaintiffs in counterclaim admit that Indianapolis Life was

advised that they did not wish to exercise its right to return the policies

and that they wanted the policies to remain in effect, all other allegations

contained in Paragraph 32 of the Complaint are hereby denied;

33.   Admitted;

34.   Admitted;

35.   Denied;

36.   Denied;

37.   Denied;

## COUNT I

38.   No Answer is required. To the extent an Answer is required the

Defendants/Plaintiffs in counterclaim hereby incorporate by reference its

Answers to Paragraphs 1 through 37 as if the same were fully set forth

herein;

39.   Denied;

40.   Denied;

41.   Denied;

42.   Denied;

## COUNT II

43.   No Answer is required. To the extent an Answer is required the

Defendants/Plaintiffs in counterclaim hereby incorporate by reference its

Answers to Paragraphs 1 through 42 as if the same were fully set forth

herein;

44.    Admitted;

45.    Denied;

## COUNT III

46.    No Answer is required. To the extent an Answer is required the

Defendants/Plaintiffs in counterclaim hereby incorporate by reference its

Answers to Paragraphs 1 through 45 as if the same were fully set forth

herein;

47.    Denied;

48.    No Answer is required as the document, the purported Agency Contract,

speaks for itself;

49.    Denied;

50.    Denied;

51.    Denied;

52.    No Answer is required as the document, the purported Agency Contract,

speaks for itself;

53.    Admitted;

54.    Admitted;

55.    Denied;

56.    Denied;

57.    Denied;

## COUNT IV

58.    No Answer is required. To the extent an Answer is required the

Defendants/Plaintiffs in counterclaim hereby incorporate by reference its Answers to Paragraphs 1 through 57 as if the same were fully set forth herein;

59.    Denied;

60.    Admitted;

61.    Denied;

62.    Denied;

## COUNT V

63.    No Answer is required. To the extent an Answer is required the Defendants/Plaintiffs in counterclaim hereby incorporate by reference its Answers to Paragraphs 1 through 62 as if the same were fully set forth herein;

64.    Denied;

65.    Denied;

66.    Denied

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted and therefore, pursuant to F.R.Civ.P. 12(b)(6), must be dismissed.

### Second Affirmative Defense

The Complaint must be dismissed for improper venue, pursuant to F.R.Civ. P. 12(b)(3).

### Third Affirmative Defense

The Complaint's allegations are barred by the Statute of Frauds.

### Fourth Affirmative Defense

The Complaint's allegations are barred based on the theories of estoppel and/or waiver.

### Fifth Affirmative Defense

The Complaint's allegations are barred based on the theories of res judicata.

### Sixth Affirmative Defense

Pursuant to F.R. Civ. P. 9(b), the Complaint stands to be dismissed.

### Seventh Affirmative Defense

Any damages sustained by Indianapolis Life were caused by persons/entities other than the Defendants/Plaintiffs in Counterclaim.

### Eighth Affirmative Defense

The Complaint's allegations are barred based upon the principles of waiver.

### Ninth Affirmative Defense

The Complaint's allegations are barred based upon the principle of unclean hands.

### Tenth Affirmative Defense

The Complaint's allegations are barred by the applicable statute of limitations.

**DEFENDANTS/PLAINTIFFS IN COUNTERCLAIM DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

## COUNTERCLAIMS

### The Parties

1.  Gregg D. Caplitz, ("hereinafter Caplitz") the plaintiff-in-counterclaim, is an individual currently residing in Chelsea, Suffolk County, Massachusetts. Caplitz is a self-employed independent contractor who, at all times relevant to this Counterclaim, served as a Senior Design Consultant to Financial Resources Network, Inc.

2.  Financial Resources Network, Inc., ("hereinafter FRN") the plaintiff-in-counterclaim, is a Massachusetts corporation with a principle place of business located at 424 Washington Street Woburn, Middlesex County, Massachusetts. At all relevant times it maintained an employer-sponsored profit sharing plan known as Financial Resources Network Profit Sharing Plan and Trust ("hereinafter The Plan"). At all relevant times Rosalind Herman, as Clerk of FRN was the administrator of the profit sharing plan and Ms. Rosalind Herman served as the plan trustee ("hereinafter Trustee");

3.  Indianapolis Life Insurance Company, the defendant-in-counterclaim is an Indianapolis Corporation with a principle place of business in Indianapolis, Indiana;

### Statement of Facts

4.  Indianapolis Life is engaged in business and/or commerce as defined by M.G.L. c.93A;

5.  At all times relevant, Gregg Caplitz was engaged in the business and/or

commerce as defined by M.G.L. c.93A;

6.    In March, 2002, Rudy K. Meiselman, M.D. became employed as an
analyst with FRN and elected to participate in The Plan.

7.    Some time on or before November 25, 2003 The Plan Trustee, in
accordance with her fiduciary duties, purchased Indianapolis Life policies
numbered B05020799 and B05020665. The policies insured the second to
die of Rudy K. Meiselman, M.D. and his wife Hope Meiselman;

8.    Rudy and Hope Meiselman agreed with and participated in the insurance
application process including; signing forms and applications, completing
a consumer interview with Indianapolis Life confirming the application's
information. They also provided medical history, including the authorized
release to Indianapolis Life of private physician medical records and
submitted to physical examinations. The policies were applied for and
issued with the complete knowledge and approval of the Meiselmans;

9.    At all relevant times to this Complaint, and since the filing of said
complaint through the present day, Caplitz served as an agent of
Indianapolis Life. The terms and conditions of said relationship were
memorialized in a so-called "Agency Contract". As such he assisted the
Meiselmans and The Plan with the implementation of the policies;

10.    Said policies were put into force by Indianapolis Life on or about
November 25, 2003;

11.    At all relevant times, from application to issuance, The Plan was the
policy owner and the Meiselmans were the insureds;

12. Said policies were so-called "second to die" policies and were underwritten on a joint life expectancy;

13. Sometime after the placement of the polices, the Meiselmans began a concerted series of actions designed to harm FRN, Rosalind Herman and Caplitz, attempting to directly interfere with The Plan Trustee's fiduciary duties;

14. The Meiselmans complained to Indianapolis Life falsely claming that he never wanted the insurance placement;

15. In early fall, 2003 Rudy Meiselman, M.D. approached The Plan Trustee and requested that certain Plan funds be transferred to Price Asset Management. Despite repeated, fruitless requests from The Plan Trustee for basic information from Price Asset Management, Meiselman insisted by written release that said funds be released;

16. The Plan Trustee relented and released certain Plan funds. However, Meiselman misrepresented the amount of the transfer, misleading The Plan Trustee that the transfer was fifty percent of its actual value;

17. The Plan Trustee, continuing the performance of her fiduciary duties under The Plan, insisted on some basic due diligence information from Price Asset Management. Said information was not forthcoming and, as a result, The Plan Trustee demanded return of the funds. These actions by The Plan Trustee upset the Meiselmans;

18. As a result of the Meiselmans' complaints, Indianapolis Life illegally rescinded the two life insurance policies. This was done despite the fact

that The Plan allowed for such insurance placements, and the placements

were made with the full knowledge and consent of the Meiselmans;

Further, the Meiselmans had no legal authority to request rescission of the

policies. The Meiselmans were named insureds, neither was a policy

owner and therefore had no contractual right to force rescission;

19.     The Policies in question mandated that during the lifetime of the survivor,

all rights and privileges could only be exercised by the Policy Owner;

20.     Indianapolis Life knew all of this when it made the unilateral decision to

rescind the policies;

### COUNT I Financial Resources Network, Inc. v. Indianapolis Life

### *Breach of Contract*

21.     FRN repeats the allegations set forth in paragraphs 1 through 17 as if fully

set forth herein;

22.     The actions of Indianapolis Life constituted a breach of their contractual

obligations;

23.     As a direct and proximate result of Indianapolis Life's actions, FRN has

suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully

pray this Honorable Court grant them the following relief:

(a)     Order the reinstatement of the policies in question;

(b)     Award damages, together with interest and costs in an amount to

be determined;

(c)     Any such further relief this Court deems appropriate

## COUNT II  Gregg Caplitz v. Indianapolis Life

### *Breach of Contract*

24.    Caplitz repeats the allegations set forth in paragraphs 1 through 17 as if fully set forth herein;

25.    The actions of Indianapolis Life constituted a breach of their contractual obligations to Caplitz ;

26.    As a direct and proximate result of Indianapolis Life's actions, Caplitz has suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully pray this Honorable Court grant them the following relief:

(a) Order the reinstatement of the policies in question;

(b) Award damages, together with interest and costs in an amount to be determined;

(c) Any such further relief this Court deems appropriate

## COUNT III FRN v. Indianapolis Life

### *Intentional Interference with Fiduciary Duty*

27.    FRN repeats the allegations set forth in paragraphs 1 through 20 as if fully set forth herein;

28.    The intentional actions of Indianapolis Life interfered with The Plan Trustee's ability to carry out her fiduciary duties under The Plan;

29.    As a direct and proximate result of Indianapolis Life's actions, FRN has

suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully

pray this Honorable Court grant them the following relief:

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully pray this

Honorable Court grant them the following relief:

(a) Order the reinstatement of the policies in question;

(b) Award damages, together with interest and costs in an amount to be

determined;

(c) Any such further relief this Court deems appropriate

### COUNT IV FRN v. Indianapolis Life

#### *Negligent Interference with Fiduciary Duty*

30.    FRN repeats the allegations set forth in paragraphs 1 through 23 as if fully

set forth herein;

31.    The negligent actions of Indianapolis Life interfered with The Plan

Trustee's ability to carry out her fiduciary duties under The Plan;

32.    As a direct and proximate result of Indianapolis Life's actions, FRN has

suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully

pray this Honorable Court grant them the following relief:

(a) Order the reinstatement of the policies in question;

(b) Award damages, together with interest and costs in an amount to be

determined;

(c) Any such further relief this Court deems appropriate

## COUNT V FRN v. Indianapolis Life

### Conspiracy

33.    FRN repeats the allegations set forth in paragraphs 1 through 26 as if fully set forth herein;

34.    Indianapolis Life conspired with other persons, known and unknown to FRN, to interfere with The Plan Trustee's fulfillment of her fiduciary duties;

35.    As a direct and proximate result of Indianapolis Life's actions, FRN has suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully pray this Honorable Court grant them the following relief:

(a) Order the reinstatement of the policies in question;

(b) Award damages, together with interest and costs in an amount to be determined;

(c) Any such further relief this Court deems appropriate

## COUNT VI Caplitz v. Indianapolis Life

### Conspiracy

36.    Caplitz repeats the allegations set forth in paragraphs 1 through 29 as if fully set forth herein;

37.    Indianapolis Life conspired with other persons, known and unknown to

Caplitz, to interfere with his business relations under the contractual terms between he and Indianapolis Life;

38.    As a direct and proximate result of Indianapolis Life's actions, Caplitz has suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully pray this Honorable Court grant them the following relief:

> (a) Order the reinstatement of the policies in question;
>
> (b) Award damages, together with interest and costs in an amount to be determined;
>
> (c) Any such further relief this Court deems appropriate

## COUNT VII FRN v. Indianapolis Life

### *Interference With Advantageous Business Relations*

39.    FRN repeats the allegations set forth in paragraphs 1 through 32 as if fully set forth herein;

40.    The negligent and intentional actions of Indianapolis Life tortiously interfered with FRN's previously established advantageous business relationships;

41.    As a direct and proximate result of Indianapolis Life's actions, FRN has suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully pray this Honorable Court grant them the following relief:

> (a) Order the reinstatement of the policies in question;

(b) Award damages, together with interest and costs in an amount to be
determined;

(c) Any such further relief this Court deems appropriate

## COUNT VIII Caplitz v. Indianapolis Life

### *Interference With Advantageous Business Relations*

42.    Caplitz repeats the allegations set forth in paragraphs 1 through 35 as if
fully set forth herein;

43.    The negligent and intentional actions of Indianapolis Life tortiously
interfered with Caplitz's established and prospective advantageous
business relationships;

44.    As a direct and proximate result of Indianapolis Life's actions, Caplitz has
suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully
pray this Honorable Court grant them the following relief:

(a) Order the reinstatement of the policies in question;

(b) Award damages, together with interest and costs in an amount to be
determined;

(c) Any such further relief this Court deems appropriate

## COUNT IX Caplitz v. Indianapolis Life

### *Chapter 93A*

45.    Caplitz repeats the allegations set forth in paragraphs 1 through 44 as if
fully set forth herein;

46.    The actions of Indianapolis Life constituted unfair and/or deceptive business practices;

47.    As a direct and proximate result of Indianapolis Life's actions, Caplitz has suffered losses and sustained damages to be proven at trial;

WHEREFFORE, the defendants/plaintiffs in counterclaim respectfully pray this Honorable Court grant them the following relief:

   (a) Order the reinstatement of the policies in question;

   (b) Award damages, including but not limited to treble damages together with interest and costs in an amount to be determined;

   (c) Any such further relief this Court deems appropriate

THE DEFENDANTS/PLAINTIFFS IN COUNTERCLAIM DEMAND A JURY TRIAL ON ALL SUCH TRIABLE ISSUES.


Respectfully submitted,
Financial Resources Network, Inc.
Financial Resources Network, Inc. Profit
Sharing Plan and Trust, Rosalind Herman, Trustee
Gregg Caplitz
By their attorneys,

Wayne R. Murphy/BBO #557658
Murphy & Flaherty, P.A.
43 Bowdoin Street
Boston, MA 02114
(617) 227-7777

CERTIFICATE OF SERVICE

I, Wayne R. Murphy, counsel for the defendants/plaintiffs in counteclaim hereby certify that I have previously caused a copy of the Defendants' Answer, Counterclaim and Jury Trial Demand to be served upon counsel for Indianapolis Life and have this day made arrangements for service of same upon counsel for the co-defendant Meiselman via hand delivery upon:

Charles Kazarian, Esq.
77 North Washington Street
Boston, MA 02114

Signed this __th day of March, 2005.

Wayne R. Murphy

# EXHIBIT F



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

---

*FINANCIAL RESOURCES NETWORK INC.* **Summary Screen**

Help with this form

| Request a Certificate |

**The exact name of the Domestic Profit Corporation:** FINANCIAL RESOURCES NETWORK INC.

**Entity Type:** Domestic Profit Corporation

**Identification Number:** 043256270

**Old Federal Employer Identification Number (Old FEIN):** 000485884

**Date of Organization in Massachusetts:** 01/09/1995

**Current Fiscal Month / Day:** 12 / 31          **Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office in Massachusetts:**
No. and Street:      424 WASHINGTON ST.
City or Town:      WOBURN          State: MA      Zip: 01801      Country: USA

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town:          State:          Zip:          Country:

**The name and address of the Registered Agent:**
Name:      KEITH HERMAN
No. and Street:      424 WASHINGTON STREET
City or Town:      WOBURN          State: MA      Zip: 01801      Country: USA

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration of Term |
|---|---|---|---|
| PRESIDENT | ROSALIND HERMAN | 10916 SUMMER QUAIL AVE<br>LAS VEGAS, NV 89144 USA | |
| TREASURER | ROSALIND HERMAN | 10916 SUMMER QUAIL AVE<br>LAS VEGAS, NV 89144 USA | |

| SECRETARY | ROSALIND HERMAN | 10916 SUMMER QUAIL AVE LAS VEGAS, NV 89144 USA | |
| DIRECTOR | BRIAN J HERMAN | 10916 SUMMER QUAIL AVE LAS VEGAS, NV 89144 USA | |
| DIRECTOR | ROSALIND HERMAN | 10916 SUMMER QUAIL AVE LAS VEGAS, NV 89144 USA | |
| DIRECTOR | BRAD J HERMAN | 10916 SUMMER QUAIL AVE LAS VEGAS, NV 89144 USA | |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments | | Total Issued and Outstanding *Num of Shares* |
| --- | --- | --- | --- | --- |
| | | *Num of Shares* | *Total Par Value* | |
| CNP | $0.00000 | 200,000 | $0.00 | 10,000 |

| __ Consent | __ Manufacturer | __ Confidential Data | __ Does Not Require Annual Report |
| **X** Partnership | __ Resident Agent | **X** For Profit | __ Merger Allowed |

**Select a type of filing from below to view this business entity filings:**
ALL FILINGS
Administrative Dissolution
Annual Report
Application for Reinstatement
Application For Revival

[ View Filings ]    [ New Search ]

| **Comments** |
| --- |
| |

© 2001 - 2006 Commonwealth of Massachusetts
All Rights Reserved

[?]
Help

# EXHIBIT G

1

| 1 | Volume:    I |
| 2 | Pages:     1-104 |
| 3 | Exhibits:  1-11 |

4              UNITED STATES DISTRICT COURT

5               DISTRICT OF MASSACHUSETTS

6                  NO. 04-12481WGY

7      - - - - - - - - - - - - - - - - - - - - - x

8    Indianapolis Life Insurance Company,

9                    Plaintiff,

10        v.

11   Rosalind Herman, Trustee, Financial Resources

12   Network, Inc. Profit Sharing Plan and Trust,

13   Financial Resources Network, Inc. Profit Sharing

14   Plan and Trust, Gregg D. Caplitz, Rudy K.

15   Meiselman, M.D., and Hope E. Meiselman,

16                    Defendants.

17     - - - - - - - - - - - - - - - - - - - - - x

18         DEPOSITION OF RUDY K. MEISELMAN

19       Thursday, September 15, 2005 1:20 p.m.

20     WILSON ELSER MOSKOWITZ EDELMAN & DICKER

21               115 Federal Street

22          Boston, Massachusetts 02110

23                                    CERTIFIED ORIGINAL
                                      LEGALINK BOSTON
24   Reporter:  Lori-Ann London, RPR

Rudy K. Meiselman                                        09/15/2005

16

1        Q       Yeah.

2        A       Oh, five or six years.

3        Q       And what -- are they both CPAs, both

4   these accountants?

5        A       Both are CPAs.

6        Q       And what services do they provide for

7   you?

8        A       They take care of my account -- my joint

9   account with my wife, they take care of the tax

10  return for the Meiselman Real Estate Limited

11  Partnership, and I believe that's all.

12       Q       Do they file your own personal income

13  taxes too; do they prepare your personal income

14  taxes?

15       A       Oh, of course.

16       Q       From the time of January of 2000 to the

17  present date, other than this woman, Ingrid, and

18  the gentleman in Chicago, did you have any other

19  accountants --

20       A       No.

21       Q       -- that you've ever retained?

22               Have you ever heard of the name A.

23  James Goodness?

24       A       In documents provided to me I heard his

Rudy K. Meiselman                                          09/15/2005

17

1    name, but prior to that, I never heard of his

2    name.

3        Q    Okay.  If I were to suggest to you that

4    he's a certified public accountant in Waltham,

5    Massachusetts, would that help?

6        A    That's what his letterhead says.

7        Q    Was he ever your accountant?

8        A    Never.

9        Q    Did you ever provide him with any

10   documents?

11       A    Never.

12       Q    Let me show you a couple of documents

13   that we'll mark.

14            MR. BOGAERT:  Gentlemen, my proposal

15   is, unless there's some major objection, is that

16   since a lot of these documents are going to be

17   shown to a number of different people, that we

18   mark them sequentially; that we have -- you know,

19   Deposition Exhibit 1 will be for all witnesses

20   rather than have five copies of the same thing --

21            MR. MURPHY:  That's fine.

22            MR. KAZARIAN:  Um-hm.

23            MR. BOGAERT:  -- since there's so

24   many documents here.  And if we happen to mark

Rudy K. Meiselman                                    09/15/2005

28

1    disagreement with Mr. Mann or any of his

2    colleagues?

3        A    Not at all.  I remained on good terms

4    with him.

5        Q    And are you still on good terms with him

6    today?

7        A    Yes.

8        Q    And how is it that you wound up at

9    Financial Resource Network?

10       A    I mentioned to Mr. Caplitz that I had

11   lost my job with Advisors Capital, and he

12   suggested that he would employ me or arrange for

13   me to be employed by Financial Resources Network.

14       Q    Did you know if Financial Resources

15   Network at that time had an employee profit

16   sharing plan or retirement plan of any type?

17       A    They did not.

18       Q    And was your principal reason of

19   accepting employment with them, them being

20   Financial Resource Network, is that they would

21   create a profit sharing plan or a retirement -- an

22   employee retirement plan?

23            MR. KAZARIAN:  Object to the form of

24   that question, Bill.

Rudy K. Meiselman                                    09/15/2005

32

1    would be less than if I were a retail customer.

2        Q    Okay.  And let me be sure that I

3    understand that.  What you just mentioned to me,

4    the fee for the accounts that you managed, those

5    were not your retirement accounts; is that what

6    you're saying?

7        A    It included my retirement accounts and

8    private accounts.

9        Q    Okay.  So Financial Resource Network

10   took a fee from your account activity that went

11   through the platform that they had with

12   TD Waterhouse; is that correct; am I correct in

13   understanding that?

14       A    Yes.

15       Q    Okay.  And those included your -- not

16   only your employee retirement plan account that

17   was with the Financial Resource Network employee

18   plan, right --

19       A    Yes.

20       Q    -- but the other accounts as well?

21       A    Yes, I had a segregated self-directed

22   account within the pension plan, and that account

23   was titled my roll-over account, because it came

24   from -- the bulk of it came from another source.

Rudy K. Meiselman                                    09/15/2005

33

1      Q    Okay.  And by segregated, that meant

2   that it was subject to the requirements of ERISA,

3   it was an employee retirement account?

4      A    Everything within a pension plan is

5   subject to ERISA constraints.

6      Q    Well, here's my question then.  I

7   thought I understood what you were saying, but I

8   may be confused.  I think you told me previously

9   you have some accounts of your own and your wife's

10  which are not segregated retirement accounts,

11  correct?

12     A    That's right.

13     Q    And your children have some accounts and

14  there's some real estate accounts you have which

15  don't -- which are not employee accounts; is that

16  right?

17     A    Right.

18     Q    And you manage those accounts on behalf

19  of yourself, your wife, your kids, the trust, and

20  you use the platform available through FRN to make

21  those trades with TD Waterhouse; is that right?

22     A    That's right.

23     Q    Okay.  And then separate from that or in

24  addition to that you also have a segregated

Rudy K. Meiselman                                    09/15/2005

34

1    account which is an employee retirement account;

2    is that what you meant by segregated?

3        A    Yes, in contra distinction to an omnibus

4    account for a company such as General Electric,

5    which has thousands of employees, they don't

6    manage their accounts individually, but I manage

7    my own pension plan account.

8        Q    And I'm going to ask you a lot of

9    questions about that in a little bit, but I just

10   want to make the distinction between the

11   retirement account and other individual accounts

12   that you were managing.

13       A    Um-hm.

14       Q    And you said that there was an advantage

15   to them being FRN by having you have all accounts

16   go through their platform; is that right?

17       A    That's right.

18       Q    And what was the fee that they made

19   on --

20       A    Three-tenths of one percent, but that

21   was on a great deal of money, and I would guess

22   their income from that was about $60,000 a year.

23       Q    And what were you being paid for your

24   services there?

Rudy K. Meiselman                                    09/15/2005

36

1   of any other employee that worked for Financial

2   Resource Network when you worked for them?

3        A    Certainly not that I know of.

4        Q    Okay.  And, I'm sorry, can you give me

5   to the best of your memory the dates of your

6   employment at FRN?

7        A    From early 2002 until the end of 2004.

8        Q    And what was your reason for leaving?

9        A    I left because -- well, I don't know

10  whether I should recite all of those, but in any

11  case, I was distinctly offended and disturbed by

12  the purchase of the Indianapolis Life Insurance

13  policy which was purchased without my permission

14  and certified during the free-look period despite

15  my objections.

16       Q    Okay.  And I take it then you left --

17  you chose to leave; is that correct?

18       A    Well, not really.  I was -- I was

19  required to sign a release form prepared by

20  another legal firm representing Mrs. Herman,

21  Gadsby & Hannah, and they had me sign a release

22  form with provisions that I would submit my

23  resignation.

24       Q    Okay.  So -- I have a better

Rudy K. Meiselman                                      09/15/2005

38

1    person who is listed as the president, CEO, and

2    owner of a hundred percent of the stock of

3    Financial Resources Network, but as far as I know,

4    she does not do any -- perform any services for

5    Financial Resources Network.  That's all done by

6    Mr. Caplitz, that is, selling life insurance and

7    money management.

8         Q    Okay.  Other than -- strike that.

9              Are you aware of any services that

10   she provided to clients?

11        A    None.

12        Q    Have you ever met Ms. Herman?

13        A    I never have met her.

14        Q    Okay.  Have you spoken with her on the

15   phone?

16        A    On one occasion.

17        Q    That was it?

18        A    Please?

19        Q    That was it?

20        A    Once, that's correct.

21        Q    So when you would prepare reports about

22   mutual funds or make recommendations about funds,

23   who did you make those reports or recommendations

24   to?

39

1       A       They went by e-mail to the e-mail
2   address of Financial Resources Network.
3       Q       Okay.  And if there were any questions
4   about those or you had any communications about
5   them, who would those communications be with?
6       A       I didn't get you.
7       Q       Okay.  You would send an e-mail of a
8   report.  Was there ever any follow-up by FRN to
9   you about those reports?
10      A       We had occasional telephone calls about
11  it.
12      Q       And who is the we?
13      A       Mr. Caplitz and I.
14      Q       So to the extent that you spoke with
15  anyone at FRN about your employment there or your
16  recommendations and reports, it was with
17  Mr. Caplitz --
18      A       Always.
19      Q       -- is that correct?
20      A       Always.
21      Q       Always.
22              And you told me before you thought
23  that his role was to sell life insurance, and he
24  was the behind-the-scenes person; is that right?

Rudy K. Meiselman

09/15/2005

40

1      A      He was what?

2      Q      The behind-the-scenes person.

3      A      That's right.

4      Q      Do you know if he had any license to

5  sell products other than life insurance?

6      A      Yes, he has a number of certifications.

7  That's in his Form ADV registration with the

8  Securities and Exchange Commission.

9      Q      Were you aware of that before you saw

10  the ADV?

11      A      I assumed that he was well certified,

12  but I did -- I never saw any evidence of his

13  certifications before I saw that form.

14      Q      I'm going to segue a little bit now into

15  that then.  When did you first meet Mr. Caplitz?

16      A      I cannot tell you when.  I met him

17  initially having been introduced by Robert Mann

18  when Mr. Mann sold me the DRV 5 policy.

19      Q      So would it be fair to say within the

20  last ten years, between 1995 and 2005, that was

21  the first time you met with him?

22      A      That's about correct.

23      Q      Okay.  And I think you told us

24  previously that Mr. Mann introduced you to

Rudy K. Meiselman

09/15/2005

55

1    A    Yes.

2    Q    **Who?**

3    A    The gentleman's name is Karl, K-A-R-L,

4    Boyer, B-O-Y-E-R, and he's the principal in Alpha

5    Omega Financial Services.

6    Q    **When were those documents prepared, if**

7    **you know?**

8    A    I can't say for sure, but the plan was

9    in place as of January 2002.

10    Q    **An did you receive a copy of the plan**

11    **documents shortly after it was created?**

12    A    The plan documents and the summary plan

13    description.

14    Q    **Okay.  Did you have any role in the**

15    **preparation of those plan documents?**

16    A    No.

17    Q    **And other than yourself, who**

18    **participated in the plan when it was first**

19    **created?**

20    A    No one else participated in 2002 and

21    2003.  Mrs. Herman had a small account beginning I

22    believe in 2004.

23    Q    **And was there -- other than to prepare**

24    **the plan documents, did Mr. Boyer or Alpha Omega**

Rudy K. Meiselman                                    09/15/2005

59

1    Mr. Boyer, which was not signed by Mr. --

2    Mrs. Herman and not submitted.

3        Q    Okay.  To your knowledge, was the plan

4    bonded with a fidelity bond, ERISA bond?

5        A    It was not bonded until sometime in

6    2004, and ERISA dictates that anyone handling

7    money in a plan must be bonded up to ten percent

8    of the plan assets to a maximum of $500,000 in

9    coverage.  The plan was not so bonded in

10   November 2003 when the purchase of the

11   Indianapolis Life policy was made, and as such,

12   the purchase was unlawful as defined by ERISA.

13       Q    And how do you know that there was no

14   Fidelity bond in place prior to 2004?

15       A    I have a letter from Mr. Caplitz in

16   which he admits there was no Fidelity bond and

17   said, We have applied for it and it should be

18   forthcoming soon.  That would have been sometime

19   in 2004.

20       Q    Okay.  Was -- who's the plan

21   administrator, to your knowledge?

22       A    I believe it's -- would be Mrs. Herman.

23       Q    Okay.  And the plan trustee?

24       A    Sole trustee is Mrs. Herman.

Rudy K. Meiselman                                    09/15/2005

64

1  or not, correct?

2       A    Yes.   When I became fed up with what was

3  my relationship with Mr. Caplitz and Mrs. Herman,

4  I requested many times by certified mail that my

5  account be rolled out of the plan into an IRA

6  which I had established at Profunds.

7       Q    We're going to get to that later, but

8  for now, I just want to under -- get on the record

9  your understanding of your ability to make trades

10 and activities within your accounts.

11            Did anyone at FRN or the plan ever

12 make any investment decisions for you other than

13 the purchase of the life insurance policy?

14      A    There was one occasion when Mr. Caplitz

15 missed making a trade that I had requested, and he

16 called me one day and said, I want to make it up

17 to you.  I've just purchased a large allocation of

18 Biolase, B-I-O-L-A-S-E, and I'd like to allocate

19 some of that to you.  And I said, Gee, that's very

20 nice of you.  Please do.

