UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 04-12481 WGY

INDIANAPOLIS LIFE INSURANCE COMPANY

Plaintiff

v.

ROSALYN HERMAN, TRUSTEE, FINANCIAL
RESOURCES NETWORK, INC. PROFIT
SHARING PLAN AND TRUST, FINANCIAL
RESOURCES NETWORK, INC. PROFIT
SHARING PLAN AND TRUST, GREGG D.
CAPLITZ, RUDY K. MEISELMAN, M.D. and
HOPE E. MEISELMAN,

Defendants

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

The plaintiff, Indianapolis Life Insurance Company, submits this memorandum of law in

support of its motion for summary judgment on all counts of the plaintiff's Complaint and the

defendants' Counterclaims.

**I.      INTRODUCTION**

This is a civil action for declaratory relief pursuant to 28 U.S.C. §2201, in which the

Plaintiff Indianapolis Life Insurance Company ("ILIC") seeks rescission of and a determination

of its rights and obligations under ILIC Policy Nos. B05020665 and B05020799 (the "Policies"),

attached hereto as Exhibits A and B respectively, both of which insure the "second to die" of Dr.

and Mrs. Meiselman and which were issued to the Financial Resources Network

50969.3
50969.2

Profit Sharing Plan and Trust ("FRN Plan"). The Plaintiff seeks rescission of the policies due to the intentional and material misrepresentations made in the procurement of the policies. Plaintiff also seeks summary judgment on its claims for Breach of Contract, Conversion and Unjust Enrichment against Defendant Caplitz for his retention of the agency commission in breach of his Agency Contract with Indianapolis Life Insurance Company (the "Agency Contract"), attached hereto as Exhibit D, between the Plaintiff and Caplitz.

ILIC seeks rescission of the subject second-to-die life insurance policies on the lives of Dr. and Mrs. Meiselman. Dr. and Mrs. Meiselman were unaware that the policies had issued, and ultimately did not consent to the purchase of the policies, or the use of Dr. Meiselman's funds within the FRN Plan for the purchase of the policies. [SOF 19-20] As the agent, Caplitz, and the owner/beneficiary of the policies, Ms. Herman (as Trustee of the FRN Plan) made intentional and material misrepresentations to ILIC in the procurement of the policies. Prior to issuance of the policies Ms. Herman certified and misrepresented that Dr. Meiselman's health had not changed since the date of the initial application, though it had in fact deteriorated. [SOF 24, 34-35]. Ms. Herman also certified and misrepresented the amount of insurance already in force on the Meiselmans' lives. [SOF 41-47] Caplitz presented ILIC with false information regarding the Meiselmans' financial condition, intending to deceive ILIC into believing that the information came from a CPA who was Meiselman's accountant. [SOF 48-56]. ILIC relied on the information provided by Caplitz and Herman in its decision to issue the policies, and would not have issued the policies under the same terms, if at all, had it known of the true circumstances. [SOF 40, 46] Once these facts were learned, ILIC notified Herman of its intent to rescind by letter dated June 14, 2004. [SOF 25] On June 15, 2004, ILIC wired the premium

-2-

received on the subject policies plus 3% interest, in the amount of $1,042,004.75, into the FRN

Plan's account. [SOF 27] Those funds were accepted by the FRN Plan, and were eventually

rolled out of the FRN Plan along with the rest of Dr. Meiselman's funds in the FRN Plan. [SOF

31-32] As a result of the misrepresentations and issuance of the policies, Caplitz received a

commission of $650,297.01. [SOF 57].

## II.   SUMMARY JUDGMENT STANDARD

A grant of summary judgment is appropriate when the evidence before the court shows

that "that there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law." Fed. R. Civ. P. 56(c); Seaboard Surety Co. v. Greenfield Middle

Sch. Bldg. Comm., 370 F.3d 215, 218 (1st Cir. 2004). In ruling on a motion of summary

judgment, a court must view "the facts in the light most favorable to the non-moving party,

drawing all reasonable inferences in that party's favor." Barbour v. Dynamics Research Corp., 63

F.3d 32, 36 (1st Cir. 1995). An issue is "genuine" for purposes of summary judgment if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a

"material fact" is one which "might affect the outcome of the suit under the governing law."