21            I thought that this was making up

22 for the losses I had for his error, but in point

23 of fact he just took the money out of my account

24 to purchase the Biolase.

Rudy K. Meiselman                                      09/15/2005

88

1    your wife's signature at the bottom?

2        A    It does.

3        Q    Do you remember signing this document on

4    July 30th of 2003?

5        A    I don't remember it, but the signatures

6    appear bona fide.

7        Q    Okay.  Let me ask you this.  Do you

8    recall what led you to complete a life insurance

9    application for insurance on behalf of -- from

10   American General in July of 2003?

11       A    I did not choose American General.  This

12   was part of Mr. Caplitz's recommendation that

13   based on the status of my ING policy that was in

14   danger of failing or would not persist for any

15   number of years, that I ought to exchange it into

16   a better product.

17       Q    Okay.  And when he made that

18   recommendation, what did you say?

19       A    What did I...

20       Q    Say, what was your response.

21       A    I said I'd be willing to look at any

22   illustrations provided and see whether I agree

23   that they are superior to the ING policy.

24       Q    Okay.  And do you recall that in

Rudy K. Meiselman                                    09/15/2005

89

1    addition to completing an insurance application

2    and other documents related to the application for

3    American General that you did -- completed a

4    similar -- similarly completed an application for

5    Indianapolis Life Insurance around the same time?

6        A    Yes.

7        Q    Okay.  And was your purpose in applying

8    for or completing an application for insurance

9    with Indianapolis Life the same as it was for

10   American General?

11       A    Yes, it was for the purpose of changing

12   the Indian -- the ING policy, which was outside of

13   a plan, into another policy which would be outside

14   of the plan.  There was no agreement between

15   Mr. Caplitz and me that there was a policy being

16   purchased with the plan being the owner.

17       Q    Okay.  And when you say "outside of the

18   plan," do you recall how it was that the ING

19   policy was owned?

20       A    It was owned by -- by a life insurance

21   partnership.

22       Q    Was it a life insurance trust, an ILIT

23   or --

24       A    Yes.

105

CERTIFIED ORIGINAL
LEGALINK BOSTON

Volume:    II

Pages:    105-323

Exhibits:  12-32

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 04-12481WGY

- - - - - - - - - - - - - - - - - - - - - - - x

Indianapolis Life Insurance Company,

                    Plaintiff,

        v.

Rosalind Herman, Trustee, Financial Resources

Network, Inc. Profit Sharing Plan and Trust,

Financial Resources Network, Inc. Profit Sharing

Plan and Trust, Gregg D. Caplitz, Rudy K.

Meiselman, M.D., and Hope E. Meiselman,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

    CONTINUED DEPOSITION OF RUDY K. MEISELMAN

    Monday, September 19, 2005, 9:51 a.m.

    WILSON ELSER MOSKOWITZ EDELMAN & DICKER

            155 Federal Street

        Boston, Massachusetts 02110

Reporter:  Lori-Ann London, RPR

110

1    which are Exhibits 11, 10, and 9, did you do

2    anything else to further the application?

3         A    No.  And when you say completing the

4    applications, it applies that there was data

5    recorded there, but there was not.

6         Q    Thank you.  You've previously told me

7    that your recollection is that when you signed the

8    applications the applications themselves weren't

9    complete and that you just signed a blank

10   application that was later filled in?

11        A    Three blank applications.

12        Q    Okay.  But in addition to signing a

13   blank application, did you provide any other

14   information in connection with the applications

15   for the life insurance?

16        A    Well, I think there may have been

17   permission to have a physical exam and blood

18   tests --

19        Q    Okay.

20        A    -- which I agreed to.

21        Q    And did you also submit yourself to a

22   medical examination?

23        A    Yes.

24        Q    And did Mrs. Meiselman do that as well?

116

1    haven't seen, I don't think, the ones that you're

2    speaking of, but it's your experience that most

3    illustrations issued during this time period of

4    2003 specifically state on them in some type of

5    verbiage that it's not a guarantee of policy

6    performance and it's merely an illustration; is

7    that your understanding?

8         A    Yes, and you have to examine the policy,

9    it says, because it may not be the same as the

10   illustration.

11        Q    So when was it that you learned that you

12   had been -- you and Mrs. Meiselman had been

13   accepted in underwriting for the issuance of the

14   policy?

15        A    I was never given that information.

16        Q    Okay.  At some point in time you learned

17   you had been accepted, correct?

18        A    Not until I saw a million and a quarter

19   having been removed from my -- my account.

20        Q    Okay.  So it was -- and that I think you

21   told us previously was in November of 2003?

22        A    That was November 26th, the day after --

23   I check my assets every day for appreciation and

24   loss, and the next day there was a million and a

117

 1    quarter that had been wired out of the plan, for

 2    whatever reason, I don't know, and I had to call

 3    Mr. Caplitz --

 4        Q     Okay.

 5        A     -- for an explanation.

 6        Q     And that was the first time that you

 7    were aware not only that you had been accepted,

 8    but a payment of the first year's premium had been

 9    paid?

10        A     That's correct.

11        Q     Now, I'm sorry, did you say that a

12    million --

13        A     And 25,000.

14        Q     Had been wired out?

15        A     Yes.

16        Q     I thought that the premium was being

17    paid on margin.  Why was a million twenty-five

18    thousand being wired out?

19        A     Well, somebody in Financial Resources

20    decided on their own that all of my assets, which

21    were in cash positions, should be placed on

22    margin, and that provided several million of

23    borrowing ability, and on that basis they could

24    write -- wire out a million and a quarter or much

1      Q    And you wouldn't know that until you

2   qualified for underwriting and they gave you an

3   illustration based upon however you qualified for

4   underwriting; isn't that right?

5      A    Yes.

6      Q    Okay.  And so my question is:  Not

7   knowing whether or not you're going to replace the

8   ING policy with either the Indianapolis policy or

9   the American General policy, were you curious as

10   to what the status of the policies were?

11      A    No.

12      Q    Okay.  Was there any change in your

13   health from the time you were examined as part of

14   the application process in November 2003?

15      A    Um-hm, there was.

16      Q    And can you tell me about that?

17      A    Yes.  I became aware of a significant

18   weight loss of about 11 pounds or so.  I can't

19   tell you when I weighed more.  It's just that my

20   wife said, You look very thin.  Why don't you

21   weigh yourself.  And I have a good quality scale

22   in my home and I weighed 149 pounds.  The last I

23   recall my weight was about 162.  I felt fine, but

24   I felt that I had to look into it.

123

1       Q       Okay.

2       A       So I saw a surgeon, Mr. -- Dr. Simon,

3  who conducted some tests.

4       Q       And where was Dr. Simon located?

5       A       In Providence.

6       Q       And had you seen him before?

7       A       Yes, he had operated on me on two

8  previous occasions.

9       Q       Now, did you have any communications

10  -- strike that.

11                  Do you recall when it was that you

12  first saw Dr. Simon?

13      A       I would think it was late August or

14  early September.

15      Q       Okay.  And did he diagnose the reason

16  for your weight loss?

17      A       No, it was not apparent on physical

18  examination or taking my history.  So he ordered a

19  CT scan of my abdomen and thorax, which I had done

20  in Providence.

21      Q       And as a result of that, was further

22  medical treatment recommended?

23      A       Well, it showed a small pulmonary nodule

24  not known of previously, and the radiologist

Rudy K. Meiselman, Vol. 2                      09/19/2005

124

1    recommended that the study be repeated in three

2    months to see if it was changing.

3        Q    Was this a new medical condition for

4    you?

5        A    Well, it was an unknown medical

6    condition.  I don't think I've had a CT scan of

7    the chest, and a regular X ray very likely would

8    not have shown that small nodule.

9        Q    Okay.  I guess my question was inartful.

10   Did you -- prior to having the CT scan of the

11   chest, had you had any preexisting medical

12   condition which --

13       A    Preexisting?

14       Q    Yes.

15       A    Well, I had a history of atrial

16   fibrillation that morphed into atrial flutter, and

17   I went to Massachusetts General Hospital and had a

18   radio frequency ablation, which cured the

19   condition, and I had no recurrences of flutter

20   after that.

21       Q    And for the layman, can you tell me what

22   that means, what your medical -- what your medical

23   condition means?

24       A    Well, they pass an electrode up through

Rudy K. Meiselman, Vol. 2                              09/19/2005

127

1     Q     -- you really can't tell just from a CT

2     scan, right?

3     A     No.

4     Q     It's just a mass?

5     A     Um-hm.

6     Q     You have to say yes.

7     A     That's a good term.

8     Q     And it's a pulmonary condition as

9     opposed to a cardiac condition, correct?

10    A     Absolutely.

11    Q     Now, did you communicate with anyone at

12    FRN or Mr. Caplitz about your weight loss --

13    A     I did.

14    Q     -- in the late summer of 2003?

15    A     Yes, I did.  And the reason that I did

16    is I told him that I was concerned about my

17    medical condition and wanted to dispose of some of

18    the money management obligations that I had, and I

19    wanted to send money to a respected money manager.

20    And it was -- in order to get permission for that

21    from him and Mrs. Herman, I had to tell him that

22    my reason for doing it was that I wanted to

23    unburden myself of management.

24    Q     So you were looking -- you're looking to

Rudy K. Meiselman, Vol. 2                                    09/19/2005

194

1    Mr. Caplitz before you wrote this letter in which

2    you discussed the fact that the policy had already

3    been purchased?

4         A    Yes.

5         Q    Okay.   And can you tell me when that

6    conversation occurred?

7         A    It would have been -- on the 26th I

8    first learned that the policy had been purchased.

9    I requested of Mr. Caplitz that it be canceled.

10   He agreed to do that.   I checked later and found

11   that it had not been canceled.   And at that point

12   I spoke with him, and I used some words that I had

13   not used in many years since I was a corporal in

14   the Army.

15        Q    Okay.   Let me back up, though.   Why

16   don't you tell me what you can recall you saying

17   to Mr. Caplitz and him saying to you in the very

18   first conversation when you learned that a policy

19   had been purchased through your account.

20        A    Well, I expressed my outrage that he

21   would do that.

22        Q    Dr. Meiselman, what you're doing for me

23   is you're characterizing what you said, and what

24   I'd first like to know is what you can recall

196

1    guidelines that were in place at the time?

2         A    Not in that discussion, but I have --

3    but it is present --

4                   MR. KAZARIAN:   That's the question

5    he asked.

6                   THE WITNESS:   Yeah.

7         Q    And do you recall any conversation about

8    the ability to cancel the purchase because the

9    policy had just been issued and there was a free

10   look period?

11        A    Yes.

12        Q    And what do you recall the substance of

13   the conversation about that between you and

14   Mr. Caplitz?

15        A    I told him I wanted the policy canceled.

16   He said, Well, why don't you let me speak with

17   your wife about this, and he did, and she

18   confirmed that both of us wanted it canceled.

19        Q    So both you and Mrs. Meiselman spoke to

20   Mr. Caplitz on the day you found out the policy

21   had been purchased?

22        A    On the 26th.

23        Q    Now, you told me that in that

24   conversation you recall saying to him that he knew

197

1   that you didn't want the policy, and I'm confused

2   by that because I've asked you about conversations

3   you've had with him before that date, and I don't

4   remember you telling me that you told him you

5   didn't want the policy.  So how --

6        A    I told him I didn't want the

7   Indianapolis policy or any other policy.

8        Q    Well, when prior to learning that the

9   policy had been purchased did you tell him that?

10       A    I can't tell you the precise date, but

11  it was on more than one occasion.

12       Q    Okay.  Because what I notice is that no

13  one seems to have any telephone notes or e-mail,

14  and there's a big gap in time as to communications

15  about the insurance between both from documents

16  produced by Mr. Caplitz and documents produced by

17  you, and is it your testimony that the reason you

18  told him that you didn't want to replace the ING

19  policy was because you thought the ING policy was

20  suitable for your interest and you didn't want to

21  pay the surrender charge?

22       A    That's true.

23       Q    But you don't recall when that

24  communication occurred?

205

1              In any of your conversations about

2     whether the policy should be returned during the

3     free look period, was there any conversation with

4     him as to him losing his commission as a result?

5          A     No.

6          Q     He never raised that to you as --

7          A     No.

8          Q     -- an issue?

9              What did he give you as a rationale

10    for why the policy should not by returned?

11         A     He said that Mrs. Herman was the owner

12    of the policy and she did not elect to purchase

13    it -- to cancel it, and in addition, Mr. Murphy

14    wrote to Indianapolis and told them that he

15    represents Financial Resources Network and he

16    advised them not to cancel it.

17         Q     Okay.  If I could direct your attention

18    to the last page of the letter, which is page 5 of

19    the letter --

20         A     Yes.

21         Q     -- the next to last paragraph, the last

22    sentence says -- strike that.  Let me back up even

23    further.

24              "I respect your professional

213

1    certain.

2         Q    Okay.  Dr. Meiselman, do you recall what

3    you did when you learned that the policy had been

4    issued and that Ms. Herman had made the decision

5    that she was not going to exercise her option

6    under the free look to return the policy?

7         A    It didn't seem to me there was anything

8    I could do at that point.

9         Q    Well, did you communicate with

10   Indianapolis Life about it?

11        A    Oh, yes, I wrote to them immediately.

12        Q    Okay.  And do you recall what you said

13   or did -- said to them in those --

14        A    Yes, I said I don't want the policy, I

15   don't need the policy, and I would like it

16   canceled.

17        Q    Did you speak to anyone in particular

18   about it?

19        A    I spoke with a clerk; I don't recall her

20   name.

21             MR. BOGAERT:  Let's mark this as the

22   next exhibit.

23             (Document marked as Exhibit No. 25.)

24             (Document marked as Exhibit No. 26.)

# EXHIBIT H

1

CERTIFIED ORIGINAL
LEGALINK BOSTON

Volume:    I

Pages:    1-63

Exhibits:  None

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 04-12481WGY

- - - - - - - - - - - - - - - - - - - - - - - x

Indianapolis Life Insurance Company,

                    Plaintiff,

        v.

Rosalind Herman, Trustee, Financial Resources

Network, Inc. Profit Sharing Plan and Trust,

Financial Resources Network, Inc. Profit Sharing

Plan and Trust, Gregg D. Caplitz, Rudy K.

Meiselman, M.D., and Hope E. Meiselman,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF GREGG D. CAPLITZ

Monday, September 19, 2005, 4:00 p.m.

WILSON ELSER MOSKOWITZ EDELMAN & DICKER

155 Federal Street

Boston, Massachusetts 02110


Reporter:  Lori-Ann London, RPR

Gregg D. Caplitz                                    09/19/2005

17

1       Q    Did you play any role in the formation

2   of Financial Resources Network?

3       A    I did not.

4       Q    You've used the phrase, both in your

5   testimony and on records, that you were a special

6   consultant.  What is a special consultant?

7       A    My title on -- which I use which is on

8   the company letter -- business cards as well as

9   what I sign is a senior design consultant.

10      Q    What is a senior design consultant?

11      A    My expertise is primarily in the area of

12  estate tax planning and compensation planning for

13  high net worth individuals.  What we do -- what I

14  do is much more in the way of a consultative

15  approach to resolving solutions.  So that's a

16  title that I believe describes what I do, as

17  opposed to, you know, vice president of whatever.

18      Q    So you're a consultant to the clients of

19  FRN?

20      A    Correct.

21      Q    On behalf of FRN, correct?

22      A    Correct, I also have my own clients.

23      Q    Well, do you have clients independent of

24  FRN?

Gregg D. Caplitz                                          09/19/2005

18

1    A    I do.

2    Q    And how long have you had clients who

3    are independent of FRN?

4    A    Since 1984.

5    Q    What is your arrangement with clients

6    that you bring to FRN?

7    A    My -- FRN pays me a regular draw, and my

8    commissions are assigned, on their clients, to

9    that entity.  For instance, Dr. Meiselman is my

10   client, has been since before FRN.

11              MR. BOGAERT:  Can I have that answer

12   read back?

13              (Answer read.)

14   Q    So taking Dr. Meiselman as an example,

15   when you were broker of record on the ING policy,

16   you were paid a commission, and that commission

17   would have been paid to FRN, and you would have

18   taken a draw from FRN for that?

19   A    That's not correct.

20   Q    Okay.  Was --

21   A    Remember I said it was on FRN's clients.

22   Dr. Meiselman's my client.

23   Q    Okay.  So my prior question to you was,

24   when you bring clients to FRN.

Gregg D. Caplitz                                    09/19/2005

20

1   accounts, what interest, if any, do you have in

2   those fees?

3        A    I do not have any interest.

4        Q    And do you get paid as part of your draw

5   and consideration for the fact that those fees are

6   from a client of yours that you brought to FRN?

7        A    I've never thought of the question that

8   way, so I'm not sure what the answer would be.

9        Q    Okay.  Can you tell me those companies

10  that you're licensed to sell life insurance from

11  currently?

12       A    Mr. Bogaert --

13       Q    Yes.

14       A    -- probably 30 companies.

15       Q    Okay.  Do you have a -- are you a career

16  agent with any company?

17       A    No.

18       Q    Have you ever been a career agent with

19  any company?

20       A    If this was a less formal circumstance,

21  I would -- I would make a sign like this

22  (indicating) and say no.  No, I've never been a

23  career agent, ever.

24       Q    So -- and when you say you're a licensed

Gregg D. Caplitz

09/19/2005

21

1    agent, are you making a distinction between a

2    brokerage agreement in which you can bring a case

3    to an underwriter for consideration and it being a

4    licensed agent under a -- an agency contract?

5         A    I would venture a guess that the vast

6    majority of my contracts are as an agent.  As you

7    may be aware, the state of Massachusetts has

8    effectively done away with the -- there used to be

9    two separate and distinct entities, a broker and

10   an agent, and effectively they don't exist

11   anymore.

12        Q    From a licensure perspective?

13        A    From a licensing point of view.

14        Q    But from a contracting and from a

15   compensation point of view, there is a difference

16   with the companies as to whether you're a broker

17   or an agent?

18        A    Correct.  There are certain companies

19   that we would do more production with.  It's all

20   production related.  If you do a lot of business,

21   you move up.  Whatever the company chooses to call

22   it, whether it's an agency agreement or a

23   brokerage agreement, it's really a function of how

24   much you bring in for business, period.

Gregg D. Caplitz                                    09/19/2005

31

1        A     Not that I'm aware of.  The last one I

2   had was Mr. Pedigo.

3        Q     **When did you last speak with Mr. Pedigo?**

4        A     I spoke with Mr. Pedigo briefly about a

5   month ago about a -- he's now acting as an

6   independent underwriting advisor, and I called him

7   about a case of mine that was extremely difficult

8   to see whether he had any ideas in how I could get

9   it placed.

10       Q     **Okay.  And the time before that one, did**

11  **you last speak with him before that?**

12       A     Just before he left, which I believe was

13  the summer of '04.

14       Q     **And what was the subject matter of that**

15  **call?**

16       A     I don't remember.

17       Q     **Okay.  When did you last -- after this**

18  **policy was issued, did you speak to Mr. Pedigo in**

19  **connection with the Dr. Meiselman matter?**

20       A     Yes.  I also spoke to Mr. Pedigo

21  extensively prior to the policy being issued --

22       Q     **Okay.**

23       A     -- including bringing him up to date

24  about Dr. Meiselman's weight loss and the return

Gregg D. Caplitz

32

1    of the atrial fibrillation.  He told me that the

2    weight loss, which I had been told by

3    Dr. Meiselman was three to five pounds which is

4    what I relayed, was within what they considered to

5    be normal weight loss, and that the atrial

6    fibrillation was very clear in the record, and it

7    was incumbent in the rating that Indy applied to

8    the contract because they felt, as subsequently

9    happened, that the -- I don't know the name of the

10   treatment.  The treatment that was done to stop it

11   generally -- at least a fair portion of the time

12   it does return, as it did for Dr. Meiselman.

13                 MR. MURPHY:  Off the record.

14                 (Off record.)

15       Q    When did you have the conversation with

16   Mr. Pedigo about Dr. Meiselman's medical

17   condition?

18       A    Early September, also spoke with him in

19   August.  We spoke, I don't know, several times a

20   week throughout the whole underwriting process.

21       Q    And with respect to the weight loss, did

22   you ever -- did you make a file note or send an

23   e-mail confirming that information?

24       A    I told both Dr. Meiselman, I told Gary

64

VOLUME: II

**CERTIFIED ORIGINAL**
**LEGALINK BOSTON**

PAGES:  64 - 281

EXHIBITS:  33 - 41

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - x

INDIANAPOLIS LIFE INSURANCE COMPANY,
                Plaintiff,

vs.                                    Docket No.
                                       04-CV-12481-WGY
ROSALIND HERMAN, TRUSTEE, FINANCIAL
RESOURCES NETWORK, INC., PROFIT SHARING
PLAN AND TRUST, FINANCIAL RESOURCES
NETWORK, INC., PROFIT SHARING PLAN AND
TRUST, GREGG D. CAPLITZ, RUDY K.
MEISELMAN, M.D., AND HOPE E. MEISELMAN,
                Defendants.
- - - - - - - - - - - - - - - - - - - x

CONTINUED DEPOSITION OF GREGG D. CAPLITZ

Friday, September 23, 2005, 10:30 a.m.

Wilson, Elser, Moskowitz, Edelman & Dicker, LLP

155 Federal Street

Boston, Massachusetts 02110


Reporter:  Deborah L. Maren, RPR

LegaLink Boston

320 Congress Street, Boston, MA 02210

(617)542-3500

132

1    three applications to be executed.  One for -- one was

2    an AIG application.  One was an Indianapolis Life

3    application.  And the third was what AGL, in their

4    infinite wisdom, called their application.  It's not

5    what I would consider to be an application but --

6         Q.    When you say you gave it to them, you gave

7    it to them to sign?  Or to complete?  Or what?

8         A.    Well, there were copies of the

9    illustrations and things that were left with

10   Dr. Meiselman at the time.  The applications were simply

11   signed.

12        Q.    And you completed the information on them

13   later?

14        A.    I did.

15        Q.    And Ms. Herman signed them later?

16        A.    That's correct.

17              Just so we are very clear, that had been

18   done at least a half a dozen times with Dr. Meiselman in

19   the past.

20        Q.    But it's fair to say that at the time he

21   signed the application there's nothing on the

22   application that called to his attention that the

23   contract is going to be owned by the plan; is that

24   correct?

148

1    be a fair characterization as to what these two

2    documents say?

3            A.    A fair characterization.

4            Q.    If there were these other reasons that you

5    thought were important, why didn't you put them into

6    your letter to Mr. Pedigo where he's asking for the

7    reasons why the contract was terminated?

8            A.    Because what they wanted -- what has been

9    my experience that he wanted and what I believe he asked

10   for was a reason.  He didn't ask for a comprehensive

11   list of reasons.

12           Q.    Okay.  Now, attached to this is a statement

13   from an A. James Goodness.  It was here.

14           (Discussion off the record.)

15           MR. BOGAERT:  Back on the record.

16           Q.    And did you submit this document from A.

17   James Goodness in response to the request for

18   information by Mr. Pedigo?

19           A.    I did.

20           Q.    And you say in the letter, Additionally,

21   I'm enclosing a letter from Dr. Meiselman's accountant,

22   providing income verification for 2002 and an estimate

23   for 2003.  Was, in fact, A. James Goodness, CPA,

24   Dr. Meiselman's accountant?

Gregg D. Caplitz, Vol. 2                                          09/23/2005

149

1        A.    Personal accountant, no.

2        Q.    **Was he his accountant in any respect?**

3        A.    No.

4        Q.    **Why did you state in the letter that he was**

5    **Dr. Meiselman's accountant?**

6        A.    As a courtesy to Dr. Meiselman --

7    Dr. Meiselman -- I contacted Dr. Meiselman when

8    Mr. Pedigo asked me for income verification.

9    Dr. Meiselman said to me that the woman -- I forget her

10   name -- his accountant charged him extensively whenever

11   he called her for anything.  And all we needed was a two

12   sentence letter indicating -- verifying the income that

13   he had which was primarily from securities trading plus

14   the 12,000 earned income from Financial Resources

15   Network or something in that vicinity.

16            I then proceeded to get Mr. Goodness on the

17   phone.  Mr. Goodness works with FRN.  We had a three-way

18   conversation on the phone.  Dr. Meiselman indicated what

19   his income was, and Dr. -- and faxed us up something.

20   I'd have to look to see where I have it in the files in

21   front of you.  I think it was the first page of her

22   1040.  I got that over to Mr. Goodness.  And

23   Mr. Goodness issued that letter.

24       Q.    **Okay.  So it's your testimony -- just so**

Gregg D. Caplitz, Vol. 2                                    09/23/2005

205

1      shorter.  Correct?

2           A.   Correct.

3           Q.   Now, in any event, it was known to you

4      during the free look period that Dr. Meiselman was

5      letting you know that he did not want the policy;

6      correct?

7           A.   Absolutely correct.

8           Q.   And why then, when he told you that he did

9      not want it for the second time now, did you continue to

10     advise Ms. Herman to keep the policy in force and -- to

11     keep the policy in force?

12          A.   Not only did I continue to advise her on

13     11/25, if you asked me the question today I'd give the

14     same advice.  That program as designed was the single

15     best piece of design work I've ever done.

16          Q.   And the fact that Dr. Meiselman didn't want

17     it didn't matter to you?

18          A.   By that point, no.

19          Q.   The fact that it was his money that was

20     going to pay for it didn't matter to you?

21          A.   The fact that it was his money that -- of

22     course the fact that it was his money matters.  It

23     always matters.  It's the client's money.  Absolutely.

24          Q.   Did the fact that if it was rescinded you'd

1    have to give up the 600,000 plus commission you earned,

2    did that matter to you?

3            A.    It mattered somewhat but far less than you

4    think.

5            May I --

6            Q.    No.   There's no question pending.

7            In this lawsuit, you continue FRN's plan --

8    FRN's plan continues to advocate for the continuing

9    enforcement of the contract; correct?

10           A.    Absolutely correct.

11           Q.    And they're opposing recission of the

12    contract.

13           A.    Absolutely correct.

14           Q.    And do you know whether FRN's plan has the

15    recourses to pay the premiums?

16           A.    They can -- yes, they have the resources.

17           Q.    Have they paid any of the premiums that are

18    outstanding?

19           A.    Who would they pay the premiums to on a

20    policy that's been cancelled?

21           Q.    They put the money in escrow.

22           A.    Not to my knowledge.

23           Q.    Have you made any efforts to tender the

24    continued premium?

Gregg D. Caplitz, Vol. 2                                              09/23/2005

279

1    information as material, it still wouldn't have changed

2    the underwriting decision as it was subsequently

3    demonstrated by the issuance of Trans America some 90

4    days after Mr. Clevenger's letter.

5            Q.    Okay.  Would you agree with me that if a

6    policy is returned during the free look period, the

7    commission is unearned and the agent has to return it?

8            A.    Absolutely.

9            Q.    Okay.  And if a contract is validly

10   rescinded, do you agree with me that an agent has to

11   return the commission?

12           A.    Absolutely.

13           MR. BOGAERT:  Okay.  Now I'll reserve,

14   unless other people have questions.

15           MR. KAZARIAN:  You know what?  I'm going to

16   be a good guy and not ask any questions.  I have a few,

17   but I'm going to hold.  Let's get out of here.

18           THE WITNESS:  I appreciate that.

19           (Whereupon the deposition was suspended at

20   5:15 p.m.)

21

22

23

24

# EXHIBIT I

AUG-04-2003 18:33    INDPLS LIFE    31799999999    P.03/31

□ **AMERUS** Life    ☒ **INDIANAPOLIS LIFE** *An AMERUS Company*

## Application for Insurance

Please check appropriate company. ONE BOX MUST BE CHECKED.
(In this application, "Company" refers to the insurance company whose name is checked above.)