Carcieri v. Norton, 398 F.3d 22, 29 (1st Cir. 2005), citing Hayes v. Douglas Dynamics, Inc., 8

F.3d 88, 90 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L.

Ed. 2d 202, 106 S. Ct. 2505 (1986)).

The summary judgment device enables a court "to pierce the boilerplate of the pleadings

and assay the parties' proof in order to determine whether trial is actually required." Acosta v.

Ames Dep't Stores, Inc., 386 F.3d 5, 8 (1st Cir. 2004), quoting Wynne v. Tufts Univ. Sch. of

Med., 976 F.2d 791, 794 (1st Cir. 1992). That device functions successfully when "the

-3-

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id., citing Fed. R. Civ. P. 56(c). "Faced with a properly documented summary judgment motion, the nonmovant can thwart the motion only by showing through materials of evidentiary quality that a genuine dispute exists about some material fact." Id., citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). This evidence "must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Id. quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989).

## III.     ARGUMENT

### A.     Defendants Are Estopped From Disputing Rescission

The Defendants are estopped from disputing that the subject policies are rescinded.   On June 14, 2004, ILIC provided notice to Herman and the FRN Plan that it was rescinding the policies based upon misrepresentations made in the application process. [SOF 25]  [The reasons for rescission are set forth below].  The notice informed the policies' owner that the premiums paid for the policies together with 3% will be returned.  [SOF 25].  On June 15, 2004, by wire transfer to the FRN Plan's account, ILIC refunded the full premium remitted by the FRN Plan for the policies, with interest, in the amount of $1,042,004.75.  [SOF 27].  The defendants have admitted to the return of the premiums. [SOF 28].  Rescission was effected upon return of the premium.  See Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 379 (1st Cir. 1991), citing 6 COUCH ON INSURANCE 2D § 34.35, at 892 (1985)(the general rule is that when an insurer ventures

-4-

to rescind a policy on the basis of a material misrepresentation in the application, it must first tender to the insured the premiums paid under the policy). "The function of rescission, after all, is to restore the status quo ante -- a feat which will customarily involve returning the consideration originally paid." Id. After the premium was returned, the defendants made no attempt to return the premium or to pay it into Court in dispute of the rescission. [SOF 29-30] Furthermore, the money is no longer in the custody or control of the FRN Plan. [SOF 31-32]. The funds used to purchase the policies were taken from Dr. Meiselman's individual retirement account. [SOF 9, 32]. Once, Dr. Meiselman learned that the policies were purchased with his funds without his consent, the policies were rescinded, and the premiums returned, Dr. Meiselman ceased employment with FRN, Inc. and his funds were rolled over into another plan unrelated to FRN, Inc. [SOF 32] Therefore, having accepted tender of the premium with interest, the policies have been rescinded as a matter of law and the defendants are estopped from claiming otherwise.

**B.** **Rescission Based on Misrepresentation in the Application**

The subject policies must be declared by this Honorable Court rescinded as they were procured by intentional and material misrepresentations in the application process. M.G.L. c. 175 §186 permits avoidance of a policy based on an oral or written misrepresentation or warranty in the negotiation of the policy, if the misrepresentation or warranty is made with actual intent to deceive or if it increased the risk of loss to the insurer. See Federal Deposit Insurance Corp. v. Underwriters of Lloyd's of London Fidelity Bond No. 834/FB9010020, 3 F. Supp. 2d 120, 138 (D. Mass. 1998); Northwestern Mut. Life Ins. Co. v. Iannacchino, 950 F. Supp. 28, 31

(D. Mass. 1997); Pahigian v. Manufacturers' Life Ins. Co., 349 Mass. 78, 206 N.E.2d 660 (1965).