### APPLICANT INFORMATION

**1 PROPOSED INSURED**
NAME (FIRST, MIDDLE, LAST) Rudy K. Meiselman.
ADDRESS 775 Longboat Club Road # 603    APT.#    E-MAIL Rudymeiselman@comcast.net
CITY Longboat Key    HOME PH (941) 383-9122  BUS PH (941) 383-9122
STATE FL ZIP 34228  COUNTY/PARISH Sarasota    SEX ☒M ☐F MAIDEN NAME 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
BIRTH DATE 1/13/26 BIRTH STATE R I    SOCIAL SECURITY NUMBER 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
DRIVER'S LICENSE # M24511711126412 STATE FL  MARITAL STATUS ☒Married ☐Single ☐Divorced or Separated ☐Widow or Widower
EMPLOYER Financial Resources Network  HOW LONG? 3    OCCUPATION/DUTIES Investment Analyst / Money Manager
IF MULTIPLE LIFE PRODUCT, (2ND APP REQUIRED FOR MULTIPLE LIFE)
JOINT INSURED NAMES, (1st) Hope Meiselman    (2nd)

**2. OWNER (Insured, unless otherwise indicated)** ☐INDIVIDUAL ☐BUSINESS ☒TRUST (date of trust) Jan 1, 01
NAME Financial Resources Network Inc. Profit Sharing Plan & Trust    BIRTH DATE N/A
ADDRESS 424 Washington St
CITY Woburn    STATE MA ZIP 01801  COUNTY Middlesex
RELATIONSHIP TO PROPOSED INSURED Profit Sharing Plan    SOCIAL SECURITY # OR TAXPAYER ID # 04-3256270
JOINT OWNER    SOCIAL SECURITY # OR TAXPAYER ID #
CONTINGENT OWNER (If none specified, policy provisions will apply.)
MAIL NOTICES TO ☐INSURED ☒OWNER ☐OTHER (specify)
OTHER NOTICE ADDRESS    CITY    STATE    ZIP

**3. PRIMARY BENEFICIARY(IES)** - Applies to primary insured only. (If trust, complete name and date of trust.)
(If necessary, use an additional page for additional details, signature of owner & date.)
Financial Resources Network Inc Profit Sharing Plan and Trust    Trust  100    04-3256270
PRINT FULL NAME    BIRTH DATE  RELATIONSHIP  PERCENTAGE  SOCIAL SECURITY NUMBER

**4. CONTINGENT BENEFICIARY(IES)**

N/A
PRINT FULL NAME    BIRTH DATE  RELATIONSHIP  PERCENTAGE  SOCIAL SECURITY NUMBER

### POLICY INFORMATION

**5. PRIMARY INSURED** Horizon
BASE PLAN SUL 2001    ☒NONSMOKER/NONTOBACCO  ☐SMOKER/TOBACCO
ADDITIONAL COVERAGE    AMT. OF INS. $ 2,200,000.00
ADDITIONAL COVERAGE    AMT. OF INS. $                    .00 AMT. OF PREM. $
    AMT. OF INS. $                    .00 AMT. OF PREM. $
RIDERS (COMPLETE SUPPLEMENTAL APPLICATION IF APPLICABLE)
☐WAIVER TYPE    ☒OTHER RIDERS (TYPE/AMOUNT) Death Benefit Maturity Extension
☐SPOUSE RIDER $    ☐CHILD RIDER $

**6. UL  DEATH BENEFIT OPTION:** ☐LEVEL  ☐INCREASING
DIVIDEND OPTION (IF APPLICABLE) ☐ADD TO ACCOUNT VALUE  ☐CASH
PREMIUM DIRECTION    INTEREST CREDITING STRATEGY    Equity Indexed Strategy    PERCENT
    INTEREST CREDITING STRATEGY    Fixed-Term Strategy    PERCENT
    INTEREST CREDITING STRATEGY    PERCENT

**7. WHOLE LIFE  DIVIDEND OPTION** ☐PUA  ☐CASH  ☐REDUCE PREMIUM  ☐OTHER
APL (IF APPLICABLE) ☐NO  DIRECT RECOGNITION (IF AVAILABLE) ☐YES

Form 14239 4/02 IMA    page 3

*168390402019*


Dr. Meiselman
EXHIBIT NO. 9
9-15-05
L. LONDON

**IL0250**

AUG-04-2003 18:34    INDPLS LIFE                    31799999999  P.04/31

## PREMIUM INFORMATION

**8. PREMIUM**  PLANNED PREMIUM 1,025,000 _____  ADDITIONAL PREMIUM (Lump Sum) _____
BILLING FREQUENCY ☑ ANNUAL ☐ SEMI-ANNUAL ☐ QUARTERLY ☐ PAC (Complete Authorization and enclose VOID check ) Other _____
☐ GOVT ALLOTMENT (if available) ☐ MONTHLY GROUP BILLING List Bill # _____
HAS THE PREMIUM FOR THE POLICY APPLIED FOR BEEN GIVEN TO THE AGENT IN EXCHANGE FOR THE CONDITIONAL
LIFE INSURANCE AGREEMENT? ☐ YES ☐ NO  AMOUNT $ _____  HOW PAID? ☐ CHECK ☐ OTHER (specify) _____
ADDITIONAL POLICY SPECIFICATIONS
POLICY DATE (optional) _____  TAX QUALIFICATION TYPE _____  ☐ SHORT TERM COVERAGE TO POLICY DATE
OTHER _____

## NON MEDICAL INFORMATION

**9. INSURANCE IN FORCE ON PROPOSED INSURED**
a. Are any life insurance or annuity contracts in force? ... ... ... ... ... ... ... ... ☑ Yes ☐ No
If yes, complete section below (Attach separate sheet if necessary)

| Company | Amount | WP? | Personal/Business | Year Issued | Replacing ? | Amount ADB |
|---------|--------|-----|-------------------|-------------|-------------|------------|
| ING | 28,000,000 | | Estate | 2002 | NO | |

b. Will any annuity or life insurance presently or recently inforce be replaced or changed by this policy applied for? ... ... ☐ Yes ☑ No
c. Have you ever been declined, rated, or had coverage modified or withdrawn, or reinstatement declined by any insurance company? ... ☐ Yes ☑ No
d. Within the last year, has any other life, health or long term care insurance been issued or applied for, or is any to be applied for? ... ☑ Yes ☐ No

**10. OTHER NON-MEDICAL INFORMATION**
a. Do you use any form of tobacco or nicotine based products? ... ... ... ... ... ... ☐ Yes ☐ No
If no, have you used any form of tobacco or nicotine based products in the past 5 years? ... ... ... ... ☐ Yes ☐ No
If yes, when did you last use tobacco or nicotine based products? _____
Type _____  Quantity _____
b. Have you engaged in the last 3 years, or do you intend within the next 12 months to engage:
1. In any aviation activity other than as a passenger? ... ... ... ... ... ... ... ... ☐ Yes ☐ No
2. In ballooning, gliding, boat or vehicle racing, mountain or rock climbing, parachuting, sky diving, underwater diving
or any other hazardous sport or activity? ... ... ... ... ... ... ... ... ... ... ☐ Yes ☐ No
c. Within the last 5 years, have you filed for bankruptcy (personal or business)? ... ... ... ... ... ☐ Yes ☐ No
d. Within the last 5 years, have you been charged with reckless driving, driving under the influence of alcohol or drugs, or 2 or more moving
violations, or had your driver's license revoked or suspended, or received a warning letter? ... ... ... ... ☐ Yes ☑ No
e. Have you been arrested for an illegal activity, acquired a criminal record, or are you currently on probation, parole, or under investigation? ... ☐ Yes ☑ No
f. Are you a member of or do you contemplate joining one of the Armed Forces of an active or reserve military unit? ... ... ☐ Yes ☑ No
g. Have you in the past 2 years traveled or do you intend to travel or live outside the United States or Canada? ... ... ... ☐ Yes ☑ No
h. Is any proposed insured, owner or beneficiary a resident or citizen of an entry organized under the laws of a country other than the U.S.? ... ☐ Yes ☑ No
i. Complete appropriate supplement or provide details here for any Yes answers in this section.
9b ING policy being 1035 exchanged to a private place variable with AGL insurance
9d See attached explanation

**11. PHYSICIAN INFORMATION**
a. Name and address of your doctor(s) or health care provider(s) Dr. Lee Harris. 2981 Hyde Park St
Sarasota FL 34329  941-366-2460
b. When did you last consult a doctor and why?  see medical
c. What medication(s) (prescribed or over the counter) are you now taking? (if none, so state)  see medical

IL0251

**MEDICAL INFORMATION** If medical exam is required, questions 12-15 do not need to be completed.

**12. PROPOSED INSURED**

a. Height in shoes _____ / _____ Weight in clothes _____
   feet   inches                    pounds

b. Have you gained or lost more than 10 pounds in the last year? ............... ☐ Yes ☐ No

c. Are you now under observation or treatment? .............................. ☐ Yes ☐ No

d. Have you ever been diagnosed by a medical professional as having or been treated for AIDS (Acquired Immune Deficiency Syndrome)
   or ARC (AIDS related complex)? .......... ................................ ☐ Yes ☐ No

e. Have you ever tested positive for antibodies to the AIDS (Acquired Immune Deficiency Syndrome) Human T-Cell Lymphotropic (HIV) virus? ☐ Yes ☐ No

f. Have you ever requested or received a benefit, military deferment, discharge or rejection, payment or pension because of a disability,
   injury, or sickness? ..................................................... ☐ Yes ☐ No

**13. HAVE YOU EVER HAD OR HAVE SYMPTOMS OF OR BEEN SEEN FOR:**

a. Disease of the heart or circulatory system, including high blood pressure, heart attack, coronary artery disease, or chest pain?........ ☐ Yes ☐ No

b. Heart murmur, rhythm abnormality, heart catheterization, echocardiogram or an exercise treadmill test?........ ☐ Yes ☐ No

c. Cancer, tumors, lymphoma, leukemia, or any growths, lesions, polyps? ........................ ☐ Yes ☐ No

d. Diabetes, thyroid, glandular or endocrine disorder? ........................ ☐ Yes ☐ No

e. Respiratory disorders including asthma, chronic bronchitis, emphysema, pneumonia, shortness of breath, or abnormal chest x-ray? ....... ☐ Yes ☐ No

f. Disorder of the stomach, liver, pancreas or intestinal tract, including ulcerative colitis, Crohn's disease or cirrhosis? ....... ☐ Yes ☐ No

g. Disorder of the kidneys, prostate, bladder, reproductive organs, sexually transmitted diseases, sugar, albumin or blood in urine? ........... ☐ Yes ☐ No

h. Stroke, transient ischemic attack (TIA), Parkinson's, multiple sclerosis, seizures, epilepsy, chronic headaches, memory changes or fainting? ..... ☐ Yes ☐ No

i. Anxiety, depression, attempted suicide, attention deficit disorder or psychosis, mental or nervous system disorder? ..... ☐ Yes ☐ No

j. Anemia, hepatitis, or any blood disorder? ........................ ☐ Yes ☐ No

k. Chronic back pain, arthritis, loss of limb, paralysis, muscle weakness or disease? .... ....... ☐ Yes ☐ No

**14. WITHIN THE LAST FIVE YEARS, OTHER THAN AS NOTED ABOVE, HAVE YOU:**

a. Seen a doctor, health care provider, counselor, therapist, or had any illness, injury, surgery, diagnostic test or treatment, or been advised to
   have any diagnostic test or treatment, or been advised to have any diagnostic test, surgery or treatment not yet completed?.. ........... ☐ Yes ☐ No

b. Been a patient of a clinic or hospital emergency room, or had any diagnostic test that was not normal?........ ☐ Yes ☐ No

c. Used any drug, narcotic or controlled substance not prescribed by a physician, or been arrested, counseled, treated, or participated
   in a support group because of alcohol, controlled substance or drug use? ..... ☐ Yes ☐ No

d. Do you currently use alcoholic beverages? ........................ ☐ Yes ☐ No
   If yes, what is the average number of drinks per day? ☐ 2 or less ☐ 3-5 ☐ 6 or more ........................ ☐ Yes ☐ No

**15. FAMILY HISTORY**

a. Is there a family history of diabetes, cancer, heart disease, mental illness, or any hereditary disorders? ........................ ☐ Yes ☐ No

b. Family information (natural parents, brothers, sisters):

| Family Member | Age if Living | Age at Death | Cause of Death |
|---|---|---|---|
| Father | | | |
| Brother(s) | | | |

| Family Member | Age if Living | Age at Death | Cause of Death |
|---|---|---|---|
| Mother | | | |
| Sister(s) | | | |

Give complete details of any YES answers to questions 12 through 15. (If necessary, use an additional page for additional details, signed by applicant & date.)

| Question Number | Date | Details, Include Diagnosis, Treatment, Duration, Result | Name, Address and Phone Number of Doctor / Medical Facility |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or settlement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

Form 14839 4/02 NA



IL0252

AUG-04-2003  18:34    INDPLS LIFE    31799999999    P.06/31

## TAXPAYER IDENTIFICATION

**Instructions** (Section references are to the Internal Revenue Code.)

Use this area to report the taxpayer identification number (TIN) of the policy owner.

Payers must generally withhold a specified percentage of taxable interest, dividend, and certain other payments if you fail to furnish payers with the correct taxpayer identification number (this is referred to as backup withholding). For most individual taxpayers, the taxpayer identification number is the social security number.

To prevent backup withholding on these payments, be sure to notify payors of the correct taxpayer identification number and properly certify that you are not subject to backup withholding under Section 3406(a)(1)(C).

Use this area to certify that the taxpayer identification number you are giving the payor is correct and that you are not subject to backup withholding.

**Backup Withholding** - You are subject to backup withholding if

(1) You fail to furnish your taxpayer identification number to the payor; OR

(2) The Internal Revenue Service (IRS) notifies the payor that you furnished an incorrect taxpayer identification number; OR

(3) You are notified that you are subject to backup withholding [under Section 3406(a)(1)(C)]; OR

(4) For an interest or dividend account opened after December 31, 1983, you fail to certify to the payor that you are not subject to backup withholding under (3) above, or fail to certify your taxpayer identification number.

**Payees Exempt From Backup Withholding** - Certain payees, such as corporations, government agencies, etc. may be exempt from backup withholding.

**What Number to Give the Payor** - Give the social security number or employer identification number of the record owner of the account. If the account belongs to you as an individual, give your social security number. If the account is owned by a corporation, give the employer identification number of the corporation.

Obtaining a Number - If you don't have a taxpayer identification number or you don't know your number, obtain Form SS-5, Application for a Social Security Number Card, or Form SS-4, Application for Employer Identification Number, at the local office of the Social Security Administration or the Internal Revenue Service and apply for a number. Write "applied for" in place of your number. When you get a number, submit a new Form W9 to the payor.

## AUTHORIZATION AND ACKNOWLEDGMENT

I understand the information obtained by the use of this authorization will be used by the Company or its reinsurers to determine eligibility for insurance or benefits, that I may request to receive a copy of this authorization and to be personally interviewed if an investigative consumer report is prepared in connection with this application and not to have personal information disclosed for marketing purposes. Any information obtained will not be released by the Company, its reinsurers, or representatives to any person or organization except to reinsuring companies, the Medical Information Bureau, or other persons or organizations performing business or legal services in connection with my application, claim, as may be permitted or required by law, or as I may further authorize.

I acknowledge receipt of the Disclosure Notice to Proposed Insured.

I authorize any physician, medical practitioner, hospital, clinic, pharmaceutical database, other medical or medically-related facility, insurance company, the Medical Information Bureau (MIB), consumer reporting organization, or employer having information available as to diagnosis, treatment, or prognosis with respect to any physical or mental condition, evaluation, or treatment of me including without limitation information about drug use, alcoholism, HIV, or mental illness and any other non-medical information about me to give to the Company, its reinsurers, or its authorized representatives any such information.

To facilitate rapid submission of such information, I authorize all said sources, except MIB, to give such records or knowledge to any agency employed by the Company to collect and transmit such information.

I agree that this authorization shall be valid for 2 years from the date shown below and that a photographic copy of this authorization shall be as valid as the original.

## AGREEMENTS AND REPRESENTATIONS

It is hereby represented that the answers and statements on the application(s) and any Supplements required are complete, true and correctly recorded. A copy of the application(s) and any Supplements shall be a part of the policy. No other changes will be made unless the owner agrees in writing.

It is agreed that the policy and copy of the application(s) and any supplements in the policy constitute the entire contract and that information not recorded on the application(s) and any supplements will not be treated as known to the Company. It is also agreed that the policy cannot be enlarged or modified except in writing and signed by an authorized officer of the Company and that the Agent has no authority to make any promise, representation or waive regarding coverage or the provisions or terms of the application or policy. It is understood that all payments after the first are to be provided directly to the Company and that the Agent has no authority or responsibility to sign, endorse, deposit or process any subsequent payments made on the policy. Acceptance of the policy shall constitute agreement to the approval of the parts and provisions of the policy.

If a Conditional Life Insurance Agreement was delivered in consideration of the payment of the first premium and is in effect, its provisions and terms will apply. Otherwise the policy will take effect and coverage will begin on the issue date specified in the policy if the full first premium is paid, the Proposed Insured(s) is (are) living, and the answers and statements in the application(s) and any supplements continue to be complete and true at the time of delivery of the policy.

Under penalties of perjury, I certify that (1) the social security or federal tax identification number shown on page 1 of this application for me as the owner of this policy is my correct taxpayer identification number, AND (2) I am a U.S. person (including a U.S. resident alien), AND (3) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the IRS that I am subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding. NOTE: You must cross out item 3 in the above certification if you have been notified by the IRS that you are currently subject to backup withholding. The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

## EQUITY INDEXED ACKNOWLEDGEMENTS

I understand that I am applying for an equity indexed product. While the values of the policy may be affected by an external index, the policy does not directly participate in any stock or equity investments. I understand that any values shown, other than guaranteed minimum values, are not guaranteed, promises or warranties.

Signature of Proposed Insured X _____

## SIGNATURES

Signed / Dated at   WOBURN  MA    _____
                    City, State

On  July 31 05    X _____
                     Signature of Proposed Insured

X _____                  _____  Trustee
Signature of Licensed Agent         Signature of Owner if other than Proposed Insured

_____
Parent/Guardian or Witness (if required)

Signature of Joint Owner if other than Proposed Insured
If Owner is a corporation, business firm or trust, give full name below and an Authorized person must sign and provide title

Form 14839 4/92 MA

page 4

IL0253

# EXHIBIT J

AUG-04-2003  18:37      INDPLS LIFE

31799999999   P.12/31

☐ **AMERUS** Life          ☒ **INDIANAPOLIS LIFE** An *AMERUS* Company

### Application for Insurance

*Please check appropriate company. ONE BOX MUST BE CHECKED.*
*(In this application, "Company" refers to the insurance company whose name is checked above.)*

**APPLICANT INFORMATION**

**1. PROPOSED INSURED**
NAME (FIRST, MIDDLE, LAST) Hope E. Meisel man.
ADDRESS 775 Longboat Club Road          APT # 603  E-MAIL Rudymeiselman@comcast.net
CITY Longboat Key          HOME PH. (941) 383-9122  BUS. PH. (941) 383-9122
STATE FL ZIP 34228 COUNTY/PARISH Seasota          SEX ☐ M ☒ F. MAIDEN NAME Elman
BIRTH DATE 05/28/32. BIRTH STATE RI          SOCIAL SECURITY NUMBER 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.
DRIVER'S LICENSE # M74557526890 STATE FL  MARITAL STATUS ☒ Married ☐ Single ☐ Divorced or Separated ☐ Widow or Widower
EMPLOYER Financial Resources Network Inc HOW LONG? 2  OCCUPATION/DUTIES Office Assistant
IF MULTIPLE LIFE PRODUCT, (2ND APP REQUIRED FOR MULTIPLE LIFE)
JOINT INSURED NAMES: (1st) Rudy K. Meiselman

**2. OWNER** (insured, unless otherwise indicated) ☐ INDIVIDUAL ☐ BUSINESS ☒ TRUST (date of trust) Dec 1, 01  (2nd)
NAME Financial Resources Network Inc Profit Sharing Plan & Trust  BIRTH DATE NA
ADDRESS 424 Washington St
CITY Woburn          STATE MA ZIP 01801 COUNTY Middlesex
RELATIONSHIP TO PROPOSED INSURED Profit Sharing Plan  SOCIAL SECURITY # OR TAXPAYER ID # 04-3256270
JOINT OWNER          SOCIAL SECURITY # OR TAXPAYER ID #
CONTINGENT OWNER (if none specified, policy provisions will apply.)
MAIL NOTICES TO ☐ INSURED ☒ OWNER ☐ OTHER (specify)
OTHER NOTICE ADDRESS

**3. PRIMARY BENEFICIARY(IES)** - Applies to primary insured only. (If trust, complete name and date of trust.)          CITY          STATE          ZIP
(If necessary, use an additional page for additional details, signature of owner & data.)

PRINT FULL NAME Financial Resources Network Profit Sharing Plan Trust  Trust  BIRTH DATE  RELATIONSHIP  PERCENTAGE 100  SOCIAL SECURITY NUMBER 04-3256270

**4. CONTINGENT BENEFICIARY(IES)**
NA

PRINT FULL NAME          BIRTH DATE  RELATIONSHIP  PERCENTAGE  SOCIAL SECURITY NUMBER

**POLICY INFORMATION**

**5. PRIMARY INSURED**          ☒ NONSMOKER/NONTOBACCO ☐ SMOKER/TOBACCO
BASE PLAN Horizon SUL          AMT. OF INS. $ 2.2.0.00.000 00
ADDITIONAL COVERAGE          AMT. OF INS. $ _____
ADDITIONAL COVERAGE          AMT. OF INS. $ _____ 00 AMT. OF PREM. $ _____
RIDERS (COMPLETE SUPPLEMENTAL APPLICATION IF APPLICABLE)          AMT. OF PREM. $ _____
☐ WAIVER TYPE          00
☐ SPOUSE RIDER $          ☐ CHILD RIDER $          ☒ OTHER RIDERS (TYPE/AMOUNT) Death Benefit Maturity Extension

**6. UL** DEATH BENEFIT OPTION: ☒ LEVEL ☐ INCREASING
DIVIDEND OPTION (IF APPLICABLE) ☐ ADD TO ACCOUNT VALUE ☐ CASH
PREMIUM DIRECTION          INTEREST CREDITING STRATEGY  Equity Indexed Strategy          PERCENT
          INTEREST CREDITING STRATEGY  Fixed-Term Strategy          PERCENT
          INTEREST CREDITING STRATEGY          PERCENT

**7. WHOLE LIFE** DIVIDEND OPTION ☐ PUA ☐ CASH ☐ REDUCE PREMIUM ☐ OTHER          PERCENT
          APL (IF APPLICABLE) ☐ NO  DIRECT RECOGNITION (IF AVAILABLE) ☐ YES

Form 14830 4/02 MA

*page 1*

IL0254

AUG-04-2003  18:37        INDPLS LIFE                        31799999999    P.13/31

## PREMIUM INFORMATION

**8. PREMIUM** PLANNED PREMIUM **1,025,000** _____ ADDITIONAL PREMIUM (Lump Sum) _____
BILLING FREQUENCY ☒ ANNUAL ☐ SEMI-ANNUAL ☐ QUARTERLY ☐ PAC (Complete Authorization and enclose VOID check) Other _____
☐ GOVT. ALLOTMENT (if available)  ☐ MONTHLY GROUP BILLING    List Bill # _____
HAS THE PREMIUM FOR THE POLICY APPLIED FOR BEEN GIVEN TO THE AGENT IN EXCHANGE FOR THE CONDITIONAL
LIFE INSURANCE AGREEMENT? ☐ YES ☐ NO   AMOUNT $_____ HOW PAID? ☐ CHECK ☐ OTHER (specify) _____
ADDITIONAL POLICY SPECIFICATIONS
POLICY DATE (optional)_____ TAX QUALIFICATION TYPE _____ ☐ SHORT TERM COVERAGE TO POLICY DATE
OTHER _____

## NON MEDICAL INFORMATION

**9. INSURANCE IN FORCE ON PROPOSED INSURED**
a. Are any life insurance or annuity contracts in force? ............................................................ ☒ Yes ☐ No
If yes, complete section below (Attach separate sheet if necessary)

| Company | Amount | WP ? | Personal/Business | Year Issued | Replacing ? | Amount ADB |
|---|---|---|---|---|---|---|
| FNG | 20,000,00 | | ESZ | 2002 | Yes | |
| | | | | | | |
| | | | | | | |

b. Will any annuity or life insurance presently or recently inforce be replaced or changed by this policy applied for? ...........  ☐ Yes ☒ No
c. Have you ever been declined, rated, or had coverage modified or withdrawn, or reinstatement declined by any insurance company? ....  ☐ Yes ☒ No
d. Within the last year, has any other life, health or long term care insurance been issued or applied for, or is any to be applied for? ...............  ☒ Yes ☐ No

**10. OTHER NON-MEDICAL INFORMATION**
a. Do you use any form of tobacco or nicotine based products? ............................................ ☐ Yes ☒ No
If yes, have you used any form of tobacco or nicotine based products in the past 5 years? ...................... ☐ Yes ☐ No
If yes, when did you last use tobacco or nicotine based products? _____ ☐ Yes ☐ No
Type _____ Quantity _____
b. Have you engaged in the last 3 years, or do you intend within the next 12 months to engage:
1 in any aviation activity other than as a passenger? ................................................. ☐ Yes ☐ No
2 in ballooning, gliding, boat or vehicle racing, mountain or rock climbing, parachuting, sky diving, underwater diving
or any other hazardous sport or activity? ......................... ☐ Yes ☐ No
c. Within the last 5 years, have you filed for bankruptcy (personal or business)? ....................... ☐ Yes ☐ No
d. Within the last 5 years, have you been charged with reckless driving, driving under the influence of alcohol or drugs, or 2 or more moving
violations, or had your driver's license revoked or suspended, or received a warning letter? ............ ☐ Yes ☐ No
e. Have you been arrested for an illegal activity, acquired a criminal record, or are you currently on probation, parole, or under investigation? ...... ☐ Yes ☐ No
f. Are you a member of or do you contemplate joining one of the Armed Forces or an active or reserve military unit? ...... ☐ Yes ☐ No
g. Have you in the past 2 years traveled or do you intend to travel or live outside the United States or Canada? .......... ☐ Yes ☐ No
h. Is any proposed insured, owner or beneficiary a resident or citizen of or a an entity organized under the laws of a country other than the U.S.? ... ☐ Yes ☐ No
i. Complete appropriate supplement or provide details here for any Yes answer in this section.
#9  FNG Policy being 1035 exchanged to AGL private placement variable product
#9  see attached

**11. PHYSICIAN INFORMATION**
a. Name and address of your doctor(s) or health care provider(s) _Dr Lee Heise 2881 Hyde Park Street_
_Sarasota FL 34239  941-366-2460_
b. When did you last consult a doctor and why? _see attached medical_
c. What medication(s) (prescribed or over the counter) are you now taking? (If none, so state) _see attached medical_

Form V4536 4/02 MA



page 2

IL0255

AUG-04-2003  18:39      INDPLS: LIFE                                    31799999999    P.14/31

**MEDICAL INFORMATION  If medical exam is required, questions 12-15 do not need to be completed.**

**12. PROPOSED INSURED**

a. Height in shoes _____ / _____     Weight in clothes _____
   feet  inches                                 pounds

b. Have you gained or lost more than 10 pounds in the last year? ........................................................................................

c. Are you now under observation or treatment? ...........................................................................................  ☐ Yes ☐ No

d. Have you ever been diagnosed by a medical professional as having or been treated for AIDS (Acquired Immune Deficiency Syndrome)
   or ARC (AIDS-related complex)?                                                                                                 ☐ Yes ☐ No

e. Have you ever tested positive for antibodies to the AIDS (Acquired Immune Deficiency Syndrome) Human T-Cell Lymphotropic (HIV) virus?   ☐ Yes ☐ No

f. Have you ever requested or received a benefit, military deferment, discharge or rejection, payment or pension because of a disability,
   injury or sickness?                                                                                                            ☐ Yes ☐ No

**13. HAVE YOU EVER HAD OR HAVE SYMPTOMS OF OR BEEN SEEN FOR:**

a. Disease of the heart or circulatory system, including high blood pressure, heart attack, coronary artery disease, or chest pain?   ☐ Yes ☐ No

b. Heart murmur, rhythm abnormality, heart catheterization, echocardiogram or an exercise treadmill test? .........................  ☐ Yes ☐ No

c. Cancer, tumors, lymphoma, leukemia, or any growths, lesions, polyps? ...............................................................  ☐ Yes ☐ No

d. Diabetes, thyroid, glandular or medicinal disorder? ..................................................................................  ☐ Yes ☐ No

e. Respiratory disorders including asthma, chronic bronchitis, emphysema, pneumonia, shortness of breath, or abnormal chest x-ray?   ☐ Yes ☐ No

f. Disorder of the stomach, liver, pancreas or intestinal tract, including ulcerative colitis, Crohn's disease, or cirrhosis?    ☐ Yes ☐ No

g. Disorder of the kidneys, prostate, bladder, reproductive organs, sexually transmitted diseases, sugar, albumen or blood in urine?   ☐ Yes ☐ No

h. Stroke, transient ischemic attack (TIA), Parkinson's, multiple sclerosis, seizures, epilepsy, chronic headaches, memory changes or fainting? ...   ☐ Yes ☐ No

i. Anxiety, depression, attempted suicide, attention deficit disorder or psychosis, mental or nervous system disorders? ..           ☐ Yes ☐ No

j. Anemia, hepatitis, or any blood disorder? ............................................................................................  ☐ Yes ☐ No

k. Chronic back pain, arthritis, loss of limb, paralysis, muscle weakness or disease? .................................................  ☐ Yes ☐ No

**14. WITHIN THE LAST FIVE YEARS, OTHER THAN AS NOTED ABOVE, HAVE YOU:**

a. Seen a doctor, health care provider, counselor, therapist, or had any illness, injury, surgery, diagnostic test or treatment, or been advised to
   have any diagnostic test or treatment, or been advised to have any diagnostic test, surgery or treatment not yet completed? ...........   ☐ Yes ☐ No

b. Been a patient at a clinic or hospital emergency room, or had any diagnostic test that was not normal? ...........................   ☐ Yes ☐ No

c. Used any drug, narcotic or controlled substance not prescribed by a physician, been arrested, counseled, treated, or participated
   in a support group because of alcohol, controlled substance or drug use? ...........................................................   ☐ Yes ☐ No

d. Do you currently use alcoholic beverages? ...........................................................................................   ☐ Yes ☐ No
   If yes, what is the average number of drinks per day? ☐ 2 or less  ☐ 3-5  ☐ 6 or more                                           ☐ Yes ☐ No

**15. FAMILY HISTORY**

a. Is there a family history of diabetes, cancer, heart disease, mental illness, or any hereditary disorders? .......................   ☐ Yes ☐ No

b. Family information (natural parents, brothers, sisters)

| Family Member | Age if Living | Age at Death | Cause of Death | Family Member | Age if Living | Age at Death | Cause of Death |
|---|---|---|---|---|---|---|---|
| Father | | | | Mother | | | |
| Brother(s) | | | | Sister(s) | | | |

Give complete details of any YES answers to questions 12 through 15. (If necessary, use an additional page for additional details, signed by applicant & date.)

| Question Number | Date | Details, include Diagnosis, Treatment, Duration, Result | Name, Address and Phone Number of Doctor / Medical Facility |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or settlement of claim containing
any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which
is a crime and subjects the person to criminal and civil penalties.