"Under the statute, the insurer seeking rescission must demonstrate that the 'misrepresentation or warranty' made in the negotiation of an insurance contract was material. Mass. Gen. Laws ch. 175, § 186 (emphasis supplied). The insurer can accomplish this (and avoid the policy) by showing either that the misrepresentation or warranty was made 'with actual intent to deceive,' or that it 'increased the risk of loss.'" Id. at 139-140. "Because an insurance contract transfers a defined risk from the insured to the insurer for a premium calculated to reflect the nature of the risk, the integrity of this process disintegrates when an insurer is induced by misrepresentations or omissions into accepting a risk it would have otherwise rejected, or accepting a risk on more lenient terms or at a lower premium than it would have if the facts had been disclosed." Id., at 138, citing Joseph K. Powers, Pulling the Plug on Fidelity, Crime, and All Risk Coverage: The Availability of Rescission as a Remedy or Defense, 32 Tort & Ins. L.J. 905, 906 (1997). "An insurer need not demonstrate that it relied on misrepresentations because under Massachusetts law 'reliance' is not a prerequisite for proof of invalidation of an insurance policy and/or denial of a claim. Northwestern Mut. Life Ins. Co. v. Iannacchino, 950 F. Supp. 28, 31 (D. Mass. 1997), citing Shapiro v. American Home Assurance Co., 584 F. Supp. 1245, 1250 (D.Mass.1984). "Rather, an insurer may void or rescind its policy and/or deny a claim if the insured makes an innocent misrepresentation of a material fact, and the disclosure of the truth would have influenced the judgment of the underwriter in making the insurance contract, in estimating the degree and character of the risk or in fixing the rate of premium." Northwestern Mut. Life Ins. Co. v. Iannacchino, 950 F. Supp. 28, 31 (D. Mass. 1997), citing Employers' Liability Ins., Ltd. v. Vella, 366 Mass. 651, 655, 321 N.E.2d 910 (1975).

The defendants made three misrepresentations in the procurement of the subject policies that were either intentional or increased the risk of loss:

**1.    The Financial Condition of the Insureds was Intentionally Misrepresented to Deceive ILIC Into Believing It Had Been Sent By Meiselman's CPA.**

The Meiselmans' financial condition was intentionally misrepresented in order to procure the policies under the terms as issued. Therefore, pursuant to M.G.L. c. 175 §186, the policies should be rescinded based upon Caplitz and Herman's intentional misrepresentations. During the underwriting process, ILIC's Chief of Underwriting on the subject application, Robert Pedigo, requested that Caplitz provide a statement of Dr. Meiselman's financial condition and his income. [SOF 48] Mr. Pedigo specifically requested that this financial information come from a Certified Public Accountant (a "CPA"). [SOF 48]. On August 21, 2003, Caplitz sent ILIC a letter enclosing a purported "Statement of Financial Condition" stating it was prepared by Meiselman's accountant, "A. James Goodness, CPA, C.P". [SOF 49-50]. The Statement of Financial Condition provides that Dr. and Mrs. Meiselman had a net worth of $24,681,419.00. [SOF 50]. Later, Pedigo questioned these figures and in response, on September 24, 2003, Caplitz sent a letter signed by "A. James Goodness, CPA, P.C." stating that Dr. and Mrs. Meiselman's unearned income for 2002 was $3,200,00 and earned income was $11,000. [SOF 54-55] ILIC was never aware that Goodness was not Dr. Meiselman's accountant and that the letters were not prepared by a CPA until after this lawsuit and discovery revealed it. During discovery, Caplitz admitted that Goodness was never Meiselman's accountant. [SOF 52] Furthermore, Dr. Meiselman testified that he never provided any documentation to Mr.