Form 34238  4/02 MA

* 14839 0205 *

page 3

IL0256

AUG-04-2003  18:38        INDPLS LIFE                    31799999999   P.15/31

## TAXPAYER IDENTIFICATION

Instructions (Section references are to the Internal Revenue Code.)
Use this form to report the taxpayer identification number (TIN) of the policy owner.
Payers must generally withhold a specified percentage of taxable interest, dividend, and certain other payments if you fail to furnish payers with the correct taxpayer identification number (this is referred to as backup withholding.) For most individual taxpayers, the taxpayer identification number is the social security number.
To prevent backup withholding on these payments, be sure to notify payors of the correct taxpayer identification number and properly certify that you are not subject to backup withholding under Section 3406(a)(1)(C).
Use this area to certify that the taxpayer identification number you are giving the payor is correct and that you are not subject to backup withholding.
Backup Withholding - You are subject to backup withholding if:
(1) You fail to furnish your taxpayer identification number to the payor; OR
(2) The Internal Revenue Service (IRS) notifies the payor that you furnished an incorrect taxpayer identification number, OR
(3) You are notified that you are subject to backup withholding (under Section 3406(a)(1)(C)); OR
(4) For an interest or dividend account opened after December 31, 1983, you fail to certify to the payor that you are not subject to backup withholding under (3) above, or fail to certify your taxpayer identification number.
Payees Exempt From Backup Withholding - Certain payees, such as corporations, government agencies, etc. may be exempt from backup withholding.
What Number to Give the Payer - Give the social security number or employer identification number of the record owner of the account. If the account belongs to you as an individual, give your social security number. If the account is owned by a corporation, give the employer identification number of the corporation.
Obtaining a Number - If you don't have a taxpayer identification number or you don't know your number, obtain Form SS-5, Application for a Social Security Number Card, or Form SS-4, Application for Employer Identification Number, at the local office of the Social Security Administration or the Internal Revenue Service and apply for a number. Write "applied for" in place of your number. When you get a number, submit a new Form W-9 to the payor.

## AUTHORIZATION AND ACKNOWLEDGMENT

I understand the information obtained by the use of this authorization will be used by the Company or its reinsurers to determine eligibility for insurance or benefits, that I may request to receive a copy of this authorization and to be personally interviewed if an investigative consumer report is prepared in connection with this application and not to have personal information disclosed for marketing purposes. Any information obtained will not be released by the Company, its reinsurers, or representatives to any person or organization except to reinsuring companies, the Medical Information Bureau, or other persons or organizations performing business or legal services in connection with my application, claim, as may be permitted or required by law, or as I may further authorize.
I acknowledge receipt of the Disclosure Notice to Proposed Insured
I authorize any physician, medical practitioner, hospital, clinic, pharmaceutical database, other medical or medically-related facility, insurance company, the Medical Information Bureau (MIB), consumer reporting organization, or employer having information now available as to diagnosis, treatment, or prognosis with respect to any physical or mental condition, evaluation, or treatment of me including without limitation information about drug use, alcoholism, H.I.V. or mental illness and any other non-medical information about me to give to the Company, its reinsurers, or its authorized representatives any such information.
To facilitate rapid submission of such information, I authorize all said sources, except MIB, to give such records or knowledge to any agency employed by the Company to collect and transmit such information.
I agree that this authorization shall be valid for 2 years from the date shown below and that a photographic copy of this authorization shall be as valid as the original.

## AGREEMENTS AND REPRESENTATIONS

It is hereby represented that the answers and statements on the application(s) and any Supplements required are complete, true and correctly recorded. A copy of the application(s) and any Supplements shall be a part of the policy. No other changes will be made unless the owner agrees in writing
It is agreed that the policy and copy of the application(s) and any supplements in the policy constitute the entire contract and that information not recorded on the application(s) and supplements will not be treated as known to the Company. It is also agreed that the policy cannot be enlarged or modified except in writing and signed by an authorized officer of the Company and that the Agent has no authority to make any promise, representation or waiver regarding coverage or the provisions or terms of the application or policy. It is understood that all payments after the first are to be provided directly to the Company and that the Agent has no authority or responsibility to sign, endorse, deposit or process any subsequent payments made on the policy. Acceptance of the policy shall constitute agreement to the approval of the parts and provisions of the policy
If a Conditional Life Insurance Agreement was delivered in consideration of the payment of the first premium and is in effect, its provisions and terms will apply. Otherwise the policy will take effect and coverage will begin on the issue date specified in the policy if the full first premium is paid, the Proposed Insured(s) is (are) living, and the answers and statements in the application(s) and any supplements continue to be complete and true at the time of delivery of the policy.
Under penalties of perjury, I certify that (1) the social security or federal tax identification number shown on page 1 of this application for use as the owner of this policy is my correct taxpayer identification number, AND (2) I am a U.S. person (including a U.S. resident alien), AND (3) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the IRS that I am subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding. NOTE: You must cross out item 3 in the above certification if you have been notified by the IRS that you are currently subject to backup withholding. The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

## EQUITY INDEXED ACKNOWLEDGEMENTS

I understand that I am applying for an equity indexed product. While the values of the policy may be affected by an external index, the policy does not directly participate in any stock or equity investments. I understand that any values shown, other than guaranteed minimum values, are not guaranteed, promises or warranties.

Signature of Proposed Insured  X

## SIGNATURES

| Signed / Dated at _Warren MB_ | X _Signature of Proposed Insured_ |
| On _July 30, 2003_  City, State | |
| Date | X _Rosalind Furman_  TRustee |
| X _Signature of Licensed Agent_ | Signature of Joint Owner if other than Proposed Insured |
| | If Owner is a corporation, business firm or trust, give full name below and an Authorized person must sign and provide title |
| _Parent/Guardian or Witness (if required)_ | |

Form 14839 6/02 MA

|| |||||| ||| ||| || ||||| ||| |||| || |||| ||
* 14839040204 *

page 6

IL0257

## TABLE OF PERCENTAGES

| Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage | Joint Equal Attained Age on the preceding policy anniversary | Applicable percentage |
|---|---|---|---|
| 40 or younger | 250% | 68 | 117% |
| 41 | 243% | 69 | 116% |
| 42 | 236% | 70 | 115% |
| 43 | 229% | 71 | 113% |
| 44 | 222% | 72 | 111% |
| 45 | 215% | 73 | 109% |
| 46 | 209% | 74 | 107% |
| 47 | 203% | 75 | 105% |
| 48 | 197% | 76 | 105% |
| 49 | 191% | 77 | 105% |
| 50 | 185% | 78 | 105% |
| 51 | 178% | 79 | 105% |
| 52 | 171% | 80 | 105% |
| 53 | 164% | 81 | 105% |
| 54 | 157% | 82 | 105% |
| 55 | 150% | 83 | 105% |
| 56 | 146% | 84 | 105% |
| 57 | 142% | 85 | 105% |
| 58 | 138% | 86 | 105% |
| 59 | 134% | 87 | 105% |
| 60 | 130% | 88 | 105% |
| 61 | 128% | 89 | 105% |
| 62 | 126% | 90 | 105% |
| 63 | 124% | 91 | 104% |
| 64 | 122% | 92 | 103% |
| 65 | 120% | 93 | 102% |
| 66 | 119% | 94 | 101% |
| 67 | 118% | 95 and higher | 100% |

## TABLE OF GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES

| JOINT EQUAL ATTAINED AGE | MONTHLY RATE | JOINT EQUAL ATTAINED AGE | MONTHLY RATE |
|---|---|---|---|
| 72 | 0.15092 | 86 | 11.74533 |
| 73 | 0.49500 | 87 | 13.14575 |
| 74 | 0.90883 | 88 | 14.55258 |
| 75 | 1.39408 | 89 | 15.97233 |
| 76 | 1.95008 | 90 | 17.41567 |
| 77 | 2.57258 | 91 | 18.90017 |
| 78 | 3.25408 | 92 | 20.46633 |
| 79 | 3.99700 | 93 | 22.17358 |
| 80 | 4.81333 | 94 | 24.28583 |
| 81 | 5.71583 | 95 | 27.23525 |
| 82 | 6.72292 | 96 | 31.85917 |
| 83 | 7.84633 | 97 | 39.89600 |
| 84 | 9.07350 | 98 | 54.77525 |
| 85 | 10.38192 | 99 | 83.33333 |

THE GUARANTEED MAXIMUM COST OF INSURANCE RATES ARE DERIVED FROM THE 1980 CSO SMOKER MORTALITY TABLE OR THE 1980 CSO NONSMOKER MORTALITY TABLE, AGE NEAREST BIRTHDAY, MALE/MALE, IN ACCORDANCE WITH THE INSUREDS' UNDERWRITING CLASSES.

IL0259

**SCHEDULE - CONTINUED**

BENEFICIARY IS AS SHOWN IN APPLICATION UNLESS CHANGED AS PROVIDED IN THE POLICY.

**TABLE OF SURRENDER CHARGES**

| BEGINNING OF POLICY YEAR | CHARGE |
|:---:|:---:|
| 1 | $559,504.00 |
| 2 | $539,921.36 |
| 3 | $514,743.68 |
| 4 | $474,459.39 |
| 5 | $439,770.14 |
| 6 | $410,116.43 |
| 7 | $384,379.25 |
| 8 | $361,439.58 |
| 9 | $340,737.94 |
| 10 | $321,714.80 |
| 11 | $303,810.67 |
| 12 | $285,906.54 |
| 13 | $268,002.42 |
| 14 | $248,419.78 |
| 15 | $227,158.62 |
| 16 | $203,099.95 |
| 17 | $176,803.26 |
| 18 | $148,268.56 |
| 19 | $118,055.34 |
| 20 | $88,961.14 |
| 21 & UP | $0.00 |

**WITHDRAWALS**

AFTER THE FIRST POLICY YEAR, MAXIMUM NUMBER OF WITHDRAWALS IN A POLICY YEAR: 1

BASED ON THE GUARANTEED INTEREST RATE, THE MAXIMUM POLICY AND PREMIUM EXPENSE CHARGES, THE MAXIMUM MONTHLY COST OF INSURANCE RATES AND THE PLANNED PREMIUM, THIS POLICY WILL EXPIRE ON OCTOBER 9, 2018.

SCHEDULE

**JOINT INSUREDS:**
RUDY K MEISELMAN                                HOPE E MEISELMAN
**RATE CLASS:**
NO TOBACCO USE                                   NO TOBACCO USE


**POLICY NUMBER:** B05020665
**JOINT EQUAL AGE AT ISSUE:** 72
**POLICY DATE:** OCTOBER 9, 2003
**ISSUE DATE:** OCTOBER 9, 2003
**FACE AMOUNT:** $18,700,000
**DEATH BENEFIT OPTION:** A

**POLICY LOAN INTEREST RATE:**        7.40% PER YEAR IN ADVANCE
**POLICY LOAN CREDITED RATE:**        6.00% PER YEAR
**REINSTATEMENT INTEREST RATE:**      6.00% PER YEAR
**GUARANTEED INTEREST RATE FOR POLICY VALUES:**     POLICY YEAR 1      6.15%
                                                     POLICY YEARS 2+    4.00% PER YEAR

THE POLICY MONTH BEGINS ON THE 9TH DAY OF THE MONTH.

**PLAN:** JOINT AND LAST SURVIVOR ADJUSTABLE LIFE

**MINIMUM FACE AMOUNT:**              $250,000.00
**MAXIMUM PREMIUM EXPENSE CHARGE:**   8% OF PREMIUMS PAID
**MAXIMUM POLICY EXPENSE CHARGE:**    $6.00 PER MONTH ALL YEARS
**MAXIMUM PER UNIT EXPENSE CHARGE:**  $0.24000 PER MONTH PER $1,000 OF FACE AMOUNT YEARS 1 - 3
                                      $0.04830 PER MONTH PER $1,000 OF FACE AMOUNT YEARS 4 +

| BENEFITS AND PREMIUMS | AMOUNT/ | FORM | PAYABLE |
|---|---|---|---|
| BASE POLICY | UNITS | NUMBER | TO AGE |
| JOINT AND LAST SURVIVOR ADJUSTABLE LIFE | $18,700,000 | ULLS-99 | 100* |

**ADDITIONAL BENEFITS** (PROVIDED BY RIDER)
DEATH BENEFIT MATURITY EXTENSION                   +          E-ULDBE-98        100+

+ THE AMOUNT EXTENDED IS EQUAL TO THE DEATH BENEFIT AT AGE 100.  SEE THE ENDORSEMENT FOR DETAILS.

* JOINT EQUAL AGE

**POLICY SPLIT OPTION CLASS:** UNRESTRICTED

**FIRST YEAR PREMIUM:**              $871,250.00
**PLANNED ANNUAL PREMIUM:**          $871,250.00
**TARGET PREMIUM:**                  $461,516.00
**BASIC NO-LAPSE PREMIUM:**          $26,295.58 PER MONTH, $315,546.96 PER YEAR
**BASIC NO-LAPSE GUARANTEE PERIOD:** 5 YEARS

THE PREMIUMS ABOVE INCLUDE AN EXTRA AMOUNT BECAUSE THE JOINT EQUAL AGE AT ISSUE HAS BEEN RATED.

**IL0261**

# EXHIBIT K

Dr Meiselman

EXHIBIT NO: 22
979.05
L. LONDON

Rudy K. Meiselman, M. D.
775 Longboat Club Road #603
Longboat Key, FL 34228-3878

Tel 941-383 9172
941-383 6538
Telefax 419 781 6235
Email rudymeiselman@comcast.net

11/28/03

Dear Gregg:

I note this morning that there is still a cash debit in my two accounts. Additionally there was a charge for margin interest in account # 51316472 dated 11/25/03. I have never had a margin expense in my PSP accounts previously. I decided not to proceed with selling more funds Friday in preparation for the transfer to Michael Price because of the uncertainty that I would have any substantial amount of cash available in my accounts without using margin borrowing. Dexter Lyons told me that we would have to tell him the precise amount to be transferred, not simply "all available cash". I did that earlier in this week. The sale of $750,000 of PISRX on Thursday cost me $7,500 in redemption fees – a needless expense without the opportunity to transfer the planned funds to Price as planned. Now I shall have to look for an alternate fund in which to re-invest the proceeds until we make the delayed transfer at the end of December.

I have spent a great deal of time considering the pros and cons of accepting the new Indianapolis Life insurance policy. Below I discuss my considerations and reasons for a decision.

The article appended says that IRS is now taking the position that PSPs are for retirement only and not for estate planning, so they do not approve of life insurance for husband and wife within a PSP (see article). IRS officials raised serious questions about the legality of a pension's purchase of life insurance in a second to die policy on the lives of the employee and his spouse. The IRS says that a pension plan is designed to provide retirement benefits. It is not to be used as an estate-planning vehicle. Purchase of life insurance that covers the wife of an employee violates a fundamental requirement for such plans.

The IRS here is relying on the "Exclusive" provision which requires that the tax qualified plans be maintained for the exclusive benefit of employees.

Another point they raise is that the IRS regulations require that a pension plan primarily provide systematically for the payment of "definitely determinable" benefits to employees over a period of years after retirement, typically for life. Although the Service has long allowed PSPs to offer incidental death benefits which can be funded by life insurance, the IRS, citing a 30-year old ruling, now seems to hold that maintaining life insurance on an individual other than an employee fails to satisfy the "definitely determinable" standard. "Those who are considering second to die purchase with retirement plan money should explore the alternatives. And those whose plans have already made such purchases would be well advised to seek counsel." (See article)

If the plan is that I give up or reduce the size of the ING policy for a new policy, I have told you previously that I am reluctant to do so because there is a large surrender charge of about $323,000. It would be very difficult to give this up and make up the difference with investments

IL1743

in a replacement policy. I started out poorly in the ING policy because of the bear market we were in. During 2003 the appreciation has been much better, despite the limitation to choices among about 40 mutual funds. With the excellent returns this year to over $5,000,000, I think I should have no trouble in maintaining the 6% annual earnings that are required to keep this policy until both deaths, even converting to a fixed return from variable, now that I have a cushion. This would unburden me of managing this asset.

Life insurance is a very good deal if Hope and I die prematurely. I am confident that Hope will not die prematurely. The longer she lives the more benefit to the insurance company. Peter Katt says that the returns on life insurance investments cannot be as large as those outside a policy because of expenses. Moneys left within the plan to compound tax-free with added margin borrowing over a period of years will be paid out as IRAs for our children in a manner that allows for a very long period of tax-free-compounding. The yearly income tax paid on withdrawals is entitled to IRD deductions against the income. Amounts inherited into these IRAs are tax-sheltered until they are withdrawn, in contradistinction to the death benefits of life insurance, which must be invested in taxable vehicles.

I am mindful of the fact that is important to have sufficient life insurance to cover estate tax for the children's IRA inheritances, and we certainly have more than enough for that purpose at this time. We don't need another 22 million of life insurance, or any other amount. There are real estate assets that the children inherit and liquidate, providing more money for estate taxes.

We don't have sufficient liquid funds to buy a policy out of the PSP. I would not want to add more borrowing to accomplish this. I have substantial margin interest borrowing at TD Waterhouse. On balance it has served me well. I have the option of stopping the margin borrowing if I elect to do so. Signing up for a large amount of life insurance is an irrevocable long-term commitment that seems unattractive to me.

There would be another very large commission to be paid for the additional insurance, coming out of the pension plan assets, leaving less to compound tax-free. Additionally, there are profit expenses to the life insurance company that are deducted from the earnings made by my premiums.

The recently completed arrangement between the affiliate of Potomac funds and Price Capital Management for a method to use margin in IRAs and pension plans makes a very strong argument for keeping my PSP assets within the plan where they can benefit from margin without UBTI. The markedly superior appreciation with this arrangement surpasses any benefit of additional life insurance within the PSP. Moreover, it is substantially less risky. Price uses margin to hedge against loss for the most part, but also uses it for increasing overall return when he feels that the investment climate is appropriate. You have seen the results of his use of margin over the past three years. You will note that in all cases he achieves more than twice the return in margin accounts versus non-margin. Equally important, you will also notice in the scatter charts that he includes in his reports that the superior margin return is achieved with far less standard deviation than the NASDAQ or the S&P unleveraged.

You cautioned me about the site of the new Price Funds in an offshore location. I know that Michael Price is putting all of his substantial retirement funds in these new funds. More importantly, if he should under perform, if the UBTI becomes an issue, or if the opinion letter from the New York law firm is equivocal, I can get my investments returned at the end of any month. There is a small downside risk, but it is measurable and therefore acceptable to me. I met

IL1744

at least a dozen of his clients at the Las Vegas meeting who told me that they intend to transfer their retirement funds into the new margin accounts.

The only potential gain to this new large expenditure for additional life insurance is that it could make my heirs super-rich. Without purchasing additional life insurance they are all going to be multi-millionaires based upon inheritances.

The substantial potential downside to the purchase of additional life insurance is that it could destroy my family's future financial security if there is a significant change in several variables. One is the cost of margin. In addition, if the bond market changes substantially and the insurance company's portfolio deteriorates with it the result would be the same. I had a taste of this with my Bankers Life policy in which I was led to believe was limited to the six payments illustrated. At the end of the six-year period the insurance company told me they needed a seventh payment. That represented a 14% price hike over the illustration.

You say that the only cost to me for the additional life insurance is margin interest. We both recognize that this is a loan to me that must be repaid. The substantial premiums taken out of the account (almost one third of the corpus) would no longer be available for investment gains, especially the outstanding margin gains that Michael Price will provide.

I recall very well during the 1980's that many real estate developers went bust because of the several year delay between conception of the project, negotiating for financing and the project ultimately coming to being completed. There was a rise in prime rate from about 6% to 22%, an unforeseen event without historical precedent. I invested several hundred thousand dollars in these projects with a good friend developer (not tax shelters) and lost almost all of it. He did not lose any significant amount of his own money. It was "heads I win and tails you lose." He simply formed new corporations and went on to make himself wealthy when the interest rates returned to a reasonable level. It took me many years of hard work to recoup the losses. At my current age of 77 I do not have the time to recover from similar losses in the short time I have ahead of me.

You know that I use 100% margin in my marginable accounts. You also know that I have never used the available margin in my PSP because I feel it is too risky. This decision is not based upon UBTI; I am happy to pay the margin interest in my non-retirement accounts in exchange for the added earnings when the time is judged propitious for using margin. If I use margin in my investments I have the option of canceling it at any time if I sense that the potential is not worth the risk. I can always go to cash entirely if the stock market goes against me for any period. The decision to use margin in my retirement account to invest more than four million in additional life insurance is irrevocable if any of the risks I have enumerated come to pass.

I am being asked to commit to several years of margin interest at whatever the current rate might become, and then, ultimately buy the policy out of the plan; again with borrowed money at whatever the current rate is at that time. The parameters of that risk are measurable and they are substantial.

Another substantial risk factor is the IRS new position on using retirement plan life insurance to insure the lives of spouses, as the appended document outlines.

The upside for the life insurance is measurable. The downside is NOT measurable. It could be enormous. At 77 years of age I would be FOOLHARDY to involve myself and my family in this multi-risk endeavor.

**IL1745**

Your guarantee of no loss from UBTI would be worth nothing if you went out of business — another risk. In any case, this is not the most important issue. Like my developer friend, you have used your best judgment to make this honest recommendation. If any of the many variables turn out to have an impact on your insurance plans for us I am sure you would tell my heirs that there was an unforeseen development and that you are very sorry that it did not work out. My family would be even more sorry than you. Should I expose my family to all of these risks to make my daughters super-wealthy in place of simply wealthy? What would it accomplish? It might well be counter-productive for their welfare. I know you have put a lot of time into planning this insurance policy. I am sure that you also do these evaluations for many potential clients who decide, for their own good reasons, not to go ahead with the purchase.

You have done a great deal for my family and me by providing the opportunity for me to defer taking MRDs. I appreciate it immensely. I am more than willing to compensate you for offering this opportunity to me. I don't think I should feel obligated to endanger my family's future security to pay this debt to you via embarking on what I judge to be a risky new endeavor. I will compensate you in any reasonable way you request, but I don't want to feel obligated to pay the debt by making life insurance commissions available to you

Don't you agree that our children are going to be multi-millionaires without this new life insurance?

Don't you agree that if the market dropped as much as 10% that I would control further loss by omitting margin and going to cash if needed, thereby insuring my family's financial future?

Don't you agree that if I were to convert all my investments to cash now and keep them there until I die that our children will still be multi-millionaires?

Don't you believe that if Michael Price's new funds do not turn out to be as represented and as successful as I believe they will be that I can simply order the return of my investments to my own account at Waterhouse at the end of any month? Price is the manager of the account, but he cannot remove funds from my accounts.

We both know the answers to the above questions.

I am trying to find some good reasons to accept this new life insurance out of gratitude for the employment status you have afforded me. The are several variables to be considered:

The IRS may prevail in its new position that retirement plan funds may be used only for the purchase of life insurance on the participant, and not on a spouse.

I can accommodate to a prolonged downward trend in the market with the techniques I use. Michael Price had positive returns for 2001 and 2002 when the market went down. Moreover, he made even greater returns in his margin accounts. On the other hand, the purchase of a large life insurance policy with the current plan contains many potential variables that we cannot control or accommodate to.

A significant change in interest rates can have a profound effect on the costs of borrowing four million dollars on margin over a period of years while the insurance is within the Plan. When it is purchased out with borrowed money the additional borrowing cost will exist for many more years.

**IL1746**

A significant change in the bond market can impact negatively on the insurance company's portfolio and the estimated period of coverage projected in this policy.

Michael Price is only 54 years of age, 23 years younger than I. He should be able to serve my heirs in a superior manner for many more years. If he should ever under perform when I am no longer here Cititrust has instructions to remove our accounts and transfer them to others. Placing money with Price for management is not an irrevocable commitment. This option is of great importance to my family and me.

My heirs have absolutely no need for another 22 million of life insurance beyond the large amount that we currently have. There is no valid reason to accept several substantial new risks to achieve something that we really don't need. The risks and rewards in choosing which course of action we take weigh heavily against not accepting this new life insurance coverage. I respect your professional judgment and recommendation that purchasing this additional insurance is a wise choice for my family and me. However, I am the one who must make the final decision as to whether we want to spend 4.5 million of my retirement funds to make the purchase. As you can see in the long dissertation above, this is a reasoned decision on my part, one that I have agonized over for a long time.

Hope and I ask that you immediately direct the return by wire of the moneys removed from my account. This is not something that can be delayed to a date approaching the purchase becoming irrevocable. We would like the funds wired back into my account on today. Please confirm to me that this has been done on Friday. Please correct the margin charge against my account so that I will not be drawing IRS scrutiny to my retirement funds in reporting UBTI.

Very truly yours,

Rudy K. Meiselman, M. D.

Enclosures:  Article from Intaernational Cyber Business services, Inc.
             Articles by Peter Katt, Life Insurance Consultant

IL1747

International Cyber Business Services, inc.

**ICBS** Business Resources Center

- home
- business, gen.
- marketing
- eBusiness
- web design
- web promotion
- cust. service
- branding
- joint venture
- finance
- success
- stress mgt.
- health
- inspirational
- legal resources
- non-profit
- patents
- miscellaneous
- 
- home
- contact us
- feedback

# Retirement Plans Are For Retirement, Not Estate Planning
## By Marc J. Lane

Some financial advisors have seen merit in buying life insurance out of one's pension plan, using tax-deductible dollars to pay the premiums. We've never been great fans of this strategy, arguing instead that a pension presents an extraordinary opportunity to grow wealth on a tax-favored basis. To the extent pension dollars are diverted to fund insurance costs, total investment returns are diluted and the pension's very purpose is compromised.

Now, two senior IRS officials have publicly raised serious questions about the legality of a pension's purchase of life insurance, in this case a 'second-to-die' policy on the lives of an employee-participant and his wife. The officials insist - as we have long held - that a pension plan is designed to provide retirement benefits. It's not to be used as an estate planning vehicle. Thus, the purchase of insurance, particularly on the life of someone other than the employee (here, his wife), violates a fundamental requirement for such plans. What's more, we've learned that the IRS position, as it is evolving, would similarly extend to profit-sharing plans.

The IRS officials, in taking their stand, have relied on the "exclusive benefit rule," which requires that tax-qualified plans be maintained for the exclusive benefit of employees. They reason that maintaining life insurance on someone other than an employee runs afoul of that mandate.

There's another problem, too. IRS regs require that a pension plan primarily provide systematically for the payment of "definitely determinable" benefits to employees over a period of years after retirement, typically for life. Although the Service has long allowed pensions to offer incidental death benefits which can be funded by life insurance, the IRS, citing a 30-year-old ruling, now seems to hold that maintaining life insurance on an individual other than an employee fails to satisfy the "definitely determinable" standard.

The new IRS position is not without controversy. After all, many retirement plans permitting the purchase of second-to-die policies have already received favorable determination letters from the Service.

The officials' comments were in fact occasioned by a pending ruling request before the IRS. As it now appears, that ruling may be issued in

IL1748

Retirement Plans Are For Retirement, Not Estate Planning, small business resources, ICB...    Page 2 of 2



adverse form - or the request may be voluntarily withdrawn by the taxpayer.

What seems clear is that the issue won't go away. So those who are considering a second-to-die purchase with retirement plan money should explore the alternatives. And those whose plans have already made such purchases would be well advised to seek counsel.

### Related Articles:

### Don't Let Poor Estate Planning Tear Your Family Apart
If you die without a will, a court will decide, based on state law, who will inherit your property. In most cases, the result might be contrary to your wishes.

### Plan Your Estate, or the State Will Do It For You
There are certain things that you must do to take care of yourself and your family. One such responsibility is planning for what will happen to your assets when you die. While it may be something most people don't like to dwell on, everyone needs an estate plan.

### How Family Limited Partnerships Build Wealth
The family limited partnership is an increasingly popular and sometimes controversial tool for saving estate taxes, protecting assets and tax-efficiently shifting income from one family member to another.

---

Marc Lane is a business and tax attorney, a Master Registered Financial Planner, a Registered Financial Consultant, and a Certified Investment Specialist. He is an Adjunct Professor of Law at Northwestern University and an Adjunct Professor of Business at the University of Illinois. He is the author of 30 books on business organization, taxation, and personal finance. His newest book, "Advising Entrepreneurs: Dynamic Strategies for Financial Growth" draws from his experience working with those who have successfully built their businesses. http://www.marcjlane.com

**[ecomhelp home] [ICBS Home]**

---

Website Developed and Hosted By:
International Cyber Business Services, Inc.
Developers of holisticonline.com, the award winning health website
Copyright © 1996-2003, ICBS, Inc. All Rights Reserved.

IL1749

Let me preface this by saying that I have nothing against permanent life insurance - I've owned lots for years. In addition, I'm also making the assumption that permanent life insurance is needed by the insured for long term estate planning needs.

Still, you have to look at the purchase from two perspectives. 1) The cost of the life insurance; and, 2) the impact on the long term accumulations of the profit sharing plan.