-7-

50969.3
50969.2

Goodness about his finances, he never retained Mr. Goodness as his accountant and that the income statement was not accurate. [SOF 53]

Following Dr. Meiselman's deposition, the plaintiff took the deposition of James Goodness. To plaintiff's surprise, Daniel Goodness, James Goodness' son, appeared at this deposition. Daniel Goodness testified he prepared the statement of Dr. Meiselman's financial condition, at Caplitz's request. [SOF 51-52]. He also testified that he is not a certified public accountant and that Mr. Caplitz asked him to prepare the letter on his father's stationary so that it would appear to have been prepared by a certified public accountant. [SOF 51-52]. Daniel Goodness also prepared a statement of financial condition at Caplitz's request and again printed it on his father's letterhead. [SOF 54]. Goodness admitted that he did it as a favor for Caplitz. [SOF 52]  Moreover, even Caplitz admitted at his deposition that James Goodness was not Dr. Meiselman's accountant. [SOF 52] Dr. Meiselman also testified that James Goodness was never his accountant. [SOF 53].

These undisputed material facts establish as a matter of law that during the application process the accuracy and the source of the Meiselmans' financial condition and income was intentionally misrepresented to ILIC with the clear purpose of deceiving ILIC as to its authenticity. As a result, rescission of the subject policies must be allowed. While it is not necessary to show reliance for a misrepresentation made with the intent to deceive under M.G.L. c. 175, §186, ILIC did in fact rely on the financials and the misrepresentation that the information was from a CPA and had been supplied by the Meiselmans. Northwestern Mut. Life Ins. Co., 950 F. Supp. at 31, citing Shapiro, 584 F. Supp. at 1250.

-8-

2.    **The Defendants Made Misrepresentations That Were Material And Increased The Risk Of Loss.**

In addition to the intentional misrepresentations noted in Section B (1) <u>supra</u>, which alone are grounds for rescission of the policies, several other misrepresentations were made during the application process concerning issues that would increase the risk of loss and that were material to ILIC decision to issue the policies under the terms as issued.   M.G.L. c. 175 §186 also provides that a policy may be avoided based upon a misrepresentation if that misrepresentation was material or increased the risk of loss.    <u>Id.</u> at 140, citing <u>Northwestern Mut. Life Ins. Co. v. Iannacchino,</u> 950 F. Supp. 28, 30-31 (D. Mass. 1997) (Misrepresentations under §186 also include omissions of material information).   "Ordinarily, whether a misstatement is 'material', in that it increases the risk of loss, is a question of fact for the jury.   However, when the facts are not in dispute, courts have held that certain misrepresentations increase the risk of loss as a matter of law." <u>Id.</u> at 141, citing <u>Iannacchino</u>, 950 F. Supp. At 32; <u>Hanover Ins. Co. v. Leeds</u>, 42 Mass. App. Ct. 54, 57, 674 N.E.2d 1091 (1997).   Herman, the Trustee, and the FRN Plan made material misrepresentations in the amendments to the applications which increased the risk of loss on the policies.   Herman and Caplitz failed to disclose Dr. Meiselman's visit to a physician and degradation of health, as well as the failure to cancel an ING life insurance policy on Dr. Meiselman's life.

a.    **Defendants Failed to Disclose the Insured's Deterioration in Health.**

Prior to issuing and delivering the policies, ILIC required that an amendment to the application for the policies on the life of Dr. Meiselman be executed by the proposed insured as a

-9-

condition of the policies' effectuation. [SOF 33] On or about November 25, 2003, Herman as

Trustee executed and delivered to ILIC the amendment which stated as follows: "I certify that

all persons proposed for such insurance are in the same condition as stated in the application; and

since the date of the application, no such person has (1) suffered an illness or injury nor

consulted a physician or practitioner...." [SOF 34] The above statement contained in the

amendment to the application was false in that between the date of the initial application, July

31, 2003, and the date of the execution of the amendment to the application, November 25, 2003,

Dr. Meiselman's physical health had changed, and in fact deteriorated. [SOF 35] Moreover, in

August of 2003, Dr. Meiselman had consulted a physician, Dr. Simon, due to an unexplained

weight loss. [SOF 36]. On September 24, 2003, a CT scan was taken of Dr. Meiselman's chest

and stomach which revealed a right middle lobe pulmonary parenchymal node. [SOF 36]