1) The Good Part - by letting the plan purchase the insurance what you are really doing is funding the first year commissions/policy loads with tax-deductible dollars. In theory, the policy is transferred (sold) to the insured or trust after about 2-3 years when the annual cash value increases look more reasonable relative to the premium paid in later years. After being sold to the insured (typically for the reserve), the policy would then be transferred to an irrevocable trust and three years later be free of the estate tax. This technique can also be done (in my opinion better) with a 2nd to die contract.

2) The Bad Part - the pension/profit sharing plan dollars used to make the initial life insurance purchase are still lost and will not be available for retirement funding. The purchase price (the reserve) paid for the policy to the pension/profit sharing plan is typically pennies on the dollar relative to premiums initially paid. What is the value of the deposits lost compounded at 6% to 8% (assumed rate) for 20 to 30 years (time to retirement)?

You have to make the decision after a "real" cost/benefit evaluation (in fact I would let the insurance agent proposing the plan do the long term evaluation) should the plan pay and reduce future retirement accumulations or should the individual pay and reduce current income and have the insurance out of the estate today.

Just my thoughts.

BY PETER KATT

IL1750

**hp officejet d135**
**printer/fax/scanner/copier**

**Fax-History Report for**
**Rosalind Herman**
**1-781-935-9728**
Nov 28 2003 9:27am

**Last Transaction**

| Date | Time | Type | Identification | | Duration | Pages | Result |
|------|------|------|----------------|---|----------|-------|--------|
| Nov 28 | 9:21am | Received | 941 383 6538 | | 5:06 | 8 | OK |

**IL1751**

# EXHIBIT L

02/09/2004   941 383 8538   P. 8

uuy K. meiselman, M.D.   702-309-2447   P.2

Dec. 06 03 07:27p   Rosalind Herman



*Financial Resources Network, Inc.*
*Insight Onsite Financial Solutions*™

**424 Washington Street      Woburn, MA 01801-2112**

SOLUTIONS

December 05, 2003

Dr. Rudy K. Meiselman MD
775 Longboat Club Road
Unit 603
Longboat Key, FL 34228

Sent via fax 1-800-450-4479

Dear Dr. Meiselman,

Please accept my apologies for my delay in corresponding with you. I was in New York on business and was delayed by the inclement weather in returning to my Las Vegas office. I have completed a thorough review of the insurance program implemented for you and Mrs. Meiselman in Financial Resources Network, Inc. Profit Sharing Plan and Trust. I have also had extensive consultation both with our corporate counsel, outside counsel and the firm's accountant. They have indicated to me that I, as trustee of the Financial Resources Network, Inc. Profit Sharing Plan and Trust, I have a clear insurable interest in you as a plan participant.

They have clearly explained to me my obligations as a fiduciary to the plan. I am obligated to follow the so-called "prudent person standard". This means, in its simplest form that I must do what a prudent person presented with the same information would do. It was also counsel's considered position that a plan participant cannot waive away this "prudent person obligation". This means that if a plan participant's instructions counter this "prudent person standard" I must ignore them and follow the standard.

My personal review of the proposed Indianapolis Life policy, the analysis presented to me by Mr. Caplitz and the review of both by our firm's accountant and corporate counsel as well as outside counsel indicates that this policy purchase is clearly in you and your families' best interest. I am, therefore, legally obligated to complete the policy purchase on your behalf and to ignore your instructions to the contrary.

The purchase, using margin loan followed by bank financing of the purchase, minimizes the plans actual out of pocket expense. Prior to making my decision I asked Mr. Caplitz to complete a present value analysis assuming an increase in current interest rates from the current low rate of

Toll Free: 800-772-4047
Phone: 781-935-7070
Fax: 781-935-9728
E Mail insightonsite@attbi.com

*A Registered Investment Advisor*

Securities offered through Wharton Equity Corp. Member NASD/SIPC.
Registered Investment Advisor

ILI2025



**Financial Resources Network, Inc.**
**Insight Onsite Financial Solutions™**

**424 Washington Street    Woburn, MA 01801-2112**

3.5% to a more historically typical rate of 6%. This analysis indicated a significant net present value to you and your family even in a significantly higher interest rate environment.

My advisors and I are so impressed with this concept that I have instructed Mr. Caplitz to implement an identical program on my behalf in the plan. I hope you will understand and appreciate my being legally unable to make any decision but to go forward with the implementation of this plan due to my fiduciary obligation to you, the plan participant.

I am in receipt of your instructions to remove margin from the profit sharing plan. I am unable to comply since the presence of margin loans is an integral part of the success of the insurance plan. I have valued your contributions as an employee to Financial Resources Network through the years. I have welcomed your valuable contributions and hope you will continue to remain an employee of my firm.

I am well aware of the value the ability to eliminate minimum distributions represents to your family. According to my cursory examinations you have eliminated almost $2.5 million of required distributions over the last three years. This has saved your family more then $875,000 in income taxes. These savings will grow dramatically over time as the required minimum distribution percentages increase. I hope you will remain as an employee and a plan participant.

Please feel free to contact me with any questions you may have.

Sincerely

*Rosalind Herman*
Rosalind Herman
Trustee

CC: Mervin Wilfe Esq, Wayne Murphy Esq., Daniel Goodness, G. Caplitz

Toll Free: 800-772-4047
Phone: 781-935-7070
Fax: 781-935-9728
E Mail insightonsite@attbi.com

*A Registered Investment Advisor*

Securities offered through Wharton Equity Corp. Member NASD/SIPC.
Registered Investment Advisor

ILI2026

# EXHIBIT M

(59)

Rudy K. Meiselman, M. D.
775 Longboat Club Road #603
Longboat Key, FL 34228-3878

Tel 941-383 9122
941-383 6536
Telefax 419 781 6235
Email rudymeiselman@comcast.net

**VIA CERTIFIED EXPRESS MAIL**

Indianapolis Life Insurance Company

Gentlemen:

I am an employee of Financial Resources Network, Inc. As such I am a participant in their profit sharing plan with a segregated self-directed account. My employer sells life insurance. My employer recommended a large insurance policy with your firm to me several months ago. I agreed to have medical evaluations done on my wife and me with a view to finding which insurance companies would offer a product suitable for our family. This process was initiated about six months ago. My employer sketched out very briefly the outlines of a fixed policy with Indianapolis Life and with a private placement product in variable from.

On Tuesday, November 25th a wire to you was sent from my profit sharing account in the amount of some $1,015,000. This action was taken without my knowledge and without my permission. When I questioned my employer the next day upon learning of the unauthorized withdrawal he informed me that he received a notice from Indianapolis life that day telling him that he had to confirm the purchase that very day because if a decision was delayed my wife and I would have to undergo repeated physical evaluations if we decided to proceed.

He said he did not have time to inform me that he had taken this action as the profit sharing plan Trustee, acting upon what he thought were my intentions. If he thought I had decided to purchase this policy there was a miscommunication that I am prepared to excuse him for. We have not discussed the Indianapolis life policy for months.

As an employee I may not have the right to cancel this purchases because I am led to believe that only the plan Trustee can do this. I have told my employer that I want the funds returned to my account immediately and that neither my wife nor I want to go forward with the purchase. He told me that he would comply if I insist, after he sends me the policy via FedEx today for delivery tomorrow, November 29th. I understand there is a "10-day free-look period that started on November 25th. I have told my employer that I want the one million returned to my account. Perhaps he will do so.

Out of an abundance of caution I am taking this opportunity to inform you that I do NOT want to go forward with the purchase of this policy. I do not wish to dwell on the legal



Dr. Meiselman
EXHIBIT NO. 25
9-19-05
L. LONDON

IL0600

fine points as to who has the right to cancel the purchase, but I want you to know that I will file a law suit against your company if I am committed to the purchase of $4,500,00 of life insurance by the pension plan Trustee, against me will. You will receive notice from my attorney giving you the same warning.

I am entirely willing to excuse the unilateral action of the Trustee of my pension plan account based upon his statement that he had to act promptly to protect my right to purchase the policy and that his committing me to the purchase was a misunderstanding. I have made it clear to him, and I now wish to make it clear to Indianapolis Life that my wife and I want to take advantage of the 10-day free look period and cancel the policy purchase.

I ask that you telephone me on receipt of this letter, and inform me whether you are prepared to honor my request.

I would point out that neither my wife nor I has ever signed any document indicating that we want to make this insurance purchase. It may well be that the Trustee is liable for breaching his fiduciary duty in taking this unilateral action, but that alone will not cancel a life insurance purchase that we do not want to make.

Very truly yours,


Rudy K. Meiselman, M. D.

IL0601

# EXHIBIT N

Rudy K. Meischman, M.D.
775 Longboat Club Road #603
Longboat Key, FL 34228-3878

Tel 941-383-9122
941-383-9936
Cell 800-497-4870
Email rmeischman@hotmail.net

12/1/2003

Indianapolis Life Insurance Company
61 Froelich Farm Blvd
Woodbury NY 11797

Re: Policy # 809020665 and Free-look-period

Attention: Jean Oh

My wife and I are the insureds on the above captioned policy.

I am a participant in the Profit Sharing Plan of my employer, Financial Resources Network, Inc. I have a segregated self-directed investment account with my employer.

This $22,000,000 policy was entered into without my permission and without my knowledge. I learned of it only after the fact, when I noted that approximately $1,015,000 was wired out of my account to you on about November 21st. It was neither my intention nor that of my wife to go forward with this purchase from Indianapolis Life or any other insurance company from among those that were considered by my employer.

My wife and I agreed to physical examinations last July that were to be submitted to three or more insurance companies. We were never told of the amounts of life insurance to be purchased. We were never asked if we would like to purchase any one of those policies.

When I checked with the Trustee about removal of funds from my account I was told that he thought it was in my best interests to do so. He had no basis for this assumption. Indeed, I told him more than a month ago that there had been a serious deterioration in my health and that I thought I could not sign to purchase a policy without acknowledging that my health had deteriorated since the physical examinations. I have developed atrial fibrillation and am taking anti-coagulants to control blood clots. He said it was unnecessary to disclose this information to an insurance company. I told him that nevertheless I was not interested in pursuing the purchase of any additional life insurance. I already have some $23,000,000 of life insurance on my life and do not need more.

It appears that even though we are speaking of $4,200,000 of MY money being committed to this purchase without my knowledge or permission, your representative told me that I did not have the authority to decide whether I want to purchase more life



Dr. Meiselman
EXHIBIT NO. 26
9·19·05
L. LONDON

IL1498

insurance. It seems that I have no authority to know whether a policy was entered into on my behalf and I have no authority to cancel it.

I spoke with the insurance agent who works for my employer, a Mr. Caplita, this morning and made it clear that we did not want this policy and want him to exercise our 10-day free look privilege to cancel it. He had told me, when I learned of the wire transfer, that we had until Friday, December 5th to exercise the 10-day free look. Mr. Caplita agreed to call you this morning, and he called me back to confirm to me that he had placed the call to effect the cancellation.

I then spoke with one of your representatives at around 12:00 PM today, Eastern Time. At my insistence she gave me the policy number. I was told that you had not received a call canceling the policy. In checking with your office later I learned that the free look period expired on October 9th. To my knowledge, no money came out of my account to enter into this transaction prior to November 25th.

I want to emphasize to you that we have never agreed to make this purchase; we have never authorized any person to act for us in making the purchase. We have never seen the policy.

I am placing you on notice that I have contacted my attorney and we shall file a lawsuit against your firm if you do not comply with the wishes of the insured, my wife and me. We do not accept your position that the Trustee of my pension plan account can commit us to an expenditure of $4,200,000 for this purchase without our approval, without our permission, and that we do not have the authority to cancel it. This was a swindle perpetrated to earn a large insurance commission. Your firm is complicit in this crime if you do not cancel the policy and return my money.

Very truly yours,

Rudy K. Meiselman, M.D.

IL1499

# EXHIBIT O

# MURPHY & FLAHERTY

### COUNSELLORS AT LAW

43 BOWDOIN STREET, BOSTON, MASSACHUSETTS 02114
617-227-7777 ● FAX 617-227-2186

WAYNE R. MURPHY
TIMOTHY R. FLAHERTY
WALTER B. STEELE, JR.
DANIEL P. FLAHERTY
KENNETH R. BROWN
PETER J. DUFFY

OF COUNSEL
HON. WALTER E. STEELE, RET.

December 12, 2003

Ms. Carolyn Roberts
Indianapolis Life Insurance Company
611 5th Avenue
P.O. Box 14590
Des Moines, IA 50306-3590

*Via Facsimile 888 329-1329 and 1st Class Mail*

Re: B05020665 (Rudy Meiselman)

Dear Ms. Roberts:

Please be advised that the undersigned represents Financial Resources Network, Financial Resources Network Profit Sharing Plan and Trust (hereinafter "The Plan") and the Plan's Trustee Rosalind Herman.

I have reviewed your December 8, 2003 facsimile regarding the above-referenced policy with attachments. This letter shall serve as written confirmation that the Plan and its Trustee do not intend to exercise the rights available under the policies' "free look" period.

It is in the present intention and, in fact, the Trustee's fiduciary obligation, to keep the applicable policies in full force and effect. Dr. and Mrs. Meiselman have received communication setting forth the Plan's position in this regard.

Thank you for your time and attention to this matter. Please do not hesitate to contact me with any questions or concerns.

Very truly yours,

Wayne R. Murphy

ILI2027

# EXHIBIT P

Rudy K. Meiselman, M. D.
775 Longboat Club Road #603
Longboat Key, FL 34228-3878

Tel 941-383 9122
Telefax 941-383 8538
Email rudymeiselman@comcast.net

3/16/2004

Indianapolis Life Insurance Company
2960 North Meridian Street
Indianapolis, IN 46208

Attention: Gary C. McPhail, President

Dear Mr. McPhail:

As you may know, I have objected to the purchase of these policies within my segregated self-directed profit sharing account by the trustee of the Financial Resources Network, Inc. profit sharing plan. This 4.2 million policy was purchased without my permission and over my objections.

A copy of your response to the investigation initiated by the Massachusetts Department of Insurance has been forwarded to me. I am replying to your response (Exhibit **39**) to them.

I disagree with your position that your were correct to accept the order of the trustee to place the policy over my objections, and I disagree with your position that I did not have the right to demand that the policies be cancelled. In support of these disagreements, I am responding in detail with supporting exhibits, identified numerically.

It is my understanding that all life insurance companies retain the right to contest the validity of a policy during the first two years if there has been any misrepresentation in the application. *There have been multiple misrepresentations in this application.*

You rely on the rules of ERISA in claiming that you are obligated to accept orders of the trustee of the plan, since the profit sharing plan is the nominal owner of the policy. You are correct only in part. You are also obligated to comply with all *other* provisions of ERISA, with the pertinent IRS rules, and with the common law of trusts.

More importantly, ERISA states that a fiduciary bond for protection of the plan from dishonesty and fraud must cover the trustee of a pension plan. A trustee may not deal with assets of the plan without such coverage. Indeed, it is *unlawful* for a trustee to deal with assets of the plan without such coverage.**(23)** This trustee was NOT covered by a fiduciary bond on 11/25/03 when she initially wired the first premium out of my self-

1

directed account and when she subsequently confirmed the order to you to accept the policies before the end of the free-look period.(39)

Every pension plan must submit a form 5500 annually to ERISA for its profit sharing plan. "This form contains several questions designed to determine if the plan has been involved in a prohibited transaction".(11) One question asks about fiduciary bond coverage. My employer, Financial Resources Network, Inc. (EIN #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) did not submit a form 5500 for the year 2002. The Department of ERISA, EBSA, can find no record of a form 5500 for the year 2002 when I was the sole participant in the plan. You might wish to check with them yourself. The trustee, in response to my request, sent me a copy of their request for extension of time to file the form 5500 for 2002.(29) This request appears to have been prepared by the outside administrator, and is unsigned. The checkbox within the request indicates that the trustee of my employer does *not* have this bond. It is unlawful not to have the coverage and unlawful not to file the form 5500 timely. Agent Caplitz has admitted to me that they did not have this coverage.

I have a segregated and self-directed account within the pension plan and am authorized to trade the account myself per ERISA rules.(70,23) Accordingly, you should have accepted my request to cancel the policy that was placed without my permission and over my objections. I was the only person who can lawfully transact business for my segregated self-directed account (the trustee may not, as documented above, and no other official is authorized to do so). I submit that you should be aware of *all* ERISA rules, since you rely on ERISA rules when you state that only the owner of the policy, the pension plan, can order or cancel the policy.

As the basis for your contesting the policy, I wish to point out to you that agent Caplitz did not submit truthful information in the original application and in his two Amendments to the application. In the Amendment dated 10/9/03 (**50**), attached to my copy of the policy *first sent to me on 12/10/03,* he did not list the outstanding ING Security Life Policy in the amount of 20 million dollars. This form requires that the *insureds* sign, attesting to the fact that their medical condition had not changed since the date of the original application of on July 3, 2003. In my case it had deteriorated significantly and I had informed agent Caplitz of this on 10/7/03 (**38**). Agent Caplitz was aware of this fact and had acknowledged it in his letter to me. He did not present this Amendment to my wife and me for signatures; it was not signed. The Amendment was submitted to you without the required signatures. It appears that you accepted it. In his letter to me of 11/25/03 ( **55**) agent Caplitz stated that *it was not necessary to inform you that there had been a change in my medical condition.* I suggest that this is another misrepresentation and it is false. In a group of documents sent to the Massachusetts Division Of Insurance recently there are substitute forms that are not in my original copy of the policy.

Agent Caplitz submitted *another* Amendment to the application on 10/14/03, according to a document forwarded to me from the Massachusetts Division of Insurance.(**66**) *This Amendment is not found in my copy of the policies!* This Amendment is signed by the *trustee* and certifies that the insured individuals are in the same condition as stated in the original application of July 3, 2003. She was not authorized to sign this form in place of the insureds because the insureds are not juveniles. As noted above, I had notified Agent Caplitz of the deterioration in my medical condition  (unexplained weight loss and onset

2

of atrial fibrillation requiring anticoagulant therapy) on 10/703 **(38)**. Rather interestingly, agent Caplitz, trustee Herman, and my employer, Financial Resources Network, dba Insight Onsite, all have the same mailing address, Telefax number and telephone number.**(55.)** Agent Caplitz acknowledged being advised of my deteriorated medical condition. I am under the care of cardiologist Dr. Geoffrey Liss, of Sarasota Florida, for the atrial fibrillation condition. I was investigated for the weight loss by Dr. Stanley Simon of Providence, R. I.

These are multiple gross misrepresentations in the application and Amendments for these policies. Exhibit **(66)** is a group of policy form pages sent to the Massachusetts Division of Insurance by agent Caplitz, and forwarded by them to me. In this group are many forms that are **not** in my copies of the policies. All of these forms are signed by the trustee, but *you* require they be signed by the insureds (it may be signed by the applicant only if the insureds are juveniles). The trustee certifies that there has been no change in our health status; she is wrong. *The appearance of these new executed forms that are not in the original policy begs an explanation.* These misrepresentations form a solid basis for your contesting the policy and returning the premium to my account.

ERISA rules state that a fiduciary of the plan may not self-deal, may not have a conflict of interest, and may not benefit financially from transactions within the plan. **(11)** Trustee Herman is a fiduciary of the plan. Agent Caplitz states that he is not an employee of my employer, but is an independent contractor. Under IRS regulations, an "independent contractor" life insurance agent who makes recommendations for the purchase of life insurance to the trustee of a pension plan is a "fiduciary" of the plan, and is subject to the same constraints.**(11)** At least one or both of these fiduciaries has a conflict of interest, is guilty of self dealing, and will benefit financially from the life insurance purchase they imposed unlawfully on my family. Within the IRS Technical Guidance Manual for agents examining form 5500 returns, they define the actions of agent Caplitz and trustee Herman as prohibited transactions and obtaining a "kick-back" fee for their roles in making this life insurance purchase. **(11)** Both agent Caplitz and trustee Herman are control persons of my employer.

Exhibit **(11)**, the IRS Technical Guidance Manual for evaluation of pension plans, speaks to prohibited transactions, the relationship between an employer and a disqualified person, infractions of IRC 4975c, definition of disqualified persons, dealings by a fiduciary for his or her own interest, receipt by a fiduciary of any consideration, from a party dealing with the plan in connection with a transaction involving assets of the plan, fiduciary self-dealing, and penalties for infractions of these rules. I submit that all of these items pertain to actions of the agent and the trustee in my case. Exhibit **(23)** also speaks to this.

Agent Caplitz said he made an "executive decision" on 11/25/03 to commit to the policy because that was the last date that he could do so without having us go through repeat physical examinations (which he knew I would not pass).**(56)** This testimony conflicts with the fax instructions from trustee Herman to wire the first premium out on 11/18/03! **(22)**

3

On 10/7/03 I sent a letter to agent Caplitz, requesting that because of my recent deteriorated health status that I be allowed to transfer additional portions of my segregated self-directed profit sharing plan assets to the independent money manager.(38) It should not be necessary to obtain permission to transfer portions of my segregated self-directed account to a money manager.(70) The trustee has no fiduciary obligation for assets managed by an outside manager.(23) On 12/31/03 the attorney for trustee Herman attempted to extort a legal release from me, absolving the trustee of any liability for the insurance purchase, in return for her authorization to allow me to make an additional transfer.(37) This is not only unlawful, but in view of their awareness my urgent need to divest myself of asset management responsibilities (38), their action is absolutely reprehensible. Indeed, if the trustee's attorney believes that his client's insurance purchase was lawful and proper there should be no need for such a Release. Webster's Dictionary offers one definition of extortion as "the act of wresting anything from a person by any undue exercise of power".(47)

I believe that Indianapolis Life had an obligation to insure that the statements made by the agent and the trustee were true, and that the trustee was authorized to trade my account lawfully. You have an obligation to insure that the trustee does no substitute her signature for those of the of the insureds.(66) Your firm has a due diligence obligation to insure that the trustee is covered by a fiduciary bond. I believe you also have an obligation to your re-insurers to verify that the statements as to outstanding life insurance coverage are presented honestly. I now have 44 million dollars of life insurance, well more than twice as much as I need. I believe Indianapolis life had a due diligence obligation to determine whether I am authorized under ERISA rules to cancel the unauthorized transaction of trustee Herman when you denied me that right.

The fact that I had sent you a certified letter objecting to the purchase as soon as I learned of it (59) should have alerted you to the fact that this application required special scrutiny to insure that it complied with all ERISA rules, IRS rules, and the common law of trusts.

I suggest that you have not only the legal right, but also the legal obligation to contest and cancel this policy.

I request that you respond to this letter as soon as possible.

Very truly yours,

Rudy K. Meiselman, M. D.
        Copies to:  Massachusetts Division of Insurance
                        Marc Machiz, Esq.

4

# EXHIBIT Q

Indianapolis Life
Insurance Company
9200 Keystone Crossing, Suite 800
Indianapolis, IN 46240-4603
317/927-6500
*www.indianapolislife.com*

June 14, 2004

**INDIANAPOLIS LIFE**

An *AMERUS* Company

Rosalind Herman, Trustee
Financial Resources Network, Inc. 401(k) Profit Sharing Plan
424 Washington Street
Woburn, MA 01801-2112

Re:  Indianapolis Life Insurance Company Policies, Numbers B05020799 and B05020665 (the "Indianapolis Policies"), insuring the second to die of Rudy K. Meiselman ("Mr. Meiselman") and Hope E. Meiselman ("Ms. Meiselman"), purchased by the Financial Resources Network, Inc. 401(k) Profit Sharing Plan (the "Plan")

Dear Ms. Herman:

As you know, Mr. Meiselman has asked us to rescind the Indianapolis Policies; i.e., he has asked us to cancel the Indianapolis Policies as though we had never issued them.  We have investigated the situation and find that the Indianapolis Policies should be rescinded for the following reasons:  material misrepresentations were made in the amendments to the applications for the Indianapolis Policies; there was a mutual mistake about a material fact that prevented the Indianapolis Policies from becoming valid contracts; and a court would find that Mr. Meiselman has an equitable right to require rescission of the Indianapolis Policies.  The purpose of this letter is to explain what we learned from our investigation, and to explain our reasons for rescinding the Indianapolis Policies.

Applications for the Indianapolis Policies were signed by you, as Trustee of the Plan, and by Mr. and Ms. Meiselman on July 30 and 31, 2003.  Both applications disclosed the existence of an ING life insurance policy with a face amount of $20,000,000 (the "ING Policy") and explained that the ING Policy was being replaced by an AGL life insurance policy (the "AGL Policy").

Mr. Meiselman received a physical examination from Dr. Frashner on August 26, 2003 (the "August 26 Physical Examination").  A report of the August 26 Physical Examination was submitted to our underwriting department, to be considered in connection with the applications for the Indianapolis Policies.  The report of the August 26 Physical Examination disclosed, among other things, the absence of a history of "disease or disorder of lungs."

Amendments to the applications for the Indianapolis Policies were signed by you, as Trustee of the Plan, on November 25, 2003.  The amendments listed the life insurance policies that were in force on Mr. and Ms. Meiselman.  The amendments did not list the ING Policy as being in force. The amendments stated that new life insurance "to be put in force shall not exceed $32,000,000." This was intended to permit the Plan to purchase the Indianapolis Policies, which total

**IL0043**

$22,000,000, and the AGL Policy with a face amount of up to $10,000,000. The amendments also included the following certification, declaration and agreement:

> I certify that all persons proposed for such insurance are in the same condition as stated in the application; and since the date of the application, no such person has (1) suffered an illness or injury nor consulted a physician or practitioner; or (2) has changed his/her occupation; I also certify that no company has declined to grant insurance on the life or health of any such person; and no company has offered to issue for less benefit or a larger premium than that applied for.

> I declare that all the above statements are true, to the best of my knowledge and belief, with the following exceptions (IF THERE ARE NO EXCEPTIONS, SO STATE) *No exceptions.*

> I agree that the statements above shall be a part of my application as fully as though made in said application.

The italicized words contained in the quotation, above, are handwritten in the amendments.

In conversations with Gregg Caplitz, we learned that the ING Policy has not been replaced by the AGL Policy. You confirmed that in our April 29, 2004 telephone conversation. Gregg Caplitz also told us that he knew Mr. Meiselman had consulted with doctors after he had signed his application for the Indianapolis Policies and before November 25, 2003, when you signed the amendments to the applications. In our April 29 telephone conversation you also confirmed that you knew this.

From Mr. Meiselman, we learned that he had consulted a Dr. Simon in August and September, 2003; i.e., after Mr. Meiselman had signed his application for the Indianapolis Policies and before you signed the amendments to the applications.

We learned from Dr. Simon that Mr. Meiselman had consulted him about Mr. Meiselman's loss of weight. Dr. Simon arranged for Mr. Meiselman to receive a CT examination of the chest and abdomen on September 24, 2003 from a Dr. Hillstrom, in an effort to explain the weight loss. We learned from Drs. Simon and Hillstrom that the CT scan disclosed a "right middle lobe pulmonary parenchymal node." Dr. Hillstrom recommended a follow-up CT examination in 3 months to "document the stability" of the node.

Based on our investigation, we have concluded that the amendments to the applications misrepresented that the ING Policy was no longer in force, and that Mr. Meiselman had not consulted a physician after signing his application. These misrepresentations were material to our underwriting of the Indianapolis Policies. If we had known that the ING Policy continued in force, or that Mr. Meiselman had seen doctors regarding loss of weight and a pulmonary node, we would not have issued the Indianapolis Policies.

You also confirmed in our April 29, 2004 telephone conversation that you believed Mr. Meiselman wanted the Plan to purchase the Indianapolis Policies. Of course, we also believed

**IL0044**

that. In fact, it clearly appears that Mr. Meiselman did not want the Plan to purchase the Indianapolis Policies, as Mr. Meiselman vigorously objected to the purchase as soon as he learned of it. Thus, both you and we were mistaken regarding Mr. Meiselman's willingness to be insured. Our mutual mistake about this material fact prevented the Indianapolis Policies from becoming valid contracts.

Finally, Mr. Meiselman claims that he has the authority to require rescission of the Indianapolis Policies. While we understand the argument you have made – i.e., you as Trustee have chosen not to exercise the "free look" granted by statute to the purchaser of a life insurance policy – we nevertheless believe a court would find that Mr. Meiselman has an equitable right to require rescission in this case.

For the reasons given above, we have concluded that the Indianapolis Policies should be rescinded. We are therefore returning the premiums paid for the Indianapolis Policies, together with 3% interest thereon, to the Plan.