" A misrepresentation is 'material' if it concerns a fact, 'the knowledge or ignorance of

which would naturally influence the judgment of the underwriter in making the contract at all, or

in estimating the degree and character of the risk, or in fixing the rate of the premium.'" Id. at

140, citing Employers' Liab. Assurance Corp. v. Vella, 366 Mass. 651, 655, 321 N.E.2d 910

(1975).   The prospective insured's health is an important consideration in the underwriting

process, as it is determinative of the risk of loss. See, e.g. Boston Mut. Ins. Co. v New York

Islanders Hockey Club, L.P., 165 F3d 93 (1st Cir. 1999) (Insurer is permitted to rescind disability

insurance policy covering professional hockey player, where hockey team failed to disclose in

application that player had sustained three concussions within span of little more than year,

because application was false in substantial respects and information omitted materially

increased risk to insurer, and that is more than enough to warrant rescission under M.G.L. c 175

-10-

§ 186); <u>Metropolitan Life Ins. Co. v De Nicola</u>, 317 Mass 416, 58 N.E.2d 841 (1944) (setting aside policy under this section where misrepresentations contained in application for life insurance with respect to matter that increased risk of loss were made with no actual intent to deceive plaintiff).

In issuing the policies, ILIC relied upon the statement in the Amendment that there had been no change in Dr. and Mrs. Meiselman's medical conditions and that neither had been to a physician since the initial application was submitted. [SOF 40]  In issuing the policies, ILIC also relied upon the statement in the Amendment that neither Dr. nor Mrs. Meiselman had consulted a physician since the initial application was submitted. [SOF 40]   Had ILIC known that Dr. Meiselman had consulted a physician or that there had been a deterioration in Dr. Meiselman's health, ILIC would not have issued the subject policies at that time and would have investigated the issue further. [SOF 40]  The results of the investigation would have determined under what terms ILIC would issue the policies, if at all.  Even if the defendants' misrepresentation in the amendment was unintentional, it was material in that it influenced the opinion of the underwriter, Mr. Pedigo, and therefore it was a valid basis for rescission.

**b.    The Defendants Failed to Disclose the Continued Existence of a $20 Million Policy on the Life of the Insured.**

In applying for the ILIC policies, it was represented that the $20 million ING policy in force on Dr. Meiselman's life at the time of the initial application for the ILIC policies would be cancelled. [SOF 17, 42]  However, the ING policy was not cancelled. [SOF 47]  ILIC would not have issued the policies had it know that fact.  [SOF 46]  The amendment required that the insured list on the amendment the life insurance policies in force on the lives of Dr. and Mrs.

-11-

Meiselman at the time the Amendment was executed. [SOF 41]  The amendment failed to list the $20,000,000 life insurance policy issued by ING.  [SOF 41]    During the application process, ILIC was aware of the ING policy, but was assured that the ING policy would be cancelled. [SOF 17, 42]  The fact that the amendment did not list the ING policy inappropriately suggested to ILIC that the ING policy had been cancelled as promised. [SOF 44]  The purpose of the Amendment is to ascertain all the insurance in place on the lives of the prospective insureds at the time of the issuance of the ILIC policies.  [SOF 41]  ILIC expected that the ING policy to be listed if it remained in force.  [SOF 44]  Furthermore, ILIC would not have issued the policies under the same terms, if at all, had they known the ING policy would not be cancelled, as Dr. Meiselman would have been over-insured. [SOF 45-46]  The misrepresentation that the ING policy would be terminated and would not remain in force was material in that it influenced the opinion of the underwriter, and thus is a valid basis for rescission.