Yours truly,

John D. Cleavenger
Senior Vice President
and General Counsel

IL0045

# EXHIBIT R

**Carlucci, Michele**

---

**From:**    rreinhold@bankofny.com
**Sent:**    Friday, November 12, 2004 10:22 AM
**To:**      Kelly O'Donnell
**Subject:** Re:


Hi Kelly – Sorry it took so long to get this to you, I was have problems pulling up the information. Here are the datails on the wire.
Rich


                    HIT # –    XREF # –    ACTION CODE
PYMT TRN – FTJ 040615 27736 44  FT STATUS – COM   EXCEPTION –

DR PARTY – ACCT #  0000177862   TYP CUS  INSTR DT 04/06/15 ADVISE BY
––––––––  AMT        1,042,004.75 USD  VALUE DT 04/06/15 MSG CHG
         COMM CHG    0.00   FUNDS S  POST DT      CBL AMT   0.00
         CRN     POLICY         DIV–REGION–DIST 085–100–121

NAME/ADDRESS                    ORDERING CUSTOMER
 INDIANAPOLIS LIFE INSURANCE COMPANY
 SECURITIES DEPARTMENT
 PO BOX 1230
 INDIANAPOLIS, IN 46206–1230
                    ORDERING BANK




PRINT MSG

FROM: 35918,KATHL
TRN: FTJ0406152773644
SEQ: 27487              STORED:  06/15/04  TIME: 16:27:14
                       RELEASED: 06/15/04  TIME: 16:27:14
20 – CUSTOMER TRANS REF NO (TRN)     policy
21 – BENE TRANS REF NO        policy
32A– VALUE DATE              040615
    CURRENCY           USD
    AMOUNT             1,042,004.75
56I– INTERMEDIARY, ACCT NO       //FW021000018
    INTERMEDIARY         BANK OF NEW YORK
                    ONE WALL STREET


11/12/04

NEW YORK, NY 10286
57I– ACNT WITH, ACCT NO          /8900437111
     ACNT WITH                FBO national investors Serivices
                      NY
                      NY
70 – PAY DET (BENE CUST)         Policy B05020665 and B05020779
                      Meiselman
                      FFC  Financial Resources network
PYMT TRN   FTJ 040615 27736 44                    ACTION CODE


                   XREF TRNS :



INSERTED   TIME – 16.27.14.75  DATE – 04-06-15
VERIFIED   TIME – 16.27.14.75  DATE – 04-06-15

FUNDS RLSD TIME – 16.27.14.83  DATE – 04-06-15


    –––– DOCUMENTS ––––     ––DE–––VR1––VR2––SRV–  –TYPE––––CART–––FRAME–
CUST DRA  07666


              –CAN––RRTE––EDI–
                      N
PYMT TRN  FTJ 040615 27736 44                    ACTION CODE
CR/PAY  – ACCT  8900437111   TYP CAS  INSTR DT 04/06/15 ADVISE BY
–––––––     AMT     1,042,004.75 USD  VALUE DT 04/06/15 MSG CHG
     COMM CHG    0.00   FUNDS S  POST  DT 04/06/15 CBL AMT    0.00
     CRN    POLICY        DIV–REGION–DIST 081–001–055
NAME/ADDRESS                ACCOUNT WITH BANK
 NATIONAL INVESTORS SERVICES CORP.
 100 WALL STREET–25TH FLOOR
 ATT:FINANCE DEPT–CUSTOMER SERVICE
 NEW YORK, N.Y. 10005
ULTIMATE BENEFICIARY           BANK TO BANK INFORMATION




DETAILS OF PAYMENT
 POLICY B05020665 AND B05020779    MEISELMAN FFC FINANCIAL RESOURCES
 NETWORK



11/12/04

# EXHIBIT S

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INDIANAPOLIS LIFE INSURANCE COMPANY | ) |
| | ) CIVIL ACTION NO.: 04-12481-WGY |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROSALIND HERMAN, TRUSTEE, FINANCIAL RESOURCES NETWORK, INC., PROFIT SHARING PLAN AND TRUST, FINANCIAL RESOURCES NETWORK, INC. PROFIT SHARING PLAN AND TRUST, GREGG D. CAPLITZ, RUDY K. MEISELMAN, M.D., and HOPE E. MEISELMAN, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF ROBERT PEDIGO

I, Robert Pedigo, upon personal knowledge information and belief do state:

1. I am currently Vice President of Underwriting at Davis Financial with Innovative Underwriting Solutions of Indiana. I have a B.S. in Management Administration from Indiana University. I am a Chartered Life Underwriter, (since 1997), a Fellow of the Academy of Life Underwriter (since 1994) and a Fellow of the Life Management Association (since 1980).

2. For 29 years I was employed by Indianapolis Life as a Life Insurance Underwriter. From 2001 until January 19, 2005, I was Vice President and Chief Underwriter at Indianapolis Life Insurance Company. In that position, I was responsible for life insurance underwriting at Indianapolis Life Insurance at the time of the application of the "second-to-die" life insurance policies on the lives of Dr. Rudy Meiselman and his wife Hope

Meiselman. I was the underwriter of the Meiselman policies. In that role I reviewed the information submitted to support the application on the Meiselman policies. I also underwrote the policy and obtained the necessary reinsurance. Ultimately, I made the decision on behalf of Indianapolis Life to issue the policies to the FRN plan on the lives of Dr. and Mrs. Meiselman.

3.    As the underwriter on the Meiselman policies, I reviewed the following information supplied in connection with the application for the policy:

a)    the applications [true and accurate copies are attached as Exhibit 1];

b)    letters and materials submitted by the agent, Gregg Caplitz [true and accurate copies are attached as Exhibit 2];

c)    the Amendments to the application [true and accurate copies are attached as Exhibit 3];

d)    financial statements made by A. James Goodness, CPA, provided by Gregg Caplitz [true and accurate copies are attached to the letters in Exhibit 2].

4.    As part of my underwriting review, I requested that Gregg Caplitz provide me with a CPA's statement of the Meiselmans' financial condition and earnings.

5.    Caplitz provided me with a statement of financial condition of the Meiselmans. Caplitz represented in writing that the financial information submitted on behalf of Dr. and Mrs. Meiselman was prepared by Meiselman's CPA. [See 8/21/03 Letter, Exhibit 2 and attached Statement of Financial Condition].

6.   The statement of financial condition allegedly prepared by A. James Goodness provided by Caplitz on August 21, 2003 stated that the Meiselmans had a net worth of $24,681,419.00. The income verification, provided by Caplitz on September 24, 2003, represented that the Meiselmans' unearned income was $3,200,000 and their earned income was $11,000, and their expected income for 2003 was similar to the figures for 2002. [See 9/24/03 Letter from Goodness, Exhibit 2].

7.   I requested information regarding Meiselman's financial condition and income because information concerning the proposed insured's financial condition is necessary to determine whether the amount of the death benefit applied for is appropriate for proposed insured's needs and whether the limits requested are acceptable to the company.

8.   As part of the underwriting process, I required the submission of an amendment to the application. The amendment requires verification of the amount of insurance in place on the proposed insured's life and that the proposed insured has not consulted a physician or had a change in health since the submission of the initial application.

9.   Amendments on the Meiselman policies were provided on November 25, 2003 and listed the life policies in force on the Meiselmans' lives, and stated and certified that there was the following coverage in force: "Bankers $1,500,000 Home Life $10,000 Phoenix Life $70,000 National service Life $15,000 New York Life $25,000 Hartford Life $5,000". The Amendments did not list an ING policy. [Exhibit 3].

10.  In my underwriting of this policy I was aware that the Indianapolis Life policy, in conjunction with a variable policy issued by another insurer, was intended as a replacement of an existing ING policy on the lives of Dr. and Mrs. Meiselman having a death benefit of $22 million. The intended plan was to increase the total coverage on Dr. and Mrs. Meiselmans' lives from $22 million to $32 million.

11.  If the ING policy was still in place at the time of execution of the amendments to the application I would have expected it to be listed on the amendments.

12.  I consider the amount of existing insurance on the proposed insured's life on each and every application, including the Meiselmans' application. The amount of insurance already in existence is crucial to the amount of insurance we will provide, if any. The amount of existing insurance on an applicant's life is important because every individual from an underwriting standpoint has a maximum amount of coverage that he can acquire.

13.  I would not have issued the Indianapolis Life policies if I had known that the ING policy would continue to remain in force after the issuance of the Indianapolis Life policies and that, as a result, the Meiselmans would have in excess of $42 million in coverage.

14.  The amendments to the application, by stating "no exceptions" to the Question, verified that the Meiselmans had not consulted a physician or had a change in health since the date of their initial application.

50866.2

15.  Subsequent to the issuance of the policy, I learned that Dr. Meiselman had consulted a physician in August of 2003 and had a CT scan in September of 2003, prior to the date of the amendments.  The CT scan revealed a nodule on his lung.  I did not learn this information regarding Dr. Meiselman's change in health until after I made my decision to issue the policy and when Dr. Meiselman notified Indianapolis Life that he had not consented to the procurement of the policies on his life and that of his wife.

16.  The amendment to the application did not disclose this information, and Gregg Caplitz never provided me with this information prior to issuance of the policies.

17.  I would have considered the doctor's weight loss, the CT Scan, and its results relevant and material to my underwriting decision and would not have issued the policy at that time, as I would have investigated the matter further.

Signed under the pains & penalties of perjury this __17__ day of January, 2006.


_Robert J. Pedigo_
Robert Pedigo

50866.2

# EXHIBIT 1

AUG-04-2003  18:37     INDPLS LIFE     31799999999   P.12/31

☐ **AMERUS** Life          ☒ **INDIANAPOLIS LIFE** An AMERUS Company

*Application for Insurance*   Please check appropriate company: ONE BOX MUST BE CHECKED. (In this application, "Company" refers to the insurance company whose name is checked above.)

## APPLICANT INFORMATION

**1. PROPOSED INSURED**
NAME (FIRST, MIDDLE, LAST) Hope E. Meiselman
ADDRESS 775 Longboat Club Road   APT # 603  E-MAIL Rudymeiselman@comcast.net
CITY Longboat Key   HOME PH (941) 383-9122  BUS. PH (941) 383-9122
STATE FL ZIP 34228  COUNTY/PARISH Sarasota   SEX ☐ M ☒ F  MAIDEN NAME Elman
BIRTH DATE 05/28/32  BIRTH STATE RI   SOCIAL SECURITY NUMBER 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
DRIVER'S LICENSE # 074557532680 STATE FL  MARITAL STATUS ☒ Married ☐ Single ☐ Divorced or Separated ☐ Widow or Widower
EMPLOYER Financial Resources Network In HOW LONG? 2  OCCUPATION/DUTIES Office Assistant
IF MULTIPLE LIFE PRODUCT, (2ND APP REQUIRED FOR MULTIPLE LIFE)
JOINT INSURED NAMES: (1st) Rudy K Meiselman   (2nd)

**2. OWNER (Insured, unless otherwise indicated)** ☐ INDIVIDUAL ☐ BUSINESS ☒ TRUST (date of trust) Dec 1, 01
NAME Financial Resources Network Inc Profit Sharing Plan & Trust   BIRTH DATE NA
ADDRESS 424 Washington St
CITY Woburn   STATE MA ZIP 01801  COUNTY Middlesex
RELATIONSHIP TO PROPOSED INSURED Profit Sharing Plan   SOCIAL SECURITY # OR TAXPAYER ID # 04-3256270
JOINT OWNER   SOCIAL SECURITY # OR TAXPAYER ID #
CONTINGENT OWNER (If none specified, policy provisions will apply.)
MAIL NOTICES TO ☐ INSURED ☒ OWNER ☐ OTHER (specify)
OTHER NOTICE ADDRESS   CITY   STATE   ZIP

**3. PRIMARY BENEFICIARY(IES)** - Applies to primary insured only. (If trust, complete name and date of trust )
(If necessary, use an additional page for additional details, signature of owner & date.)

Financial Resources Network Profit Sharing Plan Trust   Trust   .100   04-3256270
PRINT FULL NAME   BIRTH DATE   RELATIONSHIP   PERCENTAGE   SOCIAL SECURITY NUMBER
**4. CONTINGENT BENEFICIARY(IES)**

NA
PRINT FULL NAME   BIRTH DATE   RELATIONSHIP   PERCENTAGE   SOCIAL SECURITY NUMBER

## POLICY INFORMATION

**5. PRIMARY INSURED**   ☒ NONSMOKER/NONTOBACCO ☐ SMOKER/TOBACCO
BASE PLAN Horizon SUL   AMT. OF INS $ 220,000,000.00
ADDITIONAL COVERAGE   AMT. OF INS $   .00 AMT. OF PREM. $
ADDITIONAL COVERAGE   AMT. OF INS $   .00 AMT. OF PREM. $
RIDERS (COMPLETE SUPPLEMENTAL APPLICATION IF APPLICABLE)
☐ WAIVER TYPE   ☒ OTHER RIDERS (TYPE/AMOUNT) Death Benefit Maturity Extension
☐ SPOUSE RIDER $   ☐ CHILD RIDER $
**6. UL** DEATH BENEFIT OPTION: ☒ LEVEL ☐ INCREASING
DIVIDEND OPTION (IF APPLICABLE) ☐ ADD TO ACCOUNT VALUE ☐ CASH
PREMIUM DIRECTION   INTEREST CREDITING STRATEGY **Equity Indexed Strategy**   PERCENT
   INTEREST CREDITING STRATEGY **Fixed-Term Strategy**   PERCENT
   INTEREST CREDITING STRATEGY   PERCENT
**7. WHOLE LIFE** DIVIDEND OPTION ☐ PUA ☐ CASH ☐ REDUCE PREMIUM ☐ OTHER   PERCENT
   APL (IF APPLICABLE) ☐ NO  DIRECT RECOGNITION (IF AVAILABLE) ☐ YES

Form 14830 4/02 MA

*148390 40207*

page 1

Dr. Meiselman
EXHIBIT NO. 10
9-15-05
L. LONDON

IL0266

AUG-04-2003  18:37        INDPLS LIFE                            31799999999    P.13/31

## PREMIUM INFORMATION

8. PREMIUM    PLANNED PREMIUM 1,025,000    ADDITIONAL PREMIUM (Lump Sum) _____
BILLING FREQUENCY ☒ ANNUAL ☐ SEMI-ANNUAL ☐ QUARTERLY ☐ PAC (Complete Authorization and enclose VOID check.) Other _____
☐ GOVT. ALLOTMENT (if available) ☐ MONTHLY GROUP BILLING  List Bill # _____
HAS THE PREMIUM FOR THE POLICY APPLIED FOR BEEN GIVEN TO THE AGENT IN EXCHANGE FOR THE CONDITIONAL
LIFE INSURANCE AGREEMENT? ☐ YES ☐ NO  AMOUNT $_____  HOW PAID? ☐ CHECK ☐ OTHER (specify) _____
ADDITIONAL POLICY SPECIFICATIONS
POLICY DATE (optional) _____  TAX QUALIFICATION TYPE _____  ☐ SHORT TERM COVERAGE TO POLICY DATE
OTHER _____

## NON MEDICAL INFORMATION

9. INSURANCE IN FORCE ON PROPOSED INSURED
a. Are any life insurance or annuity contracts in force? ........................................ ☒ Yes ☐ No
If yes, complete section below (Attach separate sheet if necessary)

| Company | Amount | WP? | Personal/Business | Year Issued | Replacing ? | Amount ADB |
|---|---|---|---|---|---|---|
| FNB | 20,000,00 | | EST. | 2002 | YES | |

b. Will any annuity or life insurance presently or recently inforce be replaced or changed by this policy applied for? ........... ☐ Yes ☐ No
c. Have you ever been declined, rated, or had coverage modified or withdrawn, or reinstatement declined by any insurance company? ........ ☐ Yes ☐ No
d. Within the last year, has any other life, health or long term care insurance been issued or applied for, or is any to be applied for? ........ ☒ Yes ☐ No

10. OTHER NON-MEDICAL INFORMATION
a. Do you use any form of tobacco or nicotine based products? ........................................ ☐ Yes ☒ No
If no, have you used any form of tobacco or nicotine based products in the past 5 years? ................ ☐ Yes ☐ No
If yes, when did you last use tobacco or nicotine based products? _____
Type _____  Quantity _____
b. Have you engaged in the last 3 years, or do you intend within the next 12 months to engage:
1. In any aviation activity other than as a passenger? ........................................ ☐ Yes ☐ No
2. In ballooning, gliding, boat or vehicle racing, mountain or rock climbing, parachuting, sky diving, underwater diving
or any other hazardous sport or activity? ........................................ ☐ Yes ☐ No
c. Within the last 5 years, have you filed for bankruptcy (personal or business)? ........................ ☐ Yes ☐ No
d. Within the last 5 years, have you been charged with reckless driving, driving under the influence of alcohol or drugs, or 2 or more moving
violations, or had your driver's license revoked or suspended, or received a warning letter? ........... ☐ Yes ☐ No
e. Have you been arrested for an illegal activity, acquired a criminal record, or are you currently on probation, parole, or under investigation? ........ ☐ Yes ☐ No
f. Are you a member of or do you contemplate joining one of the Armed Forces or an active or reserve military unit? ...... ☐ Yes ☐ No
g. Have you in the past 2 years traveled or do you intend to travel or live outside the United States or Canada? ......... ☐ Yes ☐ No
h. Is any proposed insured, owner or beneficiary a resident or citizen of or an entity organized under the laws of a country other than the U.S.? .. ☐ Yes ☐ No
i. Complete appropriate supplement or provide details here for any Yes answer in this section.
#9. FNB policy being 1035 exchanged to AGL private placement variable product
#9. See attached

11. PHYSICIAN INFORMATION
a. Name and address of your doctor(s) or health care provider(s): Dr. Lee Hollis 2881 Hyde Park Street
Sarasota FL 34239  941-366-2760
b. When did you last consult a doctor and why? See attached medical
c. What medication(s) (prescribed or over the counter) are you now taking? (If none, so state) See attached medical

Form 14638 4/02 NA


* 1 4 8 3 9 0 4 0 2 0 2 *

page 2

IL0267

AUG-04-2003  18:38        INDPLS LIFE                                    31799999999   P.14/31

## MEDICAL INFORMATION  If medical exam is required, questions 12-15 do not need to be completed.

**12. PROPOSED INSURED**

a. Height in shoes _____ / _____     Weight in clothes _____
          feet        inches                        pounds

b. Have you gained or lost more than 10 pounds in the last year? .................................................

c. Are you now under observation or treatment? .................................................  ☐ Yes ☐ No

d. Have you ever been diagnosed by a medical professional as having or been treated for AIDS (Acquired Immune Deficiency Syndrome) ....... ☐ Yes ☐ No
   or ARC (AIDS-related complex)?

e. Have you ever tested positive for antibodies to the AIDS (Acquired Immune Deficiency Syndrome) Human T-Cell Lymphotropic (HIV) virus?  ☐ Yes ☐ No

f. Have you ever requested or received a benefit, military deferment, discharge or rejection, payment or pension because of a disability,  ☐ Yes ☐ No
   injury, or sickness? .................................................................................  ☐ Yes ☐ No

**13. HAVE YOU EVER HAD OR HAVE SYMPTOMS OF OR BEEN SEEN FOR:**

a. Disease of the heart or circulatory system, including high blood pressure, heart attack, coronary artery disease, or chest pain?

b. Heart murmur, rhythm abnormality, heart catheterization, echocardiogram or an exercise treadmill test?.......................  ☐ Yes ☐ No

c. Cancer, tumors, lymphoma, leukemia, or any growths, lesions, polyps? ................................................  ☐ Yes ☐ No

d. Diabetes, thyroid, glandular or endocrinal disorder? ................................................................  ☐ Yes ☐ No

e. Respiratory disorders including asthma, chronic bronchitis, emphysema, pneumonia, shortness of breath, or abnormal chest x-ray?  ☐ Yes ☐ No

f. Disorder of the stomach, liver, pancreas or intestinal tract, including ulcerative colitis, Crohn's disease, or cirrhosis?  ☐ Yes ☐ No

g. Disorder of the kidneys, prostate, bladder, reproductive organs, sexually transmitted diseases, sugar, albumin or blood in urine?  ☐ Yes ☐ No

h. Stroke, transient ischemic attack (TIA), Parkinson's, multiple sclerosis, seizures, epilepsy, chronic headaches, memory changes or fainting? .....  ☐ Yes ☐ No

i. Anxiety, depression, attempted suicide, attention deficit disorder or psychosis, mental or nervous system disorder?..  ☐ Yes ☐ No

j. Anemia, hepatitis, or any blood disorder? ..........................................................................  ☐ Yes ☐ No

k. Chronic back pain, arthritis, loss of limb, paralysis, muscle weakness or disease? ................................  ☐ Yes ☐ No

**14. WITHIN THE LAST FIVE YEARS, OTHER THAN AS NOTED ABOVE, HAVE YOU:**

a. Seen a doctor, health care provider, counselor, therapist or had any illness, injury, surgery, diagnostic test or treatment, or been advised to
   have any diagnostic test or treatment, or been advised to have any diagnostic test, surgery or treatment not yet completed?  ☐ Yes ☐ No

b. Been a patient of a clinic or hospital emergency room, or had any diagnostic test that was not normal? ................  ☐ Yes ☐ No

c. Used any drug, narcotic or controlled substance not prescribed by a physician, or been arrested, counseled, treated, or participated
   in a support group because of alcohol, controlled substance or drug use? ..........................................  ☐ Yes ☐ No

d. Do you currently use alcoholic beverages? ..........................................................................  ☐ Yes ☐ No
   If yes, what is the average number of drinks per day?  ☐ 2 or less   ☐ 3-5   ☐ 6 or more

**15. FAMILY HISTORY**

a. Is there a family history of diabetes, cancer, heart disease, mental illness, or any hereditary disorders? .................  ☐ Yes ☐ No

b. Family information (natural parents, brothers, sisters)

| Family Member | Age if Living | Age at Death | Cause of Death | Family Member | Age if Living | Age at Death | Cause of Death |
|---|---|---|---|---|---|---|---|
| Father | | | | Mother | | | |
| Brother(s) | | | | Sister(s) | | | |

Give complete details of any YES answers to questions 12 through 15. (If necessary, use an additional page for additional details, signed by applicant & date.)

| Question Number | Date | Details, include Diagnosis, Treatment, Duration, Result | Name, Address and Phone Number of Doctor / Medical Facility |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or settlement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

Form 14338 4/02 MA

IL0268

## TAXPAYER IDENTIFICATION

Instructions (Section references are to the Internal Revenue Code.)

Use this form to report the taxpayer identification number (TIN) of the policy owner.

Payors must generally withhold a specified percentage of taxable interest, dividend, and certain other payments if you fail to furnish payors with the correct taxpayer identification number (this is referred to as backup withholding.) For most individual taxpayers, the taxpayer identification number is the social security number.

To prevent backup withholding on these payments, be sure to notify payors of the correct taxpayer identification number and properly certify that you are not subject to backup withholding under Section 3406(a)(1)(C).

Use this area to certify that the taxpayer identification number you are giving the payor is correct and that you are not subject to backup withholding.

Backup Withholding - You are subject to backup withholding if:

(1) You fail to furnish your taxpayer identification number to the payor; OR

(2) The Internal Revenue Service (IRS) notifies the payor that you furnished an incorrect taxpayer identification number, OR

(3) You are notified that you are subject to backup withholding (under Section 3406(a)(1)(C)); OR

(4) For an interest or dividend account opened after December 31, 1983, you fail to certify to the payor that you are not subject to backup withholding under (3) above, or fail to certify your taxpayer identification number.

Payees Exempt From Backup Withholding - Certain payees, such as corporations, government agencies, etc. may be exempt from backup withholding.

What Number to Give the Payer - Give the social security number or employer identification number of the record owner of the account. If the account belongs to you as an individual, give your social security number. If the account is owned by a corporation, give the employer identification number of the corporation.

Obtaining a Number - If you don't have a taxpayer identification number or you don't know your number, obtain Form SS-5, Application for a Social Security Number Card, or Form SS-4, Application for Employer Identification Number, at the local office of the Social Security Administration or the Internal Revenue Service and apply for a number. Write "applied for" in place of your number. When you get a number, submit a new Form W-9 to the payor.

## AUTHORIZATION AND ACKNOWLEDGMENT

I understand the information obtained by the use of this authorization will be used by the Company or its reinsurers to determine eligibility for insurance or benefits, that I may request to receive a copy of this authorization and to be personally interviewed if an investigative consumer report is prepared in connection with this application and not to have personal information disclosed for marketing purposes. Any information obtained will not be released by the Company, its reinsurers, or representatives to any person or organization except to reinsuring companies, the Medical Information Bureau, or other persons or organizations performing business or legal services in connection with my application, claim, as may be permitted or required by law, or as I may further authorize.

I acknowledge receipt of the Disclosure Notice to Proposed Insured

I authorize any physician, medical practitioner, hospital, clinic, pharmaceutical database, other medical or medically-related facility, insurance company, the Medical Information Bureau (MIB), consumer reporting organization, or employer having information available as to diagnosis, treatment, or prognosis with respect to any physical or mental condition, evaluation, or treatment of me including without limitation information about drug use, alcoholism, H.I.V., or mental illness and any other non-medical information about me to give to the Company, its reinsurers, or its authorized representatives any such information.

To facilitate rapid submission of such information, I authorize all said sources, except MIB, to give such records or knowledge to any agency employed by the Company to collect and transmit such information.

I agree that this authorization shall be valid for 2 years from the date shown below and that a photographic copy of this authorization shall be as valid as the original.

## AGREEMENTS AND REPRESENTATIONS

It is hereby represented that the answers and statements on the application(s) and any Supplements required are complete, true and correctly recorded. A copy of the application(s) and any Supplements shall be a part of the policy. No other changes will be made unless the owner agrees in writing.

It is agreed that the policy and copy of the application(s) and any supplements in the policy constitute the entire contract and that information not recorded on the application(s) and any supplements will not be treated as known to the Company. It is also agreed that the policy cannot be amended or modified except in writing and signed by an authorized officer of the Company and that the Agent has no authority to make any promise, representation or waiver regarding coverage or the provisions or terms of the application or policy. It is understood that all payments after the first are to be provided directly to the Company and that the Agent has no authority or responsibility to sign, endorse, deposit or process any subsequent payments made on the policy. Acceptance of the policy shall constitute agreement to the approval of the parts and provisions of the policy.

If a Conditional Life Insurance Agreement was delivered in consideration of the payment of the first premium and is in effect, its provisions and terms will apply. Otherwise the policy will take effect and coverage will begin on the issue date specified in the policy if the full first premium is paid, the Proposed Insured(s) is (are) living, and the answers and statements in the application(s) and any supplements continue to be complete and true at the time of delivery of the policy.

Under penalties of perjury, I certify that (1) the social security or federal tax identification number shown on page 1 of this application for use as the owner of this policy is my correct taxpayer identification number, AND (2) I am a U.S. person (including a U.S. resident alien), AND (3) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the IRS that I am subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding. NOTE: You must cross out Item 3 in the above certification if you have been notified by the IRS that you are currently subject to backup withholding. The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

## EQUITY INDEXED ACKNOWLEDGEMENTS

I understand that I am applying for an equity indexed product. While the values of the policy may be affected by an external index, the policy does not directly participate in any stock or equity investments. I understand that any values shown, other than guaranteed minimum values, are not guaranteed, promises or warranties

Signature of Proposed Insured  X

## SIGNATURES

Signed / Dated at ____ Woburn MA  _____

City, State

On ____ July 30, 2003 ____

Date

X _____

Signature of Licensed Agent

X _____
Signature of Proposed Insured

X _____    Trustee
Signature of Joint Owner if other than Proposed Insured

Signature of Joint Owner if other than Proposed Insured

If Owner is a corporation, business firm or trust, give full name below and an Authorized person must sign and provide title

_____
Parent/Guardian or Witness (if required)

Form 14839 4/82 MA

*14839D40204*

page 6

IL0269

AUG-04-2003  18:33    INDPLS LIFE    31799999999    P.03/31

☐ **AMERUS** Life    ☒ **INDIANAPOLIS LIFE** *An AMERUS Company*

## Application for Insurance

*Please check appropriate company. ONE BOX MUST BE CHECKED.*
*(In this application, "Company" refers to the insurance company whose name is checked above.)*

### APPLICANT INFORMATION

**1 PROPOSED INSURED**
NAME (FIRST, MIDDLE, LAST) *Rudy K Meiselman*
ADDRESS *775 Longboat Club Road # 603*    APT# ___    E-MAIL *Rudymeiselman@comcast.net*
CITY *Longboat Key*    HOME PH ( *941* ) *383-9122*    BUS. PH ( *941* ) *383-9122*
STATE *FL* ZIP *34228* COUNTY/PARISH *Sarasota*    SEX ☒M ☐F ☐ MAIDEN NAME *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*
BIRTH DATE *11/12/26*, BIRTH STATE *RI*    SOCIAL SECURITY NUMBER *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*
DRIVER'S LICENSE # *A245171126412* STATE *FL* MARITAL STATUS ☒Married ☐ Single ☐ Divorced or Separated ☐ Widow or Widower
EMPLOYER *Financial Resources Network* HOW LONG? *3*    OCCUPATION/DUTIES *Investment Analysis / Money Manager*
IF MULTIPLE LIFE PRODUCT, (2ND APP REQUIRED FOR MULTIPLE LIFE)
JOINT INSURED NAMES (1st) *Hope Meiselman*    (2nd) ___

**2. OWNER (Insured, unless otherwise indicated)** ☐ INDIVIDUAL ☐ BUSINESS ☒TRUST (date of trust) *Oct 1, 01*
NAME *Financial Resources Network Inc. Profit Sharing Plan & Trust*    BIRTH DATE *N/a*
ADDRESS *424 Washington St*
CITY *Woburn*    STATE *MB* ZIP *01801* COUNTY *Middlesex*
RELATIONSHIP TO PROPOSED INSURED *Profit Sharing Plan*    SOCIAL SECURITY # OR TAXPAYER ID # *04-325 6270*
JOINT OWNER ___    SOCIAL SECURITY # OR TAXPAYER ID # ___
CONTINGENT OWNER (If none specified, policy provisions will apply.) ___
MAIL NOTICES TO ☐ INSURED ☒OWNER ☐ OTHER (specify) ___
OTHER NOTICE ADDRESS ___    CITY ___    STATE ___ ZIP ___

**3. PRIMARY BENEFICIARY(IES)** - Applies to primary insured only. (If trust, complete name and date of trust.)
(If necessary, use an additional page for additional details, signature of owner & date.)