These nondisclosures were material to ILIC's decision to issue the policies under the terms as issued.    "Nondisclosures have been held to increase the risk of loss by "…depriving the [insurer] of the opportunity to undertake a further investigation, which would have certainly influenced the underwriters in establishing the conditions…and fixing the premium, or in considering the decision to issue the policy at all."  Id. at 143, citing Pahigian v. Manufacturers' Life Ins. Co., 349 Mass. 78, 86, 206 N.E.2d 660 (1965)(failure to give truthful answers deprived insurer of opportunity to undertake further investigation); Northwestern Mut. Life Ins. Co. v. Iannacchino, 950 F. Supp. 28, 32 (D. Mass. 1997)(nondisclosure rendered insurer unaware of material facts and unable to discover such information through further investigation).   Both the nondisclosure of the issue of Dr. Meiselman's health and the ING policy's continued existence

-12-

50969.3
50969.2

would have influenced Pedigo's underwriting decision. [SOF 40, 46] Therefore, as a matter of law, the Court must declare the Policies rescinded based on material misrepresentations having been made in the applications which increased the risk of loss to ILIC.

### C.     Caplitz Has Admitted That If The Policies Are Properly Rescinded He Has No Right To The Commission Paid To Him, And He Must Return the Commission.

A valid insurance agent contract entitled "Indianapolis Life Insurance Company Agency Contract" ("the Agency Contract") was entered into between Caplitz and ILIC on June 11, 1997. [SOF 58] The Agency Contract provides that the "General Agent will repay to the Company all compensation received on any premium refunded." [SOF 59]. Caplitz received a commission of $650,297.01 on the Policies. [SOF 57] ILIC refunded to the FRN Plan the total premium plus interest on June 15, 2004. [SOF 27, 28] Despite ILIC's demand that he do so, Caplitz has failed and refused to refund his commission. Caplitz's failure to refund the commission to ILIC also constitutes a breach of the Agency Contract. Under the express terms of the contract, ILIC has a right to the return of Caplitz's commission earned on the Policies in the amount of $650,297.01 plus interest. At his deposition, Caplitz admitted that if the policies were validly rescinded he, as the agent, has to return the commission. [SOF 60] Caplitz's wrongful retention of the commission constitutes conversion. Furthermore, ILIC conferred a benefit upon Caplitz by paying him $650,297.01 in commission for the Policies. Caplitz knowingly retained the benefit of that sum. Caplitz's retention of the commission on the Policies is inequitable and unjust. There is no question of material fact as to the return of the premium and the express terms of the Agency Contract. Therefore, the Court must find as a matter of law that Caplitz must return the commission earned as a result of his misrepresentations.

-13-

**D.    The Defendants' Counterclaims are Based On The Premise That The Policies Were Not Validly Rescinded, Thus They Are Groundless.**

Defendants, FRN, Inc., and Caplitz have brought counterclaims against the plaintiff. [SOF 61]. FRN, Inc. brought a counterclaim for Breach of Contract (Count I), Intentional Interference with Fiduciary Duty (Count III), Negligent Interference with Fiduciary Duty (Count IV), Conspiracy (Count V), and Interference with Advantageous Business Relations (Count VII). [SOF 62]    Caplitz has brought counterclaims for Breach of Contract (Count II), Conspiracy (VI), Interference with Advantageous Business Relations (Count VIII) and violation of Chapter 93A (Count IX). [SOF 63].  Each of these counterclaims is based on the factual premise that ILIC's rescission of the subject policies was unlawful and invalid.  [SOF 64]  Therefore, should this Honorable Court grant summary judgment in the plaintiff's favor and declare the subject policies validly rescinded under the law, than defendants' counterclaims are groundless. Accordingly, the Court must grant summary judgment in favor of the plaintiff on all counts of the defendants' Counterclaim.

**III.    CONCLUSION**

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court grant the Plaintiff's motion for summary judgment on all counts of the Plaintiff's complaint and Defendants' Counterclaims.

50969.3
50969.2

Dated:_____1/17/06_____

INDIANAPOLIS LIFE INSURANCE COMPANY
By its attorneys,


_____/s/ Michele Carlucci_____
William T. Bogaert, BBO#546321
Michele Carlucci, BBO#655211
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
155 Federal Street
Boston, MA 02110
617-422-5300

-15-