*Financial Resources Network Inc. Profit Sharing Plan Trust*    *Trust*    *100*    *04-325 6270*
PRINT FULL NAME    BIRTH DATE    RELATIONSHIP    PERCENTAGE    SOCIAL SECURITY NUMBER

**4. CONTINGENT BENEFICIARY(IES)**
*N/a*
PRINT FULL NAME    BIRTH DATE    RELATIONSHIP    PERCENTAGE    SOCIAL SECURITY NUMBER

### POLICY INFORMATION

**5. PRIMARY INSURED** *Horizon*    ☒ NONSMOKER/NONTOBACCO    ☐ SMOKER/TOBACCO
BASE PLAN *SUL 2001*    AMT OF INS. $ *2,2,6,0,0,0.00*
ADDITIONAL COVERAGE ___    AMT OF INS. $ ___ .00 AMT OF PREM. $ ___
ADDITIONAL COVERAGE ___    AMT OF INS. $ ___ .00 AMT OF PREM. $ ___
RIDERS (COMPLETE SUPPLEMENTAL APPLICATION IF APPLICABLE)
☐ WAIVER TYPE ___    ☒ OTHER RIDERS (TYPE/AMOUNT) *Death Benefit Maturity Extender*
☐ SPOUSE RIDER $ ___    ☐ CHILD RIDER $ ___

**6. UL** DEATH BENEFIT OPTION: ☐ LEVEL ☐ INCREASING
DIVIDEND OPTION (IF APPLICABLE) ☐ ADD TO ACCOUNT VALUE ☐ CASH
PREMIUM DIRECTION    INTEREST CREDITING STRATEGY    *Equity Indexed Strategy*    PERCENT ___
INTEREST CREDITING STRATEGY    *Fixed-Term Strategy*    PERCENT ___
INTEREST CREDITING STRATEGY ___    PERCENT ___

**7. WHOLE LIFE** DIVIDEND OPTION ☐ PUA ☐ CASH ☐ REDUCE PREMIUM ☐ OTHER ___
APL (IF APPLICABLE) ☐ NO  DIRECT RECOGNITION (IF AVAILABLE) ☐ YES

Form 14839 4/02 IUS    page 1

* 14839 04 02 01 *



Dr. Meiselman
EXHIBIT NO. 11
4-15-05
L. LONDON

IL0262

AUG-04-2003  18:34        INDPLS LIFE                              31799999999    P.04/31

## PREMIUM INFORMATION

**8. PREMIUM**  PLANNED PREMIUM 1,025,000          ADDITIONAL PREMIUM (Lump Sum)
BILLING FREQUENCY ☑ ANNUAL ☐ SEMI-ANNUAL ☐ QUARTERLY ☐ PAC (Complete Authorization and enclose VOID check) Other
☐ GOV'T ALLOTMENT (if available)  ☐ MONTHLY GROUP BILLING   List Bill #
HAS THE PREMIUM FOR THE POLICY APPLIED FOR BEEN GIVEN TO THE AGENT IN EXCHANGE FOR THE CONDITIONAL
LIFE INSURANCE AGREEMENT? ☐ YES ☐ NO   AMOUNT $_____   HOW PAID? ☐ CHECK ☐ OTHER (specify)
ADDITIONAL POLICY SPECIFICATIONS
POLICY DATE (optional)_____   TAX QUALIFICATION TYPE _____   ☐ SHORT TERM COVERAGE TO POLICY DATE
OTHER

## NON MEDICAL INFORMATION

**9. INSURANCE IN FORCE ON PROPOSED INSURED?**
a. Are any life insurance or annuity contracts in force? ...  ...  ...  ...  ...  ... ☑ Yes ☐ No
If yes, complete section below (Attach separate sheet if necessary)

| Company | Amount | WP ? | Personal/Business | Year Issued | Replacing ? | Amount ADB |
|---------|--------|------|-------------------|-------------|-------------|------------|
| ING | 28,000,000 | | Estate | 2002 | NO | |

b. Will any annuity or life insurance presently or recently inforce be replaced or changed by this policy applied for? ...  ...  ... ☐ Yes ☑ No
c. Have you ever been declined, rated, or had coverage modified or withdrawn, or reinstatement declined by any insurance company? ... ☐ Yes ☑ No
d. Within the last 5 years, has any other life, health or long term care insurance been issued or applied for, or is any to be applied for? ... ☑ Yes ☐ No

**10. OTHER NON-MEDICAL INFORMATION**
a. Do you use any form of tobacco or nicotine based products? ...  ...  ...  ...  ... ☐ Yes ☑ No
If no, have you used any form of tobacco or nicotine based products in the past 5 years? ...  ...  ...  ... ☐ Yes ☐ No
If yes, when did you last use tobacco or nicotine based products? ...  ...  ...  ...  ...
Type_____   Quantity_____
b. Have you engaged in the last 3 years, or do you intend within the next 12 months to engage:
  1. In any aviation activity other than as a passenger? ...  ...  ...  ...  ... ☐ Yes ☑ No
  2. In ballooning, gliding, boat or vehicle racing, mountain or rock climbing, parachuting, sky diving, underwater diving
     or any other hazardous sport or activity? ...  ...  ...  ...  ...  ... ☐ Yes ☑ No
c. Within the last 5 years, have you filed for bankruptcy (personal or business)? ...  ...  ...  ... ☐ Yes ☑ No
d. Within the last 5 years, have you been charged with reckless driving, driving under the influence of alcohol or drugs, or 2 or more moving
   violations, or had your driver's license revoked or suspended, or received a warning letter? ...  ...  ... ☐ Yes ☑ No
e. Have you been arrested for an illegal activity, acquired a criminal record, or are you currently on probation, parole, or under investigation? ... ☐ Yes ☑ No
f. Are you a member of or do you contemplate joining one of the Armed Forces or an active or reserve military unit? ... ☐ Yes ☑ No
g. Have you in the past 2 years traveled or do you intend to travel or live outside the United States or Canada? ...  ... ☐ Yes ☑ No
h. Is any proposed insured, owner or beneficiary a resident or citizen of an entity organized under the laws of a country other than the U.S.? ... ☐ Yes ☑ No
i. Complete appropriate supplement or provide details here for any Yes answer in this section.
9 b  ING policy Lily 1035 exchanged to a private plac variable with AGL insurance
9 d  See attached explanation

**11. PHYSICIAN INFORMATION**
a. Name and address of your doctor(s) or health care provider(s): Dr. Lee Harris. 2981 Hyde Pack St
   Sarasota FL 34329   941-366-2460
b. When did you last consult a doctor and why?    See medical
c. What medication(s) (prescribed or over the counter) are you now taking? (If none, so state)    see medical

Form 31839 4/02 MA                    ‖‖‖‖‖‖‖‖‖‖‖‖ *14839040202*                    page 2

IL0263

AUG-04-2003  18:34     INDPLS LIFE                    31799999999    P.05/31

**MEDICAL INFORMATION  If medical exam is required, questions 12-15 do not need to be completed.**

**12. PROPOSED INSURED**

a.  Height in shoes _____ / _____     Weight in clothes _____
      feet      inches                            pounds

b.  Have you gained or lost more than 10 pounds in the last year? ....... ........ ..............     ☐ Yes ☐ No
c.  Are you now under observation or treatment? ........................................ .......     ☐ Yes ☐ No
d.  Have you ever been diagnosed by a medical professional as having or been treated for AIDS (Acquired Immune Deficiency Syndrome)
      or ARC (AIDS-related complex)? ..........                                                       ☐ Yes ☐ No
e.  Have you ever tested positive for antibodies to the AIDS (Acquired Immune Deficiency Syndrome) Human T-Cell Lymphotropic (HIV) virus?  ☐ Yes ☐ No
f.  Have you ever requested or received a benefit, military deferment, discharge or rejection, payment or pension because of a disability,
      injury, or sickness? ..................... ................                                      ☐ Yes ☐ No

**13. HAVE YOU EVER HAD OR HAVE SYMPTOMS OF OR BEEN SEEN FOR:**

a.  Disease of the heart or circulatory system, including high blood pressure, heart attack, coronary artery disease, or chest pain? ........  .     ☐ Yes ☐ No
b.  Heart murmur, rhythm abnormality, heart catheterization, echocardiogram or an exercise treadmill test? ......................     ☐ Yes ☐ No
c.  Cancer, tumors, lymphoma, leukemia, or any growths, lesions, polyps? .............  .................     ☐ Yes ☐ No
d.  Diabetes, thyroid, glandular or endocrine disorder? .............                                  ☐ Yes ☐ No
e.  Respiratory disorders including asthma, chronic bronchitis, emphysema, pneumonia, shortness of breath, or abnormal chest x-ray?  ......     ☐ Yes ☐ No
f.  Disorder of the stomach, liver, pancreas or intestinal tract, including ulcerative colitis, Crohn's disease, or cirrhosis? ...........     ☐ Yes ☐ No
g.  Disorder of the kidneys, prostate, bladder, reproductive organs, sexually transmitted diseases, sugar, albumin or blood in urine? .........     ☐ Yes ☐ No
h.  Stroke, transient ischemic attack (TIA), Parkinson's, multiple sclerosis, seizures, epilepsy, chronic headaches, memory changes or fainting? ...     ☐ Yes ☐ No
i.  Anxiety, depression, attempted suicide, attention deficit disorder or psychosis, mental or nervous system disorder? .............     ☐ Yes ☐ No
j.  Anemia, hepatitis, or any blood disorder? .....  ....                                             ☐ Yes ☐ No
k.  Chronic back pain, arthritis, loss of limb, paralysis, muscle weakness or disease? .... .............     ☐ Yes ☐ No

**14. WITHIN THE LAST FIVE YEARS, OTHER THAN AS NOTED ABOVE, HAVE YOU:**

a.  Seen a doctor, health care provider, counselor, therapist, or had any illness, injury, surgery, diagnostic test or treatment, or been advised to
      have any diagnostic test or treatment, or been advised to have any diagnostic test, surgery or treatment not yet completed? ..     ☐ Yes ☐ No
b.  Been a patient of a clinic or hospital emergency room, or had any diagnostic test that was not normal? ...................     ☐ Yes ☐ No
c.  Used any drug, narcotic or controlled substance not prescribed by a physician, or been arrested, counseled, treated, or participated
      in a support group because of alcohol, controlled substance or drug use? ...............     ☐ Yes ☐ No
d.  Do you currently use alcoholic beverages? ........... .................                           ☐ Yes ☐ No
      If yes, what is the average number of drinks per day? ☐ 2 or less  ☐ 3-5  ☐ 6 or more.

**15. FAMILY HISTORY**

a.  Is there a family history of diabetes, cancer, heart disease, mental illness, or any hereditary disorders? ...............     ☐ Yes ☐ No
b.  Family information (natural parents, brothers, sisters):

| Family Member | Age if Living | Age at Death | Cause of Death | Family Member | Age if Living | Age at Death | Cause of Death |
|---|---|---|---|---|---|---|---|
| Father | | | | Mother | | | |
| Brother(s) | | | | Sister(s) | | | |

Give complete details of any YES answers to questions 12 through 15. (If necessary, use an additional page for additional details, signed by applicant & date.)

| Question Number | Date | Details, include Diagnosis, Treatment, Duration, Result | Name, Address and Phone Number of Doctor / Medical Facility |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or settlement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

Form 14839 4/02 MA

> *74839040203*                                                          page 3

**IL0264**

## TAXPAYER IDENTIFICATION

Instructions (Section references are to the Internal Revenue Code.)

Use this form to report the taxpayer identification number (TIN) of the policy owner.

Payers must generally withhold a specified percentage of taxable interest, dividend, and certain other payments if you fail to furnish payers with the correct taxpayer identification number (this is referred to as backup withholding). For most individual taxpayers, the taxpayer identification number is the social security number.

To prevent backup withholding on these payments, be sure to notify payers of the correct taxpayer identification number and properly certify that you are not subject to backup withholding under Section 3406(a)(1)(C).

Use this area to certify that the taxpayer identification number you are giving the payor is correct and that you are not subject to backup withholding.

Backup Withholding - You are subject to backup withholding if

(1) You fail to furnish your taxpayer identification number to the payor; OR

(2) The Internal Revenue Service (IRS) notifies the payor that you furnished an incorrect taxpayer identification number; OR

(3) You are notified that you are subject to backup withholding (under Section 3406(a)(1)(C)); OR

(4) For an interest or dividend account opened after December 31, 1983, you fail to certify to the payer that you are not subject to backup withholding under (3) above, or fail to certify your taxpayer identification number.

Payees Exempt From Backup Withholding - Certain payees, such as corporations, government agencies, etc. may be exempt from backup withholding.

What Number to Give the Payer - Give the social security number or employer identification number of the record owner of the account. If the account belongs to you as an individual, give your social security number. If the account is owned by a corporation, give the employer identification number of the corporation.

Obtaining a Number - If you don't have a taxpayer identification number or you don't know your number, obtain Form SS-5, Application for a Social Security Number Card, or Form SS-4, Application for Employer Identification Number, at the local office of the Social Security Administration or the Internal Revenue Service and apply for a number. Write "applied for" in place of your number. When you get a number, submit a new Form W-9 to the payor.

## AUTHORIZATION AND ACKNOWLEDGMENT

I understand the information obtained by the use of this authorization will be used by the Company or its reinsurers to determine eligibility for insurance or benefits, that I may request to receive a copy of this authorization and to be personally interviewed if an investigative consumer report is prepared in connection with this application and not to have personal information disclosed for marketing purposes. Any information obtained will not be released by the Company, its reinsurers, or representatives to any person or organization except as releasing companies, the Medical Information Bureau, or other persons or organizations performing business or legal services in connection with my application, claim, as may be permitted or required by law, or as I may further authorize.

I acknowledge receipt of the Disclosure Notice to Proposed Insured.

I authorize any physician, medical practitioner, hospital, clinic, pharmaceutical database, other medical or medically-related facility, insurance company, the Medical Information Bureau (MIB), consumer reporting organization, or employer having information available as to diagnosis, treatment, or prognosis with respect to any physical or mental condition, evaluation, or treatment of me including without limitation information about drug use, alcoholism, HIV, or mental illness and any other non-medical information about me to give to the Company, its reinsurers, or its authorized representatives any such information.

To facilitate rapid submission of such information, I authorize all said sources, except MIB, to give such records or knowledge to any agency employed by the Company to collect and transmit such information.

I agree that this authorization shall be valid for 2 years from the date shown below and that a photographic copy of this authorization shall be as valid as the original.

## AGREEMENTS AND REPRESENTATIONS

It is hereby represented that the answers and statements on the application(s) and any Supplements required are complete, true and correctly recorded. A copy of the application(s) and any Supplements shall be a part of the policy. No other changes will be made unless the owner agrees in writing.

It is agreed that the policy and copy of the application(s) and any supplements to the policy constitute the entire contract and that information not recorded on the application(s) and any supplements will not be treated as known to the Company. It is also agreed that the policy cannot be enlarged or modified except in writing and signed by an authorized officer of the Company and that the Agent has no authority to make any promise, representation or waiver regarding coverage or the provisions or terms of the application or policy. It is understood that all payments after the first are to be provided directly to the Company and that the Agent has no authority or responsibility to sign, endorse, deposit or process any subsequent payments made on the policy. Acceptance of the policy shall constitute agreement to the approval of the parts and provisions of the policy.

If a Conditional Life Insurance Agreement was delivered in consideration of the payment of the first premium and is in effect, its provisions and terms will apply. Otherwise the policy will take effect and coverage will begin on the issue date specified in the policy if the full first premium is paid, the Proposed Insured(s) is (are) living, and the answers and statements in the application(s) and any supplements continue to be complete and true at the time of delivery of the policy.

Under penalties of perjury, I certify that (1) the social security or federal tax identification number shown on page 1 of this application for me as the owner of this policy is my correct taxpayer identification number, AND (2) I am a U.S. person (including a U.S. resident alien), AND (3) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the IRS that I am subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding. NOTE: You must cross out item 3 in the above certification if you have been notified by the IRS that you are currently subject to backup withholding. The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

## EQUITY INDEXED ACKNOWLEDGEMENTS

I understand that I am applying for an equity indexed product. While the values of the policy may be affected by an external index, the policy does not directly participate in any stock or equity investments. I understand that any values shown, other than guaranteed minimum values, are not guaranteed, promises or warranties.

Signature of Proposed Insured X _____

## SIGNATURES

| | |
|---|---|
| Signed / Dated at Woburn MA  City, State | X _____ Signature of Proposed Insured |
| On July 31 03  Title | _____ Trustee Signature of Owner if other than Proposed Insured |
| X _____ Signature of Licensed Agent | |
| _____ Parent/Guardian or Witness (if required) | Signature of Joint Owner if other than Proposed Insured If Owner is a corporation, business firm or trust, give full name below and an Authorized person must sign and provide title |

Form 14833 4/82 MA

page 4

IL0265

# EXHIBIT 2



*Financial Resources Network*
*Insight Onsite Financial Solutions™* **FILE**
424 Washington Street     Woburn, MA 01801-2112

## FAX COVER SHEET

DATE: 9/24/03

NUMBER OF PAGES 5

TO: Bob Pedigo

COMPANY NAME: Indianapolis Life

FAX NUMBER: (317) 927-3552

FROM: Gregg caplitz

COMPANY NAME:  INSIGHT ONSITE FINANCIAL SOLUTIONS

FAX NUMBER:  1-(781) 935-9728

COMMENTS:

This message is intended only for the use the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from Disclosure under the applicable Law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient. You are hereby notified that any dissemination, or copying of this communication is strictly prohibited. If you have received this message in error, please notify us immediately by telephone and return the original message to us at the above address by the U. S. Postal Service. Thank You

Toll Free: 800-772-4047     **A Registered Investment Advisor**

Phone: 781-935-7070     Securities offered through Wharton Equity Corp. Member NASD/SIPC

Fax: 781-935-9728

E Mail  insightonsite@attbi.com

IL1714

EXHIBIT
34
9/23/05



*Financial Resources Network, Inc.*
*Insight Onsite Financial Solutions™*

**424 Washington Street      Woburn, MA 01801-2112**

September 24, 2003

Mr. Bob Pedigo
Indianapolis Life Insurance Company
P. O. Box 1230
2690 North Meridan Street
Indianapolis, IN  46206

Dear Mr. Pedigo:

You have asked me to supply you with additional information concerning the decision by Dr. & Mrs. Meiselman to terminate the ING policy that was issued in 2002.

It is not now nor has it ever been the policy of Insight Onsite Financial Solutions or myself to terminate policies except under extraordinary circumstances.  You are no doubt aware that in the approximately 9 years we have been doing business with Indianapolis Life we have maintained in excess of a 90% persistency rating.

The decision to terminate the ING variable product was forced upon us by ING.  ING sent Janet Meiselman, the general partner of the Meiselman Family Partnership, a letter whose restrictive nature in the investment arena was so prohibitive as to prevent us from providing adequate management flexibility.  These restrictions include an inability to make any fax or telephone transfers as well as an outright prohibition to participate in several funds.  Given the size of the assets present in the ING contract, in excess of $4.7 million, the investment restrictions imposed by ING make it impossible to provide adequate management.

We have attempted to negotiate a more flexible policy but unfortunately ING has refused to bend.  Therefore it is our intention to place these assets in a private placement variable product that will allow adequate investment flexibility.

Since the ING variable product currently provides approximately $20 million of death benefit this death benefit needs to be adequately replaced.  The private placement product is a product, which is designed primarily for investment flexibility and provides minimum death benefit.

Toll Free:  800-772-4047          *A Registered Investment Advisor*

Phone:  781-935-7070              Securities offered through Wharton Equity Corp. Member NASD/SIPC.
Fax:  781-935-9728               Registered Investment Advisor

E Mail  insightonsite@attbi.com

IL1715



*Financial Resources Network, Inc.*
*Insight Onsite Financial Solutions™*

**424 Washington Street      Woburn, MA 01801-2112**

I hope that this additional letter will provide you with an adequate explanation as to why the decision to terminate the ING variable product has been made.

I have enclosed, for your reference, a copy of the ING letter of July 14, 2003, which was previously sent to you.

Additionally, I am enclosing a letter from Dr. Meiselman's accountant providing income verification for 2002 and an estimate for 2003.

If you have any questions or need any further information please do not hesitate to contact me.

Sincerely,

G. Caplitz, CFP, MS
Senior Design Consultant

Encl.

GDC/sb
pedigo, bob



Toll Free:  800-772-4047          *A Registered Investment Advisor*
Phone: 781-935-7070
Fax:  781-935-9728                 Securities offered through Wharton Equity Corp.  Member NASD/SIPC.
                                   Registered Investment Advisor
E Mail  insightonsite@attbi.com

IL1716

SEP-24-2003  16:30        BOTTOM LINE SPECIALISTS              781 290 0849   P.01/01

**A. JAMES GOODNESS, CPA, P.C.**
CERTIFIED PUBLIC ACCOUNTANT

395 Totten Pond Road, Suite 104                    Telephone:  (781) 290-4750
Waltham, MA 02451                                  Facsimile:  (781) 290-0849

Dr. and Mrs. Rudy Meiselman

To whom it may concern:

The unearned income for Dr. and Mrs. Meiselman for 2002 was $3,200,000 and earned income was $11,000. We anticipate that Dr. and Mrs. Meiselman will have similar income figures for 2003.

*A. James Goodness, CPA, P.C.*

September 24, 2003
Waltham, Massachusetts

TOTAL P.01

IL1717

**hp officejet d135**
**printer/fax/scanner/copier**

**Fax-History Report for**
**Rosalind Herman**
1-781-935-9728
Sep 24 2003 4:37pm

---

Last Transaction

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Sep 24 | 4:35pm | Fax Sent | 13179273552 | 2:09 | 5 | OK |

IL1718

AUG-25-2003  09:16          INDFLS LIFE                          31799999999    P.01/02



*Financial Resources Network, Inc.*
*Insight Onsite Financial Solutions*
424 Washington Street        Woburn, MA 01801-2112

EXHIBIT
37
9/23/05

August 21, 2003

B0502066S

Mr. Bob Pedigo
Indianapolis Life Insurance Company
P. O. Box 1230
2690 North Meridan Street
Indianapolis, IN 46206

Dear Bob:

I am writing this letter to update you on the current status of the Meiselman application. A physician from Exam One will perform Dr. and Mrs. Meiselman's medical exams on Tuesday August 23, 2003. The medicals will include a resting EKG, home office specimen, as well as a physician's exam.

Enclosed with this letter are copies of the most recent stress EKG's performed on Dr. and Mrs. Meiselman.

Additionally, I would like to bring to your attention additional information concerning the surgical procedure preformed on Dr. Meiselman in the fall of 2001 at Mass General Hospital in Boston. Dr. Brian McGovern, Chief of Cardiology Radiology at Mass General Hospital preformed the treatment. Unfortunately, a disgruntled employee at Mass General Hospital recently killed Dr. McGovern. I believe that the medical records are still in existence and are certainly available through Dr. Meiselman's Sarasota, Florida based cardiologist who is Dr. Goffrey Liss, Sarasota Heart Center 1921 Waldemere Street Suite 512 Sarasota, FL 34239 phone number (941) 917-8185.

Additionally, it has come to my attention that a number of small life insurance policies were inadvertently left off the application submitted to your company. There is one significant life insurance policy that is still in existence on Dr. Meiselman's life. This is a $1.5 million single life policy issued by Bankers Life Insurance in 1993. The policy is fully paid up and is expected to continue in force.

Toll Free: 800-772-4047          *A Registered Investment Advisor*
Phone: 781-935-7070
Fax: 781-935-9228               Securities offered through Winslow Equity Corp. Member NASD/SIPC.
E Mail  insightonsite@attbi.com  Registered Investment Advisor

08/25/03  MON 09:38  [TX/RX NO 8483]  Ø001



*Financial Resources Network, Inc.*
*Insight Onsite Financial Solutions*

424 Washington Street    Woburn, MA 01801-2112

Additionally, there is a $10,000 Home Life policy, a $70,000 Phoenix Life policy, a $15,000 National Service Life policy, a $25,000 New York Life policy, and $5,000 Hartford Life policy. All of these policies are fully paid and insure Dr. Meiselman's life and are expected to be in force and continue in force permanently. It is also clearly Dr. Meiselman's intention that the ING policy, currently in force for $20,000,000, will be 1035 exchanged into a successor private placement variable annuity product issued by AGL Assurance. This assumes that successful underwriting can be completed with AGL.

Also, enclosed you will find a recent copy of Dr. and Mrs. Meiselman's recent statement of financial conditioned prepared by A. James Goodness, CPA, P.C. In addition Hope Meiselman's correct Florida drivers license is M-245-325-37-638-0.

I hope that this letter will provide further clarification on any outstanding underwriting issues that may remain. If you need any further information or if you have any questions please do not hesitate to contact us.

Sincerely,

G. Caplan, CFP, MS

Encl.

GDC/sb
pedigo, bob

Toll Free: 800-772-4047
Phone: 781-935-7070
Fax: 781-935-9723
E Mail: Insightonsite@aol.com

*A Registered Investment Advisor*
Securities offered through Whiston Equity Corp. Member NASD/SIPC
Registered Investment Advisor

IL1712

INDPLS LIFE

A. JAMES GOODNESS,CPA,PC
CERTIFIED PUBLIC ACCOUNTANT
400 Totten Pond Road, Suite 104
Waltham, MA 02451

Telephone  (781) 290-1321
Facsimile   (781) 290-0143

31725555999    P. 01/02

BOSO20665

Mr. and Mrs. Rudy Meiselman

We have compiled the accompanying statement of financial condition of Mr. and Mrs. Rudy Meiselman as of June 30, 2003, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting in the form of a financial statement information that is the representation of the individuals whose financial statement is presented. We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or any other form of assurance on it.

A. James Goodness, CPA, P.C.

August 20, 2003
Waltham, Massachusetts

08/25/03  MON 09:41  [TX/RX NO 8494]  ☑001

IL1831

AUG-25-2003  09:19    INDFLS LIFE                                 3175999999    P.02/02

**MR. AND MRS. RUDY MEISELMAN**
**STATEMENT OF FINANCIAL CONDITION**
**JUNE 30, 2003**

**ASSETS**

| | |
|---|---:|
| Cash | $        114,155 |
| Residence | 1,450,000 |
| Limited partnership interest | 3,080,669 |
| Rental property | 960,000 |
| Cash surrender value of life insurance | 5,625,000 |
| Pension Accounts | 13,608,552 |
| Trust Assets | 1,326,514 |
| | 25,064,890 |

**LIABILITIES**

| | |
|---|---:|
| Bills payable | $        11,840 |
| Mortgage notes payable: | |
| Real estate | 371,631 |
| | 383,471 |

| | |
|---|---:|
| Net worth | $    24,681,419 |

TOTAL P.02

TOTAL P.02

IL1832

# EXHIBIT 3

Nov 25 03 11:27a    Rosalind Herman    702-309-2447    p.2
Nov. 25 03 02:03p    Rosalind Herman    1-781-935-9728    p.5



## INDIANAPOLIS LIFE INSURANCE COMPANY

This amendment must be signed by the PROPOSED INSURED (or APPLICANT in the case of juvenile contracts). It must be witnessed by the same person who witnessed the PROPOSED INSURED'S (or APPLICANT'S) signature on the original application.

This requirement must be met before the policy is delivered. The amendment must be returned promptly to the Home Office.

A copy of this amendment has been completed and attached to this policy.

If a change must be made in this amendment, the policy must be promptly returned to the Home Office. Complete information about the change must be sent also.

AMENDMENT to the application on the life of Name B05020665 RUDY K MEISELMAN

BEARING DATE:  10/14/2003

THE FACE AMOUNT SHALL BE $18,700,000.

RUDY SHALL BE ISSUED SPECIAL CLASS B.

COVERAGE IN FORCE- BANKERS $1,500,000 HOME LIFE $10,000 PHOENIX LIFE $70,000 NATIONAL SERVICE LIFE $15,000 NEW YORK LIFE $25,000 HARTFORD LIFE $5,000 .

TOTAL NEW COVERAGE TO BE PUT IN FORCE SHALL NOT EXCEED $32,000,000.

THE ANSWERS TO QUESTIONS 10A THROUGH 10H ON HOPE SHALL ALL BE "NO."

I request delivery of the above numbered policy. In order to induce the Company to deliver said policy, I confirm all statements, and answers made in my application for this policy. I also confirm all statements made in any confirmations or amendments thereto, including all statements made to the Medical Examiner or made in lieu of examination.

I certify that all persons proposed for such insurance are in the same condition as stated in the application; and since the date of the application, no such person has (1) suffered an illness or injury nor consulted a physician or practitioner; or (2) has changed his/her occupation; I also certify that no company has declined to grant insurance on the life or health of any such person; and no company has offered to issue for less benefit or a larger premium than that applied for.

I declare that all the above statements are true, to the best of my knowledge and belief, with the following exceptions (IF THERE ARE NO EXCEPTIONS, SO STATE)    *No exceptions*

I agree that the statements above shall be a part of my application as fully as though made in said application.

Signed on this 25 day of *November* 2003

(Witness)    27X06

(Proposed Insured/Applicant)    RH Trustee

ORIGINAL

FORM 8.1 R3/85

## INDIANAPOLIS LIFE INSURANCE COMPANY

This amendment must be signed by the PROPOSED INSURED (or APPLICANT in the case of juvenile contracts). It must be witnessed by the same person who witnessed the PROPOSED INSURED'S (or APPLICANT'S) signature on the original application.

This requirement must be met before the policy is delivered. The amendment must be returned promptly to the Home Office.

A copy of this amendment has been completed and attached to this policy.

If a change must be made in this amendment, the policy must be promptly returned to the Home Office. Complete information about the change must be sent also.

AMENDMENT to the application on the life of Name B05020799 RUDY K MEISELMAN

BEARING DATE: 10/14/2003

THE FACE AMOUNT SHALL BE $3,300,000.

COVERAGE IN FORCE - BANKERS $1,500,000. HOME LIFE $10,000; PHOENIX LIFE $70,000; NATIONAL SERVICE LIFE $15,000;NEW YORK LIFE $25,000; HARTFORD LIFE

TOTAL NEW COVERAGE TO BE PUT IN FORCE SHALL NOT EXCEED $32,000,000.

THE ANSWERS TO QUESTIONS 10A THROUGH H ON HOPE SHALL ALL BE "NO."

I request delivery of the above numbered policy. In order to induce the Company to deliver said policy, I confirm all statements, and answers made in my application for this policy. I also confirm all statements made in any continuations or amendments thereto, including all statements made to the Medical Examiner or made in lieu of examination.

I certify that all persons proposed for such insurance are in the same condition as stated in the application; and since the date of the application, no such person has (1) suffered an illness or injury nor consulted a physician or practitioner; or (2) has changed his/her occupation; I also certify that no company has declined to grant insurance on the life or health of any such person; and no company has offered to issue for less benefit or a larger premium than that applied for.

I declare that all the above statements are true, to the best of my knowledge and belief, with the following exceptions(IF THERE ARE NO EXCEPTIONS, SO STATE)    *No exception*

I agree that the statements above shall be a part of my application as fully as though made in said application.

Signed on this _25_ day of _November, 2003_

(Witness) _Z-7X00_    (Proposed Insured/Applicant) _Rosalind Herman Trustee_    _R H Trustee_

FORM 8.1 R3/85    ORIGINAL

# EXHIBIT T



## INDIANAPOLIS LIFE INSURANCE COMPANY

This amendment must be signed by the **PROPOSED INSURED** (or **APPLICANT** in the case of juvenile contracts). It must be witnessed by the same person who witnessed the **PROPOSED INSURED'S** (or **APPLICANT'S**) signature on the original application.

This requirement must be met before the policy is delivered. The amendment must be returned promptly to the Home Office.

A copy of this amendment has been completed and attached to this policy.

If a change must be made in this amendment, the policy must be promptly returned to the Home Office. Complete information about the change must be sent also.

**AMENDMENT** to the application on the life of Name B05020665  RUDY K MEISELMAN

BEARING DATE:  10/14/2003

THE FACE AMOUNT SHALL BE $18,700,000.

RUDY SHALL BE ISSUED SPECIAL CLASS B.

COVERAGE IN FORCE- BANKERS $1,500,000 HOME LIFE $10,000 PHOENIX LIFE $70,000 NATIONAL SERVICE LIFE $15,000 NEW YORK LIFE $25,000 HARTFORD LIFE $5,000 .

TOTAL NEW COVERAGE TO BE PUT IN FORCE SHALL NOT EXCEED $32,000,000.

THE ANSWERS TO QUESTIONS 10A THROUGH 10H ON HOPE SHALL ALL BE "NO."

I request delivery of the above numbered policy. In order to induce the Company to deliver said policy, I confirm all statements, and answers made in my application for this policy. I also confirm all statements made in any continuations or amendments thereto, including all statements made to the Medical Examiner or made in lieu of examination.

I certify that all persons proposed for such insurance are in the same condition as stated in the application; and since the date of the application, no such person has (1) suffered an illness or injury nor consulted a physician or practitioner; or (2) has changed his/her occupation; I also certify that no company has declined to grant insurance on the life or health of any such person; and no company has offered to issue for less benefit or a larger premium than that applied for.

I declare that all the above statements are true, to the best of my knowledge and belief, with the following exceptions (**IF THERE ARE NO EXCEPTIONS, SO STATE**)    *No exceptions!*

I agree that the statements above shall be a part of my application as fully as though made in said application.

Signed on this *25* day of *November 2003*

*Rosalind Herman Trustee*

(Witness)    *27X06*    (Proposed Insured/Applicant)  *RH Trustee*

FORM 8.1 R3/85    ORIGINAL

## INDIANAPOLIS LIFE INSURANCE COMPANY

This amendment must be signed by the PROPOSED INSURED (or APPLICANT in the case of juvenile contracts). It must be witnessed by the same person who witnessed the PROPOSED INSURED'S (or APPLICANT'S) signature on the original application.

This requirement must be met before the policy is delivered. The amendment must be returned promptly to the Home Office.

A copy of this amendment has been completed and attached to this policy.

If a change must be made in this amendment, the policy must be promptly returned to the Home Office. Complete information about the change must be sent also.

AMENDMENT to the application on the life of Name B05020799 RUDY K MEISELMAN

BEARING DATE: 10/14/2003

THE FACE AMOUNT SHALL BE $3,300,000.

COVERAGE IN FORCE – BANKERS $1,500,000. HOME LIFE $10,000; PHOENIX LIFE $70,000; NATIONAL SERVICE LIFE $15,000;NEW YORK LIFE $25,000; HARTFORD LIFE

TOTAL NEW COVERAGE TO BE PUT IN FORCE SHALL NOT EXCEED $32,000,000.

THE ANSWERS TO QUESTIONS 10A THROUGH H ON HOPE SHALL ALL BE "NO."

I request delivery of the above numbered policy. In order to induce the Company to deliver said policy, I confirm all statements, and answers made in my application for this policy. I also confirm all statements made in any continuations or amendments thereto, including all statements made to the Medical Examiner or made in lieu of examination.

I certify that all persons proposed for such insurance are in the same condition as stated in the application; and since the date of the application, no such person has (1) suffered an illness or injury nor consulted a physician or practitioner; or (2) has changed his/her occupation; I also certify that no company has declined to grant insurance on the life or health of any such person; and no company has offered to issue for less benefit or a larger premium than that applied for.

I declare that all the above statements are true, to the best of my knowledge and belief, with the following exceptions(IF THERE ARE NO EXCEPTIONS, SO STATE) _No exception_

I agree that the statements above shall be a part of my application as fully as though made in said application.

Signed on this _25_ day of _November, 2003_

(Witness) _27x00_    (Proposed Insured/Applicant) _Rosalind Herman Trustee_    _R H Trustee_

ORIGINAL

FORM 8.1 R3/85

# EXHIBIT U

# ING

| | | | |
|---|---|---|---|
| **Insured** | MEISELMAN MD,RUDY K | **Issue Company** | Security Life of Denver |
| **Insured** | MEISELMAN,HOPE E | | |
| **Product Name** | VARIABLE SURVIVORSHIP UNIVERSAL LIFE | **Product Type** | Joint Survivor Variable Universal Life |
| **Policy** | 610028174 | **As of Date** | 08/05/2004 |
| | | **Issue Date** | 11/27/2001 |

## Values

| Gross Cash Value | $5,465,980.12 | Net Account Value | $5,143,245.17 |
|---|---|---|---|
| Surrender Charge | $322,734.95 | Rebalancing Requested | No |
| Sales Refund Amount | $0.00 | Dollar Cost Averaging | No |

| Investment Option | # Units | Unit Value | Current Value | Allocation % | Actual % |
|---|---|---|---|---|---|
| ING Liquid Assets Portfolio | 546366.2439 | 010.004242 | $5,465,980.12 | 100% | 100.00% |

## Coverages

| Total Death Benefit | $20,000,000.00 | Underwriting Type | Underwritten |
|---|---|---|---|
| Death Benefit Option | Option 1 | MEC | Yes |



Dr. Meiselman
EXHIBIT NO. 16
9/19/05
L. LONDON

| OLI test | Guideline Premium | Sex Distinct / Unisex | Sex Distinct |
|---|---|---|---|

| Primary Insured Coverage | Face Amount | Issue Age | Issue Date | Underwriting Class | Substandard |
|---|---|---|---|---|---|
| Stated Death Benefit | $13,000,000 | 72 | 11/27/2001 | Preferred & Non-smoker | No |
| Term Rider | $7,000,000 | 72 | 11/27/2001 | Preferred & Non-smoker | No |

## Billing / Premiums

| Total Amount Billed | | Premiums Paid this Policy Year | |
|---|---|---|---|
| Last Paid Amount | $7,318.60 | Last Paid Date | 04/18/2002 |
| Last Billing Date | | Loan Interest Due | |
| Next Payment Due Date | | Billing Frequency | |
| Modal Premium | | Billing Option | No Billing |
| List Bill Number | | | |

## Payor Information

| Name | JANET MEISELMAN GP |
|---|---|
| Address | 110 SAND HILL COVE RD |
| | NARRAGANSETT |
| | RI |
| | 02882 |

## Loans / Withdrawals

| Maximum Loanable Value | $5,079,236.59 |
|---|---|
| Loan Payoff Amount | $0.00 |
| Interest Accrued | $0.00 |
| Next Loan Interest Capitalization Date | |
| Loan Interest Rate | |
| Loan Interest Type | Interest in arrears |
| Partial Withdrawals Taken | $0.00 |

## Insured Information

| Primary Insured | MEISELMAN MD, RUDY K |
|---|---|
| Insured Sex | M |
| Date of Birth | 11/12/1926 |
| Address | 775 LONGBOAT CLUB RD #603 |
| | LONGBOAT KEY |
| | FL |
| | 34228 |
| Primary Insured | MEISELMAN, HOPE E |
| Insured Sex | F |
| Date of Birth | 05/28/1932 |
| Address | 110 SAND HILL COVE RD |
| | NARRAGANSETT |
| | RI |
| | 02882 |

## Owner Information

| Owner | JANET MEISELMAN GP |
|---|---|
| Ownership % | 100% |
| Address | 110 SAND HILL COVE RD |
| | NARRAGANSETT |
| | RI |
| | 02882 |

## Beneficiary Designation

| Beneficiary Information |
|---|
| MEISELMAN LIFE INSURANCE LTD PARTNERSHIP |

## Assignment

| Assignee | |
|---|---|
| Assignment Type | |
| Assignment Effective Date | |

## Agent Information

| Broker / Dealer | WHARTON EQUITY CORP | | |
|---|---|---|---|
| **Servicing Agent** | **Phone** | **Fax** | **Address** |
| CAPLITZ, GREGG D | (781) 935-7070 | (781) 935-9728 | 424 WASHINGTON STREET WOBURN , MA 01801-0000 |

## Compliance/Confidentiality

**Purpose:**

The policy data provided in this Inforce Policy Information is for **policy owner use only** and is not authorized for presentation to any other persons. It is for informational purposes only.

**Restrictions:**

For security purposes, this policy data should **not** be downloaded to your computer and should **not** be e-mailed under any circumstances. E-mailing or downloading this information could expose your confidential personal information to unauthorized access and create liability for you.

**Confidentiality:**

Information furnished to you by Security Life of Denver or Southland Life Insurance Company is designated as confidential in nature and shall be held by you in confidence and used only as described above. Printouts of this material should be kept in confidential files or destroyed after use. It is important that you protect and do not give your user identification and password to anyone. By accessing this information, you are agreeing to adhere to these procedures.

# EXHIBIT V

Page 1

 1                UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3

 4

 5    INDIANAPOLIS LIFE INSURANCE CO.      )

 6              Plaintiff,                 )  Case No.

 7        vs.                             )  04-12481 WGY

 8    ROSALYN HERMAN, TRUSTEE, FINANCIAL )

 9    RESOURCES NETWORK, INC. PROFIT      )

10    SHARING PLAN AND TRUST, FINANCIAL   )

11    RESOURCES NETWORK, INC. PROFIT      )

12    SHARING PLAN AND TRUST, GREGG D.    )

13    CAPLITZ, RUDY K. MEISELMAN, M.D.,   )

14    and HOPE E. MEISELMAN,              )

15              Defendants.               )
                                           ORIGINAL
16

17      DEPOSITION TRANSCRIPT OF DANIEL J. GOODNESS

18            TAKEN 11/15/05 at 10:15 a.m.

19

20          The deposition of DANIEL J. GOODNESS,

21    a witness called by and on behalf of the

22    Plaintiff, taken pursuant to the provisions of

23    the Federal Rules of Civil Procedure of the

24    United States District Courts pertaining to the

Page 10

```
 1    but I do remember such a letter.

 2         MR. BOGAERT:  Let me do this.  Let's mark

 3    this as an exhibit, which will be 49, which is

 4    the prior notice of deposition for the keeper of

 5    the records, and we will mark as Exhibit 50 your

 6    response to that.

 7                        (WHEREUPON, certain documents

 8                         were marked Deposition Exhibit

 9                         Nos. 49 and 59, for

10                         identification, as of 11/15/05.)

11    BY MR. BOGAERT:

12         Q.    Do you see attached to Exhibit 49 is

13    the letter of September 24, 2003?

14         A.    Yes, sir.

15         Q.    And that's written on your letterhead?

16         A.    It is actually written on my father's

17    letterhead, but I prepared the letter.

18         Q.    So there are two A. James Goodnesses?

19         A.    No.  I am Daniel Goodness.

20         Q.    Well, why are you here in response to

21    a deposition notice to A. James Goodness?

22         A.    A. James Goodness has no information

23    regarding this.

24         Q.    Okay.  Does your father have an
```

Page 11

1    accounting practice at Totten Pond Road?

2         A.    Yes.

3         Q.    And he is a CPA?

4         A.    Correct.

5         Q.    Are you a CPA?

6         A.    I am not.

7         Q.    Was your father aware that you had

8    prepared this letter dated September 24 on this

9    letterhead?

10        A.    He was not.

11        Q.    Why don't you tell me how it is that

12   you came to prepare this August 20, 2003 letter?

13        A.    So you are changing --

14        Q.    I'm sorry.  My apologies.

15              The August 24 letter.  Let's stick

16   with that.

17        A.    Could you rephrase?

18        MR. MURPHY:  I think it is September 24.

19        THE WITNESS:  That's true, yes.

20   BY MR. BOGAERT:

21        Q.    Okay.  The September 24 letter, how is

22   it that you came to prepare it?

23        A.    How is it that -- it was information

24   that I received from Gregg and Dr. Meiselman.

Page 13

1     Dr. Meiselman had participated in the preparation

2     of that information?

3          A.    We had had a three-way conversation in

4     the weeks prior to completion of this letter.

5          Q.    Do you have any notes of the three-way

6     conversation?

7          A.    I do not.

8          Q.    Do you recall what day that occurred

9     on?

10         A.    I do not.

11         Q.    Who called whom?

12         A.    Mr. Caplitz called me.

13         Q.    Okay.  And was Dr. Meiselman on the

14    phone or was he --

15         A.    Dr. Meiselman was on the phone, yes.

16         Q.    And what was said at that time?

17         A.    I don't recall.

18         Q.    Why is it that you prepared this

19    document on your father's letterhead?

20         A.    I was told by Mr. Caplitz that we were

21    turning this information in to, I believe, a life

22    insurance company, and they wanted the signature

23    of a CPA on it.

24         Q.    But no CPA looked at it?

Page 14

1    A.    Correct.

2    Q.    Bear with me for one second.

3          And you don't even have a copy of the

4    letter itself in your files, is that correct, the

5    September 24, 2003 letter?

6    A.    We actually did look for it in our

7    computer and couldn't find it.  It is probably in

8    there somewhere, but we write a lot of letters.

9    Q.    Okay.  Well, that's my earlier

10   question of what you did to look.

11         Did you scan faxes as well?

12   A.    We do not.

13   Q.    Do you have a file in your office for

14   Dr. Meiselman?

15   A.    I do not.

16   Q.    Who did you bill for this work?

17   A.    Nobody.

18   Q.    Why not?

19   A.    It was a favor I did for Gregg.

20   Q.    Did you understand that in preparing

21   this document and putting your father's signature

22   stamp on it as a CPA that the recipient of it

23   would believe that it was, in fact, coming from a

24   certified public accountant?

Page 15

1        A.      Could you ask that question again,

2    sir?

3        MR. BOGAERT:  Could you repeat it, please.

4                    (WHEREUPON, the record was read by

5                    the reporter as requested.)

6    BY THE WITNESS:

7        A.      Yes.

8    BY MR. BOGAERT:

9        Q.      And so it was -- it was intended to

10   make the insurance company that received it

11   believe that an accountant had, in fact, reviewed

12   Dr. and Mrs. Meiselman's income for 2002 and

13   determined or verified that it was, in fact, as

14   stated in this September 24, 2003 letter, which

15   is also marked as Exhibit 1; is that right?

16       A.      It was a compilation.

17       Q.      And do you recall any information that

18   Dr. Meiselman gave you in connection with this?

19       A.      Yes, I do.  Dr. Meiselman prepared a

20   condition of finance.  Let me see if I have the

21   document.  We are missing a paper that I gave to

22   you, that I sent to you.

23       Q.      No, sir.  Every document you sent me

24   is attached right there.

Page 16

1      A.     Yeah, I received a fax.  I believe it

2  came from Greg's office, but it was prepared by

3  Dr. Meiselman.  And I believe it was '02 income

4  and net worth and assets.  That's how I prepared

5  this statement of financial condition.  So all of

6  these numbers came off of a document prepared by

7  Dr. Meiselman.

8      Q.     Do you know whether Dr. Meiselman had

9  an accountant?

10     A.     I believe he did, yes.

11     Q.     Did you ever have any communications

12  with his accountant?

13     A.     No, I did not.

14     Q.     Did you have any understanding as to

15  why it was that Mr. Caplitz was asking you to

16  prepare on your father's letterhead a statement

17  about his financial net worth when Dr. Meiselman

18  had his own accountant?

19     A.     I do know, yes, actually.

20     Q.     Okay.  Why?

21     A.     Dr. Meiselman complained that his

22  accountant was very expensive and was going to

23  charge him a lot of money for this and he asked

24  Gregg if he could get it done cheaper, and Gregg

1    said, yes, he could.

2         Q.    Okay.  Now, how long have you provided

3    professional services to Mr. Caplitz?

4         A.    About six years.

5         Q.    And when did you last speak to him

6    about your deposition?

7         A.    Couple weeks ago.

8         Q.    Did you review with him the issue of

9    these letters and how they were prepared to help

10   refresh your memory?

11        A.    No.

12        Q.    You have a memory of it independent of

13   your conversation with Mr. Caplitz?

14        A.    Correct.

15        Q.    What is your record retention policy

16   with your company?

17        A.    Usually three years.

18        Q.    And do you know why it is then that

19   you don't have copies of the records that you

20   used to prepare these documents with?

21        A.    I do have records.  I've seen them

22   recently.  I thought I sent them in the Fed Ex

23   package to you.

24        Q.    So you have the fax from

Page 18

1    Dr. Meiselman -- Dr. Meiselman's figures upon

2    which you prepared --

3         A.    I do.  I do.

4         Q.    Well, I think what we'll do when we're

5    done here is we are going to suspend, and I am

6    going to ask you to go look for those, and, you

7    know, provide them to me, and either we will call

8    you back or we may not need to call you back, but

9    I can represent to you that the documents I have

10   marked there are the documents you produced to

11   me.

12        A.    Okay.

13        Q.    Now, if we go back to the schedule,

14   and then we'll come back to these documents, with

15   respect to items 4 and 5 in Schedule A, which

16   relate to the two letters on your father's

17   letterhead?

18        A.    Yes.

19        Q.    The August 20, 2003 and the September

20   24, 2003 letters, is it your testimony that those

21   were both prepared from the same fax from

22   Mr. Caplitz?

23        A.    Yes.

24        Q.    And they included information that you

Page 19

```
 1    say Dr. Meiselman had provided to Mr. Caplitz; is

 2    that correct?

 3         A.    Correct.

 4         Q.    And you believe you still have those

 5    documents in your possession?

 6         A.    Yes, I do.

 7         Q.    Prior to September -- strike that.

 8               Prior to August of 2003, had you had

 9    any dealings with Dr. Meiselman before that?

10         A.    Not directly, no.

11         Q.    When you say not directly, what

12    dealings did you have with him?

13         A.    He was an employee of Financial

14    Resources Network, and I believe I helped in the

15    preparation of a W-2 of his.  Gregg does his own

16    payroll.  Gregg did the payroll for FRN and

17    needed help preparing W-2s.  So it was another --

18    again, a quick service I offered him.

19         Q.    What did you understand Gregg's

20    relationship with FRN was?

21         A.    I don't know.

22         Q.    You say he did the payroll for FRN?

23         A.    Right.

24         Q.    And on behalf of Financial Resources
```

# EXHIBIT W

AUG-08-2003  16:22        INDPLS LIFE                    31799999999    P.01/04

**Financial Resources Network, Inc.**
*Insight Onsite Financial Solutions™*
424 Washington Street        Woburn, MA 01801-2112



July 30, 2003

B0S020665

Mr. Bob Pedigo
Indianapolis Life Insurance Company
P. O. Box 1230
2690 North Meridan Street
Indianapolis, IN 46206

EXHIBIT
33
9/23/05

RE: Dr. Rudy K. Meiselman and Hope Meiselman

Dear Bob:

Enclosed you will find a new application in the amount of 22 million dollars on the above clients. Financial Resources Network Profit Sharing Plan is purchasing this policy on behalf of the plan participant Dr. Rudy K. Meiselman. Currently his Profit Sharing Plan it is made up of two accounts currently located at TD Waterhouse containing approximately 15 million dollars

The purpose of this insurance is to replace an existing ING variable life contract in conjunction with a private placement variable life contract issued by AGL Life Assurance Company, a subsidiary of Phoenix Home Life. The ING contract was purchased early last year, as a result a decision made by Dr. Meiselman, in conjunction with an insurance advisor to terminate a prior private placement product. ING has created a set of investment restrictions on Dr. Meiselman that make it impossible for him to remain invested with ING (copy attached).

It is Dr. Meiselman's intention to transfer the proceeds of this policy to a private placement product issued by AGL, a subsidiary of Phoenix Home Life. This product will be used primarily as an asset accumulation vehicle and will have the minimum death benefit required to meet the definition of life insurance. Currently, we anticipate the minimum death benefit would be 9.325 million dollars given the 1035 Exchange amount of 4.5 million dollars. Replacement and 1035 exchange terms will be completed for AGL from ING. The policy will continue to be owned by the Meiselman Insurance Limited Partnership; Dr. Meiselman's daughter Janet is the General Partner.

*A Registered Investment Advisor*

Toll Free:  800-772-4947
Phone:  781-935-9070
Fax:  781-935-9728                 Securities offered through Wharton Equity Corp. Member NASD/SIPC
E-Mail  insightonsite@attbi.com    Registered Investment Advisor

AUG-08-2003  16:22    INDPLS LIFE    31799999999  P.02/04

*Financial Resources Network, Inc.*
*Insight Onsite Financial Solutions™*

424 Washington Street        Woburn, MA 01801-2112

Currently Dr. and Mrs. Meiselman have joint assets of approximately 30 million dollars. Dr. Meiselman's remaining profit sharing plan balance grows rapidly since he is an employee of Financial Resources Network and has not now nor has he ever had any incidence of ownership in said company. He is allowed to eliminate the required minimum distribution that would normally be necessary for him to make. This allows the continued growth of the profit sharing plan.

Profit sharing plans, as you well know, are subject to a combination of income and estate taxes that could easily approach seventy-five percent. Dr. Meiselman has historically generated a very high rate of return inside his profit sharing moneys. Current balances of 15 million dollars are the result of early contributions made in the late seventies of approximately 7 hundred thousand dollars. Additionally, in the early nineties Dr. Meiselman took a significant distribution of 3 million dollars from the profit sharing plan that was used to fully utilize his unified credit and as part of the Gifting Program to his three daughters.

An analysis of the rates of return achieved by Dr. Meiselman inside of his qualified plan indicates that he has actually achieved growth rate of in excess of seventeen percent. If we take into account the 3 million dollar distribution form the qualified plan in 1992 it is clear Dr. Meiselman's historic rate of return is well in excess of twenty percent. It is our intention that the Indianapolis Life Policy form the basis to provide enough liquidity to pay the estate and income taxes upon Dr. and Mrs. Meiselman's ultimate demise. It is their intention to continue to manage the death benefit in the private placement product so as to minimize the total amount of insurance death benefit. It is important to Dr. and Mrs. Meiselman that the moneys necessary to settle their estate and income tax cost be available independent of market unrest or downturn.

Dr. Meiselman's experience over the last year with ING has convinced him that he must have a basis of coverage that is independent of stock market performance. It is our intention under our proprietary WEIT™ Program to reduce the face from 22 million to 11 million in the fifth year in order to reduce the cost burden on the policy.

Toll Free: 800-772-4047        *A Registered Investment Advisor*
Phone: 781-935-7070        Securities offered through Wharton Equity Corp. Member NASD/SIPC.
Fax: 781-935-9728          Registered Investment Advisor
E Mail insightonsite@attbi.com

08/08/03  FRI 15:44  [TX/RX NO 8150] Ø092

AUG-08-2003  16:23     INDPLS LIFE                    31799998999   P.03/04



*Financial Resources Network, Inc.*
*Insight Onsite Financial Solutions™*

**424 Washington Street      Woburn, MA 01801-2112**

Clearly, this could potentially change and we must provide you with economic justification for a combined coverage of approximately 31.5 million dollars total life insurance coverage. The reduction in face is important because of the longevity that both Dr. and Mrs. Meiselman have in their family. It is certainly quite possible, if not likely, that one or both of them may very well live into their nineties. They currently live a healthy life style and each is engaged in daily exercise. Dr. Meiselman continues to work daily designing and implementing investment strategies for Financial Resources Network. They both remain vigorous and healthy individuals and we must as practical planners anticipate a long life for both of them. Therefore, it is our intention to reduce the burden on the Indianapolis Life Policy by reducing the face from 22 million to 11 million dollars in the fifth year.

It is Dr. Meiselman's intention that the profit sharing plan balance be received by his daughters ultimately and held by them in IRAs making only required minimum distributions. This intent has been made clear both verbally and in writing to his heirs. Therefore, we must have in place life insurance sufficient to pay all estate and income taxes that will come due upon the ultimate demise of the survivor. Additionally, we have gone with an increased face of 22 million dollars since it is at least theoretically possible that both Dr. Meiselman and Hope could pass away during the five year period time when the policy is owned by the profit sharing plan. If such an event were to occur, we would immediately take the assets of the plan to a balance of approximately 37 million dollars. This would mean that immediate income and estate taxes that would be due would be in the area of 27.5 million dollars.

Clearly, you can see that it is necessary for us to have approximately 31 million dollars of insurance coverage during this period of time where the insurance policy is held by the profit sharing plan since the other assets included in the estate in addition to the profit sharing plan would create a significant incremental estate tax burden. The only liquid assets controlled by the Meiselman's, with the exception of the profit sharing plan are approximately 5 million dollars of investment assets that Dr. Meiselman manages on behalf of Financial Resources Network.

In addition to the liquid assets they own two ocean front homes, one located in Long Boat Key, Florida and the other one in Narragansett, Rhode Island. The home in Narragansett, Rhode Island is located directly on the beach with beachfront access and is conservatively worth 4.5 to 5 million dollars. The home in Long Boat Key, Florida is a Penthouse Condominium overlooking the Gulf of Mexico worth approximately 3 million dollars.

Toll Free: 800-772-4047              *A Registered Investment Advisor*
Phone: 781-935-7070
Fax: 781-935-9728               Securities offered through Wharton Equity Corp. Member NASD/SIPC.
E Mail Insightonsite@attbi.com           Registered Investment Advisor

08/08/03  FRI 16:44  [TX/RX NO 5159]  [003]

IL1707



**Financial Resources Network, Inc.**
**Insight Onsite Financial Solutions™**

424 Washington Street      Woburn, MA 01801-2112

Therefore the Meiselman's current estate absent any growth, if we assumed the death would occur while the insurance policy was held inside the profit sharing plan would be approximately 50 million dollars and the estate tax bill would be in excess of 25 million dollars. We add this to the forty percent income tax due on the 37 million dollars that would be in the profit sharing plan and you will clearly see the need for an incremental 18 million dollars to provide the liquidity necessary to pay the estate and income taxes.

You can see that this would justify the proposed 31.5 million dollars of total death benefit to be placed.

I hope that this information along with the attached financial statements will answer any questions you may have on this case. It is important that I bring to your attention the fact that this case is also being sent to US Life Insurance Company. I will absolutely arrange for their chief underwriter to speak with you in order to coordinate any contacts with the reinsurance market so as to avoid any potential confusion. I will also coordinate the appropriate contact at AGL on the private placement product.

Given the size of this case it is key as to what the underwriting offer will be. This is why we decided it is best to place it with two companies to see which will give us the best competitive offer. This is intended to keep you informed of exactly what we are doing. I hope this information will allow you to successfully complete your underwriting and if given a satisfactory offer from Indianapolis Life we will quickly be able to bring this matter to completion. The moneys necessary to pay the premiums are currently located inside of the profit sharing plan and can easily be forwarded upon receipt of the policy.

I look forward to an answer and any further questions you may have.

Sincerely,

J. Caplitz, CFP, MS
Senior Design Consultant

Toll Free: 800-772-4047          *A Registered Investment Advisor*
Phone: 781-935-7070
Fax: 781-935-9723                Securities offered through Whitten Baley Corp. Member NASD/SIPC.
E Mail  Insightonsite@anbi.com  Registered Investment Advisor